IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| SOUND INPATIENT PHYSICIANS, INC. AND ROBERT A. BESSLER, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> T. M. CARR, M.D., <br><br> Defendant | Case No. _____ <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL** |

Plaintiffs Sound Inpatient Physicians, Inc. ("Sound Physicians") and Robert A. Bessler, M.D. ("Dr. Bessler") (collectively with Sound Physicians, "Plaintiffs"), state the following claims for declaratory judgment and damages against Defendant T. M. Carr, M.D. ("Defendant").

## PARTIES

1. Plaintiff Sound Physicians is a Delaware corporation having its principal place of business at 1498 Pacific Avenue, Tacoma, Washington.

2. Plaintiff Dr. Bessler is an individual who is domiciled in and is a citizen of the State of Washington.

3. On information and belief, Defendant is an individual who is domiciled in and is a citizen of the State of Tennessee.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action because this lawsuit is between "citizens of different States" and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs," 28 U.S.C. § 1332(a)(1).

5. This Court has personal jurisdiction over Defendant because he is domiciled in the State of Tennessee. Tenn. Code Ann. § 20-2-222(1).

6. To the extent that Defendant cannot be personally served with process within the State of Tennessee, this Court also has personal jurisdiction over Defendant because of Defendant's transaction of business within the State of Tennessee. Tenn. Code Ann. § 20-2-214(a)(1).

7. Venue is proper in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. §§ 1391(b) and (c).

## STATEMENT OF FACTS

### The Agreement

8. On March 16, 2016, Plaintiffs and Defendant (collectively, the "Parties") knowingly and voluntarily entered into an LLC Interest and Stock Purchase Agreement (the "Agreement," attached hereto as Exhibit A) whereby Dr. Bessler, for the benefit of Sound Physicians, purchased the entire membership interests in two Tennessee professional limited liability companies and all of the issued and outstanding stock of a Tennessee professional corporation (collectively, the "Companies") from the Defendant, who was the sole member of each of the Tennessee professional limited liability companies and the sole shareholder of the Tennessee professional corporations. *See* Exhibit A, Agreement, Recitals. All capitalized terms not otherwise defined herein are ascribed the meaning assigned in the Agreement.

9. The Companies were, and continued to be, engaged in the business of providing emergency medicine physicians and other providers to staff the emergency medicine departments of five hospitals (the "Hospitals") located in the Memphis, Tennessee metropolitan area (the "Business"). As of the Closing of the transaction described in the Agreement, Sound Physicians has operated the Business through the Companies.

### The Purchase Price and the Second Payment

10. Pursuant to the Agreement, the Parties agreed upon a Purchase Price that was equal to a multiple of 7.37 times the Earnings Before Overhead realized by Sound Physicians from the operation of the Business during the twelve month period ended March 31, 2018 (the "Calculation Period"), provided that the Purchase Price would be neither less than $30,000,000 nor greater than $59,000,000.

11. At the Closing of the transaction, an Initial Payment of $30,000,000 (the minimum Purchase Price allowable under the Agreement) was paid by the Plaintiffs to the Defendant.

12. A Second Payment of the Purchase Price, if any, was to be determined following the end of the Calculation Period and paid by the Plaintiffs to the Defendant in cash, less the amount, if any, of indemnity claims made by Sound Physicians pursuant to the Agreement. *See* Agreement § 1.4. The Parties negotiated the Purchase Price terms in good faith, and even if the Purchase Price was ultimately determined to be less than $30,000,000, the Defendant was entitled to retain the entire $30,000,000 Initial Payment.

13. The purpose of the Second Payment was to ensure that Sound Physicians paid for Business that actually materialized—that is, to ensure that the Purchase Price

reflected the value that Sound Physicians actually earned from the Business, as manifested during the Calculation Period.

14. On April 27, 2018, in accordance with the procedure outlined in § 1.4(d) of the Agreement for calculation of the Second Payment, Sound Physicians prepared and delivered to Defendant an initial Purchase Price Schedule showing its computation of the Purchase Price to be $26,605,885, resulting in a Second Payment of $0. The Purchase Price Schedule was prepared by Sound in good faith in accordance with the terms of the Agreement and set forth all components (and the amounts thereof) necessary to compute the Purchase Price.

15. Beginning on or around May 2, 2018 and continuing through August 31, 2018, Defendant and his accounting advisors made numerous and detailed requests for additional financial and accounting information from Sound Physicians regarding the operation of the Business during the Calculation Period and held various telephone calls with the accounting staff of Sound Physicians regarding the calculation of the Purchase Price as shown in Sound Physicians' initial Purchase Price Schedule. During this entire time, Sound Physicians agreed to extend the 30-day period after delivery of the Purchase Price Schedule during which Defendant was allowed to object to any amount or computation appearing in the Purchase Price Schedule.

