EXECUTION VERSION

# LLC INTEREST AND STOCK
# PURCHASE AGREEMENT

THIS LLC INTEREST AND STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of March 16, 2016 by and among SOUND INPATIENT PHYSICIANS, INC., a Delaware corporation ("Sound Physicians"), Robert A. Bessler, M.D., an individual resident of the State of Washington ("Sound Nominee"), and T. M. CARR, M.D., an individual resident of the State of Tennessee ("Dr. Carr"). Sound Physicians, Sound Nominee and Dr. Carr are sometimes individually referred to herein as a "Party" and are sometimes referred to collectively as the "Parties." The meanings of other defined terms used in this Agreement are set forth in Section 8.1 hereof.

## RECITALS

A. Dr. Carr is the sole member of Professional Coverage Services, PLLC, a Tennessee professional limited liability company ("PCS") that is in the business of providing professional coverage services to hospital emergency departments. PCS has entered into that certain Personal Services Agreement - Emergency Department Staffing, dated October 1, 2008, and amended on September 26, 2012, December 11, 2012, May 1, 2013 and February 6, 2016 (the "PSA"), with Methodist Healthcare-Memphis Hospitals ("Methodist") relating to those hospitals owned and operated by Methodist that are listed on Schedule A hereto (each a "Hospital," and collectively, the "Hospitals").

B. Dr. Carr is also (i) the sole member of Carr, PLLC, a Tennessee professional limited liability company d/b/a Germantown Emergency Physicians ("Carr PLLC") that contracts with PCS to supply physicians that provide emergency medicine services at certain of the Hospitals and (ii) the sole shareholder of T. M. Carr, M.D. P.C., a Tennessee professional corporation ("Carr PC") that contracts with PCS to supply physicians that provide emergency medicine services at certain of the Hospitals. PCS, Carr PLLC and Carr PC are sometimes individually referred to herein as a "Company" and are sometimes referred to collectively as the "Companies."

C. Sound Physicians is a leading provider of physician services to hospitals throughout the United States.

D. Sound Nominee is a physician licensed to practice medicine in the State of Tennessee who, for the benefit of Sound Physicians, desires to (i) purchase the entire membership interests in PCS and in Carr PLLC from Dr. Carr and to become the sole member of PCS and Carr PLLC and (ii) purchase all of the issued and outstanding capital stock of Carr PC from Dr. Carr and become the sole shareholder of Carr PC, all on the terms and conditions set forth herein.

E. Dr. Carr desires to (i) sell the entire membership interests in PCS and in Carr PLLC to Sound Nominee and to withdraw as the member of PCS and Carr PLLC and (ii) sell all of the issued and outstanding capital stock of Carr PC to Sound Nominee, all on the terms and conditions set forth herein.


EXHIBIT
A

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

AGREEMENT

1.     **Purchase of Interests and Shares; Closing.**

1.1.     Purchase of Interests and Shares.   Subject to each of the terms and conditions of this Agreement, at the Closing (defined in Section 1.2 below), Sound Nominee hereby purchases from Dr. Carr, and Dr. Carr hereby sells, assigns, and transfers to Sound Nominee, in each case for the benefit of Sound Physicians and free and clear of all liens, security interests or other encumbrances or competing interests of any nature whatsoever, (a) a 100% membership interest in PCS, (b) a 100% membership interest in Carr PLLC and (c) all of the issued and outstanding shares of capital stock of Carr PC (individually, the "Purchased Interests" with respect to the membership interests in PCS and/or Carr PLLC, the "Purchased Shares" with respect to the stock of Carr PC and collectively, the "Purchased Interests and Shares") for a total purchase price calculated and payable to Dr. Carr in accordance with Section 1.4 below (the "Purchase Price"). As a result of the sale of the Purchased Interests and Shares by Dr. Carr to Sound Nominee: (i) Sound Nominee will be duly admitted as the sole member of PCS and Carr PLLC and shall be entitled to all of the rights and privileges thereof, (ii) Dr. Carr will withdraw as a member of PCS and Carr PLLC for all purposes, and (iii) Sound Nominee will become the record and beneficial owner of 100% of the authorized, issued and outstanding shares of the capital stock of Carr PC.

1.2.     Closing.   The closing for the purchase, sale, assignment and transfer of the Purchased Interests and Shares from Dr. Carr to Sound Nominee as described herein (the "Closing") shall occur as of the date of this Agreement (the "Closing Date") and be accomplished by electronic delivery of documents; provided, however, that (a) the obligation of Sound Nominee at Closing to acquire the Purchased Interests and Shares from Dr. Carr and to become the sole member and sole shareholder, as the case may be, of the Companies and the obligation of Sound Physicians at Closing to pay the Purchase Price to Dr. Carr in accordance with Section 1.4 hereof are each subject to satisfaction of each of the conditions set forth in Section 5 hereof and (b) the obligation of Dr. Carr at Closing to sell, assign and transfer the Purchased Interests and Shares to Sound Nominee and to cause Sound Nominee to become the sole member and sole shareholder, as the case may be, of the Companies shall be subject to satisfaction of each of the conditions set forth in Section 6 hereof.

1.3.     Actions at Closing.   All acts, deliveries and confirmations comprising the Closing, regardless of chronological sequence, shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery or confirmation of the Closing, and none of such acts, deliveries or confirmations shall be effective unless and until the last of the same shall have occurred.   At the Closing:

(a)     Dr. Carr shall deliver assignments of the Purchased Interests, each in substantially the form attached hereto as Exhibit A, duly conveying the Purchased Interests in both PCS and Carr PLLC to Sound Nominee free and clear of all liens, security interests or other encumbrances or competing interests of any nature whatsoever

and evidencing Dr. Carr's withdrawal as a member of both PCS and Carr PLLC for all purposes as of the Closing Date, along with such other written evidence as may be reasonably deemed necessary by Sound Physicians to establish that the conveyance of such Purchased Interests by Dr. Carr to Sound Nominee has been made in compliance with all requirements for the transfer of the Purchased Interests under the terms of the current operating agreements of PCS and Carr PLLC (the "Existing Operating Agreements") and with all applicable legal requirements, including those in the LLC Act;

(b)     Sound Nominee shall be duly admitted as the sole member of both PCS and Carr PLLC and will be exclusively entitled to all of the rights and privileges as such under the provisions of the amended operating agreements for each of PCS and Carr PLLC (the "Amended Operating Agreements") and the LLC Act;

(c)     Dr. Carr shall deliver stock certificates representing 100% of the authorized, issued and outstanding shares of capital stock of Carr PC, either duly endorsed for transfer or accompanied by a duly executed stock power in a form reasonably satisfactory to Sound Physicians, conveying the Purchased Shares of Carr PC to Sound Nominee free and clear of all liens, security interests or other encumbrances or competing interests of any nature whatsoever, along with such other written evidence as may be reasonably deemed necessary by Sound Physicians to establish that the conveyance of such Purchased Shares by Dr. Carr to Sound Nominee has been made in compliance with all requirements for the transfer of the Purchased Shares under the terms of the then existing bylaws of Carr PC and/or shareholder agreement relating to the Purchased Shares and all applicable legal requirements, including those in the PC Act;

(d)     Sound Nominee will be shown in the stock registry of Carr PC as the sole shareholder of record and will be exclusively entitled to all of the rights and privileges as such as set forth in the amended bylaws of Carr PC (the "Amended Bylaws") and the PC Act;

(e)     To the extent permitted under laws applicable to professional entities in Tennessee and Mississippi, Dr. Carr will grant Carr PLLC and Carr PC a (i) perpetual license to use the name "Professional Coverage Services" and (ii) limited license to use the "Carr" name for a transition period not to exceed twenty-four (24) months following the Closing Date, in each case as part of their respective business names; provided, however, with respect to the "Carr" name, such use shall be primarily limited to use in connection with their operation of an inpatient hospitalist, intensivist and emergency medicine business;

(f)     Sound Physicians shall pay the Purchase Price to Dr. Carr as described in Section 1.4 below;

(g)     Dr. Carr will enter into an agreement, in substantially the form set forth as Exhibit B hereto, pursuant to which Dr. Carr will serve as Sound Physicians' Regional Medical Director for the Memphis, Tennessee region;

(h)     Dr. Carr will deliver a duly executed certificate of non-foreign status dated as of the Closing Date and substantially in the form of the sample certification set forth in Treasury Regulations Section 1.1445-2(b);

(i)     Dr. Carr shall deliver, or cause to be delivered, to Sound Physicians possession and custody of all books, records, files, and other documents of the Companies, including all financial and banking records, and such consents, withdrawals, termination, resignations and similar documents as shall be necessary to transfer full and effective control of the Companies and the assets thereof to Sound Physicians; and

(j)     Each of Sound Physicians, Sound Nominee and Dr. Carr will deliver to the other the additional closing documents described in Sections 5 and 6 hereof, each of which will be in a form reasonably satisfactory to Sound Physicians and Dr. Carr.

1.4.    Payment of the Purchase Price.

(a)     The Purchase Price will be equal to (i) a multiple determined in the manner described in Schedule B hereto times (ii) the Companies' consolidated "Earnings Before Overhead" generated during the twelve (12) month period ending March 31, 2018 (the "Calculation Period"); provided, however, that in no event shall the Purchase Price be less than THIRTY MILLION DOLLARS ($30,000,000) or greater than FIFTY-NINE MILLION DOLLARS ($59,000,000).

(b)     The Purchase Price to be paid by Sound Physicians for the Purchased Interests and Shares will be equal to and will be paid as follows:

(i)     An initial payment of THIRTY MILLION DOLLARS ($30,000,000) on the Closing Date (the "Initial Payment"); and

(ii)     A second payment equal to the amount by which (A) the Purchase Price as determined above exceeds (B) $30,000,000 (the "Second Payment"), subject to adjustment pursuant to Sections 1.4(c) and 1.5 hereof. The Second Payment will be payable within five business days of the final determination of the amount of the Purchase Price in the manner described in Section 1.4(d) hereof; provided the PSA between PCS and Methodist, as in effect on the Closing Date, or any extension thereof or successor agreement thereto, remains in full force and effect as of the last day of the Calculation Period (unless the PSA or the relationship with any of the Hospitals was terminated by PCS, terminated by mutual agreement of PCS and Methodist or terminated by Methodist pursuant to Section H.2.a (except in the case of a charge or conviction involving Dr. Carr), H.2.c or H.2.d of the PSA), and, as of such date, neither PCS nor Sound Physicians has received written notice from Methodist that it intends to terminate the PSA with respect to any of the Hospitals.

The Initial Payment and the Second Payment will be made by Sound Physicians by wire transfer of immediately available funds to a bank account identified for such purpose by Dr. Carr along with detailed wiring instructions delivered to Sound Physicians. Sound Physicians may require a portion of the Initial Payment to be remitted directly to any

lenders of one or more of the Companies in order to satisfy the condition in Section 5.8 hereof that all borrowings of the Companies be repaid at or prior to the Closing Date.

(c)     Notwithstanding the foregoing, if on or prior to the payment of the Second Payment, one or more Sound Physicians Indemnified Parties has in good faith provided notice of any claim or liability for which such Sound Physicians Indemnified Parties are entitled to indemnification under Section 7 hereof, Sound Physicians shall be entitled to retain from the Second Payment, and not pay over to Dr. Carr, the aggregate amount that would be payable to such Sound Physicians Indemnified Parties pursuant to Section 7 if such Sound Physicians Indemnified Parties were to prevail in respect to the full amount of any such claim or liability.  If at any time any such claim or liability shall be resolved, either by mutual agreement of the Parties or as otherwise provided pursuant to Section 7.4(c) hereof, Sound Physicians shall promptly remit to Dr. Carr any unpaid portion of the Purchase Price that was not required to satisfy the indemnity obligations of Dr. Carr to Sound Physicians Indemnified Parties pursuant to Section 7 hereof.

