**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| SOUND INPATIENT PHYSICIANS, INC. AND ROBERT A. BESSLER, M.D., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 2:19-cv-02034-TLP-dkv |
| v. | ) ) | **HEARING REQUESTED** |
| T.M. CARR, M.D., | ) ) | |
| Defendant | ) ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**PARTIAL MOTION TO DISMISS PURSUANT TO RULE 12(B)**

Defendant T.M. Carr, M.D. ("Dr. Carr") submits the following memorandum of law in support of its motion to dismiss the First and Second Causes of Action of Plaintiffs Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. ("Plaintiffs") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.

## I. INTRODUCTION

Plaintiffs' claims in this matter are rooted in their willful disregard for the plain, unambiguous language of the relevant provisions of the parties' March 2016 Purchase Agreement. They ignore the binding arbitration provision at Section 1.4(d) of the Agreement in asking this Court, instead of a Neutral Accountant, to resolve Dr. Carr's objection to Plaintiffs' calculation of the Purchase Price. And they ignore the Agreement's explicit distinction between independent, subcontracting physicians and employees in asking this Court to find Dr. Carr failed to disclose such physician subcontracts on Disclosure Schedules that pertained **only** to employees.

Clear agreements and the law interpreting such agreements do not tolerate Plaintiffs' strategic ignorance, and, respectfully, the Court should dismiss Plaintiffs' First and Second Causes

of Action pursuant to Federal Rule of Civil Procedure 12(b). First, because Plaintiffs cannot meet their burden of proof that this Court has subject matter jurisdiction over their Declaratory Judgment Claim, the Court should dismiss Plaintiffs' First Cause of Action under Rule 12(b)(1), compelling arbitration of that claim and staying other claims not dismissed until arbitration concludes. Second, because Plaintiffs failed to allege a set of facts that would establish their right to relief with respect to their Breach of Representation and Warranty Claim for employment termination losses, the Court should dismiss Plaintiffs' Second Cause of Action under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

## II.  FACTUAL BACKGROUND

### A.    The Purchase Agreement

In March 2016, Plaintiffs and Dr. Carr entered into an LLC Interest and Stock Purchase Agreement ("Agreement") through which Plaintiffs purchased Dr. Carr's membership interests in two Tennessee professional limited liability companies and all of the issued and outstanding stock of a Tennessee professional corporation (collectively, the "Companies").[1] (Compl., ¶ 8; Carr Decl., ¶ 2 (Ex. 1: Agreement ("PA")[2]). Relevant to this motion, the Agreement set forth the process for determining the Purchase Price and for resolving Dr. Carr's specific objections to Plaintiffs' calculation of the Purchase Price, if any were unresolved. (PA, § 1.4(a), (b), (d)). The Agreement also contained the relevant representations and warranties Dr. Carr and Plaintiffs made in connection with the transaction. (PA, § 2).

---

[1] In support of their Complaint, Plaintiffs attached the Agreement as Exhibit A thereto. Because Plaintiffs failed to attach the Disclosure Schedules to the Agreement, which the parties incorporated by reference into the Agreement and are relevant to Plaintiffs claims, Dr. Carr attaches the Agreement, along with relevant Disclosure Schedules 2.12, 2.18(a), and 2.18(b), to the instant motion. (Carr Decl., ¶ 2).

[2] The Declaration of T.M. Carr, M.D. and Mark A. Nebrig, which support Defendant's Partial Motion to Dismiss Plaintiffs' First Cause of Action only, are filed contemporaneously herewith.

**B.      Calculation of the Purchase Price Under the Agreement**

Plaintiffs' First Cause of Action for Declaratory Judgment seeks a judgment from this Court as to the amount of the Purchase Price. (Compl., ¶ 41). Such a request ignores the plain terms of the Agreement that a Neutral Accountant must decide this dispute; thus, this claim falls outside the jurisdiction of this Court and, respectfully, should be dismissed under Rule 12(b)(1).

The Agreement defined "Purchase Price" as the "total purchase price calculated and payable to Dr. Carr in accordance with Section 1.4." (PA, § 1.1). Section 1.4, <u>Payment of the Purchase Price</u>, set forth both the method of the purchase price calculation and the manner of its payment:

> (a) The Purchase Price will be equal to (i) a multiple determined in the manner described in <u>Schedule B</u> hereto times (ii) the Companies'[3] consolidated "Earnings Before Overhead" generated during the twelve (12) month period ending March 31, 2018 (the "Calculation Period");….

