IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SOUND INPATIENT PHYSICIANS, INC. AND ROBERT A. BESSLER, M.D., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 2:19-cv-02034-TLP-dkv |
| v. | ) ) ) | **HEARING REQUESTED** |
| T. M. CARR, M.D., | ) ) ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD

Plaintiffs Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. (collectively, "Sound" or "Plaintiffs"), hereby respond to the Motion to Confirm Arbitration Award, Doc 57 ("Motion"), filed by Defendant T. M. Carr, M.D. ("Defendant") (collectively with Plaintiffs, the "Parties").

**I.   SUMMARY OF THE RESPONSE**

This Court should deny Defendant's Motion for the simple reason that no arbitration award has been issued by any arbitrator. Sound respectfully submits that it has been compelled to arbitrate a $10 million contractual dispute that the Parties in their Agreement[1] never intended to be the subject of a binding arbitration proceeding, particularly as to factual issues not involving accounting. Sound, in particular, intended to waive neither its right to adjudicate this dispute before a court, guided by well-defined procedural and substantive statutory and legal principles, nor its right to all available appellate remedies in favor of a summary proceeding before an accountant. Particularly in light of new developments that have occurred since the

---

[1] LLC Interest and Stock Purchase Agreement dated March 16, 2016 among the Parties. *See* Doc 19-1, Exhibit A to Amended Complaint ("Am. Compl."), Doc 19.

Court issued its arbitration order, Sound respectfully requests that the Court review the language of the Agreement that expressly provides that the resolution of this dispute would not call for a binding arbitration. Sound bases its request in part on newly discovered documents, namely (1) defense counsel's submission to Mr. Wolf dated February 21, 2020, *see* Passarelli Decl. ¶ 3 (Ex. A, "Moore Letter"), and (2) Mr. Wolf's Opinion, *id.* ¶ 4 (Ex. B, "Wolf Opinion").

Alternatively, this Court should deny Defendant's Motion because Sound has not had an opportunity to refute new factual disputes and attacks upon its credibility impermissibly raised by Defendant in his letter submission to the Neutral Accountant. In addition, even if this Court finds a valid arbitration award, Defendant has provided no evidence to support the monetary award it seeks. Finally, the Motion must be denied because Sound did not agree to judicial enforcement of the Neutral Accountant's opinion.

Accordingly, this Court should allow the case to proceed to trial as to all three of Sound's claims, including the cause of action that is the subject of this memorandum.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

As the Amended Complaint describes, the Parties entered into an Agreement for the sale of three medical entities owned by Defendant. Am. Compl. ¶ 8. Under the Agreement, Sound would make an Initial Payment on the Purchase Price of $30,000,000 to Defendant. *Id.* ¶ 11. After a Calculation Period intended to ensure that the Purchase Price reflected the actual value of the Companies, if the Purchase Price were calculated to be less than the Initial Payment of $30,000,000, then Defendant would *keep the difference*. *Id.* ¶ 12. If the Purchase Price were found to be greater than the Initial Payment, a Second Payment would be due. *Id.*

On April 27, 2018, Sound provided Defendant an initial Purchase Price Schedule showing the Purchase Price as $26,605,885, resulting in a Second Payment of $0. *Id.* ¶ 14. The Agreement then allowed for a 30-day Purchase Price Review Period, during which Defendant

could identify any objections to the Purchase Price Schedule. *Id.* ¶ 15. Thereafter, the Parties engaged in extensive correspondence regarding disputes over the calculation of the Purchase Price but were unable to resolve such disputes. Because the Parties fundamentally disagreed as to the appropriate interpretation of the Agreement as to the calculation of the Purchase Price, Sound sought relief from this Court in the form of a declaratory judgment. *See* Am. Compl. Sound also brought two additional claims for breach of representation and warranty. *See id.*

Defendant moved to dismiss the declaratory judgment cause of action under Rule 12(b)(1) in favor of arbitration and moved to dismiss one of the breach claims under Rule 12(b)(6). *See* Doc 21. This Court granted the motion to compel arbitration, staying the claim, and denied the motion to dismiss. Doc 36 ("Order") at 19. The Court sent to arbitration "only those matters to which Dr. Carr objected and left unresolved by the parties," which had to do with the accounting treatment of bad debt expense. *Id.* at 2, 12. The Court endorsed the procedure outlined in Section 1.4(d) with regard to the Parties presenting their positions to a Neutral Accountant and then expecting a decision within 30 days thereafter, stating that this would allow the Parties to "present their argument" and finding that courts "uph[o]ld Arbitration clauses with similar time restrictions." *Id.* at 9.

