# EXHIBIT A

## Neutral Accountant Submission of T.M. Carr, M.D.

# TABLE OF CONTENTS

I.      Introduction ............................................................................................................ 1

II.     Factual Background and Scope ............................................................................... 3

    A.      The Purchase Agreement ............................................................................ 3

    B.      Delivery of and Objection to the Purchase Price Under the Agreement ................ 4

    C.      Dr. Carr's Objection to Sound's Purchase Price Calculation ........................... 5

    D.      The Court's Order Compelling Arbitration .................................................... 7

III.    Detailed Accounting Analysis ................................................................................ 8

    A.      Sound's Calculation of Purchase Price and Second Payment ......................... 9

    B.      Sound Changes Billing Companies ............................................................ 10

    C.      Identifying Sound's $1.84M Sunset Expense Entry .................................... 12

    D.      Understanding the $1.84M Sunset Expense Entry ..................................... 13

        (1)      Sunsetting Billing Companies .................................................... 13

        (2)      Sources of Information for Analysis ........................................... 14

        (3)      Timing of Sunset Entry and Receivables .................................... 14

        (4)      Failure of Internal Controls over Financial Reporting ................. 15

        (5)      "1611-PCS ACCTG" Site Number and Location ........................ 16

    E.      Accounting Treatment of the $1.84M Sunset Expense Entry ....................... 17

    F.      Timing of Sound's Error ........................................................................... 20

    G.      Correct Calculation of the Purchase Price (and, as a result, the Second Payment) ............... 21

IV.     Conclusion – Sound's Sunset Expense Entry was Inappropriate ........................... 22

# I.    **Introduction**

In accordance with Section 1.4(d) of the LLC Interest and Stock Purchase Agreement (the "Agreement"[1]) between Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. (collectively "Sound") and T.M. Carr, M.D. ("Dr. Carr;" collectively with Sound, "the Parties"), Dr. Carr makes the following written submission to Stephen A Wolf, CPA (the "Neutral Accountant"), specifying the required scope of the Neutral Accountant's analysis and setting forth Dr. Carr's position as to his sole objection to Sound's calculation of the Purchase Price. Herein, Dr. Carr demonstrates why it was improper for Sound to include in its calculation of the Purchase Price a single journal entry for a bad debt expense adjustment of $1,844,541.94 (the "Bad Debt Expense"), which Sound incurred prior to and outside of the calculation period of April 1, 2017 through March 31, 2018 (the "Calculation Period") but recorded in June 2017. Further, Dr. Carr shows how this improper inclusion of the Bad Debt Expense artificially reduced the second payment of the Purchase Price owed by Sound to Dr. Carr, as contemplated by the Agreement, from $10,734,142 to $0.

Before moving into the substance of the sole accounting issue to be decided here by the Neutral Accountant, it is important for the Neutral Accountant to understand the scope of the analysis as required by the Agreement and the order of the federal court presiding over the Parties' dispute. Once the scope is defined, the detailed accounting analysis that follows will show how Sound improperly reduced the amount of the Purchase Price, and therefore the second payment owed to Dr. Carr.

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

In his order and opinion dated October 10, 2019 (the "Order"), U.S. District Court Judge Thomas L. Parker determined that the unambiguous terms of the Agreement delegated a single responsibility to the Neutral Accountant here:  to "decide 'only the matters objected to by Dr. Carr and not resolved by Sound Physicians and Dr. Carr with respect to the determination of the Purchase Price.'" (Exhibit A: October 10, 2019 Order; Exhibit B: Agreement §1.4(d)). The Purchase Price calculated by Sound, under the procedure set forth in the Agreement and referenced by the Court, was $26,605,885, and the **only** matter to which Dr. Carr objected that was not resolved by the Parties, also in accordance with the Agreement and the Order, was Sound's inclusion of the Bad Debt Expense in its calculation, which reduced the amount of the second payment rightfully owed to Dr. Carr by $10,734,142. Therefore, in keeping with the terms of the Agreement and the Order, the Neutral Accountant's sole task here is to determine the propriety of Sound's inclusion of the Bad Debt Expense in its Purchase Price calculation of $26,605,885. Note that this sole issue for consideration by the Neutral Accountant is not bad debt expense in general, but the consideration of the propriety of a single Bad Debt Expense journal entry made by Sound in June 2017.

The Neutral Accountant's determination as to the propriety of the inclusion of the Bad Debt Expense will dictate whether Sound's calculated Purchase Price of $26,605,885 is correct. If Sound's inclusion of the Bad Debt Expense was proper, the Purchase Price stands. If its inclusion was improper, the Purchase Price must be adjusted by the Neutral Accountant to reflect the removal of the improperly-included expense. This adjustment would result in a Purchase Price of $40,734,142 and would require a second payment of $10,734,142. While Sound may invite the Neutral Accountant to disregard the Agreement and Judge Parker's Order and inappropriately

broaden the analysis – for example, to recalculate the Purchase Price beyond the inclusion of the Bad Debt Expense or to consider alternative Purchase Price Schedules – the Neutral Accountant is not allowed to accept such invitations.[2]