16. On September 27, 2018, Defendant delivered a letter to Mr. Brian Pope of Sound Physicians in which Defendant objected to the calculation of the Purchase Price in the Purchase Price Schedule. Defendant's objections were primarily based on alleged assertions that Sound Physicians (i) improperly accrued approximately $1,844,000 of bad debt expense relating to a prior period and (ii) included certain non-medical compensation expense when calculating Earnings Before Overhead for the Calculation

Period.  Defendant "demand[ed] that Sound Physicians re-calculate the Purchase Price Schedule and the Purchase Price to correct these errors and remit payment due."

17. On October 19, 2018, Sound Physicians delivered a letter to Defendant indicating that Sound Physicians did not agree with either of the two objections raised by Defendant and setting forth a detailed explanation of Sound Physicians' disagreement.  In addition, partially as a result of the extensive discussions with Defendant and his accounting advisors, and as "demanded" by Defendant, Sound Physicians prepared and delivered to Defendant an updated Purchase Price Schedule showing Earnings Before Overhead of $1,752,968, which resulted in a Purchase Price of $12,919,376, which is lower than the Purchase Price as determined in Sound Physicians' initial Purchase Price Schedule.  As a result, even if the issues raised by Defendant in his objection notice were resolved in Defendant's favor, the Purchase Price would still be less than $30,000,000 and the Second Payment would be $0.

18. In the event of a disagreement among the Parties as to an accounting issue regarding the Purchase Price, each Party has an option to engage an unaffiliated accounting firm to resolve such accounting issue: "[E]ither Dr. Carr or Sound Physicians *may* immediately engage the Neutral Accountant to resolve any items that remain in dispute." Agreement § 1.4(d) (emphasis added).

19. On November 14, 2018, legal counsel representing Defendant advised Sound Physicians that it was electing under the terms of § 1.4(d) of the Agreement to submit the dispute regarding the calculation of the Second Payment to a Neutral Accountant.  But Defendant described the sole matter in dispute as "whether it was appropriate for Sound to include in its calculation of the Purchase Price Schedule bad debt expenses from a prior period (in the amount of $1,844,541.94)."   Defendant

5

completely ignored Sound Physicians' updated Purchase Price Schedule, prepared in part due to the "demand" of Defendant, showing Earnings Before Overhead of $1,752,968 and a Purchase Price of $12,919,376.

20.     In ongoing correspondence, Defendant has specifically rejected Sound Physicians' right and ability to prepare the updated version of the Purchase Price Schedule and to use that as the basis for calculation of the Purchase Price.

21.     Accordingly, Defendant has refused to allow any such Neutral Accountant to address the fundamental disagreement among the Parties as to the calculation of the Purchase Price, going so far as to say that would be a "violation of the Agreement." Defendant's actions are not commensurate with the intent of the Parties and the goal of the negotiated terms of the Purchase Price and Second Payment—that Plaintiffs would pay a Purchase Price that reflected the value that Sound Physicians actually earned from the Business during the Calculation Period.  As it is, Sound Physicians' financial results during the Calculation Period were substantially below the Initial Purchase Price valuation.

22.     Defendant inappropriately attempts to funnel any review by the Neutral Accountant into one discrete and isolated issue, such that Defendant states that its characterization of the Parties' dispute is "the only appropriate question to be submitted, and the only question for which the parties may appropriately offer their submissions."  In so doing, Defendant has inappropriately insisted on review of one journal entry in isolation when auditing financial statements, rather than considering any such journal entry in the context of all others.  In this case, the journal entry bears upon Sound Physicians' best estimate of net revenue per billable visit during the

Calculation Period, which directly affects the calculation of the Purchase Price and cannot be separated from such net revenue calculation.

23. Defendant claims that under the terms of the Agreement, the Parties' dispute must be presented to the Neutral Accountant, but that the Neutral Accountant may only review those financial issues identified solely by Defendant and inappropriately narrowed to Defendant's advantage, rather than address all disputed items related to the calculation of the Purchase Price.

24. Pursuant to the Agreement, the Neutral Accountant does not have plenary power, and it is not assigned an omnibus role for all matters requiring dispute resolution. Rather, the Neutral Accountant's role is limited to its area of expertise, namely, accounting, such that the Neutral Accountant may only "act[] as an expert and not an arbitrator." Agreement § 1.4(d).