(d)     Within thirty (30) days following the end of the Calculation Period, Sound Physicians, at its expense, shall prepare and deliver to Dr. Carr its determination of the amount of the Purchase Price (the "Purchase Price Schedule") setting forth all components (and the amounts thereof) necessary to compute the Purchase Price.  The Purchase Price reflected on the Purchase Price Schedule will be determined in good faith on a basis consistent with Schedule B hereto.  Dr. Carr shall have the right to review the Purchase Price Schedule for a period of thirty (30) days following the delivery of the Purchase Price Schedule by Sound Physicians (the "Purchase Price Review Period"). Sound Physicians shall make the work papers, back-up materials and books and records used in preparing the Purchase Price Schedule available to Dr. Carr and his accountants at reasonable times and upon reasonable notice following the delivery of the Purchase Price Schedule by Sound Physicians to Dr. Carr hereunder, and any delay in making such documents and materials available shall result in an automatic extension of the Purchase Price Review Period by a number of days equal to the delay.  Dr. Carr shall have the right to object to any amount or computation appearing in the Purchase Price Schedule by notifying Sound Physicians in writing of such objections prior to the expiration of the Purchase Price Review Period.  If Dr. Carr does not make any such objection prior to the expiration of the Purchase Price Review Period, the Purchase Price as set forth on the Purchase Price Schedule shall be determinative for purposes of this Agreement and final and binding on all of the parties to this Agreement.  If Dr. Carr timely objects to any item or computation appearing in the Purchase Price Schedule prior to the expiration of the Purchase Price Review Period, Dr. Carr and Sound Physicians shall, during the thirty (30) day period following the delivery of Dr. Carr's objection, attempt in good faith jointly to resolve the matters on the Purchase Price Schedule to which Dr. Carr objected.  In the event Dr. Carr and Sound Physicians cannot resolve all of such matters by the end of such thirty (30) day period, either Dr. Carr or Sound Physicians may immediately engage the Neutral Accountant to resolve any items that remain in dispute.  Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing, and the parties shall require the Neutral Accountant, within thirty (30) days thereafter, acting as an expert and not an arbitrator, to resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound Physicians with respect

to the determination of the Purchase Price. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant. All fees and expenses of the Neutral Accountant in connection with any dispute under this Section 1.4(d) shall be paid fifty percent (50%) by Sound Physicians and fifty percent (50%) by Dr. Carr. The Purchase Price finally determined pursuant to this Section 1.4(d) shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to this Agreement.

1.5.     Working Capital Adjustments.

(a)     Schedule D attached hereto (which schedule shall be deemed to be part of the Company Financial Information described in Schedule 2.8 hereto) sets forth:

(i)     Dr. Carr's good faith estimate of the Companies' consolidated average accrued liability for compensation expense for a 24-day period associated with all Company employees and independent contractors providing services at each Hospital, other than Olive Branch Hospital, who are not compensated on the basis of a percentage of collections, which amount shall equal $340,608 (24 days x $14,192);

(ii)     Dr. Carr's good faith estimate of the Companies' consolidated accrued liability for compensation expense for the period March 1, 2016 through the day prior to the Closing Date associated with all Company employees and independent contractors providing services at each Hospital, other than Olive Branch Hospital, who are compensated on the basis of a percentage of collections;

(iii)     Dr. Carr's good faith estimate of the Companies' consolidated cash on hand as of the Closing Date;

(iv)     the Companies' consolidated accounts receivable (net of contractual allowances and other allowances) as of January 31, 2016 generated by the Companies from services provided by the Companies to the Hospitals, other than Olive Branch Hospital; and

(v)     any other current assets and current liabilities of the Companies as of the Closing Date.

(b)     Within thirty (30) days after November 30, 2016, Sound Physicians shall prepare and deliver to Dr. Carr a written statement showing the following (the "Calculation Statement"):

(i)     the Companies' actual consolidated compensation expense for the period from March 1, 2016 through the day prior to the Closing Date associated with all Company employees and independent contractors providing services at each Hospital, other than Olive Branch Hospital, who are not compensated on the basis of a percentage of collections, which liability amount shall be calculated based on the e-mail reports submitted by such employees and independent

contractors to the Companies at the end of March 2016 showing the dates and times during which such employees and independent contractors worked during March 2016;

(ii)     the Companies' actual consolidated compensation expense for the period from March 1, 2016 through the day prior to the Closing Date associated with all Company employees and independent contractors providing services at each Hospital, other than Olive Branch Hospital, who are compensated on the basis of a percentage of collections;

(iii)     the Companies' actual consolidated compensation expense for all Company employees and independent contractors providing services at each Hospital, other than Olive Branch Hospital, for March 2016 and other operating expenses incurred by the Companies during the month of March 2016 in the ordinary course of the Companies' operations (with the exception of operating expenses related to Olive Branch Hospital) that were paid by the Companies during such month;

(iv)     the Companies' total consolidated amount of collections (net of all billing expenses and fees and patient refunds) for the 30-day period following the Closing;

(v)     the Companies' consolidated cash on hand as of the Closing Date (the "Closing Date Cash Amount");

(vi)     the calculation of Net Underestimated Non-Production Liabilities (as defined in Section 1.5(d)(i) below) or Net Overestimated Non-Production Liabilities (as defined in Section 1.5(d)(ii) below) (as applicable);

(vii)     the amount of any Closing Date Cash Shortfall (as defined in Section 1.5(e)(i) below) or Closing Date Excess Cash (as defined in Section 1.5(e)(ii) below);

(viii)     the amount of any Collections Shortfall (as defined in Section 1.5(f) below; and

(ix)     the total amount of Olive Branch Collection Amount (as defined in Section 1.5(g) below).

Dr. Carr shall have the right to review the Calculation Statement for a period of twenty-one (21) days following the delivery thereof and to request any work papers, back-up materials and books and records used in preparing such statement from Sound Physicians. Any delay in making such documents and materials available to Dr. Carr shall result in an automatic extension of his review period by a number of days equal to the delay. If Dr. Carr does not object to the information or any of the calculations set forth in the Calculation Statement provided by Sound Physicians during such review period, then the amounts shown therein shall be final and binding on all Parties. If Dr. Carr does object to any of the information or calculations set forth in the Calculation

Statement provided by Sound Physicians, then he must provide written notice thereof to Sound Physicians prior to the end of his review period, which notice shall set forth in reasonable detail the grounds for such objection. The Parties shall attempt in good faith to resolve any such objections as quickly as possible, but if the Parties cannot resolve all objections within thirty (30) days of the delivery of the written notice of objection, then the Parties shall engage the Neutral Accountant to resolve any items that remain in dispute. Sound Physicians and Dr. Carr shall each present its position on the disputed items to the Neutral Accountant in writing, and the Parties shall require the Neutral Accountant, within thirty (30) days thereafter, acting as an expert and not an arbitrator, to resolve only the matters described in the written notice of objection that were not resolved by Dr. Carr and Sound Physicians. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant and such resolution by the Neutral Accountant shall be final and binding on the Parties. All fees and expenses of the Neutral Accountant in connection with any dispute under this Section 1.5(b) shall be paid fifty percent (50%) by Sound Physicians and fifty percent (50%) by Dr. Carr.

(c)     During the 30-day period following the Closing Date, and subject to any limitations or requirements under its Corporate Integrity Agreement, dated June 27, 2013, Sound Physicians shall cause the Companies (i) to continue to use the same billing companies that were being used by the Companies prior to Closing, and not to notify any such billing companies of any termination or anticipated termination of their services, (ii) not to change the terms or conditions on which such billing companies provide services to the Companies, (iii) not to request or encourage any such billing companies to reduce their efforts to collect amounts due or to slow-down the deposit of any collections, and (iv) not to change their payroll practices or compensation terms for their employees and independent contractors or hire additional employees or independent contractors, except to the extent required to provide actual patient care in a manner consistent with the operations of the Companies prior to Closing.

(d)     In the event:

(i)     the amount described in Section 1.5(b)(i) exceeds the amount described in Section 1.5(a)(i) the amount of such excess will be deemed a "Net Underestimated Non-Production Liabilities;" and

(ii)     the amount described in Section 1.5(b)(i) is less than the amount described in Section 1.5(a)(i) the amount of such shortage will be deemed a "Net Overestimated Non-Production Liabilities."

(e)     In the event:

(i)     the Closing Date Cash Amount is less than the amount described in Section 1.5(b)(ii), then such shortfall will be deemed the "Closing Date Cash Shortfall;" and

(ii)      the Closing Date Cash Amount exceeds the amount described in Section 1.5(b)(ii), then such excess will be deemed "Closing Date Excess Cash."

(f)      In the event the amount described in Section 1.5(b)(iii) exceeds the sum of (i) the Closing Date Cash Amount and (ii) the amount of collections described in Section 1.5(b)(iv), then such excess amount will be deemed as "Excess Payables." In the event the amount of Excess Payables, if any, exceeds the amount, of any Closing Date Cash Shortfall (which amount will be deemed to be $0 if there was Closing Date Excess Cash), such amount will be deemed the "Collections Shortfall."

(g)      As used herein, "Olive Branch Collection Amount" means an amount equal to all amounts of cash (net of all billing expenses and fees and patient refunds) collected by Washington Group, PLLC pursuant to that certain Emergency Department Staffing Subcontract, dated February 2, 2013, as amended January 23, 2015, during the period beginning on May 13, 2016 (which is the effective date of termination of such Emergency Department Staffing Subcontract) and ending on November 30, 2016 with respect to those accounts receivable from Olive Branch Hospital recorded on the books of Washington Group, PLLC as of May 13, 2016; provided, however, if neither Sound Physicians, the Companies nor Dr. Carr is  able to obtain monthly billing reports with respect to the Olive Branch Collections Amount from the billing company for the entire period ending on the earlier of (A) November 30, 2016 or (B) the date the billing company is no longer obligated to provide billing reports under its agreement, then the Parties agree that the Olive Branch Collection Amount shall be deemed to equal $1,100,000. Sound Physicians agrees that the Companies and Sound Physicians shall (i) use their best efforts to timely obtain such monthly billing reports using all legal remedies available to it pursuant to the agreement with the billing company or at law, (ii) in the event the billing company fails to provide a monthly billing report within 10 days after the end of the month, immediately request such monthly billing report be provided, (iii) promptly notify Dr. Carr in the event they are not receiving any monthly billing reports, (iv) provide copies of such billing reports to Dr. Carr upon request and (v) not terminate the services of such billing company on or before May 13, 2016.

(h)      Within five (5) Business Days after the Parties have reached an agreement with respect to the calculation of any Net Underestimated Non-Production Liabilities or Net Overestimated Non-Production Liabilities (as applicable), any Closing Date Cash Shortfall or any Closing Date Excess Cash (as applicable), any Collections Shortfall and the  Olive Branch  Collection  Amount  pursuant  to  the  procedures  described  in Section 1.5(b), Dr. Carr shall remit to Sound Physicians an amount equal to (i) the Olive Branch  Collection  Amount  plus  (ii) the  amount  of  any  Net  Underestimated Non-Production Liabilities (or less the amount of any Net Overestimated Non-Production Liabilities) plus (iii) any Closing Date Cash Shortfall (or less any Closing Date Excess Cash) plus (iv) any Collections Shortfall, provided, however, in the event the sum of any Net Overestimated Non-Production Liabilities and any Closing Date Excess Cash exceeds the sum of (i) the Olive Branch Collection Amount, (ii) any Net Underestimated Non-Production Liabilities, (iii) any Closing Date Cash Shortfall and (iv) any Collections Shortfall, then Sound Physicians shall remit such excess amount to Dr. Carr.