(PA, § 1.4(a)). It further required Plaintiffs to pay the Purchase Price in two installments – an initial payment on the closing date of the transaction and a then second payment "within five business days of the final determination of the amount of the Purchase Price in the manner described in Section 1.4(d) hereof." (PA, § 1.4(b)(i)-(ii)). The second payment would represent the excess between the final determination of the Purchase Price and the amount of the initial payment. (PA, § 1.4(b)(i)). If the final determination of the Purchase Price did not exceed Plaintiffs' initial payment to Dr. Carr, they would not owe Dr. Carr a second payment. (Compl., ¶ 12).

---

[3] In the Agreement, the term "Companies" included Professional Coverage Services, PLLC, Carr, PLLC, and T.M. Carr, M.D. P.C., each individually a "Company." (PA, Recitals).

**C.**     <u>Delivery of and Objection to the Purchase Price Under the Agreement</u>

Under Section 1.4(d), Plaintiffs were required to prepare and deliver to Dr. Carr their determination of the amount of the Purchase Price (the "Purchase Price Schedule") within 30 days of the end of the calculation period (or by approximately April 30, 2018), "setting forth all components (and the amounts thereof) necessary to compute the Purchase Price." (PA, § 1.4(d)). Plaintiffs were to determine the purchase price "in good faith on a basis consistent with Schedule B [there]to." (*Id.*) Nothing within the plain language of Section 1.4(d) permitted Plaintiffs to present subsequent revised or alternative calculations to Dr. Carr at a later date. Nor did Section 1.4(d) require Dr. Carr to consider, evaluate, or even respond to any such subsequent, after-the-fact calculation.

Once a timely Purchase Price Schedule was delivered to Dr. Carr, Section 1.4(d) afforded Dr. Carr the right to review the Schedule, examine its underlying calculations and materials, and "object to any amount or computation" in the Purchase Price Schedule by providing Plaintiffs with such objections in writing before the expiration of the review period. (*Id.*). In the event Dr. Carr objected to aspects of Plaintiff's final calculation of the Purchase Price, Section 1.4(d) established the process to address the specific matters to which Dr. Carr objected:

> If Dr. Carr timely objects to any item or computation appearing in the Purchase Price Schedule prior to the expiration of the Purchase Price Review Period, Dr. Carr and Sound Physicians shall, during the thirty (30) day period following the delivery of Dr. Carr's objection, attempt in good faith jointly to resolve **the matters on the Purchase Price Schedule to which Dr. Carr objected**.

(emphasis added). If the parties could not resolve any of Dr. Carr's objections in good faith, Section 1.4(d) further detailed the process for binding resolution of those objections through engagement of a Neutral Accountant:

In the event Dr. Carr and Sound Physicians cannot resolve all of such matters by the end of such thirty (30) day period, either Dr. Carr or Sound Physicians may immediately engage the Neutral Accountant to resolve any items that remain in dispute. Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing, and **the parties shall require the Neutral Accountant**, within thirty (30) days thereafter, acting as an expert and not an arbitrator, **to resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound Physicians with respect to the determination of the Purchase Price**. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant. All fees and expenses of the Neutral Accountant in connection with any dispute under this Section 1.4(d) shall be paid fifty percent (50%) by Sound Physicians and fifty percent (50%) by Dr. Carr. The Purchase Price finally determined pursuant to this Section 1.4(d) **shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to the Agreement**.

(PA, § 1.4(d) (emphasis added)).

## D.      Dr. Carr's Objection to Plaintiffs' Purchase Price Calculation

Plaintiffs delivered their only timely Purchase Price Schedule to Dr. Carr on or about April 27, 2018. (Compl., ¶ 14). This Purchase Price Schedule was the only Purchase Price Schedule submitted by Plaintiffs within the established timeframe and the only Purchase Price Schedule called for in the Agreement. (Nebrig Decl., ¶ 3). Plaintiffs calculated a Purchase Price lower than the initial payment Plaintiffs made to Dr. Carr, which would result in no second payment to Dr. Carr. Following several months of communications, through which Dr. Carr requested and Plaintiffs provided certain information underlying their calculation, Dr. Carr provided his formal objections to Plaintiffs' Purchase Price Schedule on September 27, 2018. (Compl., ¶ 15-16; Carr Decl., ¶ 3). These objections set the "matters objected to by Dr. Carr" that required good faith discussions and, if unsuccessful, submission to the Neutral Accountant. (PA, § 1.4(d)).