A.   **Sound's Submission to Mr. Wolf Followed the Court's Order**

Following the Court's Order, Sound submitted a letter to Mr. Wolf explaining why Sound's bad debt expense entry was entirely appropriate Under Generally Accepted Accounting Principles ("GAAP"). *See* Passarelli Decl. ¶ 5 (Ex. C, "Kutak Letter"). Sound first advised Mr. Wolf that upon the Parties' agreement at oral argument before this Court, Mr. Wolf had the option to ask for more information if needed. *Id.* at 1-2. Mr. Wolf declined to do so.

Next, Sound provided a brief four-paragraph discussion, comprising less than one page, of the procedural history of the case. Sound could have gone into all the detail previously

3

supplied to this Court, *see* Doc 27 at 2-6, regarding Defendant's numerous demands for more information causing delay, threats to litigate, demand that Sound recalculate the Purchase Price, allegations of bullying and only "purported good faith," refusal to engage in an accountants' call, etc. This Sound did not do, because it followed this Court's Order stating that the only issue before Mr. Wolf was bad debt expense. Instead, Sound summarized Defendant's prior behavior to Mr. Wolf with the neutral statement that Defendant "[g]enerally follow[ed] the procedure outlined in the Purchase Agreement." Kutak Letter at 2.

From there, Sound went straight to the question at hand, explaining why "bad debt expense from prior periods must be included in calculating net revenue," *id.*, without any insult whatsoever to Dr. Carr that could have biased Mr. Wolf. First, Sound explained why revenue recognition must take bad debt expense into account, following the Financial Accounting Standards Board ("FASB") Accounting Standards Codification *ASC 954-605 Health Care Entities - Revenue Recognition*. *Id.* at 2-4. Next, Sound explained that, particularly in the health care field, net revenue is an estimate, showing the appropriate GAAP treatment of such an estimate. *Id.* at 4-6. Finally, effectively incorporating a major accounting tenet that considers the economic reality of any accounting treatment, Sound showed that its estimate of net revenue is reasonable when compared with actual collections, because actual collections were actually *lower* than Sound's estimate. *Id.* at 6. This meant that the Purchase Price, based upon this estimate of net revenue, is actually *higher* than it should have been. *Id.*

    **B.**    **Defendant's Submission to Mr. Wolf Did Not Follow the Court's Order**

In his submission to Mr. Wolf, Defendant did not follow this Court's Order. Defendant did not limit his submission to only the unresolved issue of bad debt expense. Defendant chose instead to engage in an unjustified harming of Sound's good reputation, making unfounded, denigrating allegations and introducing new factual issues never presented to this Court. And

4

Defendant knew that within the confines of the Court's Order, there was no chance for Sound to respond, refute, and defend itself. Unlike a true arbitration proceeding, there would be no hearing, no witnesses, no rebuttal, and no opportunity for Sound to establish its own credibility in the face of such harmful allegations.

### 1. Defendant Submitted an Extensive, Inflammatory Procedural History

Even though Defendant claimed that "the appropriateness of this single journal entry is the only matter that is properly before the Neutral Accountant for resolution," Moore Letter at 8, Defendant filled *eight pages* of his submission with inflammatory rhetoric, theoretically summarizing procedural history ("Factual Background and Scope"). Some examples follow:

- "While Sound may invite the Neutral Accountant to disregard the Agreement and Judge Parker's Order and inappropriately broaden the analysis . . . the Neutral Accountant is not allowed to accept such invitations." *Id.* at 2-3.

- "These broadening tactics by Sound were considered by and expressly rejected by Judge Parker." *Id.* at 3 n.2.

- "In the ensuing months, Sound repeatedly delayed providing Dr. Carr with the information underlying its calculation." *Id.* at 5.

- "Rather than facilitate the engagement of a Neutral Accountant, Sound debated the merits of Defendant's objection and even attempted to submit an alternative, untimely calculation." *Id.* at 6.

- "Sound simultaneously sought to hijack the scope of Dr. Carr's objection and improperly expand the inquiry of the Neutral Accountant." *Id.* at 6-7.

- "Sound side-stepped its obligation to submit the matter to the Neutral Accountant." *Id.* at 7.

Sound wonders what these allegations have to do with accounting treatment of bad debt expense.

### 2. Contrary to Defendant's Allegations, Defendant Actively Encouraged and Expected Sound to Change Billing Companies

Defendant's "Detailed Accounting Analysis" section, too, is rife with innuendo and actual insults. First, Defendant connected the bad debt expense entry with Sound's decision to

5

change billing companies after Closing, a factual matter that has never been raised before this Court. *Id.* at 10. Defendant states that he used two billing companies prior to Closing, and that Sound's decision to use the biller of its choice post-Closing was improper. *Id.* at 10-12. Defendant expounded about what he called Sound's "strategic decision to transition the existing billing companies utilized by the Companies for four of the hospital billing sites at which the Companies provided services to a new billing company, Intermedix." *Id.* at 10.