## II.     Factual Background and Scope

### A.     *The Purchase Agreement*

In March 2016, the Parties entered into the Agreement, through which Sound purchased Dr. Carr's membership interests in two Tennessee professional limited liability companies and all of the issued and outstanding stock of a Tennessee professional corporation (collectively, the "Companies"). The Agreement defined "Purchase Price" as the "total purchase price calculated and payable to Dr. Carr in accordance with Section 1.4." (*Id.* at § 1.1). Under Section 1.4, Payment of the Purchase Price, the Purchase Price would equal "(i) a multiple determined in the manner described in Schedule B hereto times (ii) the Companies' consolidated 'Earnings Before Overhead' generated during the twelve (12) month period ending March 31, 2018 (the "Calculation Period");…." (*Id.* at § 1.4(a)). The Purchase Price would be an amount no less than $30,000,000 and no greater than $59,000.000. (*Id.*)

Section 1.4 required Sound to pay the Purchase Price in two distinct payments: an initial payment of $30,000,000 on the closing date, and a second payment of an amount to be calculated based on Schedule B of the Agreement less the initial payment amount. According to Schedule B, the Purchase Price would be calculated based on the lesser of the two methods defined in Schedule B. If the lesser of those two methods yielded a final Purchase Price less than Sound's initial payment to Dr. Carr, there would be no second payment to Dr. Carr.

---

[2] These broadening tactics by Sound were considered by and expressly rejected by Judge Parker.

### B. *Delivery of and Objection to the Purchase Price Under the Agreement*

Under Section 1.4(d), Sound was required to prepare and deliver to Dr. Carr its final

determination of the amount of the Purchase Price (the "Purchase Price Schedule") within 30

days of the end of the calculation period (or by approximately April 30, 2018), "setting forth all

components (and the amounts thereof) necessary to compute the Purchase Price." (*Id.* at §

1.4(d)). Sound was to determine the purchase price "in good faith on a basis consistent with

Schedule B [there]to." (*Id.*) Notably, Section 1.4(d) did not provide for a process by which Sound

could present subsequent alternative calculations to Dr. Carr at a later date, nor did it require Dr.

Carr to consider, evaluate, or respond to such subsequent calculations. (*Id.*)

Once Sound timely delivered its Purchase Price Schedule to Dr. Carr, Section 1.4(d)

afforded Dr. Carr the right to review the Schedule, examine its underlying calculations and

materials, and "object to any amount or computation" in the Purchase Price Schedule by

providing Sound with such objections in writing before the expiration of the review period. (*Id.*)

It also established a process to address the specific matters to which Dr. Carr objected:

> If Dr. Carr timely objects to any item or computation appearing in
> the Purchase Price Schedule prior to the expiration of the Purchase
> Price Review Period, Dr. Carr and Sound Physicians shall, during the
> thirty (30) day period following the delivery of Dr. Carr's objection,
> attempt in good faith jointly to resolve **the matters on the
> Purchase Price Schedule to which Dr. Carr objected**.

(*Id.* (emphasis added)). If the Parties could not resolve any of Dr. Carr's objections in good faith,

Section 1.4(d) further detailed the process for binding resolution of those objections through

engagement of a Neutral Accountant:

> In the event Dr. Carr and Sound Physicians cannot resolve all of
> such matters by the end of such thirty (30) day period, either Dr.
> Carr or Sound Physicians may immediately engage the Neutral

Accountant to resolve any items that remain in dispute. Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing, and **the parties shall require the Neutral Accountant**, within thirty (30) days thereafter, acting as an expert and not an arbitrator, **to resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound Physicians with respect to the determination of the Purchase Price**. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant. ... The Purchase Price finally determined pursuant to this Section 1.4(d) **shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to the Agreement**.

(*Id.* (emphasis added)).

### C. *Dr. Carr's Objection to Sound's Purchase Price Calculation*

On or about April 27, 2018, Sound delivered to Dr. Carr its Purchase Price Schedule – the only such schedule Sound delivered within the timeframe established by Section 1.4(d). (Exhibit C: PCS Contingent Payment Analysis – 3/31/2018). Sound's Purchase Price Schedule reflected a price calculation of $26,605,885.00, which was lower than the initial payment Sound made to Dr. Carr and, if accurate, would result in no second payment to Dr. Carr. (*Id.*).

In the ensuing months, Sound repeatedly delayed providing Dr. Carr with the information underlying its calculation. On September 27, 2018, as required by Section 1.4(d), Dr. Carr submitted to Sound his specific, formal objections to its Purchase Price Schedule. (Exhibit D: 9/27/18 Corresp. Stating Objections). Relevant here, Dr. Carr expressly objected to Sound's treatment of the Bad Debt Expense:

> Sound Physicians improperly accrued material charges for bad debt expenses during the Calculation Period relating to prior periods. This prior period adjustment affecting Net Patient Services Revenue during the Calculation Period is inappropriate under GAAP

> accounting and the Purchase Agreement. Sound Physicians'
> calculation of the Purchase Price Schedule and the Purchase Price
> included improperly accrued bad debt expenses of at least
> $1,844,541.94.