25. The Parties here have a fundamental legal dispute as to the proper construction of the Agreement and the role of the Neutral Accountant, which legal dispute is not within the purview of any "expert" accountant contemplated by the Agreement.

26. The Parties also have a fundamental dispute as to the calculation of the Purchase Price, which Defendant insists may not be addressed by the Neutral Accountant.

**Defendant's Representations and Warranties**

27. As an inducement to Sound Physicians and Dr. Bessler to enter into the Agreement, Defendant made certain representations and warranties in the Agreement regarding the Companies and the Business and affirmed that these representation and warranties were true at Closing. *See* Agreement §§ 2, 5.3.

7

*Employee Termination Losses*

28. Section 2.18(b) of the Agreement provides, "Except as set forth on Disclosure Schedule 2.18(b), (i) the employment of each employee of any Company is terminable at the will of the employing Company, and, upon termination of the employment of any such employee, no severance or other payments will become due to such employee and (ii) no Company has a policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of employees' services." No exceptions to this representation were included in Schedule 2.18(b) to the Agreement.

29. Notwithstanding this representation, most of the physicians under contract to the Companies are entitled to receive termination payments ranging from at least one month to as much as six months continued payout of accounts receivable relating to the fees for professional services rendered by these physicians while they are employed by the Companies.

30. Thus far, Sound Physicians has incurred over $1,500,000 in expenses for these termination payments when these physicians terminated their legacy employment agreements with the acquired entities.

*Medical Scribe Losses*

31. Section 2.18(a) of the Agreement provides that "Disclosure Schedule 2.18(a) sets forth the following information for each individual who is either an employee of a Company or who is providing ongoing services to a Company as an independent contractor: (i) name of the individual, (ii) Company employing or retaining such individual as an independent contractor, (iii) title or job description and (iv) status as a full-time employee, a part-time employee or an independent contractor." In

8

addition, § 2.8(b) of the Agreement provides that "The Companies have no material liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability for taxes), except for (i) liabilities set forth in the Company Financial Information, and (ii) liabilities of the type that are not required to be disclosed on a balance sheet (or the notes thereto) prepared in accordance with GAAP."

32. As of the Closing, the Companies were obligated to provide ongoing medical scribe coverage to certain mid-level providers that provide professional services at the Hospitals. This obligation was not disclosed to the Plaintiffs pursuant to either § 2.8(b) or § 2.18(a) of the Agreement. As a result, the Companies are providing scribe coverage in the amount of approximately 50 hours per day, rather than the 18 hours per day the Plaintiffs were led to believe from the Defendant's representations and warranties in the Agreement.

33. The pay rate for these scribes ranges from $15.00 to $20.00 per hour, which results in an unanticipated annual expense to Sound Physicians of over $200,000. If this expense had been properly disclosed and taken into account in setting the Purchase Price, it would have resulted in a reduction in both the upper and lower thresholds of the Purchase Price of approximately $1,750,000.

*Indemnification Clause*

34. Defendant agreed to indemnify Plaintiffs "from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, encumbrances and all costs and expenses (including, without limitation, reasonable attorneys' fees, interest and penalties) (collectively, 'Losses') which are

9

sustained, incurred or paid by any Sound Physicians Indemnified Party resulting from or arising out of: . . . Any inaccuracy in or breach of any representation or warranty of Dr. Carr contained in this Agreement or in any certificate, Disclosure Schedule or Exhibit delivered by Dr. Carr pursuant hereto; or . . . Any failure by Dr. Carr to perform any of his covenants or obligations set forth in this Agreement." Agreement § 7.2.

35. The survival period for the representations and warranties on which Plaintiffs' claims for Losses are based extended until September 16, 2017, eighteen months after Closing. Prior to that time, on April 18, 2017, Plaintiffs duly delivered notice of their claims for these Losses to Defendant and demanded that payment of the Losses be made by Defendant to Plaintiffs. Per the Agreement, the delivery of such notice has extended the survival period of these representations until any disputes among the Parties with respect thereto are resolved.

36. On May 5, 2017, and on several occasions thereafter, Defendant, either himself or through his attorneys, has denied any liability for Plaintiffs' Losses and associated indemnity claims under the Agreement and has refused to make indemnity payments to Plaintiffs for these Losses in accordance with the terms of the Agreement.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT**

37. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

38. On March 16, 2016, Plaintiffs and Defendant knowingly and voluntarily entered into the Agreement, which is a binding and enforceable legal contract.