1.6.  Tax Treatment and Related Matters,

(a)    For federal (and, where applicable, for state and local) income tax purposes, the Parties intend to treat (i) the purchase and sale of the Purchased Interests as the purchase and sale of all the assets of PCS and Carr PLLC by Dr. Carr to Sound Physicians and (ii) the purchase and sale of the Purchased Shares as the purchase and sale of all the stock of Carr PC by Dr. Carr to Sound Physicians.  After the Closing Date, the Parties will agree to an allocation of the Purchase Price for federal (and, where applicable, for state and local) income tax purposes between PCS, Carr PLLC and Carr PC (and a further allocation among the assets of PCS and Carr PLLC in accordance with Section 1060 of the Code and Treasury Regulations promulgated thereunder) based on the report of a third-party advisor and consistent with the methodology and principles set forth on Schedule C hereto, provided, however, that the Parties agree that no portion of the Purchase Price shall be allocable to the non-compete covenant described in Section 4.5 hereof.

(b)    Except to the extent otherwise required by applicable law, any payment made by either Party pursuant to Section 1.5 hereof, or made by Dr. Carr in satisfaction of his indemnification obligation under Section 7.2 hereof, shall be treated as an adjustment to the Purchase Price allocable to the assets of PCS and Carr PLLC or to the Purchased Shares as reasonably determined by the Parties.

(c)    The Parties agree to file all tax returns and other tax filings consistent with the provisions of this Section 1.6 and shall not take any contrary position with any taxing authority with respect thereto unless required to do otherwise by law.  The Parties also agree that for income tax purposes no portion of the Purchase Price shall be allocated to, or characterized as a payment for, any past or future services by Dr. Carr.

1.7.  Further Assurances.   At or after the Closing Date, and without further consideration, each Party will execute and deliver to the other Party such further documents and instruments as any Party hereto may reasonably request in order to more effectively convey and transfer the Purchased Interests and Shares to Sound Nominee, to admit Sound Nominee as the sole member of PCS and Carr PLLC and to otherwise consummate the other transactions contemplated hereby.  The Parties agree to cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement before and after the Closing Date, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents and instruments; and (c) do such other acts and things, all as any other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated hereby.

2.     **Representations and Warranties of Dr. Carr.**  As an inducement to Sound Physicians and Sound Nominee to enter into this Agreement and to consummate the transaction contemplated hereby, and acknowledging that Sound Physicians and Sound Nominee have specifically relied on the following representations and warranties in connection with their decisions to do so, Dr. Carr hereby represents and warrants to Sound Physicians and Sound Nominee that the statements contained in this Section 2 are accurate, true, correct and complete as of the date hereof, subject to the information contained in the attached Disclosure Schedules which are hereby incorporated by reference and made a part hereof.

2.1.     <u>Binding Obligation</u>.  This Agreement has been duly executed and delivered by Dr. Carr and constitutes the valid and legally binding obligation of Dr. Carr, enforceable against him in accordance with the terms hereof, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.2.     <u>Noncontravention.</u>  Neither the execution or delivery of this Agreement or any of the other agreements, certificates or instruments to be delivered by Dr. Carr nor the consummation of the transactions contemplated hereby will (a) conflict with or constitute a breach, violation or termination of any of the governing documents of the Companies, (b) except as set forth on <u>Disclosure Schedule 2.2</u>, constitute a violation of, a default under, or a conflict with any order, writ, injunction or decree of any court, Governmental Authority or arbitration tribunal, or any contract, commitment, indenture, lease, sublease or other agreement, or any other restriction of any kind to which Dr. Carr or any of the Companies is a party or by which any of them is otherwise bound, or (c) except as set forth on <u>Disclosure Schedule 2.2</u>, cause, or give any Person grounds to cause (with or without notice, the passage of time or both), the maturity of any material liability or obligation of any of the Companies to be accelerated or increase the amount of any such liability or obligation.

2.3.     <u>Organization, Good Standing and Authority of the Companies</u>.  Each of the Companies is duly organized, validly existing and in good standing as a professional limited liability company or professional corporation, as the case may be, under the laws of the State of Tennessee and has all requisite power and authority to carry on its business as presently conducted by such Company and to own, lease and operate the assets used by it to carry out its business as presently conducted.

2.4.     <u>Company Organizational Documents</u>.  Each Company has delivered to Sound Physicians correct and complete copies of its Articles of Organization, Articles of Incorporation, Operating Agreement and Bylaws (as the case may be), as in effect on the date hereof and including all amendments thereto made to date.  Other than the Existing Operating Agreements of PCS and Carr PLLC and the agreements contemplated hereby, there are no agreements of any nature by or among Dr. Carr and/or any Company or other Person affecting the rights of Dr. Carr as a member of PCS or Carr PLLC or as a shareholder of Carr PC.

2.5.     <u>Capitalization</u>.  The Purchased Interests and Shares have been validly issued by their respective Company and are fully paid and nonassessable, except as may be provided in the Existing Operating Agreements.  All of the Purchased Interests and Shares were issued by the

respective Company in compliance with all applicable federal and state securities laws.  There are no members or shareholders of any Company or any other holders of record or a beneficial equity interest in any Company other than Dr. Carr.  There are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements of any nature (other than this Agreement) under which any Company has issued, or is or may become obligated to issue, to any Person any membership interest in PCS or Carr PLLC, any share of capital stock of Carr PC or other equity position in any Company (including any right to participate in cash distributions paid to members or shareholders of any Company or to admit any Person as a member or shareholder of any Company), or any securities convertible into or exchangeable for membership interests in PCS or Carr PLLC or shares of capital stock of Carr PC.

2.6.    Ownership of Purchased Interests and Shares.  Dr. Carr owns all of the Purchased Interests and Shares of record and beneficially in his own name and holds good and transferable title to all of the Purchased Interests and Shares, free and clear of all liens, security interests or other encumbrances or competing interests of any nature whatsoever, including any restriction on his right to transfer the Purchased Interests and Shares to Sound Nominee pursuant to this Agreement.

2.7.    Consents and Approvals.  Disclosure Schedule 2.7 contains a complete list and description of all notices to, filings with, and consents or approvals of, any Governmental Authority or other Person, including, but not limited to, any customers, suppliers, lessors or lenders, required to be made or obtained by or on behalf of any Company or Dr. Carr in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

2.8.    Company Financial Information.

(a)    While the consolidated financial information for the Companies set forth in Disclosure Schedule 2.8(a) (the "Company Financial Information") does not include full and complete financial statements of the Companies, the information presented therein does fairly and accurately present, in all material respects, the assets, liabilities, financial condition and operating results of the Companies as of the dates, and for the periods, indicated therein.

(b)    The Companies have no material liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability for taxes), except for (i) liabilities set forth in the Company Financial Information, and (ii) liabilities of the type that are not required to be disclosed on a balance sheet (or the notes thereto) prepared in accordance with GAAP.  In that regard, the Companies have paid in full their respective payroll liabilities for all periods through February 29, 2016.

2.9.    <u>No Subsequent Events</u>.  Except as set forth on <u>Disclosure Schedule 2.9</u>, since September 30, 2015, there has not been with respect to any Company:

(a)    any material adverse change in the assets, liabilities, financial condition or operating results of such Company, including, but not limited to, the incurrence by any Company of any indebtedness for money borrowed or any other liabilities in excess of $10,000 individually or in excess of $50,000 in the aggregate;

(b)    any material damage to or destruction or loss of any Company asset (including intangible assets), whether or not covered by insurance;

(c)    any amendment to a Material Contract (defined in Section 2.12 below) or a waiver by any Company of any material breach of a Material Contract;

(d)    any waiver or compromise by any Company of a material debt owed to it;

(e)    any imposition of a lien, security interest or other encumbrance on any asset of any Company, except for statutory liens for the payment of current taxes that are not yet delinquent;

(f)    any loan made by any Company to any third party or guarantee by any Company of the liability of any other Person, other than advances for expense reimbursement made to Company employees in the ordinary course of business;

(g)    any increase in the rates of pay or level of benefits of any of the employees or independent contractors of any Company;

(h)    receipt by any Company of notice from a Governmental Authority to the effect that such Company (or the Companies in the aggregate) may be liable for the repayment of any amount collected by such Company (or the Companies in the aggregate) in excess of $10,000 individually or $50,000 in the aggregate;

(i)    any other event or condition of any character that could reasonably be expected to result in a Material Adverse Effect on any Company; or

(j)    any written notice from another Person of its intent to do, or any arrangement or commitment by any Company to do, any of the things described in this Section 2.9.

2.10.    <u>Litigation</u>.

(a)    Except as set forth on <u>Disclosure Schedule 2.10(a)</u>, there is no claim, action, suit, proceeding, arbitration, complaint, regulatory action or investigation (collectively, "<u>Legal Actions</u>") pending or, to the Knowledge of Dr. Carr, threatened against any Company or any director, manager, member, officer or employee of any Company acting in his or her capacity as such.  Copies of any and all pleadings and other documents related to those Legal Actions listed on <u>Disclosure Schedule 2.10(a)</u> have been provided to Sound Physicians.

(b)     Except as set forth on <u>Disclosure Schedule 2.10(b)</u>, no Company has had any professional malpractice liability claims filed against it or any physician or other provider employed by, or acting as an independent contractor for, such Company since January 1, 2013, and, to the Knowledge of Dr. Carr, there are no circumstances which are reasonably likely to give rise to any such claims.

(c)     There are no Legal Actions pending or, to the Knowledge of Dr. Carr, threatened, that question the validity of this Agreement or the right of Dr. Carr to enter into this Agreement or to consummate the transactions contemplated hereby.

2.11.   <u>Ownership of Assets</u>.  All of the assets owned by any Company are owned by such Company free and clear of all mortgages, deeds of trust, liens, or other encumbrances or competing interests except for statutory liens for the payment of current taxes that are not yet delinquent.

2.12.   <u>Material Contracts</u>.

(a)     <u>Disclosure Schedule 2.12</u> is a true and complete list of each contract, agreement, note, indenture, mortgage, security agreement, lease or similar document to which any Company is a party or by which any Company is otherwise bound that constitutes: (i) a payment obligation (contingent or otherwise) of such Company in excess of $25,000; (ii) a lease of any interest in any real property or a capital asset; (iii) a loan agreement or other instrument under which a Company has borrowed money and each note, indenture, mortgage and security agreement associated therewith; (iv) a guaranty, contribution agreement or any agreement that obligates a Company to pay, indemnify for or contribute to an obligation of any other Person; (v) any partnership agreement, operating agreement, shareholders' agreement, joint venture agreement or similar arrangement, (vi) a contract with a third-party payor; (vii) an agreement that limits or restricts the type of services a Company may provide during any time or at any location or otherwise; (viii) any contract with a physician; (ix) any employment agreement or other agreement with an employee or independent contractor; (x) a contract between one Company and one or more of the other Companies or with Dr. Carr or any Affiliate of Dr. Carr and (xi) the PSA and any other contract to provide professional services to any other Person (each being referred to herein as a "<u>Material Contract</u>").  True and correct copies of each Material Contract listed in <u>Disclosure Schedule 2.12</u> (including all amendments, renewals and other modifications thereof) have been provided to Sound Physicians by posting them to the due diligence document site maintained for the transaction described herein.

(b)     Each Material Contract is in full force and effect and is enforceable in accordance with its terms against the applicable Company and, to the Knowledge of Dr. Carr, against the other party thereto, except, in either case, as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedy.  No Company or, to the Knowledge of Dr. Carr, any other party to any Material Contract, is in material default under any such Material Contract.

No Company has received notice from any other party to any Material Contract that such other party intends to cancel, terminate or exercise any option or remedy available to it under such Material Contract.