The discussions between the parties during the subsequent weeks resulted in a narrowing of Dr. Carr's objections, and on November 14, 2018, Dr. Carr notified Plaintiffs that one objection to Plaintiffs' sole Purchase Price calculation remained unresolved: the appropriateness of Plaintiffs' inclusion in its Purchase Price Schedule of bad debt expenses from a prior period. (Nebrig Decl., ¶ 4). Given the unresolved objection, and in accordance with the terms of the Agreement, Dr. Carr requested a conference with Plaintiffs so the parties could proceed with engaging Ernst & Young ("E&Y") as a Neutral Accountant for resolution of this sole outstanding issue. (*Id.*; Compl., ¶ 19).

Rather than facilitate the engagement of a Neutral Accountant, Plaintiffs continued to debate the merits of Dr. Carr's remaining objection. (Nebrig Decl., ¶ 5). Plaintiffs also attempted to submit alternative, untimely, calculations of the Purchase Price that Dr. Carr neither requested nor agreed to consider and that were neither expressly nor implicitly permitted under Section 1.4(d). (Compl., ¶ 17; Nebrig Decl., ¶¶ 3, 5). These efforts aside, Plaintiffs, through December 6, 2018 correspondence to Dr. Carr, demonstrated their acknowledgment and agreement to submit Dr. Carr's sole objection to their Purchase Price calculation to the Neutral Accountant:

> Sound is prepared to engage Ernst & Young to act as the Neutral Accountant pursuant to Section 1.4(d) of the Purchase Agreement for the purpose of determining whether Sound properly included a bad debt reserve of $1,844,541.94 in connection with its estimation of the Companies' Net Revenue during the Calculation Period.

However, notwithstanding Plaintiffs' explicit acknowledgment that submission of Dr. Carr's remaining objection to a Neutral Accountant was the agreed-upon process for resolving that objection under the terms of the Agreement, they simultaneously sought – in the very same correspondence – to hijack the scope of Dr. Carr's objection and inappropriately expand the inquiry of the Neutral Accountant:

> Because this is the context in which this dollar amount was recorded by Sound, we want to be clear that the question as presented to Ernst & Young will focus on whether the Companies' Net Revenues during the Calculation Period were properly determined by Sound pursuant to GAAP and the terms of the Purchase agreement for purposes of calculating Earnings Before Overhead.

(Nebrig Decl., ¶ 6-7). Nothing within Section 1.4(d) of the Agreement permitted Plaintiffs to dictate, redefine or expand the nature and scope of Dr. Carr's objection to the Purchase Price Schedule; rather, the objection was Dr. Carr's to articulate.

In response, on December 14, 2018, Dr. Carr, through his counsel, rejected Plaintiff's efforts to redefine his objection for the Neutral Accountant, reiterated the only objection that remained in dispute ("Was it appropriate for Sound to include in its calculation of the Purchase Price Schedule bad debt expenses from a prior period?"), and pressed once again for a prompt engagement of E&Y as the Neutral Accountant. (Nebrig Decl., ¶ 8).

The holidays passed in silence. On January 2, 2019, upon another prompting by Dr. Carr's counsel, Plaintiffs' counsel apologized for the delay and again signaled Sound's agreement to approach E&Y for engagement, but inexplicably suggested that the parties should first be "fully in agreement" as to the "description of the issue that is being submitted for resolution." A week later, Sound and its counsel's delay and obfuscation were laid bare – instead of adhering to the terms and process of the Agreement, Plaintiffs side-stepped their obligations to submit the matter to the Neutral Accountant and filed the instant matter on January 10, 2019. (Nebrig Decl., ¶ 9-10).

**E.     Relevant Representations and Warranties of Dr. Carr Under the Agreement**

Plaintiffs' Second Cause of Action for Breach of Representation and Warranty, which is unrelated to the Purchase Price Calculation, seeks indemnification for "employment termination losses" purportedly incurred upon the termination of legacy contracts with physicians. (Compl.,

¶ 28-30, 42-46).[4] The plain terms of the Agreement warrant dismissal of this claim under Rule 12(b)(6).

## 1.   Material Contracts

In Section 2.12 of the Agreement, <u>Material Contracts</u>, Dr. Carr represented and warranted that Disclosure Schedule 2.12 was a true and complete list of specific categories of contracts, agreements or similar documents to which the Companies were a party. Disclosure Schedule 2.12(viii) reflected at least 43 contracts with various physicians. Crucial to the analysis, the Disclosure Schedule specifically enumerated which physician agreements were Employment Agreements and which physician agreements were Subcontractor Agreements. (PA, Disclosure Schedule ("Discl. Sch.") 2.12(viii), p. 14-18). Disclosure Schedule 2.12(ix) separately identified at least 20 employment or other agreements with employees or independent contractors. (PA, Discl. Sch. 2.12(ix), p. 18-20). Thus, the Agreement and its supporting Disclosure Schedules specifically contemplate and describe a distinction between independent subcontracting physicians and "employees," and the Companies' respective contractual obligations thereto.