Defendant then alleged, without evidence, that this decision resulted in "an expectation of higher than normal uncollectible revenue during the transition period." *Id.* at 11. Defendant stated this conclusion was based upon an "understanding" of "any reasonable businessperson." *Id.* Defendant implied that Sound should have expected that the billing companies personally chosen by Defendant prior to Closing would breach their duties to him post-Closing, which would be against their own self-interests, since fees are based upon a percentage of collections, as admitted by Defendant. *See id.* at 10. But Defendant offers no evidence that this is what actually happened—that the bad debt expense had any relation to non-performance by Defendant's chosen billers. Plus, Defendant failed to tell Mr. Wolf that there was nothing in the Agreement prohibiting Sound from streamlining its operations by using just one billing company instead of several.

Most importantly, Defendant neglected to tell Mr. Wolf that this was *exactly what Defendant intended to happen post-Closing*. In a document prepared by Defendant's advisors in an attempt to entice Sound to purchase Defendant's Companies, Defendant listed his "Reason for Sale" as follows: "Dr. Carr is exploring opportunities to partner with a larger organization that can provide scalable resources by: Navigating *the increasing complexity of billing services* and payor negotiations *by consolidating these activities* . . . ." *See* Pope Decl. ¶ 2 (Ex. A, "Carr Sales

Memo") at 8 (emphases added).  Defendant stated that the buyer of his Companies would have an "Opportunity to Maximize Contract Income" because the buyer could "Reduce current billing costs *by consolidating billing* and obtaining a market-competitive billing rate."  *Id.* at 5 (emphasis added).  Defendant later gave an exact estimate of the major savings that would inure to Sound from Defendant's recommended billing-company consolidation.  *Id.* at 28.

Yet because this was not a real arbitration, with a hearing and witnesses and the opportunity to introduce evidence, Sound had no opportunity to present this document to Mr. Wolf.  Sound could never have anticipated that Defendant would belie his own Carr Sales Memo such that Sound would have included it in its initial submission to Mr. Wolf.  Following this Court's Order, Sound limited its submission to accounting issues.

### 3.    Defendant Imagines What Plaintiffs' Accounting Practices Are

In an arbitration setting with witnesses and a hearing, Defendant could have interrogated Sound personnel on accounting practices, and Sound would have had the same right to interview its personnel before the arbitrator.  Here, Defendant simply speculated as to how Sound runs its business.  First, Defendant claimed he asked for information that was provided by Sound Controller Autumn Huiatt.  Moore Letter at 13.  Defendant stated what he understood Ms. Huiatt to explain: "that the entry reserved for certain uncollectible amounts related to revenue and receivables recorded in 2016."  *Id.* at 13.  Defendant then speculated as follows:

> In a typical business with functioning internal controls over financial reporting, it would be expected that a "periodic" control as fundamental as the one described above would be performed on at least a quarterly basis. Sound should have performed this analysis and identified the need for an adjustment to receivables and bad debt expense during the preparation of its 2016 year-end financials. Sound should have performed this analysis again during the preparation of the financial statement close for the quarter ending March 31, 2017.

7

*Id.* at 15. Defendant guessed, "Sound's internal accounting policies required procedures to be performed regularly that would have identified those uncollectible accounts in a timely manner, had they actually performed them." *Id.* p. 23. "By delaying the recording of the $1.84M Sunset Expense until June 2017, Sound failed to comply with their own procedures and standard accounting practices." *Id.* p. 23. Sound had no opportunity to refute this conjecture. The Moore Letter ignored the Court's order and brought in new "facts" irrelevant to the issue to be decided.

### 4. Defendant Advances More Ad Hominem Attacks

When Defendant finally started addressing the accounting treatment of bad debt expense, Defendant injected his analysis with more innuendo and insult to Sound, effectively accusing Ms. Huiatt of "malicious" behavior:

- "The inexplicable delay in recognizing the Sunset Expense is suspicious given that it serves to benefit Sound to the tune of $10.7M." *Id.* at 16.

- "[T]he unique nature of the account numbers and 'site' number/location of the bad debt expense accounts is also suspicious." *Id.*

- "Regardless of whether Sound's intent was malicious by delaying the recognition of the Sunset Expense (i.e. intentional oversight or misuse) . . . ." *Id.* at 19.

- "Sound's improper treatment resulted in a **windfall to Sound** . . . at Dr. Carr's expense." *Id.* at 20.