(*Id.*). This objection represented the "matters objected to by Dr. Carr" that would require good

faith discussions and, if unsuccessful, submission to the Neutral Accountant under the terms of

the Agreement. (Agreement § 1.4(d)).[3]

Rather than facilitate the engagement of a Neutral Accountant, Sound debated the merits

of Dr. Carr's objection and even attempted to submit an alternative, untimely calculation of the

Purchase Price that (1) Dr. Carr neither requested nor agreed to consider, and (2) was neither

expressly nor implicitly permitted under Section 1.4(d). Ultimately, Sound demonstrated its

acknowledgment and agreement to submit Dr. Carr's sole objection to its lone valid Purchase

Price calculation to the Neutral Accountant:

> Sound is prepared to engage Ernst & Young to act as the Neutral
> Accountant pursuant to Section 1.4(d) of the Purchase Agreement
> for the purpose of determining whether Sound properly included a
> bad debt reserve of $1,844,541.94 in connection with its
> estimation of the Companies' Net Revenue during the Calculation
> Period.

(Exhibit F: 12/6/18 Corresp. re: Neutral Accountant; *see also* Exhibit G: 12/14/18 Corresp. re:

Confusion of Issue of Neutral Accountant Submission)). However, notwithstanding its expressed

agreement to submit Dr. Carr's remaining objection to a Neutral Accountant, Sound

---

[3] While Dr. Carr initially asserted a second objection to Sound's inclusion of non-medical compensation expenses in the Purchase Price, that objection was ultimately resolved by the Parties. Mark Nebrig's correspondence to Steven Amen with Kutak Rock, dated November 14, 2018, confirms the objection to the inclusion of bad debt expense was the only remaining objection for resolution by the Neutral Accountant. (Exhibit E: 11/14/18 Corresp. Re: Unresolved Objection).

simultaneously sought to hijack the scope of Dr. Carr's objection and improperly expand the inquiry of the Neutral Accountant (*Id.*).

Nothing within the negotiated language of Section 1.4(d) permitted Sound to dictate, redefine, or expand the nature and scope of Dr. Carr's objection to the Purchase Price Schedule; rather, the objection was Dr. Carr's to articulate. (*Id.* at § 1.4(d)). While Dr. Carr continued to press for the expeditious engagement of a Neutral Accountant to resolve his sole objection, Sound side-stepped its obligation to submit the matter to the Neutral Accountant and initiated litigation in January 2019, through which it sought a declaratory judgment as to the calculation of the Purchase Price and the scope of the Neutral Accountant's analysis.

### D.    *The Court's Order Compelling Arbitration*

After full briefing and argument from counsel, Judge Parker expressly rejected Sound's attempts to broaden the scope of inquiry by the Neutral Accountant beyond a determination of whether the Bad Debt Expense (which was incurred prior to and outside of the Calculation Period of April 1, 2017 through March 31, 2018) was properly included in Sound's $26,605,885.00 Purchase Price.  On October 10, 2019, the Court granted Dr. Carr's motion to compel Sound's declaratory judgment claim to arbitration before a Neutral Accountant. In so ruling, Judge Parker **rejected** Sound's arguments that the scope of Section 1.4(d) covered "any items remaining in dispute" (as determined by either party) or that the Neutral Accountant should consider another "Purchase Price" from Sound, rather than only resolve Dr. Carr's only remaining objection to the $26,605,885.00. (Order p. 11). In compelling the sole issue of the Bad Debt Expense to a Neutral Accountant, Judge Parker noted that the clear language of Section 1.4(d) narrowed the scope of

any arbitration to **only** those matters objected to by Dr. Carr that remained unresolved. The Court opined:

> Section 1.4(d) specifies that the parties agreed to structure their arbitration agreement so that the arbitration is limited to only those issues objected to by Dr. Carr and only his objections that remained unresolved by the parties. The parties drafted § 1.4(d)'s arbitration clause to be quite narrow. **And the language of § 1.4(d) leaves no doubts about the scope of arbitrable issues – only those matters to which Dr. Carr objected and left unresolved by the parties are subject to arbitration.**

(*Id.* at p. 12) (emphasis added). In accordance with the Court's Order and the plain terms of the Agreement, Sound, through its Neutral Accountant submission, may not change the scope of the only relevant issue or offer alternative calculations to the $26,605,885.00 Purchase Price.

## III. Detailed Accounting Analysis

As set forth above, Dr. Carr's sole objection to Sound's Purchase Price calculation is whether Sound improperly accrued material charges for bad debt expenses of at least $1,844,541.94 during the Calculation Period relating to prior periods. More specifically, the $1.84M Bad Debt Expense is comprised of a single adjusting journal entry, JE-028542, posted on June 30, 2017, and the appropriateness of this single journal entry is the only matter that is properly before the Neutral Accountant for resolution. The entry exclusively relates to revenues and receivables recorded between March 16, 2016 and December 31, 2016, as shown in the chart below.



June 2017 Journal Entry to Bad Debt Exp:
Amount Reserved by Date of Service

Sound's inappropriate, prior period adjustment recorded during the Calculation Period impacted the second payment calculation associated with the Agreement by $10,734,142, which should be paid to Dr. Carr.