39. The dispute between Plaintiffs and Defendant as to the calculation of the Purchase Price pursuant to the Agreement is an "actual controversy within [this]

jurisdiction," which creates a remedy such that this Court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). *See* Fed. R. Civ. P. 57.

40.  To resolve the legal and factual questions raised by Defendant, and to afford relief from the uncertainty and controversy that Defendant's assertions have precipitated, Plaintiffs are entitled to a declaratory judgment of their rights under 28 U.S.C. §§ 2201-02.

41.  Plaintiffs therefore seek a declaratory judgment stating as follows:

   a. The disputes among the Parties are disputes arising from the construction of the Agreement;

   b. Any effort to engage a Neutral Accountant to construe the Agreement invades the province of this Court;

   c. The Purchase Price under the Agreement is $12,919,376, or that in any event the Purchase Price does not exceed $30,000,000; and

   d. The Second Payment under the Agreement is $0 (zero dollars).

### SECOND CAUSE OF ACTION
### BREACH OF REPRESENTATION AND WARRANTY
### (Employee Termination Losses)

42.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

43.  On March 16, 2016, Plaintiffs and Defendant knowingly and voluntarily entered into the Agreement, which is a binding and enforceable legal contract.

44.  In the Agreement, Defendant represented and warranted, "Except as set forth on Disclosure Schedule 2.18(b), (i) the employment of each employee of any Company is terminable at the will of the employing Company, and, upon termination of

the employment of any such employee, no severance or other payments will become due to such employee and (ii) no Company has a policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of employees' services."

45. Defendant breached his duty to provide representations and warranties that are true and correct in all respects, because severance payments were due to Company employees, which expense Sound Physicians incurred. As a result, Sound Physicians has been damaged and will continue to be damaged in an amount to be determined at trial, at a minimum of $1,500,000.

46. Pursuant to the Agreement, Defendant has agreed to indemnify Plaintiffs for any such Losses.

## THIRD CAUSE OF ACTION
## BREACH OF REPRESENTATION AND WARRANTY
### (Medical Scribe Losses)

47. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

48. On March 16, 2016, Plaintiffs and Defendant knowingly and voluntarily entered into the Agreement, which is a binding and enforceable legal contract.

49. In the Agreement, Defendant represented and warranted, "The Companies have no material liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability for taxes), except for (i) liabilities set forth in the Company Financial Information, and (ii) liabilities of the type that are not required to be disclosed on a balance sheet (or the notes thereto) prepared in accordance with GAAP."

50. Defendant breached his duty to provide representations and warranties that are true and correct in all respects, because the Companies, and now Plaintiffs, have an ongoing liability to pay for medical scribe services in excess of that amount represented and warranted by Defendant. As a result, Sound Physicians has been damaged in an amount to be determined at trial.

51. Pursuant to the Agreement, Defendant has agreed to indemnify Plaintiffs for any such Losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief and request that this Court enter judgment in favor of Plaintiffs and against Defendant by:

A. Entering declaratory judgment stating as follows:

1. The disputes among the Parties are disputes arising from the construction of the Agreement;

2. Any effort to engage a Neutral Accountant to construe the Agreement invades the province of this Court;

3. The Purchase Price under the Agreement is $12,919,376, or in any event the Purchase Price does not exceed $30,000,000; and

4. The Second Payment under the Agreement is $0 (zero dollars).

B. Awarding Plaintiffs monetary damages for Defendant's breaches of representations and warranties, in an amount to be proven at trial;

C. Awarding Plaintiffs interest in an amount according to proof, including prejudgment interest;

D. Awarding Plaintiffs costs, fees, and reasonable attorney fees, as provided by the Agreement and allowed by law; and

E. Awarding Plaintiffs such further legal or equitable relief as this Court deems just and proper.

Dated this 10th day of January, 2019.

Respectfully submitted,

**McNABB, BRAGORGOS, BURGESS & SORIN, PLLC**

s/ *Leland M. McNabb*
Leland M. McNabb #7551
Pam W. Blair #10407
Courtney S. Vest #23005
81 Monroe, Sixth Floor
Memphis, Tennessee 38103
Telephone: (901) 624-0640
Fax: (901) 624-0650
lmcnabb@mbbslaw.com
pblair@mbbslaw.com
cvest@mbbslaw.com

**KUTAK ROCK LLP**

s/ *John P. Passarelli*
John P. Passarelli (to be admitted *pro hac vice*)
Carol A. Svolos (to be admitted *pro hac vice*)
The Omaha Building
1650 Farnam Street
Omaha, NE  68102-2186
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
carol.svolos@kutakrock.com

*Attorneys for Plaintiffs*