2.13.   Real Property.  None of the Companies own any real property.  To the Knowledge of Dr. Carr, (a) the use and operation of the real property leased by any Company does not violate any applicable law, covenant, condition, restriction, easement, license, permit or agreement and (b) no improvements constituting a part of the real property used by any Company are subject to any encroachment on real property owned or leased by another Person. None of the Companies have received any written notice of any action or charge, at law or in equity, pending against or affecting any leased real property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain actions, and, to the Knowledge of Dr. Carr, none is threatened.

2.14.   Compliance With Judgments, etc.  Each Company is in material compliance with the terms of each judgment, order, writ or similar decree of any court, Governmental Authority or arbitration tribunal applicable to such Company or its operations or assets.

2.15.   Permits, Licenses and Certifications.  Each Company has all permits, licenses, certifications and similar authorizations from Governmental Authorities necessary for the conduct of such Company's business as presently conducted (collectively, "Licenses").  All such Licenses are in full force and effect, and no Company is in default in any respect under any License held by it.

2.16.   Legal Compliance.

(a)   Each Company has operated and otherwise conducted its business activities in material compliance with all statutes, rules, regulations, codes and other laws of any Governmental Authority with which such Company is required to comply, including, but not limited to, any Health Care Law.

(b)   Each Company and Dr. Carr is in compliance in all material respects with (i) the administrative simplification provisions of HIPAA and implementing regulations; and (ii) all other applicable information privacy or security laws.  Each Company and Dr. Carr has entered into business associate contracts in each case in which it is acting as a business associate or as a covered entity as defined in 45 C.F.R. 160.103.  No Company or Dr. Carr (i) is under investigation by any Governmental Authority for a violation or potential violation of any information privacy or security laws, including, without limitation, receiving any notices from the United States Department of Health and Human Services Office of Civil Rights, the Department of Justice or a State Attorney General relating to any such violations or (ii) has had an incident or breach that would trigger a notification or reporting requirement under any contract or law related to the collection, use, disclosure or security of personal information.

(c)   Each Company meets all of the applicable requirements of any Federal Health Care Programs (as defined in 42 U.S.C. § 1320a-7(b)) ("Programs") in which it participates in all material respects.  There is no proceeding pending or, to the Knowledge

of Dr. Carr, threatened against any Company which relates to failure to comply with the applicable requirements of any Program. The Companies have made available to Sound Physicians true and complete copies of all material surveys, reviews, or audits of any Company conducted by or in connection with any of the Programs or any licensing or accrediting bodies during the past three (3) years, including any written statements of deficiencies and plans of correction. No Company has, during the past three (3) years, been the subject of any inspection, investigation, survey, audit, monitoring or other form of review by any Governmental Authority, trade association, professional review organization, accrediting organization or certifying agency based upon any alleged improper activity on the part of such Company, nor has any Company received any notice or other communication of deficiency from any Governmental Authority in connection with the business of such Company. There are not presently any outstanding deficiencies or plans of correction claimed or imposed by any Governmental Authority having jurisdiction over the business of any Company or requiring conformity to any applicable agreement, governing document, or applicable laws, rules, regulations, codes, ordinances, and applicable orders of any Governmental Authority. No Company has received a written notice from any Governmental Authority which enforces the statutory or regulatory provisions with respect to either the Medicare or Medicaid program of any pending or threatened investigations. Neither the U.S. Department of Health and Human Services nor any state agency has conducted or given any Company written notice that it intends to conduct any audit or other review of such Company's participation in the Medicare or Medicaid programs.

(d)     Neither the Companies, Dr. Carr nor other Person servicing as an officer, manager, director or agent (as those terms are defined in 42 C.F.R. § 1001.1001) of any Company: (i) has been charged with or convicted of any criminal offense relating to the delivery of an item or service under any federal or state health care program, including, but not limited to, the Medicare and Medicaid programs; (ii) has been debarred, excluded or suspended from participation in the Medicare and Medicaid programs; (iii) has had a civil monetary penalty assessed against it, him or her under Section 1128A of the Social Security Act; (iv) is currently listed on the General Services Administration published list of parties excluded from federal procurement programs and nonprocurement programs; (v) is a party to, or bound by, any order, individual integrity agreement, corporate integrity agreement or other formal or informal agreement with any Governmental Authority concerning compliance with laws, or (vi) has been notified that she or he is the target or subject of any current or, to the Knowledge of Dr. Carr, potential investigation involving or relating to any offense relating to the Medicare or Medicaid programs or Health Care Laws.

(e)     Except as otherwise permitted by applicable law, none of the Companies, Dr. Carr or any other Person servicing as an officer, manager, director or agent (as those terms are defined in 42 C.F.R. § 1001.1001) of any Company has directly or indirectly (i) offered, paid or received any remuneration, in cash or in kind, to, (ii) made any financial arrangements with or (iii)  given or agreed to give to or received a gift from (whether in money, property or services) any Person in exchange for a referral of patients or other health care business.

(f)      All billing practices of the Companies and Dr. Carr (including those of third party billing agents) are, and have been, in material compliance with all applicable laws and the applicable policies and procedures of all nongovernmental third-party payors, and neither the Companies nor Dr. Carr has billed for or received any payment or reimbursement in excess of amounts allowed by any applicable laws, except overpayments that have been properly refunded to, or otherwise recouped by, the applicable third-party payor in the ordinary course of business.

(g)      Since January 1, 2010, no Company has received any written notice of overpayments from any Program or any other third-party payor amounting to more than $25,000, individually, or $75,000 per year in the aggregate, or that is otherwise outside of the ordinary course of business, other than overpayments that have been refunded to, recouped by, or otherwise resolved with the applicable Program or third-party payor.  No Company has any outstanding overpayment or refund due to any Program or third-party payor in excess of $25,000, individually, or $75,000 in the aggregate.

(h)      No Company or any of their respective directors, managers, officers, employees or independent contractors at the time of becoming a director, manager, officer, employee or independent contractor or while they were serving as a director, manager, officer, employee or independent contractor was listed on HHS/OIG List of Excluded Individuals/Entities (LEIE) database (http://exclusions.oig.hhs.gov) or the General Services Administration's Excluded Parties List System (http://www.epls.gov) as being excluded or debarred from participation in any Program.

(i)      Each Company has conducted its operations in accordance with the compliance programs maintained by the applicable Hospitals.  None of the Companies (i) are parties to a corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services, (ii) have reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (iii) have been the subject of any Government Program investigation conducted by any federal or state enforcement agency, (iv) have been defendants in any qui tam/False Claims Act litigation (other than by reason of a sealed complaint of which Dr. Carr may have no Knowledge), (v) have been served with or received any search warrant, subpoena, civil investigation demand, contact letter or telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third parties who may be defendants or the subject of investigation into conduct unrelated to the Companies' business) and (vi) have received any complaints through any Company compliance "hotline" from employees, independent contractors, vendors, physicians, patients, or any other Persons that could reasonably be considered to indicate that any Company has violated, or is currently in violation of, any applicable laws, rules, regulations, codes, ordinances, and applicable orders of any Governmental Authority.  For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services.

(j)      Each physician, physician assistant, nurse practitioner or Persons acting in similar capacities ("Provider Personnel") who is or was employed at any time since

January 1, 2013 by, or who renders or has rendered professional medical services as an independent contractor at any time since January 1, 2013 on behalf of, any Company, has been since January 1, 2013 (during the period of such Provider Personnel's employment or engagement by the applicable Company), and continues to be, in compliance with the following:

(i)        Each such Provider Personnel has been duly licensed or certified pursuant to the applicable laws, rules, regulations, codes, ordinances, and applicable orders of any Governmental Authority of the applicable state where such Provider Personnel practices on behalf of the applicable Company, and said license or certification has not been suspended, revoked or restricted in any manner, holds the applicable clinical privileges required to practice at the Hospital or Hospitals where such Provider Personnel practices on behalf of the applicable Company and such required privileges have not been suspended, revoked or restricted in any manner since January 1, 2013, maintains the required current state and federal Drug Enforcement Agency and controlled substances numbers necessary to perform the services such Provider Personnel performs on behalf of the applicable Company, and is covered by medical malpractice insurance with limits consistent with the requirements of the Medical Staff  Bylaws of the applicable Hospital where such Provider Personnel practices on behalf of the applicable Company;

(ii)       No Provider Personnel (A) is currently, or has ever been, found to have, either civilly or criminally, violated any laws and regulations governing the Medicare or Medicaid programs, or any other federal or state healthcare program, (B) has been excluded or suspended from participation in the Medicare and Medicaid programs, or any other federal or state healthcare program, or (C) has been found to have, either civilly or criminally, violated any laws and regulations governing the Medicare or Medicaid programs, or any other federal or state healthcare program; and

(iii)      No Provider Personnel has:

(A)       Been reprimanded, sanctioned or disciplined as the result of any disciplinary investigation or proceeding instituted by any licensure board, hospital, medical school, health care facility or entity, professional society or association, payor, peer review or professional review committee or body, or Governmental Authority;

(B)       Been a party to any criminal complaint, indictment or criminal proceedings;

(C)       Been charged with or convicted of any criminal or civil offense, whether administrative, civil or criminal, relating to, or, to the Knowledge of Dr. Carr, is under investigation with respect to, any allegations of filing false health care claims, violating state or federal

antikickback or self-referral laws, or engaging in any other billing or health care services-related improprieties;

    (D)    Been diagnosed with or treated for any dependency on, or habitual use or episodic abuse of, alcohol or controlled substances, or any participation in any alcohol or controlled substance detoxification, treatment, recovery, rehabilitation, counseling, screening or monitoring program, other than the circumstance relating to a single Provider Personal that has been disclosed to Sound Physicians;

    (E)    Been reprimanded, sanctioned or disciplined as the result of any investigation or proceeding based on any allegation, of violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the provision of medical care; or

    (F)    Failed to comply in any material respects with the requirements, if any, set forth in all applicable third-party payor contracts.

Notwithstanding the foregoing, none of the representations contained in this Section 2.16 shall be deemed to cover or relate to tax matters.

2.17.   <u>Tax Matters</u>.  Each Company has filed or caused to be filed all tax returns required to have been filed by or for it, and all information set forth in such tax returns is correct and complete in all material respects. Each Company has paid all taxes due and payable by it. There are no unpaid taxes due and payable, and no taxing authority has asserted any claim against any Company for the assessment of any such tax liability. There are no liens with respect to taxes upon the assets of any Company except for statutory liens for the payment of current taxes that are not yet delinquent. There is no action or audit currently proposed, pending or, to the Knowledge of Dr. Carr, threatened against, or with respect to, any Company in respect of any taxes. PCS and Carr PLLC are classified as "disregarded entities" for federal income tax purposes. The representations contained in this Section 2.17 refer only to the past activities of the Companies and are not intended to serve as representations to, or a guarantee of, nor can they be relied upon with respect to, taxes attributable to any tax periods (or portions thereof) beginning after, or tax positions taken after, the Closing Date.

2.18.   <u>Employee and Labor Matters</u>.

    (a)    <u>Disclosure Schedule 2.18(a)</u> sets forth the following information for each individual who is either an employee of a Company or who is providing ongoing services to a Company as an independent contractor: (i) name of the individual, (ii) Company employing or retaining such individual as an independent contractor, (iii) title or job description and (iv) status as a full-time employee, a part-time employee or an independent contractor.

(b)     Except as set forth on <u>Disclosure Schedule 2.18(b)</u>, (i) the employment of each employee of any Company is terminable at the will of the employing Company, and, upon termination of the employment of any such employee, no severance or other payments will become due to such employee and (ii) no Company has a policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of employees' services.