## 2.   Employee and Labor Matters

The specific provisions of the Agreement relied upon by Plaintiffs reveal the deficiency of the employment termination losses claim. At Section 2.18(a) of the Agreement, Dr. Carr represented and warranted that Disclosure Schedule 2.18(a) set forth certain information "for each individual who is either an employee of a Company or who is providing ongoing services to a Company as an independent contractor." (PA, § 2.18(a)). And Disclosure Schedule 2.18(a), by designation of "EE" or "IC," indeed identified the distinction between employees and independent

---

[4] Plaintiffs' Third Cause of Action for Breach of Representation and Warranty relating to medical scribe losses is not a subject of the instant motion.

contractors of the Companies. To avoid any ambiguity as to whether an independent subcontracting physician was an employee, the Schedule specifically identified such physicians as independent contractors. Following in Section 2.18(b), Dr. Carr further represented:

> Except as set forth on Disclosure Schedule 2.18(b), (i) the **employment** of each **employee** of any Company is terminable at the will of the employing Company, and, upon termination of the **employment** of any such **employee**, no severance or other payments will become due to such **employee** and (ii) no Company has a policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of **employees'** services.

(PA, § 2.18(b) (emphasis added)). Disclosure Schedule 2.18(b), by reflecting "none," represented that all **employees** of the Companies were terminable at will and would not be owed severance or other payments upon termination. (PA, Discl. Sch. 2.18(a) and (b)). Because both Section 2.18(b) and Disclosure Schedule 2.18(b) explicitly pertained only to employees, not to subcontracting physicians or other independent contractors, Disclosure Schedule 2.18(b) did not require, and accurately did not identify, any subcontracting physicians or other independent contractors. To argue otherwise would disregard the distinctions and specific language set forth in the Agreement and corresponding Disclosure Schedules.

## III. ARGUMENT

**A.     Plaintiffs' Declaratory Judgment Cause of Action Is Subject To Arbitration, And Any Claims not Dismissed Should be Stayed.**

In seeking its declaratory judgment, Plaintiffs ask the Court to ignore the plain terms of the Agreement and insert itself beyond its jurisdiction into matters the parties agreed should be decided by a Neutral Accountant. Specifically, Plaintiffs seek a declaratory judgment that (1) the dispute between the parties arises from the construction of the Agreement; (2) a Neutral Accountant's engagement to resolve that dispute would invade the province of this Court; (3) the Purchase Price

calculated under the Agreement is $12,919,376; and (4) the Second Payment under the Agreement is $0. None of these requests are appropriate, unless the Court rewrites the Agreement.

The parties' actual matter in dispute – Dr. Carr's sole remaining objection to Plaintiffs' timely-submitted Purchase Price calculation – arises directly from Section 1.4(d) of the Agreement and the process set forth therein, not from the "construction of the Agreement" generally. The process in Section 1.4(d) is unambiguous, and at this stage, the remaining dispute related to the Purchase Price calculation falls squarely within the purview and binding decision of the agreed-upon Neutral Accountant. As such, the Court lacks subject matter jurisdiction to resolve that dispute or render a final determination as to the Purchase Price. For the reasons set forth herein, the Court should compel arbitration of Dr. Carr's objection and dismiss Plaintiffs' Declaratory Judgment Claim, staying any remaining claims not dismissed until arbitration concludes. *Winn v. Tenet Healthcare Corp.*, No. 2:10-cv-02140, 2011 U.S. Dist. LEXIS 8085, at *34 (W.D. Tenn. Jan. 27, 2011) (dismissing claims subject to arbitration because retaining arbitrable claims would serve no purpose); *Regions Bank v. Chanda*, No. 11-2296, 2011 U.S. Dist. LEXIS 105389, at *32-33 (W.D. Tenn. Sept. 16, 2011) (staying remaining claims pending the outcome of arbitration).

### 1.      Legal Standard

Plaintiffs' Declaratory Judgment Claim is properly dismissed under Rule 12(b)(1), as Plaintiffs cannot establish subject matter jurisdiction. "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1),…the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Patton v. Volkswagen Grp. Of Am. Chattanooga Operations, LLC,* No. 1:16-CV-327, 2017 U.S. Dist. LEXIS 52738, at *7-8 (E.D. Tenn. Apr. 6, 2017) (citing *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996)). Where a motion to dismiss constitutes a factual attack to the existence of subject matter jurisdiction, as here, a court "has wide

discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir. 1990)); *Uttilla v. City of Memphis*, No. 98-2729, 1999 U.S. Dist. LEXIS 4753, at *4-5 (W.D. Tenn. Apr. 6, 1999). A plaintiff's allegations receive no presumption of truthfulness, and a court can weigh evidence in order to determine its power to hear the case. *Id.* (holding defendant's motion to compel arbitration under Rule 12(b)(1) was a factual attack on the pleadings and that plaintiff's allegations were not presumptively truthful).