- "Suspiciously, Sound recorded this Sunset Expense . . . ." *Id.* at 23.

- Whether this failure was inadvertent or intentional . . . ." *Id*.

Defendant further questioned Ms. Huiatt's expertise and credibility in a footnote that *even Defendant admitted was irrelevant* to the question before Mr. Wolf, but Defendant's attack on Ms. Huiatt's credibility is there nonetheless: "Whether the Companies were recording the appropriate NPSR/Visit is not within the scope of this arbitration, per Judge Parker's orders;

8

however, as shown in the graph above, the Companies actually started recording an even higher NPSR/Visit after June 2017, which contradicts the assertion made by Ms. Huiatt." *Id.* at 13 n.6.

### C. The Wolf Opinion

Mr. Wolf rendered a decision based solely upon the Parties' submissions within the 30-day period allowed by the Court. *See* Wolf Opinion. The Wolf Opinion contains none of the following words: (1) arbitrate; (2) arbitrator; (3) arbitration; (4) award. Rather, Mr. Wolf stated that he "offer[s] an expert opinion" and that he "only comment[s] on the appropriate accounting treatment and do[es] not recalculate the Purchase Price pursuant to the [Agreement]." *Id.*

### D. Huiatt Affidavit and Simon Report

In response to Defendant's surprising and unfounded accusations in the Moore Letter alleged against both Sound and Ms. Huiatt, Sound asked Ms. Huiatt to provide her understanding of Sound's accounting practices. *See* Passarelli Decl. ¶ 6 (Ex. D, "Huiatt Affidavit"). Ms. Huiatt's affidavit shows that if Sound were allowed to address the factual disputes raised by Defendant, which Defendant believed were necessary for the identification of the proper accounting treatment for bad debt expense under GAAP, then Defendant's accusations would be refuted by Ms. Huiatt's testimony. Among other things, Ms. Huiatt provided information as to Sound's audited financial statements and recording net revenue, Huiatt Affidavit ¶¶ 4-7; timing of evaluation of net revenue accrual, *id.* ¶¶ 8, 16; Sound's audited financial statements, which were relied upon by a publicly traded major investor, making it unlikely that Sound would "suspiciously" doctor the books as insinuated by Defendant, *id.* ¶ 9; and all aspects relevant to the bad debt expense challenged by Dr. Carr, *id.* ¶¶ 10-15, 17-18.

When confronted with the remarkably abbreviated Wolf Opinion—providing scant, conclusory, and faulty analysis—Sound asked Simon Consulting, LLC to provide a second opinion. *See* Passarelli Decl. ¶ 7 (Ex. E, "Simon Report"). The Simon Report concludes as

9

follows: "The conclusions and analyses presented in the Wolf Report require an interpretation of the Purchase Agreement, are materially flawed, are not supported by the Purchase Agreement, do not comport with GAAP, are not consistent with a comprehensive basis of accounting other than GAAP, are applied inconsistently and violate the GAAP consistency principle, and thus cause Net Revenue during the Calculation Period to be materially overstated and unreliable." *Id.* § 4.

### III.   ARGUMENT AND AUTHORITIES

#### A.   The Wolf Opinion Cannot Be "Confirmed"—It Is Not an Arbitration Award

"Pursuant to the [Federal Arbitration Act ("FAA")], the Court may only confirm an arbitration award '[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration.'" *NWI Consulting, LLC v. Ragab*, No. 3:13-MC-05, 2014 WL 3579598, at *3 (E.D. Tenn. 2014) (quoting 9 U.S.C. § 9). It follows that if there is neither an "arbitration" nor an "award" "agreed" to "in [the parties'] agreement," then there is nothing to "confirm." *See, e.g.*, *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 748 F.3d 708, 720 (6th Cir. 2014) ("Challenging the fairness of an arbitration proceeding or the partiality of an arbitrator is different in kind than challenging the underlying contract that contained the agreement to arbitrate."). If the initial decision to compel arbitration was errant because no valid arbitration agreement existed, then there is no "arbitration award" to be confirmed.[2]  Respectfully, Sound requests that the Court review its decision that an arbitration agreement existed among the Parties to the Agreement, particularly in light of the ensuing events since entry of the Court's Order.

---

[2] Sound presents these arguments here to preserve them for appeal, if necessary. *See, e.g.*, *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014) ("Generally, we will not address arguments raised for the first time on appeal.").