### A. Sound's Calculation of the Purchase Price and Second Payment

As previously stated, Schedule B of the Agreement required Sound to calculate the Purchase Price (and therefore the Second Payment amount) based on the lesser of two methods defined in Schedule B. Sound's calculation resulted in the following:

1) Method 1[4]: Purchase Price of $43,208,886, indicating a Second Payment of $13,208,886; and

2) Method 2: Purchase Price of $26,605,885, indicating a Second Payment of $0.

Sound provided the below showing its calculations of the two Methods:

---

[4] Method 1 was designed in a manner that approximated the Net Patient Service Revenue ("NPSR"), the operating ratios, costs, and profitability of the Companies as managed by Dr. Carr, adjusted for the patient volume – the actual business.

| METHOD 1 PAYOUT CALCULATION: | | | METHOD 2 PAYOUT CALCULATION: | | |
|---|---|---|---|---|---|
| Annual Visits (actual) | | 295,596 | Annual Visits (actual) | | 295,596 |
| NPSR / Visit (max $107.21) | | 107.21 | NPSR / Visit (actual) | | 117.76 |
| Net Revenue | $ | 31,690,847 | Subsidy Revenue (actual) | | $ 1,207,804 |
| | | | Net Revenue | | $ 36,016,625 |
| | | | | | |
| Less: Billing Expense (at 6.5% contract billing rate) | $ | (2,059,905) | Less: Billing Expense (actual) | | (2,135,694) |
| Less: Labor Costs and Malpractice (not to exceed 75% revenue) | $ | (23,768,135) | Less: Labor Costs and Malpractice (actual) | | (30,270,906) |
| | | | | | |
| Earnings before Overhead | $ | 5,862,807 | Earnings before Overhead | | $ 3,610,025 |
| | | | | | |
| Earnings before Overhead Multiple | | 7.37x | Earnings before Overhead Multiple | | 7.37x |
| Purchase Price | | 43,208,886 | Purchase Price | | 26,605,885 |
| 1st Payment | | 30,000,000 | 1st Payment | | 30,000,000 |
| 2nd Payment | | 13,208,886 | 2nd Payment | | - |
| | | | | | 3,394,115 |
| | | | | | shortfall |

| 3/31/18 earnout liability analysis: | | | | |
|---|---|---|---|---|
| Earnout liability on balance sheet | $ | - | | |
| Earnout per current forecast | | - | Lower of Method 1 or Method 2 | |
| 3/31/18 reduction in liability | $ | - | | |

(PCS Contingent Payment Analysis – 3/31/18; Sound's Earnout Calculation Xcel file is attached with this Submission and Exhibits). As Method 2 resulted in the lesser value, Sound determined that no Second Payment was due. Dr. Carr's sole objection to that calculation followed.

## B.   *Sound Changes Billing Companies*

Critical to Dr. Carr's objection to the Purchase Price calculation is Sound's decision to change billing companies, as that change is the lone component of the disputed single journal entry of $1.84M. Healthcare entities often use billing companies to handle their revenue cycle management ("RCM"). RCM is the process by which these third-party billing companies handle a healthcare entity's initial encounter/appointment, billing for healthcare services, and collection of payments, among other related administrative tasks. Typically, these billing companies are paid based on a percentage of payment collections billed by that company. Historically, the Companies used two billing companies to handle their RCM: Martin Gottlieb and Associates ("Gottlieb") and Physician Revenue Management and Consulting, LLC ("PRMC").

Shortly after the acquisition of the Companies, Sound implemented a strategic decision to transition the existing billing companies utilized by the Companies for four of the hospital sites at which the Companies provided services to a new billing company, Intermedix. A strategic

decision of this nature would have been the subject of planning and financial analysis culminating in the decision to move forward with the transition.

An impending change of a billing company may reduce the efforts put forth toward collection of the Companies' outstanding receivables, since the prior billing company's incentives are significantly reduced leading up to and after termination. For any reasonable businessperson, this understanding should necessitate an expectation of higher than normal uncollectible revenue during the transition period. This is a factor that would have or should have been discussed and considered as Sound contemplated the transition of billing companies.

In July 2016, less than five months after Sound acquired the Companies, Sound terminated Gottlieb and contracted with Intermedix to handle the RCM related to two of the Companies' hospital sites. It is Dr. Carr's understanding that, around that same time, Sound attempted to terminate PRMC as the billing company for two other hospital sites; however, PRMC's contract only allowed Sound to terminate them at year-end with at least three months' notice. As such, Sound provided PRMC notice and terminated them as of December 31, 2016, less than ten months after Sound acquired the Companies. On January 1, 2017, Intermedix started serving as the new billing company for those two hospital sites.

Based on documents and data provided to Dr. Carr by Sound, Sound referred to this strategic decision and event as "Sunsetting Billing Companies." This strategic decision to sunset the existing billing companies is of particular note because all of the $1,844,542 in Bad Debt Expense (the "Sunset Expense," hereafter used synonymously with Bad Debt Expense), reflected in the journal entry (JE-028542) posted in June 2017 (the "Sunset Expense Entry"), is related to

those revenues and receivables managed by Gottlieb (through July 2016) and PRMC (through December 2016). None of the adjustment related to any of Intermedix's billings in 2016 or 2017.