(c)     To the Knowledge of Dr. Carr, none of the individuals listed in <u>Disclosure Schedule 2.18(a)</u> intend to terminate employment with a Company or are otherwise likely to become unavailable to continue as an employee of, or independent contractor to, such Company, nor does any Company have a present intention to terminate the employment or independent contractor relationship with any of its current employees or the individuals listed in <u>Disclosure Schedule 2.18(a)</u>.

(d)     No Company is delinquent in the payment of wages, salaries, bonuses, or other direct compensation for service performed for it by any of its employees or independent contractors or in the reimbursement of reimbursable expenses incurred by such employees or independent contractors on behalf of such Company.

(e)     Each Company has (i) complied in all material respects with all federal and applicable state laws relating to the employment of labor, including any provisions thereof relating to wages, hours, collective bargaining, immigration, classification of employees and independent contractors, equal employment opportunity, occupational safety and health and the withholding and payment of Social Security and similar employment taxes; and (ii) properly withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of such Company and is not liable for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing.

(f)     There are no unions representing the interests of any of the employees of, or independent contractors to, any Company, and, to the Knowledge of Dr. Carr, there are no active union-organizing activities or other requests or attempts to organize the employees of, or independent contractors to, any Company.

(g)     During the past three (3) years, there have been no material labor disputes, strikes, work stoppages, work disruptions or employment disruptions by the employees of, or independent contractors to, any Company and no such actions have been threatened or, to the Knowledge of Dr. Carr, are otherwise impending.

(h)     During the past three (3) years, there have been no suits, actions, administrative proceedings, hearings, arbitrations or other proceedings between any Company and any of its employees or independent contractors or filed by any Company or any of its employees or independent contractors with any Governmental Authority and no such actions have been threatened or, to the Knowledge of Dr. Carr, are otherwise impending.

2.19.   Benefit Plans.

(a)    Disclosure Schedule 2.19(a) sets forth all fringe benefit and bonus opportunities made available by any Company to its employees and former employees (each a "Fringe Benefit").

(b)    No Company or any Person (whether or not incorporated) which is or was treated as a single employer with a Company under Section 414 of the Code (an "ERISA Affiliate"), maintains, sponsors, or contributes to, or has ever maintained, sponsored, or contributed to, on behalf of any current or former employee of any Company (including retirees) any (i) "employee welfare benefit plan" (as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) or (ii) "employee pension benefit plan" (as defined in Section 3(2) of ERISA). No Company has a formal plan or commitment, whether legally binding or not, to create any "employee benefit plan" within the meaning of Section 3(3) of ERISA or change any existing Fringe Benefit that would affect any current or former employee of any Company or any ERISA Affiliate.

(c)    No actions or claims are currently pending or threatened with respect to any Fringe Benefit.

(d)    The consummation of the transactions contemplated by this Agreement will not accelerate the time of vesting or the time of payment, or increase the amount of any compensation due, to any current or former manager, director, officer or employee of any Company.

(e)    No written or oral representations have been made by Dr. Carr or any other Person authorized to act on behalf of any Company to any employee or former employee of such Company concerning the employee benefits of Sound Physicians, other than as duly authorized by Sound Physicians.

2.20.   Insurance.  Disclosure Schedule 2.20 sets forth an accurate and complete list of all insurance policies, self-insurance arrangements and surety bonds currently in effect for each Company.  With respect to each such insurance policy: (a) such insurance policy is in full force and effect; (b) no Company is in breach or default of any of its obligations under such policy (including those with respect to the full and timely payment of premiums or the giving of notices), and no event has occurred which, with notice or the lapse of time, or both, would constitute such a breach or default, or permit termination, modification, or acceleration of such insurance policy; (c) no party to such insurance policy has repudiated any provision thereof, and no Company has received any written notice of cancellation or nonrenewal of such insurance policy nor has termination of such insurance policy or arrangement been threatened; and (d) neither the insurance policy, nor any proceeds thereof, have been assigned by a Company to any other Person.  Since inception of its business activities, each Company has maintained insurance policies covering general liability, property damage and medical malpractice for all acts and occurrences arising in the conduct of its business, excluding, however, acts and omissions of each Company's Provider Personnel who are independent contractor and maintain their own separate medical malpractice insurance coverage.  Such medical malpractice insurance

coverage has or will have coverage limits of at least $3,000,000 per occurrence and $5,000,000 in the aggregate.

2.21.   Broker or Finders' Fees.   Other than Brookwood Associates, Carr Consulting and Mr. Burke Haywood Ramsay, there are no third-party investment bankers, brokers, finders or other intermediaries that have been retained by, or that are authorized to act on behalf of, Dr. Carr or any Company which would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement. All fees, commissions and other amounts payable to Brookwood Associates, Carr Consulting and Mr. Burke Haywood Ramsay are the sole responsibility of Dr. Carr.

2.22.   Effect of Due Diligence.   The representations and warranties set forth in this Section 2 apply with full force and effect regardless of any due diligence investigation conducted by Sound Physicians, or its representatives and agents.

2.23.   Scope of Representations and Warranties.   The representations and warranties contained in this Section 2, as modified by the information set forth in the applicable Disclosure Schedules, do not omit to state a material fact necessary to make such statements not misleading. Other than the representations and warranties contained in this Section 2, including any modification or qualification thereto included in the Disclosure Schedules, or in any certification delivered by Dr. Carr or any Company in connection with the transactions described herein, there are no express or implied representations or warranties made by Dr. Carr or any Company to Sound Physicians or Sound Nominee in connection with the transaction described herein.

**3.      Representations and Warranties of Sound Physicians and Sound Nominee.** As an inducement to Dr. Carr to enter into this Agreement and to consummate the transactions contemplated hereby, and acknowledging that Dr. Carr has specifically relied on the following representations and warranties in connection with his decision to do so, Sound Physicians and Sound Nominee hereby represents and warrants to Dr. Carr that the statements contained in this Section 3 are accurate, true, correct and complete as of the date hereof.

3.1.   Organization, Good Standing and Authority.   Sound Physicians is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power to enter into this Agreement and any other documents relating to the transactions described herein and to perform all of its obligations hereunder and thereunder.

3.2.   Authorization.   All actions required to be taken by or on behalf of Sound Physicians and Sound Nominee, as applicable, in order to duly authorize Sound Physicians and/or Sound Nominee to execute and deliver this Agreement, become a member of PCS and Carr PLLC and a shareholder of Carr PC, pay the Purchase Price in accordance with the terms of this Agreement and to otherwise perform each of its obligations under this Agreement has been duly taken by and on behalf of Sound Physicians and Sound Nominee. This Agreement has been duly executed and delivered by Sound Physicians and Sound Nominee and constitutes the valid and legally binding obligation of Sound Physicians and Sound Nominee, enforceable against Sound Physicians and Sound Nominee in accordance with the terms hereof, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as

limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.3.   Noncontravention.  Neither the execution or delivery of this Agreement or any of the other agreements, certificates or instruments to be delivered by Sound Physicians or Sound Nominee hereunder nor the consummation of the transactions contemplated hereby will (a) conflict with or constitute a breach, violation or termination of Sound Physicians' Certificate of Incorporation or the Bylaws, or (b) constitute a violation of or a default under, or a conflict with, any order, writ, injunction or decree of any court, Governmental Authority or arbitration tribunal, or any contract, commitment, indenture or other agreement, or any other restriction of any kind to which Sound Physicians or Sound Nominee is a party or by which it is otherwise bound.

3.4.   Consents.  There are no notices to, filings with, or consents or approvals of, any Governmental Authority or other Person required to be made or obtained by or on behalf of Sound Physicians or Sound Nominee in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

3.5.   No Litigation.  There are no Legal Actions pending or, to the Knowledge of Sound Physicians, threatened, that question the validity of this Agreement or the right of either Sound Physicians or Sound Nominee to enter into this Agreement or to consummate the transactions contemplated hereby.

3.6.   Broker or Finders' Fees.  There is no third-party investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Sound Physicians or Sound Nominee who would be entitled to any fee or commission in connection with this Agreement.

3.7.   Investment Representation.  Sound Nominee is acquiring the Purchased Interests and Shares for investment for his own account and not with a view to, or for sale in connection with, any distribution thereof in violation of federal or state securities laws and neither Sound Physicians nor Sound Nominee has any contract, undertaking, agreement or arrangement to sell or otherwise transfer or dispose of any of the Purchased Interests and Shares.  Sound Physicians and Sound Nominee understand that the Purchased Interests and Shares are "restricted securities" that may only be sold pursuant to an available exemption from the registration requirements under the Securities Act of 1933, as amended, and applicable state securities laws.

3.8.   Financing.  Sound Physicians has sufficient cash and/or available credit facilities to pay the total Purchase Price with interest thereon as and when due hereunder and to make any other necessary payment of fees and expenses in connection with the consummation of the transactions contemplated herein.

4.   **Additional Covenants of the Parties.**

4.1.   Publicity.  The Parties will cooperate with each other in the development and distribution of all news releases and other public disclosures relating to the transactions contemplated hereby.  Neither Sound Physicians nor Dr. Carr, nor any of its or his respective Affiliates, will issue or make, or allow to have issued or made, any press release or public

announcement concerning the transactions contemplated hereby without the prior approval thereof by the other Party, which consent shall not be unreasonably withheld by such other Party. Notwithstanding the foregoing, in no event shall any Party or its Affiliates make any press release or other public announcement which includes any of the financial terms or conditions of the transactions contemplated by this Agreement.

4.2.   Transaction Expenses.  Except as expressly provided otherwise herein, Sound Physicians will be solely responsible for, and shall pay, all Transaction Expenses incurred by it and Sound Nominee and Dr. Carr will be solely responsible for, and shall pay, all Transaction Expenses incurred by Dr. Carr or any of the Companies.  The Parties agree that, for federal (and, where applicable, state and local) income tax purposes, any deductions attributable to the Transaction Expenses paid by or on behalf of the Company shall be for the account of Dr. Carr.

4.3.   Protection of Confidential Information.  Each Party shall, and shall take steps to cause its directors, managers, officers, employees or other agents and Affiliates to, keep confidential the terms of this Agreement and the agreements or other documents to be executed or delivered at Closing and all information provided by any Party to any other Party or such other Party's Affiliates in connection with this Agreement and shall exercise the same care in handling such information as such Party would exercise with similar information of its, his or her own. In connection with the foregoing, each Party hereto agrees to be subject to, and to fully abide by, the terms of that certain Non-Disclosure and Confidentiality Agreement, dated April 27, 2015, as if such Party was a party thereto and that said Non-Disclosure and Confidentiality Agreement shall remain in full force and effect after the date hereof and the terms thereof shall be deemed to have been incorporated by reference herein.

4.4.   Certain Tax Covenants.

(a)   All transfer, sales, use, value added, documentary and stamp and all other similar taxes (including any real property or leasehold interest transfer tax and any similar tax), fees and charges (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne 50% by Sound Physicians and 50% by Dr. Carr.  Sound Physicians shall prepare and file any tax returns required in connection with Transfer Taxes.  Each Party hereto shall cooperate in the preparation, execution and filing of all tax returns and other documents required in connection with such Transfer Taxes.

(b)   Sound Physicians shall, at its expense, cause to be prepared and timely filed all tax returns of the Companies required to be filed after the Closing Date.  In the case of any tax return of any Company with respect to any taxable period that ends on or prior to the Closing Date (a "Pre-Closing Tax Return") or that begins prior to but ends after the Closing Date (a "Straddle Period Tax Return") with respect to taxes imposed on or measured by income, Sound Physicians shall, at least twenty (20) days prior to the date (including extensions) on which any such Pre-Closing Tax Return or Straddle Period Tax Return is due, submit such Tax Return to Dr. Carr for his review and comment, and Sound Physicians shall consider and incorporate all reasonable changes requested by Dr. Carr with respect thereto.