The Sixth Circuit has identified the factors a court should consider when addressing a 12(b)(1) motion to compel arbitration: (1) whether the parties agreed to arbitrate; (2) the scope of the agreement; and (3) whether to stay the remainder of the proceeding pending arbitration. *Ward v. Dillard's*, No. 2:15-cv-02499, 2016 U.S. Dist. LEXIS 55347, at *6-7 (W.D. Tenn. Mar. 23, 2016) (citing *Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005)).[5] The court must compel arbitration "if it is satisfied that the agreement to arbitrate is not 'in issue.'" *Winn*, 2011 U.S. Dist. LEXIS 8085, at *5; *see also Glazer*, 394 F.3d at 451 ("It is well-established that any doubts regarding arbitrability should be resolved in favor of arbitration.")

An analysis of each of the above factors supports granting the motion and compelling the parties to submit Dr. Carr's objection to the Neutral Accountant for a binding decision.

### 2.     The Parties Agreed to Arbitrate Dr. Carr's Objection to the Purchase Price.

The Court must first determine whether a valid and enforceable agreement to arbitrate exists. *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 665-66 (6th Cir. 2003); *Third Nat'l*

---

[5] The Sixth Circuit identified an additional element – whether Congress intended federal statutory claims, if any, to be arbitrable – that is inapplicable here.

*Bank v. Wedge Group, Inc.*, 749 F. Supp. 851, 853 (M.D. Tenn. 1990). The Federal Arbitration

Act provides, in relevant part:

> A written provision in…a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction,…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 692 (6th Cir. 2012) (citing 9 U.S.C.

§ 2)). The term "arbitration" is not required by any means; rather, "[f]ederal courts have enforced

agreements under the FAA when something other than 'arbitration' is required, so long as the

parties have agreed to submit their disputes to an independent third party for final resolution."

*Urology Assocs., P.C. v. CIGNA Healthcare of Tenn., Inc.*, No. M2001-02252-COA-R3-CV, 2002

Tenn. App. LEXIS 726, at *23-24 (Tenn. Ct. App. Oct. 11, 2002) (citations omitted).

The Neutral Accountant provision applicable here qualifies as an agreement to "arbitrate."

To begin, the Sixth Circuit has held that federal law, rather than state law, applies in determining

whether an "appraisal" provision comparable to Section 1.4(d) constitutes "arbitration" as

contemplated by the FAA. *Evanston Ins. Co.*, 683 F.3d at 693 ("We agree with the First and Tenth

Circuits that federal law should control the definition [of arbitration], basically because '[i]t seems

counter-intuitive to look to state law to define a term in a federal statute on a subject as to which

Congress has declared the need for national uniformity."); *see also Salt Lake Tribune Publ. Co.,*

*LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684, 688 (10th Cir. 2004) ("In the absence of clear evidence

that Congress intended state law to define 'arbitration,' we must assume that federal law provides

the definition.").

Under the FAA, a provision constitutes an agreement to arbitrate, even if not clearly labeled

"arbitration," if it includes the following: an independent adjudicator, substantive standards, an

opportunity for both sides to present their positions, and finality. *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015) ("The First Circuit has persuasively held that the following elements…amounted to 'arbitration in everything but name:' finality, 'an independent adjudicator, substantive standards (the contractual terms…), and an opportunity for each side to present its case.'") (citing *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004)); *Salt Lake Tribune*, 390 F.3d at 689 ("Central to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute.")

In their Complaint, Plaintiffs do not allege that Section 1.4(d) is not a valid agreement to arbitrate.[6] They would be wrong to do so, as the process set forth in Section 1.4(d) satisfies all elements necessary for arbitration. First, the process identifies an independent adjudicator, the Neutral Accountant. Second, the process includes substantive standards by which the Neutral Accountant will make its determination – namely, the accounting standards and methods for calculating the Purchase Price set forth in Section 1.4 of the Agreement. Third, it provides both parties with an opportunity to present their positions: "[e]ach of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing." Finally, the process includes finality: "[t]he Purchase Price finally determined pursuant to this Section 1.4(d) shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to this Agreement." Thus, Section 1.4(d) is a valid agreement to arbitrate.