### 1. The Order Ignored the Clear Intent of the Parties and the Plain Text of the Agreement

In this case, the Order cited Tennessee case law for the proposition that "'When the terms of a contract are unambiguous, "[i]t is the Court's duty to enforce contracts according to their plain terms."'"  Order at 12 (internal marks in original) (quoting *Power & Tel. Supply Co. v. Suntrust Banks, Inc.*, No. 03-2217 M1/V, 2005 WL 1329851, at *2 (W.D. Tenn. May 1, 2005)).[3] An additional quotation is especially relevant here:

> "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. The intent of the parties is presumed to be that specifically expressed in the body of the contract." In construing a contract, a Court looks to "ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy."

*Id.* (internal citations omitted) (quoting *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)).  Here, the "plain terms" of the Agreement stated there is to be *no arbitration*: the Neutral Accountant is to "act[] as an expert and not an arbitrator." Agreement § 1.4(d).  Yet the Order dispensed with this clear statement in one paragraph, never explaining why these "plain terms" were to be excised from the four corners of the Agreement. Order at 7.  The Order barely acknowledged that this pivotal phrase is included in the Agreement—the Order treated this phrase as Plaintiff's "argu[ment]."  *Id.* (quoting Sound's brief, rather than the Agreement).  The Order stated, "Plaintiff is correct that the parties did not explicitly label § 1.4(d) as an arbitration provision."  *Id.*  But this misses the mark: not only was Section 1.4(d) *not* labeled as an arbitration provision, it *did* include a *non-arbitration* provision,

---

[3] "'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state-law principles that govern the formation of contracts.'"  *Smith v. Altisource Sols.*, 726 F. App'x 384, 390 (6th Cir. 2018) (alterations omitted) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

11

stating in effect, "We do not want an arbitration award; we want an expert opinion." That's what the Parties received from Mr. Wolf: an opinion, not an award. *See* Wolf Opinion at 2.

The Order's sole treatment that relied upon any case law precedent was to observe that "the Court must look at the substance of the agreement over form," citing *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015). But *Shy* is inapposite and provides no support for the proposition for which it is cited: There, "[t]he parties d[id] not dispute for purposes of this appeal that § 8.4 is an arbitration agreement." *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015). And the "expert not arbitrator" phrase does not amount to "form," requiring some kind of interpretation; it is the express language of the Agreement.

The Order further states that "'[n]o particular language is required to evidence an agreement to arbitrate.'" Order at 7 (quoting *Widmer Enterprises, LLC v. Falck USA, Inc.*, No. 18-CV-11138, 2019 WL 1057422, at *3 (E.D. Mich. Mar. 6, 2019)). But again, this has it exactly backward: the Parties' Agreement had "particular language . . . to evidence an agreement" NOT "to arbitrate." The Order concludes this short paragraph by stating, "This language, alone, does not mean that the parties did not intend to arbitrate." *Id.* But what else could it mean? The Order does not explain an alternative meaning, because there is none. The meaning is patently clear: No Arbitrator.[4]

"In Tennessee, 'an enforceable contract must result from a meeting of the minds in mutual assent to terms.'" *Winn v. Tenet Healthcare Corp.*, No. 2:10-CV-02140, 2011 WL 294407, at *4 (W.D. Tenn. Jan. 27, 2011) (quoting *Thompson v. Hensley*, 136 S.W.3d 925, 929–30 (Tenn. Ct. App. 2003)). "It is the Court's duty to enforce contracts according to their plain

---

[4] Defendant may attempt to invoke the "law of the case" doctrine, but it is inapposite here: "The phrase 'law of the case' refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided *in a prior appeal of the same case.*" *Memphis Pub. Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (emphasis added).

12

4812-3766-1626.3

terms. Further, the language used must be taken and understood in its plain, ordinary and popular sense. The courts, of course, are precluded from creating a new contract for the parties." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (internal citations omitted). And as to purported arbitration clauses in particular, "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration, *we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract*, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (emphasis added) (citation omitted). Unfortunately, the Order did both: it overrode the clear intent of the Parties, and it reached a result inconsistent with the plain text of the contract, evidence of the meeting of the minds of the Parties: No Arbitrator.

At this very early stage in the proceedings, there was scant extraneous evidence of any kind available to the Court. But what evidence there was showed that Sound did *not* intend to arbitrate. *See* Doc 28 ("Amen Decl.") ¶ 4 ("Plaintiffs understood that Agreement § 1.4(d) provided that any Neutral Accountant engaged by the Parties would not act as an arbitrator.")). The Order did not address this evidence of Sound's intent; it is unclear whether the Court considered it. It *is* clear that the Order "overr[o]de" it. *Waffle House*, 534 U.S. at 294.