### C. Identifying Sound's $1.84M Sunset Expense Entry

During Dr. Carr's review of Sound's Purchase Price Schedule, Dr. Carr identified an unusually low NPSR per visit ("NPSR/Visit") for the month June 2017, as seen below.[5] For the month June 2017, the Companies had an NPSR/Visit of $46.04, which is just 37% of the average $124.28/Visit for all other months in the Calculation Period.



As seen in the calculation of the Purchase Price, NPSR/Visit is one of the most important inputs into the Method 2 calculation. Dr. Carr identified that this unusually low rate in June 2017 appeared to be related to a journal entry increasing bad debt expense by $1.84M for the month – the Sunset Expense Entry.

---

[5] Months outside of Calculation Period are Blue; Months inside of the Calculation Period are Green and Red; June 2017 is Red.

Dr. Carr requested information and support relating to the journal entry. On July 13, 2018, Dr. Carr had a call to discuss this $1.84M journal entry and other questions with Autumn Huiatt ("Ms. Huiatt"), Controller and Vice President of Accounting for Sound. Ms. Huiatt explained that the entry reserved for certain uncollectible amounts related to revenue and receivables recorded in 2016. She agreed to provide supporting documentation for the journal entry.[6]

The supporting documentation received by Dr. Carr after his request was a two page PDF document that included journal entry JE-028542, the Sunset Expense Entry, printed from Sound's accounting system and an analysis schedule titled "Sunsetting Billing Companies" that detailed the net $1.84M Sunset Expense Entry (Exhibit H: JE 028542 and Sunsetting Analysis).

### D. Understanding the $1.84M Sunset Expense Entry

After reviewing the supporting documents in tandem with other information provided by Sound, Dr. Carr identified several troubling characteristics about the substance of the $1.84M Sunset Expense Entry and Sound's corresponding analysis, as described below.

(1) Sunsetting Billing Companies

Sound's analysis that calculated the Sunset Expense is titled "Sunsetting Billing Companies." As described previously, this refers to Sound's decision to change the billing companies used by the Companies from the existing providers Gottlieb and PRMC to a new billing company, Intermedix. Again, the Companies stopped using Gottlieb by the end of July 2016 and PRMC by the end of December 2016. Sound's sunsetting analysis calculates the anticipated

---

[6] Additionally, Sound explained to Dr. Carr that the Companies had been recording too high of an NPSR/Visit and the Companies needed to revise that rate down. Whether the Companies were recording the appropriate NPSR/Visit is not within the scope of this arbitration, per Judge Parker's orders; however, as shown in the graph above, the Companies actually started recording an even higher NPSR/Visit after June 2017, which contradicts the assertion made by Ms. Huiatt. In the two months prior to the improper Sunset Expense Entry, NPSR/Visit averaged $121.64, while in the nine months following the adjustment, NPSR/Visit averaged $124.85, a 2.6% increase.

uncollectible receivables for each billing company and each hospital location where that revenue and receivables were generated for the months of March 2016 through July 2016 for Gottlieb and March 2016 through December 2016 for PRMC. This analysis does not include any calculations of uncollectible amounts for Intermedix receivables recorded in 2016 or 2017.

(2)    <u>Sources of Information for Sound's Analysis</u>

Sound's analysis resulting in the Sunset Expense Entry was based on Sound's general ledger accounting system and the monthly reporting received by Sound from the Sunsetting Billing Companies. These monthly reports detail cash collections made on accounts receivable. As such, this is all information that was readily available to Sound any time it wished to analyze cash collections and accounts receivable.

(3)    <u>Timing of Sunset Expense Entry and Receivables</u>

As previously stated, this $1.84M Sunset Expense was posted to the financials in June 2017, the third month of the Calculation Period that started on April 1, 2017. The receivables being reserved for relate to revenue recognized in months March through December 2016. The chart below displays the amounts included in the Sunset Expense Entry organized by the month the revenue was recognized (i.e. the patients' dates of service).



14

As of December 31, 2016 – six months prior to the June 2017 entry – more than $1.66M of the $1.84M in sunset receivables are already aged at least 60 days and more than $1.47M of the receivables are aged at least 90 days. As of the quarter-ended March 31, 2017 (the day before the Calculation Period), all $1.84M receivables included in this Sunset Expense Entry are over 90 days old and **$1.82M are over 120 days old**.

### (4)    Failure of Internal Controls over Financial Reporting

Sound provided an excerpt of their Revenue Recognition Process Narrative (the "Narrative") to help Dr. Carr understand how revenue, bad debt expense, contractual adjustments, accounts receivable, and allowance for doubtful accounts are supposed to be recorded according to Sound Physicians' policies. (Exhibit I: Sound Revenue Recognition Process Excerpt). The Narrative describes several processes and controls that should have taken place regularly during the relevant period. As an example, the last paragraph of the Narrative states:

> Periodically cash collections are reviewed and compared with revenue recorded to ensure appropriate estimates of APC per billable visit. Adjustments are taken as necessary to reflect ultimate cash expected to be received.