(c)     Sound Physicians shall not (and shall not permit any Company to) amend a tax return of any Company with respect to a taxable period ended on or before the Closing Date, or file, amend or make changes to any tax elections or accounting methods with respect to a tax return of any Company with respect to a taxable period ended on or before the Closing Date, in each case without the prior written consent of Dr. Carr (which consent shall not be unreasonably withheld, conditioned or delayed).c

(d)     After the Closing, upon reasonable prior written notice, each Party hereto shall furnish or cause to be furnished to each other, as promptly as practicable, such information (to the extent within the control of such Party) and reasonable assistance relating to the Companies (including access to books, records and personnel) as is reasonably necessary for the filing of tax returns (including any extensions thereof), the making of any election related to taxes, or the preparation, prosecution or defense of any tax audit, assessment, adjustment, examination or proceeding relating to the Companies. Sound Physicians (on behalf of itself and the Companies) and Dr. Carr agree to retain all books and records with respect to tax matters relating to any taxable period beginning before the Closing Date until the expiration of the applicable statute of limitations and to abide by all record retention agreements entered into with any Governmental Authority.

4.5.   Restrictive Covenants.

(a)     For a period of seven (7) years from and after the Closing Date, Dr. Carr shall not, directly or indirectly (including through any Affiliate of Dr. Carr), compete with the nationwide inpatient hospitalist, intensivist, and emergency medicine businesses of Sound Physicians or its Affiliates by serving as or being, as applicable, an equity owner (except as the holder of 1% or less of the stock of a publicly traded corporation), manager, officer, consultant, administrative service provider, lessor, partner, member, employee or investor in, of or to an entity that, directly or indirectly, provides inpatient hospitalist, intensivist, or emergency department services anywhere in the United States. The restrictive covenant set forth in this Section 4.5(a) does not, and will not be deemed to, preclude Dr. Carr from working clinically for another entity or health system, provided that such employment location is at least 20 miles from any hospital (including, but not limited to the Hospitals) with which Sound Physicians (or any Affiliate, including the Companies) has an active professional services agreement under which it provides inpatient hospitalist, intensivist, or emergency department services.

(b)     For a period of seven (7) years from and after the Closing Date, Dr. Carr shall not, directly or indirectly (including through any Affiliate of Dr. Carr):

(i)     recruit or solicit any employees or independent contractors of any Company for purposes of employing or contracting with the same; or

(ii)     request or induce or attempt to induce any employee or contractor of any Company to terminate his or her relationship with such Company.

(c)     Dr. Carr, on behalf of himself and any manager, director, officer, employee or other representative of him or the Companies, hereby agrees not to make

any statements, comments, or communications that could constitute disparagement of Sound Physicians, Sound Nominee or any of the Companies that may be considered to be derogatory or disparaging of the good name or business reputation of any of them.

(d)     Dr. Carr acknowledges that the restrictive covenants set forth in this Section 4.5 are integral to protecting the goodwill acquired by Sound Physicians as a result of the transactions described in this Agreement and are an integral and material inducement to Sound Physicians to enter into this Agreement and to consummate the transactions described herein.

(e)     In the event the provisions of this Section 4.5 are declared by a court of competent jurisdiction to exceed time, geographic, occupational or other limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum time, geographic, occupational or other limitation held reasonable and enforceable by such court. The covenants and restrictions contained in this Section 4.5 are separate and divisible. Each provision and clause shall be enforced to the maximum extent permitted by law.

(f)     Dr. Carr acknowledges and agrees that a remedy at law for any breach or anticipatory breach of the provisions of this Section 4.5 may be inadequate and that, because of the inadequacy of such legal remedies, Sound Physicians, Sound Nominee or any of the Companies, as the case may be, shall be entitled to seek injunctive and other equitable relief, including specific performance, in case of any such breach or attempted breach, in addition to such other remedies as may exist at law. Dr. Carr hereby waives any requirement for securing or posting any bond in connection with obtaining any such injunctive or other equitable relief.

4.6.     Director and Officer Indemnification.

(a)     Sound Physicians agrees that all rights to indemnification, advancement of expenses and exculpation from the Companies existing in favor of each Person who is or was an officer, manager or director of a Company at any time prior to the Closing Date (as provided in the articles of incorporation, articles or organization, operating agreement or by-laws of such Company, as the case may be) shall survive the Closing Date for a period of six (6) years and shall continue in full force and effect in accordance with their respective terms; provided, however, that in no event shall any right of indemnification, advancement of expenses and exculpation from the Companies existing in favor of Dr. Carr be applicable in any manner to, or otherwise relieve or indemnify Dr. Carr from any liabilities with respect to, any obligation of Dr. Carr to indemnify a Sound Indemnified Party pursuant to Section 7.2 hereof.

(b)     The obligations of Sound Physicians under this Section 4.6 shall not be terminated or modified in such a manner as to adversely affect Dr. Carr or any director, manager, or officer to whom this Section 4.6 applies without the consent of such affected director, manager, officer or Dr. Carr (it being expressly agreed that Dr. Carr and the directors, managers and officers to whom this Section 4.6 applies shall be third-party beneficiaries of this Section 4.6, each of whom may enforce the provisions of this

Section 4.6). In the event Sound Physicians, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of Sound Physicians or any Company, as the case may be, shall assume all of the obligations set forth in this Section 4.6.

4.7.   Medical Malpractice Insurance.   In the event Sound Physicians causes any Company to terminate or cancel any policy of medical malpractice insurance maintained by such Company as required by Section 2.20 hereof, or to lower the coverage limits of any such insurance policy below the amounts required in Section 2.20 hereof, and such insurance policy was written on a claims made basis, then Sound Physicians shall (at its sole cost and expense), or cause such Company to (at its sole cost and expense), acquire a replacement policy of medical malpractice insurance with coverage limits no less than those required by Section 2.20 hereof, including "prior acts" insurance covering insurable events occurring prior to the Closing Date, and Sound Physicians shall cause Dr. Carr to be named as an additional insured on the medical malpractice "prior acts" policy being purchased by Sound Physicians for the Companies to the extent possible.

5.   **Conditions to the Obligations of Sound Physicians and Sound Nominee at Closing.** The obligations of Sound Nominee to acquire the Purchased Interests and Shares being conveyed to it by Dr. Carr, of Sound Physicians to pay the Purchase Price in the manner described herein, and of Sound Physicians and Sound Nominee to otherwise perform their respective responsibilities at Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived by Sound Physicians:

5.1.   Representations and Warranties.   The representations and warranties of Dr. Carr contained in Section 2 shall be true and correct in all material respects as of the date hereof, except for any (a) representation or warranty which references a given date, which will be true and correct in all material respects as of such date, and (b) such representation or warranty that is qualified by materiality, which shall be true and correct in all respects.

5.2.   Performance.   Dr. Carr and each Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by him or it on or before the Closing Date.

5.3.   Closing Certificate.   Dr. Carr shall have delivered a certificate, dated as of the Closing Date, confirming the matters set forth in Section 5.1 and Section 5.2.

5.4.   Closing Deliverables.   Dr. Carr shall have duly executed and/or delivered to Sound Physicians and/or Sound Nominee each of the documents required to be so executed and delivered at Closing pursuant to Section 1.3 hereof.

5.5.   Company Actions.   All action required to be taken by or on behalf of each of the Companies in order to allow Dr. Carr to convey the Purchased Interests and Shares, to admit Sound Nominee as the sole member of PCS and Carr PLLC and to recognize Sound Nominee as

the sole record and beneficial shareholder of Carr PC in accordance with the provisions of this Agreement and to consummate the transactions contemplated by this Agreement have been duly taken by and on behalf of each Company.

5.6.   Consents and Approvals.  Dr. Carr shall have delivered to Sound Physicians evidence of his receipt of each of the consents, approvals and authorizations identified on Disclosure Schedule 2.7.

5.7.   No Obstructive Proceeding.  No action or proceedings shall have been instituted against, and no order, decree or judgment of any Governmental Authority shall be subsisting against, any Party hereto which seeks to, or would, render the transaction contemplated by this Agreement unlawful as of the Closing Date, and no such action shall seek damages in a material amount or injunctive relief by reason of completion of the transactions contemplated hereby. No substantive legal objection to the transactions contemplated by this Agreement shall have been received from or threatened by any Governmental Authority.

5.8.   No Debt.  Sound Physicians shall have received evidence that all of the Companies' indebtedness for borrowed money has been repaid in full by the Companies on or prior to the Closing Date and all security interests in the assets of the Companies in favor of any lender shall have been released at or prior to Closing (or, pursuant to a payoff letter for such lender, will be released upon payment of the full amount set forth in such payoff letter).

5.9.   PSA.  The PSA remains in full force and effect with respect to each Hospital and neither PCS, Dr. Carr nor Sound Physicians has received notice from Methodist of its intention to terminate the PSA with respect to any Hospital.

5.10.   Physicians and Providers.  The Companies shall have employed or contractually retained physicians and mid-level providers currently providing clinical services on behalf of the Companies so that such employed or contractually-retained physicians and mid-level providers are sufficient to cover at least 95% of all shifts at the Hospitals.

5.11.   Condition for Dr. Washington.  Sound has reached a satisfactory understanding with Michael Washington, M.D. with respect to his role with the Companies following the Closing Date.

5.12.   ED Staffing Subcontracts.  Sound shall have received written confirmation that PCS has duly delivered notice of termination as required under the terms of each ED Staffing Subcontract on or before the Closing Date.

5.13.   Insurance Certificate.  Sound Physicians shall have received an insurance certificate or other acceptable written evidence that the malpractice insurance required by Section 2.20 hereof is in full force and effect on the Closing Date.

5.14.   Company Boards and Officers.  Dr. Carr and any other person serving as a director, manager or officer of any of the Companies shall have delivered his or her written resignation from all such positions and capacities to the appropriate Company.

**6.     Conditions of Dr. Carr's Obligations at Closing.**  The obligation of Dr. Carr to sell the Purchased Interests and Shares to Sound Nominee and to otherwise perform his responsibilities at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by Dr. Carr:

6.1.     Representations and Warranties.  The representations and warranties of Sound Physicians and Sound Nominee contained in Section 3 shall be true and correct in all material respects as of the date hereof, except for any (a) representation or warranty which references a given date, which will be true and correct in all material respects as of such date, and (b) such representation or warranty that is qualified by materiality, which shall be true and correct in all respects.

6.2.     Performance.  Sound Physicians and Sound Nominee shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before such Closing Date.

6.3.     Officer's Certificate.  Sound Physicians shall have delivered a certificate, dated as of the Closing Date and signed by a duly authorized officer thereof (a) certifying the incumbency of each Person executing this Agreement and any other agreements, documents or instruments to be delivered by Sound Physicians pursuant to this Agreement at the Closing, and (b) confirming the matters set forth in Section 6.1 and Section 6.2 with respect to Sound Physicians.

6.4.     Closing Deliverables.  Sound Physicians shall have made the Initial Payment of the Purchase Price in accordance with Section 1.4(b)(i) hereof and Sound Physicians and Sound Nominee shall have duly executed and delivered to Dr. Carr each of the documents required to be so executed and delivered by them at Closing by Section 1.3 hereof.

6.5.     No Obstructive Proceeding.  No action or proceedings shall have been instituted against, and no order, decree or judgment of any Governmental Authority shall be subsisting against, any Party hereto which seeks to, or would, render the transaction contemplated by this Agreement unlawful as of the Closing Date, and no such action shall seek damages in a material amount or injunctive relief by reason of completion of the transactions contemplated hereby. No substantive legal objection to the transactions contemplated by this Agreement shall have been received from or threatened by any Governmental Authority.