---

[6] Plaintiffs' claim appears premised on whether Dr. Carr's objection falls within the scope of the process outlined in Section 1.4(d) rather than on whether Section 1.4(d) establishes an arbitration process. (*See* Compl, ¶ 18-22). Plaintiffs concede that the Purchase Agreement is a "binding and enforceable legal contract" and that, under Section 1.4(d), disputes regarding the Purchase Price would be submitted to and decided by a Neutral Accountant. (Compl., ¶ 18, 38).

### 3. The Dispute Falls Within the Scope of the Arbitration Agreement.

If a valid arbitration agreement exists, the Court must determine whether the agreement covers the dispute in question. *Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 160 (6th Cir. 1983). "When an arbitration clause is not broadly worded, and does not cover *all* disputes arising out of the agreement, only those claims that fall within the scope of the clause can be subject to mandatory arbitration." *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, 383 Fed. App'x 517, 520 (6th Cir. 2010) (emphasis in original). To determine whether a dispute falls within the scope of an arbitration clause, a court looks at the plain language of the agreement. *Id.* at 521 (citing *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006)). Any doubts regarding the scope of an arbitration provision should be resolved in favor of arbitration. *Pureworks, Inc. v. Unique Software Solutions, Inc.*, 554 Fed. App'x 376, 378 (6th Cir. 2014).

Dr. Carr does not and has never argued that Section 1.4(d) gives a Neutral Accountant "plenary" power to resolve any disputes arising under the Agreement. (*See* Compl., ¶ 24). However, Section 1.4(d) unambiguously sets forth the scope of issues to be resolved by the Neutral Accountant: namely Dr. Carr's unresolved objections to the Plaintiffs' Purchase Price calculation. All prerequisites to the engagement of the Neutral Accountant were satisfied: (1) Plaintiffs delivered a timely and Purchase Price Schedule on April 27, 2018; (2) Dr. Carr identified objections to the Purchase Price Schedule; (3) Dr. Carr communicated those objections to Plaintiffs in writing on September 27, 2018; and (4) the parties attempted to resolve those objections in good faith. If any lingering objection of Dr. Carr's existed following the completion of those requirements (and one did), Section 1.4(d) provided that Dr. Carr's remaining objection be fully and finally decided by a Neutral Accountant – not this Court. (*See* Sections II.C, D, *supra*).

In the months preceding the filing of Plaintiffs' Complaint, the parties corresponded at length regarding Dr. Carr's remaining objection to the Purchase Price Calculation, with full acknowledgment that what could not be resolved would go the Neutral Accountant. (*See* Section II.D, *supra*). While that correspondence makes clear that Plaintiffs disagreed with both the merits and the scope of Dr. Carr's objection, such disagreement was of no consequence, as Section 1.4(d) contains **no** requirement that Plaintiffs agree with Dr. Carr's articulation of his objection prior to its submission to a Neutral Accountant. Plaintiffs' belief that Dr. Carr's objection was "wrong" did not entitle Plaintiffs to unilaterally deprive Dr. Carr of an arbitration process upon which the parties agreed. (Compl., ¶ 19-22). Otherwise, the Neutral Accountant procedure in Section 1.4(d) would be rendered useless.

Plaintiffs' Complaint purports to identify a "fundamental legal dispute as to the proper construction of the Agreement." (Compl., ¶ 25). This is a fiction. No dispute as to Agreement construction actually exists, and Plaintiffs' failure to clearly articulate the nature of this alleged dispute anywhere in their Complaint reveals the fallacy of their position. It appears that Plaintiffs are, in retrospect, displeased with the language of Section 1.4(d) to the extent it offers them insufficient control over the scope of any objection ultimately presented to a Neutral Accountant. Plaintiffs first tried to avoid the Agreement and the eyes of a professional accountant by, after submitting their Purchase Price Schedule, concocting new calculations not permitted under the plain language of Section 1.4(d), but Dr. Carr stayed true to the process and the plain terms of the Agreement by maintaining his objections to the Purchase Price Schedule delivered by Plaintiffs on April 27, 2018. (*See* Section II.D, *supra*; Nebrig Decl., ¶ 3-4). Unable to manipulate a change in the Agreement, Plaintiffs now look to avoid the Neutral Accountant by manufacturing a dispute as to Agreement construction so this Court, not the agreed-upon Neutral Accountant, will resolve

Dr. Carr's objection. Plaintiffs' avoidance strategy unfolds in their request that the Court determine the Purchase Price and the amount of the second payment, which necessarily requires the Court, not the Neutral Accountant, to resolve Dr. Carr's remaining objection as to the inclusion of the prior year's bad debt expense.