### 2. The Order Ignored Persuasive Authority From All Parties

Sound provided ample persuasive authority from several courts across the country, all of which drew the same conclusion: language along the lines of "expert and not an arbitrator" in a contract negates an arbitration agreement.[5] As Sound pointed out in its briefing, the Delaware

---

[5] Even Defendant's favored case did not support granting a motion to compel *arbitration. See Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 801 (7th Cir. 2005) (declining the invitation to decide "whether this contract calls for 'arbitration'"). *Cf.* 16.3. Express words, Expert Determination 16.3 (5th ed. 2015) (observing that in the United Kingdom, "[t]he use of the expression 'as expert and not as arbitrator' is now so common that it is difficult to conceive of a case in which a court would not treat those words as meaning exactly what they say," meaning no arbitration).

13

Chancery Court evaluated a "Dispute Resolution Provision" having many of the same features as here, with provisions for the parties' submissions to an accountant, rules for the accountant, and the understanding that "the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator." *Penton Bus. Media Holdings, LLC v. Informa PLC*, No. CV 2017-0847-JTL, 2018 WL 3343495, at *3 (Del. Ch. July 9, 2018). The Vice Chancellor stated, "The parties evinced their clear intent in the Dispute Resolution Provision by using 'expert not arbitrator' language." *Penton*, 2018 WL 3343495, at *16. The Vice Chancellor concluded it "does not contain any features that might render this ['expert not arbitrator'] language ambiguous." *Id*. *See also* Doc 27 at 9-10 (citing other cases from other courts with similar decisions).

Indeed, in *Penton*, the court observed, "One national survey posits that only twenty-four states continue to recognize a distinction between experts and arbitrators," and *Tennessee is included in that list of twenty-four*. *Id.* & *id.* n.41 (citing Lina M. Colón Santiago, Insurance Appraisal & Arbitration, 8 No. 1 U. Puerto Rico Bus. L.J. 65, 74 (2016)) (citing *Merrimack v. Batts*, 59 S.W.3d 142 (2001), for the proposition that Tennessee allows use of appraisals in insurance disputes, but that the informal appraisal process is not akin to a quasi-judicial, binding arbitration). *See also Evanston Ins. Co. v. Cogswell Properties, LLC*, 683 F.3d 684, 693–94 (6th Cir. 2012) (finding that an "appraisal provision does not constitute arbitration for purposes of the FAA" even when the "appraisal provision state[d] that 'A decision agreed to by any two [umpire and appraisers] will be binding,'" in part because the appraisal provision "does not suggest that a hearing-type appraisal process is required" (second alteration in original)). Like an appraisal, the interaction with Mr. Wolf was nothing near "quasi-judicial." Rather, the interaction with Mr. Wolf was "informal." The Parties submitted merely one submission each,

14

and Mr. Wolf appraised them, basing his decision on his own—faulty—knowledge, and without a "hearing-type appraisal process."

### 3. Sound Did Not Have an Opportunity To Present Its Case on the Non-Accounting Issues Put Forth by Defendant

"'[C]ommon incidents' of classic arbitration include . . . an opportunity for each side to present its case.'" *Evanston Ins.*, 683 F.3d at 693 (6th Cir. 2012) (quoting *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004)). Here, Sound did not have the opportunity to present its case—either to refute Defendant's surprising and unwarranted attack on Sound's character, or to correct Defendant's new, inaccurate factual allegations.

As noted above, while Sound complied with the Order by following the procedure outlined in Section 1.4(d), Defendant did not. Defendant introduced new, non-accounting factual disputes in his submission to Mr. Wolf, proving that not even Defendant believed that this was a narrow question—*Defendant believed that resolution of extraneous, non-accounting, evidentiary issues was necessary to decide the accounting issue*, *i.e.*: Did Sound have the right under the Agreement to change billing companies? Did Dr. Carr approve and encourage this plan, thereby waiving any right to object to it now? Did the billing companies in fact breach their duty to collect on outstanding bills once they knew they would be under contract with Dr. Carr for a limited time? If this happened, was there any causal effect between those breaches and any bad debt expense entry? What expert can opine as to what a "reasonable business person" would understand about the behavior of billing companies near the end of a contractual relationship? What were Sound's accounting practices? Did Sound follow those practices? What was Sound's intent in doing so (a question raised repeatedly by Dr. Carr)? Did Sound act "strategically" when changing billing companies? Was Sound's intent "malicious" and "intentional"? Did Ms. Huiatt, in particular, "suspiciously" manufacture the June 2017 bad debt

15

expense for the purpose of affecting the Purchase Price? Or did Ms. Huiatt and Sound follow Sound's own internal, consistent accounting practices that were ultimately used in Sound's audited financial statements, as noted to Mr. Wolf (Kutak Letter at 4)? It is Defendant who raised these factual issues in his submission to Mr. Wolf. Defendant cannot eat his cake and have it, too: he cannot present such new factual issues to Mr. Wolf, completely one-sided, hoping Mr. Wolf will consider them, but then avoid any discovery or weighing of *both Parties'* evidence in a bench trial before a legitimate arbiter, this Court. *See* Agreement § 8.6. If Sound had had the opportunity, it would have presented testimony from Ms. Huiatt largely as evidenced by her affidavit presented here, showing that Defendant's guesses and allegations as to Sound's accounting practices were wrong. *See, e.g.*, Huiatt Affidavit ¶¶ 5-18.