In a typical business with functioning internal controls over financial reporting, it would be expected that a "periodic" control as fundamental as the one described above would be performed on at least a quarterly basis. Sound should have performed this analysis and identified the need for an adjustment to receivables and bad debt expense during the preparation of its 2016 year-end financials. Sound should have performed this analysis again during the preparation of the financial statement close for the quarter ending March 31, 2017.

(5) "1611-PCS ACCTG" Site Number and Location

The inexplicable delay in recognizing the Sunset Expense is suspicious given that it serves to benefit Sound to the tune of $10.7M. Further, the unique nature of the account numbers and "site" number/location of the bad debt expense accounts is also suspicious. In the document "Request #3 - PCS Consolidated Monthly Trial Balances FINAL.xlsx" provided by Sound, the structure of the account numbering system used by Sound was described by Sound in the below note:

> **Note:** Each tab represents a consolidated monthly trial balance for all PCS entities. The overall GL account structure is as follows:
>
> 1111-22-3333-444
> 1111 = Main general ledger account
> 22 = Department number
> 3333 = Site number
> 444 = Legal entity
>
> GL accounts can be sorted by site number and legal entity to show separate trial balances. However, site trial balances will not have debits and credits equal since some assets and liaiblities are not site specific (e.g., cash, AR).

As seen above, the seventh through tenth digits of the account number represent the "Site number." As seen in the Sunset Expense Entry below, the $1.84M entry is associated with the "1611" site number with the corresponding site name "PCS Acctg." PCS Acctg is presumably an abbreviation for Professional Coverage Services accounting. Professional Coverage Services ("PCS") was the longtime legal name used by Dr. Carr for the primary entity that comprised the Companies. In the Agreement, Sound purchased the stock of PCS from Dr. Carr. Sound's coding of these one-time, particularized entries further indicate its mistreatment of the Sunset Expense to improperly reduce its second payment to Dr. Carr.

| Source Journal | Posting Date | Journal Comment | | Reversing Date | User Updated Logon | |
|---|---|---|---|---|---|---|
| Batch Number: 25104 | | | | | | |
| JE-028542 | 6/30/2017 | EM Bad Debt Reserve | | | amarchetti | |
| Account Number | | Description/Comment | | Debit | | Credit |
| 1328-00-1607-287 | | Doubtful Allow-Athen/Germantown/Carr PLLC EM Bad Debt Reserve | | 135,710.85 | | |
| 1328-00-1608-288 | | Doubtful Allow-Athen/MethodNort/TMCarrMDPC EM Bad Debt Reserve | | | | 635,144.96 |
| 1328-00-1609-288 | | Doubtful Allow-Athen/MethodSout/TMCarrMDPC EM Bad Debt Reserve | | | | 905,231.77 |
| 1328-00-1610-287 | | Doubtful Allow-Athen/MethodUniv/Carr PLLC EM Bad Debt Reserve | | | | 439,876.06 |
| 5701-01-1611-287 | | BD Self Pay PT/Site Ops/PCS Acctg/Carr PLLC EM Bad Debt Reserve | | 304,165.21 | | |
| 5701-01-1611-288 | | BD Self Pay PT/Site Ops/PCS Acctg/TMCarrMDPC EM Bad Debt Reserve | | 1,540,376.73 | | |
| | | Journal JE-028542 Totals: | | 1,980,252.79 | | 1,980,252.79 |

As part of Dr. Carr's review, Dr. Carr requested and Sound provided the entire general ledger detail reports for the period January 1, 2017 through March 31, 2018.[7] Over this 15 month period of time, there were over 1,500 journal entries posted to the general ledger including over 24,000 non-zero account entries. The Sunset Expense Entry **consists of the only two instances** that site number "1611" or site location "PCS Acctg" **ever** appear with activity in the general ledger.

### E. *Accounting Treatment of the $1.84M Sunset Expense Entry*

During Dr. Carr's review period, Sound tried to claim that the Sunset Expense Entry was appropriate because it was a change in accounting estimate per ASC 250 – Accounting Changes and Error Corrections. That argument is patently false and contrary to GAAP, as shown below. ASC 250-10-20 offers the following four definitions:

Change in Accounting Estimate:

A change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities. A change in accounting estimate is a necessary consequence of the assessment, in

---

[7] "Request #4 - GL_DetailReport FY2017.xlsx" and "Request #4 - GL_DetailReport FY2018.xlsx"

conjunction with the periodic presentation of financial statements, of the present status and expected future benefits and obligations associated with assets and liabilities. **Changes in accounting estimates result from new information.** Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, and warranty obligations.

Accounting Change:

A change in an accounting principle, an accounting estimate, or the reporting entity. **The correction of an error in previously issued financial statements is not an accounting change.**

Error in Previously Issued Financial Statements:

**An error in recognition, measurement, presentation, or disclosure in financial statements resulting from** mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or **oversight or misuse of facts that existed at the time the financial statements were prepared**. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

Restatement:

The process of **revising previously issued financial statements to reflect the correction of an error** in those financial statements.

(emphasis added). APB 20 paragraphs 10 and 13 provide further distinction and context to the matter at hand:

[...]Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained.

...