**7.     Indemnification; Survival.**

7.1.     Survival of Representations and Warranties.  The representations and warranties of the Parties made in or pursuant to this Agreement, and the right of any Party to make a claim for indemnification under this Section 7 for Losses (defined in Section 7.2 below) arising out of a breach thereof, will survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby until the date which is eighteen (18) months after the Closing Date; provided, however, that (a) any representation or warranty made pursuant to Section 2.8(b), Section 2.16 or Section 2.18(e)(ii) hereof, and the right of any Sound Physicians Indemnified Party to make a claim for indemnification under this Section 7 for Losses arising out of a breach thereof, will survive until the date which is twenty-four (24) months after the Closing Date and (b) any representation or warranty made pursuant to Section 2.1, 2.2, 2.3,

2.5, 2.6, 3.1, 3.2 or 3.3 and the right to make a claim for indemnification under this Section 7 for Losses arising out of a breach thereof and the right to make a claim for indemnification under this Section 7 with respect to Losses arising out of any representation or warranty made fraudulently will survive indefinitely after the Closing Date. Without limiting the foregoing, a claim for indemnification pursuant to this Section 7 based on the breach or alleged breach of a representation or warranty may be asserted by any Indemnified Party at any time prior to the date on which such representation or warranty expires hereunder (regardless of the time it takes to finally resolve such claim) as long as the Indemnified Party duly notifies the applicable Indemnifying Party in accordance with Section 7.4 hereof prior to the date on which such representation or warranty would otherwise expire hereunder. No representation or warranty made by a Party hereunder shall be affected or limited by any investigation of the subject matter thereof made by or on behalf of the other Party hereto.

7.2.   _Indemnity by Dr. Carr_.  Subject to the conditions and provisions set forth in this Section 7, Dr. Carr agrees to indemnify, defend and hold harmless Sound Physicians and Sound Nominee and their respective directors, officers, employees, agents and Affiliates collectively (each, a "Sound Physicians Indemnified Party") from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, encumbrances and all costs and expenses (including, without limitation, reasonable attorneys' fees, interest and penalties) (collectively, "Losses") which are sustained, incurred or paid by any Sound Physicians Indemnified Party resulting from or arising out of:

(a)   Any inaccuracy in or breach of any representation or warranty of Dr. Carr contained in this Agreement or in any certificate, Disclosure Schedule or Exhibit delivered by Dr. Carr pursuant hereto; or

(b)   Any failure by Dr. Carr to perform any of his covenants or obligations set forth in this Agreement.

7.3.   _Indemnity by Sound Physicians_.  Subject to the conditions and provisions herein set forth, Sound Physicians agrees to indemnify, defend and hold harmless Dr. Carr and his heirs, estate and Affiliates (each, a "Carr Indemnified Party") from and against any and all Losses which are sustained, incurred or paid by any Carr Indemnified Party resulting from or arising out of:

(a)   Any inaccuracy in or breach of any representation or warranty of Sound Physicians contained in this Agreement or in any certificate, Disclosure Schedule or Exhibit delivered by Sound Physicians pursuant hereto;

(b)   Any failure by Sound Physicians or Sound Nominee to perform any of its respective covenants or obligations set forth in this Agreement; or

(c)   The operation of the businesses of the Companies from and after the Closing; provided, however, Sound Physicians shall not be obligated to indemnify, defend and hold harmless any Carr Indemnified Party pursuant to this Section 7.3(c) from any Losses (i) to the extent Dr. Carr is required to indemnify a Sound Physician Party pursuant to Section 7.2 or pursuant to any agreement entered into by Dr. Carr with a

Sound Physician Party contemporaneously with the Closing or (ii) are attributable to Dr. Carr's own actions taken in connection therewith.

7.4.   <u>Rules Regarding Indemnification</u>.   The obligations and liabilities of a Party to provide indemnity pursuant to Section 7.2 or 7.3 hereof (an "<u>Indemnifying Party</u>") with respect to claims resulting from the assertion of liability by an Indemnified Party shall be subject to the following terms and conditions:

(a)   The Party entitled to indemnification under this Section 7 (an "<u>Indemnified Party</u>") shall give written notice to the Indemnifying Party as soon as reasonably practicable (and in any event within thirty (30) days) after learning of any Loss for which the Indemnified Party believes in good faith it is entitled to indemnification pursuant to Section 7.2 or Section 7.3 hereof.  The written notice shall state the nature and basis of said Loss and set forth a calculation of the amounts of the Loss, to the extent reasonably ascertainable at the time such notice is given.

(b)   In connection with any action by a third party against an Indemnified Party for which indemnity is sought under Section 7.2 or 7.3 hereof, the Indemnifying Party may, at its own expense, (i) participate in the defense of any claim, suit, action or proceeding and (ii) assume the defense thereof at any time during the course of any such claim; provided, however, that in all cases health care compliance matters shall be controlled exclusively by Sound Physicians provided Sound Physicians shall consult with Dr. Carr and his counsel in good faith and in advance in connection with the resolution thereof.  If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party.  Whether or not the Indemnifying Party chooses to defend or prosecute any such claim, suit, action or proceeding, each Party shall cooperate in the defense or prosecution thereof; provided, however, that neither Party shall be obligated to provide information as part of such cooperation if legal counsel for such Party reasonably concludes that the provision of such information would require the Party to waive any applicable legal privilege.  The Indemnifying Party shall have the right to enter into settlements or compromises with respect to any claim for which an indemnification claim is made and the Indemnified Party shall not agree to any settlement or compromise with respect to any claim subject to indemnification by the Indemnifying Party without the prior written consent of the Indemnifying Party, provided that if a settlement or compromise is entered into by the Indemnified Party or the Indemnifying Party in accordance with the requirements of this Section 7.4(b) such settlement or compromise shall also be binding upon the Indemnifying Party or the Indemnified Party, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such settlement or compromise. The Indemnified Party will give the Indemnifying Party at least thirty (30) days' written notice of any proposed settlement or compromise of any claim, suit, action or proceeding it is defending, during which time the Indemnifying Party may reject such proposed settlement or compromise; provided, however, that from and after such rejection the Indemnifying Party shall be obligated to assume the defense of and full and complete liability and responsibility for such claim, suit, action or proceeding, including any and all Losses in connection

therewith in excess of the amount of unindemnifiable Losses which the Indemnified Party would have been obligated to pay under the proposed settlement or compromise.

(c)     The full amount of an indemnity claim for any matter not involving a third-party claim shall be due and payable within thirty (30) days following the receipt by the Indemnifying Party of written notice of such claim from the Indemnified Party, unless, and to the extent, the Indemnifying Party, acting in good faith, contests such claim for indemnity and has notified the Indemnified Party in writing of the grounds therefor (a "Notice of Objection"). If an Indemnifying Party delivers a Notice of Objection, the Parties shall meet and negotiate in good faith to resolve any contested claim for indemnity hereunder for a period of up to thirty (30) days after delivery after the Notice of Objection prior to initiating litigation.

(d)     An Indemnifying Party shall be liable for all Losses incurred by an Indemnified Party up to the full amount of the Purchase Price with respect to claims relating to the representations and warranties listed in Section 7.1(b) hereof or claims arising out of fraud. In any other case, an Indemnifying Party shall not be liable for any Losses incurred by an Indemnified Party arising under Section 7.2(a) or (b) or 7.3(a) or (b) of this Agreement, as the case may be:

(i)     unless the total liability of such Indemnifying Party with respect to claims for Losses under Section 7.2(a) or (b) or Section 7.3(a) or (b) hereof, as the case may be, for which such Indemnifying Party would otherwise be liable, exceeds $200,000, it being the intent of the Parties that no Indemnifying Party shall have liability under Section 7.2(a) or (b) or Section 7.3(a) or (b) hereof, as the case may be, with respect to the first $200,000 of Losses incurred in the aggregate by the Sound Physicians Indemnified Parties or the Carr Indemnified Parties, as the case may be;

(ii)     to the extent total Losses for which all Sound Physicians Indemnified Parties would otherwise be entitled to indemnity under Section 7.2(a) or (b), other than with respect to Losses arising out of a breach of any representation or warranty made pursuant to Section 2.16 hereof or Section 2.18(e)(ii) hereof, exceed 10% of the Purchase Price; and

(iii)     to the extent total Losses for which all Sound Physicians Indemnified Parties would otherwise be entitled to indemnity under Section 7.2(a) or (b) arising out of a breach of any representation or warranty made pursuant to Section 2.16 hereof or Section 2.18(e)(ii) hereof exceed 15% of the Purchase Price.

(e)     In any case where Sound Physicians has duly made a claim for indemnity under this Section 7 and Sound Physicians has not received a Notice of Objection from Dr. Carr, Sound Physicians shall withhold the amount of such claim from the Second Payment otherwise due to Dr. Carr pursuant to Section 1.4(b)(ii) hereof to the extent such claim remains unpaid by Dr. Carr as of the due date for the Second Payment. If Dr. Carr has duly delivered a Notice of Objection to Sound Physicians with respect to any claim or

a portion thereof, then Sound Physicians may withhold the contested amount of such claim from the Second Payment only if either (i) Dr. Carr agrees thereto in writing; or (ii) Sound Physicians' right to receive payment of the contested amount of such claim has been determined by a non-appealable final order of a court of competent jurisdiction. In any other case, the contested amount shall be deposited within five days into a third-party escrow account with a mutually agreed-upon escrow agent on the due date of the Second Payment and will be disbursed therefrom at such time as Sound Physicians and Dr. Carr agree on the amount of such claim Sound Physicians is entitled to withhold or set off from the Second Payment or resolved pursuant to a final, binding, non-appealable order of a court of competent jurisdiction.

(f)    If, after an indemnification payment is made hereunder, the Indemnified Party to which such payment is made receives insurance proceeds in respect of the Loss for which it had received such payment, the amount of such insurance proceeds (up to and not to exceed the amount of the indemnification payment from the Indemnifying Party to the Indemnified Party with respect to such Loss and net of any increased premium costs) shall promptly be remitted by the Indemnified Party to the Indemnifying Party. In addition, any indemnification obligation hereunder shall be reduced to take into account any income tax benefit realized or to be realized by the Indemnified Party arising from the occurrence of the applicable Loss or payment of such indemnified amount.

(g)    Notwithstanding anything to the contrary herein, if Sound Physicians has duly made a claim for indemnity under this Section 7 and, prior to the date that the amount of the Second Payment has been finally determined pursuant to Section 1.4(d) hereof, such indemnity claim is finally resolved pursuant to a written agreement between Sound Physicians and Dr. Carr or a final, binding, non-appealable order of a court of competent jurisdiction, then the amount due to any Sound Physicians Indemnified Party with respect to such indemnity claim shall not become due and payable until the amount of the Second Payment has been finally determined pursuant to Section 1.4(d) hereof. In addition, notwithstanding anything to the contrary herein, any amount required to be paid by Dr. Carr pursuant to this Section 7 shall first be paid via setoff against the Second Payment until the Second Payment is exhausted and only then by Dr. Carr directly, in all cases, however, subject to the limitations set forth herein.

7.5.    Exclusive Remedy.  Other than claims for fraud or equitable relief (including, but not limited to, specific enforcement of this Agreement), any claim arising with respect to the matters set forth in Sections 7.1 and 7.2 hereof, or any Losses alleged to be suffered by any Party arising therefrom, shall be governed solely and exclusively by the provisions of this Section 7. With respect to any other claims, all remedies afforded to a Party, either under this Agreement or under law or otherwise, shall be cumulative and not alternative.