The language of Section 1.4(d) is clear – objections articulated by Dr. Carr to the Purchase Price Schedule and unresolved by the parties were to be resolved by a Neutral Accountant upon engagement by either party – and the Court must enforce the Agreement according to its plain terms. *Power & Tel. Supply Co. v. Suntrust Banks, Inc.*, No. 03-2217 M1/V, 2005 U.S. Dist. LEXIS 49594, at *5 (W.D. Tenn. May 1, 2005). ("When the terms of a contract are unambiguous, '[i]t is the Court's duty to enforce contracts according to their plain terms.'") Plaintiffs' hindsight displeasure with the terms of the Agreement does not create a "fundamental legal dispute" for this Court to resolve. And their (apparently strategic) delay in cooperating with Dr. Carr's counsel to engage Ernst & Young, despite acknowledging their agreement to do so on multiple occasions, in writing, should not be countenanced.

The only actual dispute between the parties is Dr. Carr's objection to the Purchase Price Schedule, as acknowledged by the parties' pre-litigation conduct and specifically reflected in their correspondence. *Bailey v. Brister*, 49 Tenn. App. 191, 202 (Tenn. Ct. App. 1961) ("The practical interpretation of a contract by the parties thereto is entitled to great, if not controlling influence, and will be adopted by the courts.") Dr. Carr's objection – whether it was appropriate for Plaintiffs to include bad debt expenses from a prior period in their calculation of the Purchase Price Schedule – falls squarely within the scope of Section 1.4(d). Thus, under the uncontestable facts and applicable law of this Circuit, the Court should dismiss Plaintiffs' First Cause of Action and compel arbitration on that issue, staying any claims that are not otherwise dismissed.

**B.** **Plaintiffs Fail to State a Valid Claim for Breach of Representation and Warranty Relating to Employee Termination Losses.**

Plaintiffs allege they have incurred expenses relating to termination payments to physicians in connection with their decision to terminate these physicians' legacy agreements with the Companies. (Compl., ¶ 29-30). Plaintiffs further claim that Dr. Carr's failure to disclose these alleged physician termination payment obligations on Disclosure Schedule 2.18(b) somehow constitutes a violation of his representations and warranties, thereby entitling Plaintiffs to indemnification. (Compl., ¶ 28, 44-46). Once again, Plaintiffs simply ignore the plain language of the Agreement. Section 2.18(b) and Disclosure Schedule 2.18(b), by their express terms, relate only to **<u>employees</u>** – not to subcontracting physicians or other independent contractors. This bright distinction between employees on the one hand and subcontracting physicians or independent contractors on the other hand was known and readily apparent in the disclosures of the respective <u>Material Contracts</u> in Section 2.12 and the Agreement's corresponding Disclosure Schedules. Since the unambiguous language of the Agreement's relevant provisions contradicts Plaintiffs' revisionist allegations, the law dictates that Plaintiffs have failed to articulate a valid claim that Dr. Carr breached the representations and warranties in question; therefore, respectfully, the Court should dismiss Plaintiffs' claim pursuant to Federal Rule 12(b)(6).

**1.** **Legal Standard**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a plaintiff's claims for relief.[7] "To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain 'sufficient factual matter,

---

[7] In considering such a motion, a court may consider only matters properly part of the complaint or pleadings. *Uttilla*, 1999 U.S. Dist. LEXIS 4753, at *6. Dr. Carr's 12(b)(6) motion is based on the allegations in the Complaint, the Purchase Agreement, which Plaintiffs attached to their Complaint, and the relevant Disclosure Schedules to the Purchase Agreement, which the parties incorporated by reference into the Purchase Agreement, are referenced in the Complaint, and are otherwise central to Plaintiffs' claims. *Church Joint Venture v. Blasingame*, No. 12-2999, 2016

accepted as true, to state a claim that is plausible on its face.'" *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 782 (6th Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "However, 'when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'" *Id.* (citations omitted). Such is the case here.

### 2. Plaintiffs Fail to State a Claim with Respect to Employment Termination Losses because the Agreement Provisions in Question Do Not Pertain to Physicians.

It would be inappropriate to interpret the Agreement as Plaintiffs ask the Court to do. "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Power & Tel. Supply Co.* 2005 U.S. Dist. LEXIS 49594, at *5. Such intent is presumably expressed in the contract itself, and "[w]hen the contract terms are unambiguous, 'it is the Court's duty to enforce contracts according to their plain terms.'" *Id.* (citation omitted). As shown below, the terms of the Agreement are unambiguous and did not obligate Dr. Carr to disclose purported termination obligations to **independent subcontracting** physicians[8] on a disclosure schedule relating only to **employees**.