Accordingly, Sound respectfully requests that this Court move this case where it belongs, into discovery, such that the Parties can further explore the factual disputes brought into the process *by Defendant himself* and meaningfully litigate the question of the bad debt expense dispute, complete with expert reports and testimony as in the normal course.

### B.   The Wolf Opinion Cannot Be Confirmed Because It Does Not Provide a Final, Binding Remedy—It Does Not Recalculate the Purchase Price

"'[C]ommon incidents' of classic arbitration include a final, binding remedy . . . .'" *Evanston Ins.*, 683 F.3d at 693 (quoting *Fit Tech*, 374 F.3d at 7). But here, the Wolf Opinion does not provide such a "final, binding remedy." *Id.*

#### 1.   Mr. Wolf Did Not Recalculate the Purchase Price

Mr. Wolf stated that he "d[id] not recalculate the Purchase Price." Wolf Opinion at 2. The only conclusion he drew was as to the $1.8 million "bad debt expense charge." *Id.* at 6. This was consistent with Defendant's stance all along. *See* Doc 24-6 (where Defendant states that the "bad debt expenses" issue "is the only appropriate question to be submitted" to the

16

Neutral Accountant). At most, Mr. Wolf only repeated Defendant's calculation of the Purchase Price, "according to Dr. Carr," without endorsing it any way. Wolf Opinion at 3. Accordingly, there is simply no "award" for the Court merely to "confirm."

### 2. Defendant Provided No Evidence as to His Preferred Purchase Price

From Mr. Wolf's conclusion solely relating to bad debt expense, Defendant somehow wants the Court to "confirm" something never determined by Mr. Wolf: "that the Purchase Price under the Agreement [is] $40,734,142 . . . requiring Sound to pay to Dr. Carr a second payment of $10,734,142." Motion at 2. Defendant provides *no evidence* in his memorandum or papers for his requested Purchase Price of $40,734,142 or his purported "award" of $10,734,142.

Rather, Defendant merely cites the Wolf Opinion, which itself cites the Purchase Price favored by Defendant in his submission to Mr. Wolf. *See* Doc 58 ("Def. Memo.") at 9 (quoting Wolf Opinion at 3 (citing Moore Letter with no pin cite)). This is double if not triple hearsay: first, Defendant's submission to Mr. Wolf (an out-of-court statement offered to prove the truth of the matter asserted); second, Mr. Wolf's citation to that submission (which was not offered to prove the truth of the matter asserted, but repeated Defendant's hearsay); and finally, Defendant's repetition of the same here. *See* Fed. R. Evid. 801(c), 802, 805. Defendant is obliged to prove up his claim for an "award" with evidence, not with attorney argument. *See* Def. Memo. at 12 (arguing that this Court should "confirm the decision of the Neutral Accountant, which requires a simple adjustment to the valid Purchase Price Schedule consistent with the decision and, in turn, triggers Sound's second payment to Dr. Carr."). Defendant does not offer any advice to the Court about how it should go about making this "simple adjustment" *sua sponte*. Should Defendant attempt to provide new evidence with his reply brief, Sound should have the right to refute such new evidence in support of a $10 million "award."

17

### 3. This Court Should Afford Sound the Opportunity To Provide Evidence in the Form of Expert Testimony as to the Purchase Price

The Simon Report clearly establishes that Sound's accounting treatment for bad debt expense under GAAP is entirely justified. Accordingly, the Purchase Price as reported by both Parties is the same: $26,605,885. *See* Moore Letter at 2 ("The Purchase Price calculated by Sound . . . was $26,605,885 . . . . If Sound's inclusion of the Bad Debt Expense was proper, the Purchase Price stands."). Because this amount is less than the minimum payment to Defendant, $30 million, no further calculation is needed: there is no additional payment to be made to Defendant. But even if the Court were to decide to follow Mr. Wolf's methodology, the Purchase Price is then even lower: $25,691,429, *see* Simon Report at 13, and there is still no second payment to be made. Sound requests clear judicial review of the Neutral Accountant's Opinion, just as an appellate court gives a *de novo* review to a judgment of the trial court. Sound contracted for just that when it declined to engage in an arbitration. Agreement § 1.4(d).