Reporting a correction of an error in previously issued financial statements concerns factors similar to those relating to reporting

an accounting change and is therefore discussed in the Opinion. **Errors in financial statements result from** mathematical mistakes, mistakes in the application of accounting principles, or **oversight or misuse of facts that existed at the time** the financial statements were prepared. **In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate.** A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error for purposes of applying this Opinion.

(APB 20 ¶¶ 10, 13 (emphasis added)).

Regardless of whether Sound's intent was malicious by delaying the recognition of the Sunset Expense (i.e. intentional oversight or misuse) or simply a matter of oversight, the facts and information related to the aged receivables were available in the regular reporting provided to Sound each month by the sunsetting billing companies. Further, Sound had accounting policies and procedures in place that should have identified the need to address the Sunset Expense long before the Calculation Period began.

There was no new information or subsequent developments leading to better insight or improved judgment regarding the collection of excessively aged receivables. The billing companies reported this information to Sound every month. Thus, Sound's error is clearly distinguishable from a change in estimate scenario.

As Sound's recognition of the Sunset Expense is clearly identifiable as an error, ASC 250-10-45-24 describes the appropriate accounting treatment:

Those items that are reported as error corrections **shall**, in single period statements, **be reflected as adjustments of the opening balance of retained earnings**. When comparative statements are

presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, **to reflect the retroactive application of the error corrections**.

Instead of treating the Sunset Expense appropriately as an adjustment to retained earnings, Sound's improper treatment resulted in a **windfall to Sound** of $10,734,142 – at Dr. Carr's expense.

### F.    *Timing of Sound's Error*

Treating the Sunset Expense as a one-time expense during the Calculation Period caused a direct reduction to NPSR and, therefore, the calculated Purchase Price. Recall that the Purchase Price is not calculated until Sound has operated the Companies for approximately two full years, as illustrated here:

| | March 16, 2016 | Closing Date | Sound takes control of Operations |
|---|---|---|---|
| March 16, 2016 - March 31, 2017 | | Sound Operations | Not included in Calculation Period |
| April 1, 2017 - March 31, 2018 | | Sound Operations | Calculation Period (i.e. Second Payment) |

Yet, the Sunset Expense Entry was for receivables generated from revenues that Sound recorded between March 2016 and December 2016, which is prior to the Calculation Period.

Sound should have reserved for the anticipated uncollectible receivables related to their Sunsetting Billing Companies transition prior to April 1, 2017, the beginning of the Calculation Period. As explained above, including the Sunset Expense in the financials during the Calculation Period ran afoul of both general accounting practice as well as Sound's own internal control procedures.

### G.    *Correct Calculation of the Purchase Price (and Resulting Second Payment)*

As seen in Sound's calculation below, NPSR and the number of patient visits are the two most significant drivers in arriving at Net Revenue:

| METHOD 2 PAYOUT CALCULATION: | |
|---|---:|
| Annual Visits (actual) | 295,596 |
| NPSR / Visit (actual) | 117.76 |
| Subsidy Revenue (actual) | $ 1,207,804 |
| **Net Revenue** | **$ 36,016,625** |
| | |
| **Less: Billing Expense (actual)** | **(2,135,694)** |
| **Less: Labor Costs and Malpractice (actual)** | **(30,270,906)** |
| | |
| **Earnings before Overhead** | **$ 3,610,025** |
| | |
| Earnings before Overhead Multiple | 7.37x |
| Purchase Price | 26,605,885 |
| 1st Payment | 30,000,000 |
| **2nd Payment** | **-** |

Because Sound had all the information necessary and the opportunity to appropriately reserve for the $1.84M Sunset Expense long before the beginning of the Calculation Period, and should have done so, Dr. Carr has corrected Sound's error by removing the $1.84M Sunset Expense Entry from the Calculation Period, adding $1.84M back into the NPSR calculation for June 2017. The below schedules show the revised NPSR/Visit and recalculated Second Payment (certain amounts rounded):

| | Sound Method 2: NPSR / Visit Calculation | | | | Corrected Method 2: NPSR / Visit Calculation | | | |
|---|---|---|---|---|---|---|---|---|
| | Net Patient Service Revenue (NPSR) | Visits | NPSR/Visit | Add Back | Correct NPSR | Visits | NPSR/Visit |
| Apr-2017 | $ 3,030,127 | 24,891 | $ 121.74 | | $ 3,030,127 | 24,891 | $ 121.74 |
| May-2017 | 3,190,899 | 26,255 | 121.53 | | 3,190,899 | 26,255 | 121.53 |
| Jun-2017 | 1,091,282 | 23,702 | 46.04 | $ 1,844,542 | 2,935,824 | 23,702 | 123.86 |
| Jul-2017 | 2,973,151 | 23,789 | 124.98 | | 2,973,151 | 23,789 | 124.98 |
| Aug-2017 | 3,292,339 | 26,345 | 124.97 | | 3,292,339 | 26,345 | 124.97 |
| Sep-2017 | 2,885,744 | 23,178 | 124.50 | | 2,885,744 | 23,178 | 124.50 |
| Oct-2017 | 3,007,037 | 24,173 | 124.40 | | 3,007,037 | 24,173 | 124.40 |
| Nov-2017 | 3,105,381 | 24,876 | 124.83 | | 3,105,381 | 24,876 | 124.83 |
| Dec-2017 | 3,249,639 | 26,027 | 124.86 | | 3,249,639 | 26,027 | 124.86 |
| Jan-2018 | 3,155,904 | 25,182 | 125.32 | | 3,155,904 | 25,182 | 125.32 |
| Feb-2018 | 2,877,529 | 23,067 | 124.75 | | 2,877,529 | 23,067 | 124.75 |
| Mar-2018 | 3,018,047 | 24,111 | 125.17 | | 3,018,047 | 24,111 | 125.17 |
| Total | $ 34,877,078 | 295,596 | | $ 1,844,542 | $ 36,721,620 | 295,596 | |
| **Average NPSR/Visit** | | | **$ 117.76** | | | | **$ 124.24** |