7.6.    Limitation on Liabilities.  No Party shall be responsible for or have any obligation to indemnify, defend or hold harmless any other party or any other Person hereunder for special, consequential, punitive, exemplary, or incidental damages or claims, except to the extent Losses resulting from a third-party claim include special, consequential, punitive, exemplary, or incidental damages, costs, expenses, charges, or claims of the third party, and then only to the

extent of such Losses, subject, however, to all other limitations set forth herein and except as otherwise provided in this Section 7.

8.  **Miscellaneous.**

    8.1.   <u>Defined Terms</u>.  For purposes of this Agreement, the term:

        (a)   "<u>Affiliate</u>" means, with respect to any Person, any (i) director, manager, officer, limited or general partner, member or shareholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (ii) any spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (i) above relating to such Person) and (iii) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  For purposes hereof, "<u>control</u>" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

        (b)   "<u>Agreement</u>" means this LLC Interest and Stock Purchase Agreement.

        (c)   "<u>Amended Bylaws</u>" has the meaning set forth in Section 1.3(d) hereof.

        (d)   "<u>Amended Operating Agreements</u>" has the meaning set forth in Section 1.3(b) hereof.

        (e)   "<u>Business Day</u>" means a weekday on which national banks are open for business in the State of Tennessee.

        (f)   "<u>Calculation Statement</u>" has the meaning set forth in Section 1.5(b) hereof.

        (g)   "<u>Carr Indemnified Party</u>" has the meaning set forth in Section 7.3 hereof.

        (h)   "<u>Carr PC</u>" has the meaning set forth in Recital B hereto.

        (i)   "<u>Carr PLLC</u>" has the meaning set forth in Recital B hereto.

        (j)   "<u>Closing</u>" has the meaning set forth in Section 1.2 hereof.

        (k)   "<u>Closing Date</u>" has the meaning set forth in Section 1.2 hereof.

        (l)   "<u>Closing Date Cash Amount</u>" has the meaning set forth in Section 1.5(b)(v) hereof.

        (m)   "<u>Closing Date Cash Shortfall</u>" has the meaning set forth in Section 1.5(e)(i) hereof.

        (n)   "<u>Closing Date Excess Cash</u>" has the meaning set forth in Section 1.5(e)(ii) hereof.

(o)     "Code" means the Internal Revenue Code of 1986, as amended.

(p)     "Collections Shortfall" has the meaning set forth in Section 1.5(f) hereof.

(q)     "Company" and "Companies" have the meanings set forth in Recital B hereto.

(r)     "Company Financial Information" has the meaning set forth in Section 2.8 hereof.

(s)     "Dr. Carr" has the meaning set forth in the introductory paragraph of this Agreement.

(t)     "Earnings Before Overhead" means the amount determined as such in the manner described in Schedule B hereto.

(u)     "ED Staffing Subcontracts" means (i) the Emergency Department Staffing Subcontract by and between PCS and Methodist Emergency Physicians, PLLC, dated October 1, 2008 and amended on January 1, 2015 and (ii) the Emergency Department Staffing Subcontract by and between PCS and Washington Group PLLC, dated February 2, 2013 and amended on January 23, 2015.

(v)     "ERISA" has the meaning set forth in Section 2.19(b) hereof.

(w)     "ERISA Affiliate" has the meaning set forth in Section 2.19(b) hereof.

(x)     "Excess Payables" has the meaning set forth in Section 1.5(f) hereof.

(y)     "Existing Operating Agreements" has the meaning set forth in Section 1.3(a) hereof.

(z)     "Fringe Benefit" has the meaning set forth in Section 2.19(a) hereof.

(aa)    "Governmental Authority" means any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any private or public court or tribunal over a Party hereto or its business operations, as applicable.

(bb)    "Health Care Law(s)" means (i) all laws and regulations applicable to Medicare and applicable State Medicaid Programs, (ii) the Federal Anti-kickback Statute, (iii) the Federal Stark Law, (iv) the Civil False Claims Act (31 U.S.C. § 3729 et seq.), (v) the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), (vi) the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), (vii) the Medicare and Medicaid Patient and Program Protection Act of 1987 (42 U.S.C. § 1320a-7b), (viii) HIPAA, (ix) the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. § 3801 et seq.), (x) TRICARE laws, (10 U.S.C. § 1071 et seq.), (xi) any comparable self-referral, false claims or fraud and abuse laws, directives and regulations promulgated by any state agency, (xii) any regulations thereunder promulgated by the U.S. Department of Health

and Human Services or any applicable state agency relating to the foregoing, (xiii) any other federal or state law or regulation of general applicability to health care fraud and kickback/fee-splitting prohibitions governing or regulating the delivery of health care services and management of health care providers, or regulating medical billing or reimbursement, including, but not limited to, all applicable Medicare and Medicaid statutes and regulations, and (xiv) the regulations promulgated pursuant to such laws, and to the extent applicable to any Company.

(cc)   "HIPAA" means the Administrative Simplification provisions of the U.S. Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. § 17921 et seq.), and the regulations promulgated thereunder and any state or local counterpart thereof or other law or regulation the purpose of which is to protect the privacy of individually identifiable or prescriber-identifiable information.

(dd)   "Hospital" and "Hospitals" has the meaning set forth in Recital A hereto.

(ee)   "Indemnified Party" has the meaning set forth in Section 7.4(a) hereof.

(ff)   "Indemnifying Party" has the meaning set forth in Section 7.4 hereof.

(gg)   "Initial Payment" has the meaning set forth in Section 1.4(b)(i) hereof.

(hh)   "Knowledge of Dr. Carr" means the knowledge of Dr. Carr or Candice Carr. Either Dr. Carr or Candice Carr shall be deemed to have knowledge of a particular fact or matter if they are actually aware of that fact or matter, or if they would be reasonably expected to discover or otherwise become aware of such fact or matter in the course of diligently performing their duties for the Companies.

(ii)   "Legal Actions" has the meaning set forth in Section 2.10(a) hereof.

(jj)   "Licenses" has the meaning set forth in Section 2.15 hereof.

(kk)   "LLC Act" means the Tennessee Revised Limited Liability Company Act (Tenn. Code Ann. § 48-249-101 et seq.).

(ll)   "Losses" has the meaning set forth in Section 7.2 hereof.

(mm)   "Material Adverse Effect" means any effect or change that would be materially adverse to the Companies and their business as currently conducted taken as a whole, provided that any adverse change, event, development, or effect arising from or relating to (a) general business or economic conditions, including general changes or developments in emergency medicine, unless such conditions have a substantially disproportionate impact on the Companies, (b) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel

(bbb)   "PSA" has the meaning set forth in Recital A hereto.

(ccc)   "Purchase Price" has the meaning set forth in Section 1.1 hereof.

(ddd)   "Purchase Price Review Period" has the meaning set forth in Section 1.4(d) hereof.

(eee)   "Purchase Price Schedule" has the meaning set forth in Section 1.4(d) hereof.

(fff)   "Purchased Interests" has the meaning set forth in Section 1.1 hereof.

(ggg)   "Purchased Shares" has the meaning set forth in Section 1.1 hereof.

(hhh)   "Purchased Interests and Shares" has the meaning set forth in Section 1.1 hereof.

(iii)   "Referral Source" has the meaning set forth in Section 2.16(h) hereof.

(jjj)   "Second Payment" has the meaning set forth in Section 1.4(b)(ii) hereof.

(kkk)   "Sound Nominee" has the meaning set forth in the introductory paragraph of this Agreement.

(lll)   "Sound Physicians" has the meaning set forth in the introductory paragraph of this Agreement.

(mmm) "Sound Physicians Indemnified Party" has the meaning set forth in Section 7.2 hereof.

(nnn)   "Straddle Period Tax Return" has the meaning set forth in Section 4.4(b) hereof.

(ooo)   "Transaction Expenses" means the fees, costs and expenses of any nature incurred by a Party in connection with, or arising out of, the transactions described in this Agreement or the planning, structuring, negotiation or consummation thereof, including, but not limited to, fees, commissions, and other forms or remuneration and payments made by or on behalf of such Party to investment bankers, financial advisors, attorneys, accountants, actuaries, consultants, experts or other professionals.

8.2.   Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt.  All communications shall be sent to the respective Party at the address set forth below, or to such e-mail address, facsimile

number or address as subsequently modified by written notice given in accordance with this Section 8.2:

| | |
|---|---|
| If to Dr. Carr | 587 South Belvedere Boulevard<br>Memphis, Tennessee 38104<br>Attention: T. M. Carr, M.D.<br>Fax: (901) 272-7439<br>E-mail: tcarr@bellsouth.net |
| With a copy to: | Moore & Van Allen PLLC<br>100 North Tryon St., Suite 4700<br>Charlotte, NC 28202-4003<br>Attention: Hal Levinson<br>Fax: (704) 378-2050<br>E-mail: hallevinson@mvalaw.com |
| If to Sound Physicians:<br>or Sound Nominee | Sound Inpatient Physicians, Inc.<br>1498 Pacific Avenue, Suite 400<br>Tacoma, WA 98402<br>Attention: General Counsel<br>Fax: (253) 682-6128<br>E-mail: smccarty@soundphysicians.com |
| With a copy to: | Kutak Rock LLP<br>1650 Farnam Street<br>Omaha, NE 68102<br>Attention: Robert L. Cohen<br>Fax: (402) 346-1148<br>E-mail: robert.cohen@kutakrock.com |

8.3.    _Entire Agreement_.   This Agreement (including the Exhibits, Schedules and Disclosure Schedules referenced herein) constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties (including, without limitation, that certain Letter of Intent, dated September 23, 2015) is expressly superseded hereby.

8.4.    _Parties in Interest_.   This Agreement shall be binding upon and inure solely to the benefit of each Party hereto (including, for this purpose, the Sound Physicians Indemnified Parties and the Carr Indemnified Parties, the Persons identified in Section 4.6 hereof, and any successors and permitted assigns of the Parties), and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

8.5.    _Governing Law_.   This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, without regard to its principles of conflicts of laws.

8.6.    <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY.  THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE, INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE UNITED STATES OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS.  EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY.

8.7.    <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent otherwise provided or as the context otherwise requires (a) when a reference is made to any Section, subsection or Disclosure Schedule, such reference is to the corresponding Section or subsection of, or Disclosure Schedule to, this Agreement unless otherwise indicated; (b) the Section headings are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement; (c) whenever the word "include," "includes" or "including" is used in this Agreement, it is deemed to be followed by the words "without limitation"; (d) the words "hereof," "herein" and "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the definitions are applicable to the singular as well as the plural forms of such terms; (f) any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws; (g) the use of "or" is not intended to be exclusive unless expressly indicated otherwise; and (h) the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.   The Parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

8.8.    <u>Amendments and Waivers</u>.   Any term of this Agreement may be amended, terminated or waived only with the written consent of both Parties hereto.

8.9.    <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

8.10.   <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such nonbreaching or nondefaulting Party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and signed by the Party making such waiver and shall be effective only to the extent specifically set forth in such writing.

8.11.   <u>Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   This Agreement may also be executed and delivered by facsimile or PDF signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[ End of Agreement.  Signature page follows ]*

Each Party has caused this LLC Interest and Stock Purchase Agreement to be duly executed on its behalf as of the date first written above.

SOUND INPATIENT PHYSICIANS, INC.

By _____

Robert A. Bessler, M.D., Chief Executive Officer

SOUND NOMINEE

_____

Robert A. Bessler, M.D.

T. M. CARR, M.D.

_____

T. M. Carr, M.D.

Each Party has caused this LLC Interest and Stock Purchase Agreement to be duly executed on its behalf as of the date first written above.

SOUND INPATIENT PHYSICIANS, INC.

By _____
    Robert A. Bessler, M.D., Chief Executive Officer

SOUND NOMINEE

_____
    Robert A. Bessler, M.D.

T. M. CARR, M.D.

_____
    T. M. Carr, M.D.