Preliminarily, it is critical to note the Agreement's distinction between independent contracting physicians and employees, because Plaintiffs' claim is rooted in their merging of those two terms into one. As discussed in Section II.E. *supra,* Dr. Carr represented and warranted that Disclosure Schedule 2.12 reflected the Companies' contracts and agreements and then **separately** identified Subcontractor Agreements with physicians, Employment Agreements with physicians,

---

U.S. Dist. LEXIS 189261, at *4 n.3 (W.D. Tenn. Jan. 13, 2016) (holding a court may consider matters outside the pleadings which are attached to or referenced in a complaint or which are otherwise central to the claims).

[8] Any termination obligation to a physician would have been readily apparent with even a cursory review by Plaintiffs of the specific physician contracts that were provided to Plaintiffs and listed on Disclosure Schedule 2.12(viii).

and other contracts with employees or independent contractors. Thus, the Agreement terms and construction established that independent subcontracting physicians were distinct from employees, as were their respective contracts.

That distinction is further crystallized in Section 2.18(b) of the Agreement and its corresponding Disclosure Schedule 2.18(b), on which Plaintiffs **solely** rely for their claim. Section 2.18(b) and Disclosure Schedule 2.18(b) unambiguously required representations and information relating to employees only, not independent contractors, echoing the distinction in terms from the Material Contracts referenced and disclosed in Section 2.12 and Disclosure Schedule 2.12. Indeed, Paragraph 28 of Plaintiffs' Complaint calls out this distinction and the sole application of the 2.18(b) representation and warranty to employees:

> Section 2.18(b) of the Agreement provides, "Except as set forth on Disclosure Schedule 2.18(b), (i) the **employment** of each **employee** of any Company is terminable at the will of the **employing** Company, and, upon termination of the **employment** of any such **employee**, no severance or other payments will become due to such **employee** and (iii) no Company has a policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of **employees'** services."

(Compl., ¶ 28 (emphasis added)). Because both Section 2.18(b) and Disclosure Schedule 2.18(b) relate only to employees and not independent contractors, on the face of the Agreement, not listing any independent subcontracting physicians on Schedule 2.18(b) was precisely in accordance with the Agreement's terms and Dr. Carr's obligations thereunder. At bottom, nothing in the Agreement relied upon by Plaintiffs actually supports a claim that Dr. Carr breached any representation or warranty. In reality, the Agreement contradicts Plaintiffs' allegations, thereby invalidating this claim under the law. Accordingly, the Court should dismiss Plaintiff's employment termination losses claim pursuant to Rule 12(b)(6).

## <u>CONCLUSION</u>

Parties must be held to the terms of their agreements. This unremarkable tenet of contract interpretation is at the heart of this motion and justifies the grant of relief requested by Dr. Carr. Thus, for the foregoing reasons, Dr. Carr respectfully asks this Court to enforce the plain terms of the Agreement and compel arbitration of Dr. Carr's objection to Plaintiffs' Purchase Price Calculation; dismiss the First Cause of Action under Rule 12(b)(1); and dismiss the Second Cause of Action under Rule 12(b)(6).

Respectfully submitted,

/s/ Emily C. Pera
Emily C. Pera (Tennessee Bar No. 023830)
Mark A. Nebrig (Admission *Pro Hac Vice* Pending)
***MOORE & VAN ALLEN PLLC***
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202-4003
Telephone: (704) 331-3787
Facsimile: (704) 339-5997
emilypera@mvalaw.com

***ATTORNEYS FOR DEFENDANT***

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that on March 12, 2019, the foregoing

**DEFENDANT'S MEMORANDUM IN SUPPORT OF PARTIAL MOTION TO DISMISS**

**PURSUANT TO RULE 12(B)** was filed electronically through the Court's CM/ECF system

and a true and correct copy was served to all counsel of record by electronic mail as

follows:

> Leland M. McNabb
> Pam W. Blair
> Courtney S. Vest
> McNabb, Bragorgos, Burgess & Sorin, PLLC
> 81 Monroe, Sixth Floor
> Memphis, Tennessee 38103
> lmcnabb@mbbslaw.com
> pblair@mbbslaw.com
> cvest@mbbslaw.com
>
> John P. Passarelli
> Carol A. Svolos
> The Omaha Building
> 1650 Farman Street
> Omaha, NE 68102-2186
> john.passarelli@kutakrock.com
> carol.svolos@kutakrock.com

This the 12th day of March, 2019.

> /s/ Emily C. Pera
> Emily C. Pera