### C. Sound Did Not Agree to Judicial Enforcement of the Wolf Opinion

The FAA requires for confirmation of an arbitration award that "the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration . . . ." 9 U.S.C. § 9. Here, for all the reasons noted above, there was no agreement at all, much less an agreement regarding the entry of judgment of the court on an award. *See* Agreement § 1.4(d). Yet Defendant cites Fourth Circuit case law to contend that Sound contemplated judicial enforcement of the "award" because, among other things, Sound "followed the arbitration process set forth in the agreement without objection." Def. Memo. at 14. This is not so. Sound followed the Neutral Accountant process set forth in the Agreement (and Defendant did not, as noted above) because Sound was dutifully following *the Order of this Court*. Sound vigorously objected to the alleged "arbitration process" both in its briefing papers,

*see* Doc 27-29, and at oral argument, *see* Doc 39.  But once the Court issued its Order, Sound followed the Order and complied with the extremely abbreviated process outlined in Section 1.4(d): a lone submission to Mr. Wolf, as ordered by this Court.

Defendant also mistakenly alleges that Sound "did not disavow its obligation to arbitrate Dr. Carr's objection to its Purchase Price calculation."  Def. Memo. at 15 n.2 (apparently referring to Doc 24-5, where Sound stated that "the question as presented to Ernst & Young[6] will focus on whether the Companies' Net Revenues during the Calculation Period were properly determined by Sound pursuant to GAAP and the terms of the Purchase Agreement for purposes of calculating Earnings Before Overhead.").  Defendant's allegation is misleading at best.  Sound never addressed, nor did it ever agree to, "arbitration," for the simple reason that the Agreement had already laid out the contours of the dispute resolution process: *no* arbitration.  Thus, there was never any reason for Sound to "disavow" arbitration until Defendant moved to compel the same.  While Sound agreed to a Neutral Accountant process with fair procedure and evaluation of the proper accounting treatment of bad debt expense under GAAP, it never agreed to "arbitration."  There is no doubt in anyone's mind that if Sound had not complied with the Court's Order and had not followed the Court's mandated procedure with the Neutral Accountant, Defendant would have cited this as an example of Sound's alleged "bad faith," as Defendant is eager to do.  *See* Def. Memo. at 11; Doc 58-1 at 3, 58.

---

[6] The Agreement called for resolution by either Ernst & Young or KPMG, two of the Big Four Accounting Firms.  Agreement § 8.1(rr).  When both firms declined due to conflicts, Sound had no choice but to follow this Court's order and continue to locate another Neutral Accountant.

Defendant even implies that because Sound is availing itself of its statutory right to object to a confirmation of an "award" under 9 U.S.C. § 9 and to move to vacate the same under § 10, this is somehow the equivalent of "intentionally ignoring this Court's order in its ongoing scheme to deprive Dr. Carr of the full purchase price of his Companies." Def. Memo. at 12. No. Sound is intentionally asserting its statutory and legal rights to retain the property it lawfully owns, after already overpaying Defendant by millions of dollars for his Companies.

## IV.    CONCLUSION

Sound respectfully requests that this Court deny Defendant's Motion, such that this case may be prepared for discovery on the very factual issues that Defendant raised in his submission to Mr. Wolf, along with a judicial review of Mr. Wolf's errant Opinion, including expert testimony. Pursuant to Local Rule 7.2(d), Sound hereby requests a hearing on all issues raised in this response because the matters addressed herein are complex, and resolution of the Motion could conceivably result in a judgment against Sound.

Dated this 1st day of May, 2020.

Respectfully submitted,

| McNABB, BRAGORGOS, BURGESS & SORIN, PLLC | KUTAK ROCK LLP |
|---|---|
| s/ *Pam Warnock Blair* <br> Leland M. McNabb #7551 <br> Pam Warnock Blair #10407 <br> Courtney S. Vest #23005 <br> 81 Monroe, Sixth Floor <br> Memphis, TN  38103 <br> Telephone: (901) 624-0640 <br> Facsimile: (901) 624-0650 <br> lmcnabb@mbbslaw.com <br> pblair@mbbslaw.com <br> cvest@mbbslaw.com | s/ *John P. Passarelli* <br> John P. Passarelli (admitted *pro hac vice*) <br> Carol A. Svolos (admitted *pro hac vice*) <br> The Omaha Building <br> 1650 Farnam Street <br> Omaha, NE  68102-2186 <br> Telephone: (402) 346-6000 <br> Facsimile: (402) 346-1148 <br> john.passarelli@kutakrock.com <br> carol.svolos@kutakrock.com <br><br> *Attorneys for Plaintiffs* |

4812-3766-1626.3