| METHOD 2 PAYOUT CALCULATION: | | CORRECTED METHOD 2 PAYOUT CALCULATION: | |
|---|---|---|---|
| Annual Visits (actual) | 295,596 | Annual Visits (actual) | 295,596 |
| NPSR / Visit (actual) | 117.76 | NPSR / Visit (actual) | 124.24 |
| Subsidy Revenue (actual) | $ 1,207,804 | Subsidy Revenue (actual) | $ 1,207,804 |
| **Net Revenue** | **$ 36,016,625** | **Net Revenue** | **$ 37,933,620** |
| **Less: Billing Expense (actual)** | (2,135,694) | **Less: Billing Expense (actual)** | (2,135,694) |
| **Less: Labor Costs and Malpractice (actual)** | (30,270,906) | **Less: Labor Costs and Malpractice (actual)** | (30,270,906) |
| **Earnings before Overhead** | **$ 3,610,025** | **Earnings before Overhead** | **$ 5,527,021** |
| Earnings before Overhead Multiple | 7.37x | Earnings before Overhead Multiple | 7.37x |
| Purchase Price | 26,605,885 | Purchase Price | 40,734,142 |
| 1st Payment | 30,000,000 | 1st Payment | 30,000,000 |
| **2nd Payment** | **-** | **2nd Payment** | **$ 10,734,142** |

As shown above, by correcting the sole error in the calculation that is at issue for the Neutral Accountant – removing the $1.84M Sunset Expense and recalculating the Purchase Price to $40,734,14 – the second payment amount due to Dr. Carr is $10,734,142.

## IV.     Conclusion – Sound's Sunset Expense Entry was Inappropriate

Sound's inappropriate inclusion of the Sunset Expense of $1.84M dramatically reduced the Purchase Price Calculation. The Sunset Expense Entry was exclusively related to prior periods and should have been recorded in those prior periods. To summarize the information described above:

- Sound acquired the Companies on March 16, 2016.

- The Parties negotiated a Second Payment Calculation that <u>excluded</u> the first year of Sound's operations of the Companies.

- The Parties negotiated that the Second Payment Calculation Period would utilize the second year of the Companies' performance and was defined as "the twelve (12) month period ending March 31, 2018." (Agreement, § 1.4(d)).

- In the first year of operations, Sound executed a strategic plan to replace third party billing companies that the Companies had utilized historically in favor of a new billing company, Intermedix.

- As should be expected, ending the business relationship with a company responsible for billing and collecting your receivables reduces that company's incentive to try to collect your outstanding receivables.

- Sound received monthly billing reports from the sunsetting billing companies that provided detail on accounts receivable. As of year-end December 31, 2016, Sound had clearly identifiable uncollectable receivables related to sunsetting the previous billing companies.

- Sound's internal accounting policies required procedures to be performed regularly that would have identified those uncollectible accounts in a timely manner, had they actually performed them.

- Suspiciously, Sound recorded this Sunset Expense to an account site number, 1611, and location name, "PCS Acctg," that was never utilized in any other journal entry in their entire general ledger.

- By delaying the recording of the $1.84M Sunset Expense until June 2017, Sound failed to comply with their own procedures and standard accounting practices. Whether this failure was inadvertent or intentional, this failure directly resulted in a cash benefit to Sound (at the expense of Dr. Carr) of almost six times (6x) the Sunset Expense.

- The Sunset Expense Entry was not the result of new information or subsequent events. The information Sound utilized to perform the calculations for the entry was readily available for the financial statement close procedures for the year ended December 31, 2016 and the quarter ended March 31, 2017.

- Sound's error was the result of oversight or the misuse of facts that existed at the time the financial statements were prepared.

- As the Sunset Expense Entry is actually correcting an error in previously issued financial statements, the appropriate accounting entry should be an adjustment to the opening balance of retained earnings, not bad debt expense during the Calculation Period.

Sound Physicians failed to record the Sunset Expense in a timely manner. This error – the sole issue before the Neutral Accountant here – resulted in a material misstatement in the Companies' financials in prior periods and materially impacted the Second Payment Calculation by reducing the calculation by $10,734,142.

Respectfully submitted this 21st day of February, 2020

MOORE & VAN ALLEN, PLLC

Mark A. Nebrig
Emily C. Pera
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Telephone: (704) 331-3787
Fax: (704) 339-5997
marknebrig@mvalaw.com
emilypera@mvalaw.com

Attorneys for T.M. Carr, M.D.