# EXHIBIT B



March 20, 2020

Mr. John P. Passarelli, Esq.
and Ms. Carol A. Svolos, Esq.
Kutak Rock LLP, 1650 Farnam
Street, Omaha, NE 68102

Ms. Pam W. Blair,, Esq.
McNabb, Bragorgos, Burgess &
Sorin, PLLC, 81 Monroe, Sixth
Floor, Memphis, TN 38103

Mr. Mark A. Nebrig, Esq. and
Ms. Emily Pera, Esq.,
Moore & Van Allen, 100 North
Tryon Street,   Charlotte, NC
28202

Re: Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. v. T.M. Carr, M.D.

To Parties Counsel:

This letter report is written in response to the February 21, 2020 submissions presented by the Parties to me as the Neutral Accountant pursuant to the Court's Order dated October 10, 2019.[1] Each Parties submission presents information and their position regarding the propriety of the accounting treatment of a $1,844,541.94 bad debt expense charge made through journal entry in June 2017 by Sound Inpatient Physicians, Inc. and Robert A. Bessler, MD (collectively, "Sound Physicians") during the Calculation Period relating to prior period operations.[2] This bad debt expense charge as applied by Sound Physicians results in a reduction of the Purchase Price since it reduces the Earnings before Overhead calculation amount for the twelve (12) month period ending March 31, 2018. Sound Physicians submission is included as **Exhibit A** (without attachments) and Dr. Carr's submission (without attachments) is included as **Exhibit B**. These

---

[1] I have adopted the defined terms presented in the Court Order Case 2:19-cv-02034 –TLP-dkv and submissions.
[2] It appears that there is no disagreement between the Parties that the June 2017 bad debt expense journal entry totaling $1,844,541.94 is associated with Sound Physician operations between March 2016 and December 2016.



submissions provide the background, scope and position of each party which I only briefly reiterate herein.

I have carefully considered the information included in both submissions and have concluded that the information provided is sufficient to allow me to offer an expert opinion. I am a certified public accountant and partner in the accounting and advisory firm Cherry Bekaert LLP. Cherry Bekaert LLP is a leading top 25 public accounting and advisory firm with offices in the United States and India with more than 1,300 employees. My curriculum vitae is included as **Exhibit C**.

I have supplemented the information presented by the Parties with independent authoritative accounting research and do not seek additional information or clarification. Finally, I only comment on the appropriate accounting treatment and do not recalculate the Purchase Price pursuant to the LLC Interest and Stock Purchase Agreement ("Purchase Agreement").

**Background**

It is my understanding based on the documents reviewed that Sound Physicians and Dr. Carr entered into the Purchase Agreement on March 16, 2016. According to the terms of the Purchase Agreement, the Purchase Price for the emergency medical services entities (the "Companies") could be no less than $30 million and no greater than $59 million. At closing, on March 16, 2016, Sound Physicians tendered an Initial Payment of $30 million. Thereafter, a Second Payment, if any, was determinable at the end of the Calculation Period.

According to the Purchase Agreement, the calculation of the Purchase Price of the Companies would be determined based on its "Earnings Before Overhead" for the twelve month period ending on March 31, 2018 (Calculation Period) determined as the lesser of applying two different calculation methods.[3] According to the Purchase Agreement, Earnings Before Overhead under either Method for the Calculation Period is determined as shown in **Table 1**:

---

[3] See Purchase Agreement, Schedule B, <u>Calculation of Purchase Price</u>.

**Table 1**

| |
|---|
| Net Revenue |
| Less: Billing Expense |
| Less: Labor Costs and Malpractice |
| Equals: Earnings before Overhead |

The key difference underlying each Parties calculation of Earnings Before Overhead is the determination of whether a prior period adjustment should be included in the calculation of Net Revenue used to determine the Calculation of Purchase Price for the Calculation Period, April 1, 2017 through March 31, 2018.

At the end of the Calculation Period, applying Method 2, Sound Physicians calculated a Purchase Price of $26,605,885 which is below the minimum Initial Payment. Thus, Sound Physicians believes no Second Payment is owed to Dr. Carr. This calculation includes a single journal entry deduction of $1,844,541.94 from Net Revenue for bad debt expense relating to revenue realized in periods before the Calculation Period (March 2016 through December 2016).

In contrast, Dr. Carr's calculation excludes the deduction of $1,844,541.94 from Net Revenue since the bad debt expense charge is associated with prior period revenue outside the Calculation Period. As a result of excluding this bad debt expense charge, the calculation of Earnings Before Overhead during the Calculation Period is greater resulting in a calculated Purchase Price of $40,734,142. This calculation would result in a Second Payment of $10,734,142 according to Dr. Carr.

**Analysis**

Based on accounting guidance and my professional experience, net patient service revenue (Net Revenue) is determined by subtracting from gross patient revenue contractual adjustments, policy discounts and other discounts, and adjustments less provisions for bad debts to arrive at net patient service revenue for the subject reporting period. This determination of Net Revenue is consistent with the Financial Accounting Standards Board (FASB) Accounting Standards Codification *ASC 954-605 Health Care Entities – Revenue Recognition*.[4]

This treatment is noted in authoritative AICPA guidance prepared by the Health Care Committee and Health Care Audit Guide Task Force (updated as of September 1, 2019).[5] The AICPA recognizes that the difference between gross patient service revenues and the estimated realizable amount includes deductions for contractual adjustments, policy discounts and other discounts, and adjustments that adjust gross service revenues, excluding charity care, to arrive at net patient service revenue in the statement of operations.[6] Thus is further illustrated in *FASB ASC 954-605-55-2* as presented in the statement of operations which includes a provision for bad debts to arrive at net patient service revenue for the accounting period. The AICPA states that in the period in which services are rendered, healthcare entities estimate the amount to which they will ultimately will be entitled for providing those services and report that amount as revenue.[7] Both submissions acknowledge that net patient service revenue (Net Revenue) includes these deductions from gross patient service revenue.

In effect, each of the deductions from gross patient service revenue are charges against such revenue to arrive at net patient service revenue earned during that accounting period. This accounting treatment is generally accepted and consistent with the matching principle, one of the most fundamental concepts in accrual accounting. The matching principle is an extension of the revenue recognition convention and is one of the basic underlying rules in accrual-based accounting. The matching principle directs a company to report an expense on its income

---

[4] These standards are in accordance with generally accepted accounting principles ("GAAP").
[5] AICPA Audit and Accounting Guides, Health Care Entities (updated as of September 1, 2019), Chapter 10: Health Care Service Revenue and Related Receivables
[6] Ibid, Chapter 10.21.
[7] Ibid.

statement in the period in which the related revenues are realized. The matching principles main purpose is to avoid any possibility of misstatement of earnings for a given period.

The accrual accounting concept requires accounting transactions to be recorded in the time period in which they occur, regardless of the time period when the actual cash flows for the transaction are received. Specific to this matter, the matching principle requires that bad debt expense be matched and reported in the same period as the sales that generated the receivable. While it is appropriate to estimate bad debt expense based on historical performance and adjust the estimate periodically, it is not appropriate to take a bad debt expense charge from a prior period to adjust net revenue for a subsequent period in the future. Companies should exclude the effect of prior period adjustments from current financial statements, since the changes have no relationship to the current period statement.

More simply, the matching principle requires that revenues and any related expenses be recognized together in the same reporting period so that financial performance during a specific period can be measured. Accordingly, if there is a cause and effect relationship between revenue and certain expenses, then record them at the same time.

*ASC 250-10-45-17* states that a change in accounting estimate is required to be accounted for in the period of change if the change affects that period only or in the period of change and future periods if the change affects both, rather than accounting for it by restating or retrospectively adjusting amounts reported in financial statements of prior periods. While GAAP requires an expense to be recognized once known, including prior period adjustments to determine Net Revenue earned during the Calculation Period for purposes of calculating Earnings Before Overhead is not appropriate. In this circumstance, the adjustment relates only to prior period operations and not related to the Calculation Period or the future.

Doing so would be inconsistent with the matching principle and could misstate Earnings Before Overhead for the underlying Calculation Period. The appropriate accounting treatment for this adjustment from a prior period would be to adjust the carrying amounts of any impacted assets or liabilities as of the first accounting period presented, with an offset to the beginning retained earnings balance in that same accounting period.

Sound Physicians decision to post a journal entry for a bad debt expense charge related to a period prior to the Calculation Period does not serve to properly match revenue and expense. While Sound Physicians' position is that the bad debt expense reserve during the Calculation Period was presumably inadequate to accurately determine Net Revenue for the Calculation Period, it has not sufficiently demonstrated that the additional $1,844,541.94 bad debt expense charge relating to prior period operations should be deducted from Revenue realized during the Calculation Period between April 1, 2017 through March 31, 2018. This prior period adjustment should be reflected in the Companies opening retained earnings balance and not be charged as an expense during the Calculation Period.

**Conclusion**

Sound Physicians bad debt expense charge in June 2017 in the amount of $1,844,541.94 related to prior period operations was not appropriate because the timing of the expense does not match the revenue during the Calculation Period.

I am available to discuss any questions the Parties may have.

Respectfully,

Steven A. Wolf, CPA
Cherry Bekaert LLP

# EXHIBIT A



**Kutak Rock LLP**
The Omaha Building, 1650 Farnam Street, Omaha, NE 68102-2103
office 402.346.6000


**John P. Passarelli**
402.346.6000
john.passarelli@kutakrock.com

February 21, 2020


**VIA E-MAIL**

Steven A. Wolf, CPA
Cherry Bekaert LLP
200 East Broward Boulevard, Suite 2000
Fort Lauderdale, FL 33301

   Re: Resolution by Neutral Accountant of Dispute Under LLC Interest and Stock
     Purchase Agreement dated March 16, 2016, by and among Sound Inpatient
     Physicians, Inc. and Robert A. Bessler, M.D. (collectively, "Sound
     Physicians") and T.M. Carr, M.D. ("Dr. Carr") (the "Purchase Agreement")

Dear Mr. Wolf:

   Sound Physicians has prepared the following information to provide background into the question before you, which is whether, in calculating Net Revenue as a component of the Purchase Price[1], the recording during the Calculation Period[2] of $1,844,541.94 of bad debt expense relating to prior periods was appropriate.

   Sound Physicians specifically notes that in the Court's Order dated October 10, 2019 that allowed for this Neutral Accountant procedure, the Court found that "Section 1.4(d) of the Agreement explicitly states '[e]ach of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant . . . .' Thus, [Sound Physicians] will be able to present [its] argument for why [it] included Bad Debt Expenses in the calculation of the Purchase Price." Order at 8-9. Indeed, the Purchase Agreement specifically states, "Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing." Purchase Agreement § 1.4(d). Though both parties are interested in an expedited arbitration process, Sound Physicians believes the process should afford you the opportunity to request additional information and seek clarification of the respective parties' positions on this matter. For example, during oral argument before the Court, Dr. Carr's counsel told the Court that there would be "a potential for the Neutral Accountant to say 'I need another piece of information.'" Dr. Carr's counsel told the Court that during this Neutral Accountant procedure, "we have an expert accountant I would expect to say, 'I don't think I need that or I do.' That's why he's the expert."

---

[1] All undefined capitalized terms herein have the same meaning as in the Purchase Agreement. *See* Purchase Agreement § 1.1; *see also* Purchase Agreement Schedule B, Calculation of the Purchase Price.
[2] The twelve (12) month period ending March 31, 2018. *See* Purchase Agreement § 1.4(a).

Sound agrees with that interpretation and approach and would be pleased to provide a supplement to today's submissions. Accordingly, while Sound Physicians took time and care to provide comprehensive information for your consideration, we welcome the opportunity to respond in writing to provide any additional information that you, as the expert, may require.

**The Purchase Agreement and the Purchase Price**

Sound Physicians and Dr. Carr entered into the Purchase Agreement to facilitate Dr. Carr's sale of emergency medicine services entities (the "Companies") to Sound Physicians. *See* Purchase Agreement page 1, Recitals A-C. According to the terms of the Purchase Agreement, the Purchase Price for these emergency medicine services Companies could be no less than $30 million nor greater than $59 million. *Id.* § 1.4(a). At Closing, Sound Physicians tendered the Initial Payment of $30 million. *Id.* § 1.4(b)(i). The Purchase Price, and therefore a Second Payment, if any, was determinable at the end of the Calculation Period. *Id.* § 1.4(b)(ii).

Under the Purchase Agreement, the Purchase Price would be calculated using a multiple times the Earnings Before Overhead realized by Sound Physicians from the operation of the purchased Companies during the Calculation Period. *See* Purchase Agreement, Schedule B at page 3. Earnings Before Overhead for the Calculation Period is defined as Net Revenue, Less Billing Expenses, and Less Labor Costs and Malpractice (each of which was defined slightly differently in two different calculation Methods). *See* Schedule B at pages 1-2. After utilizing both calculation Methods to calculate Earnings Before Overhead, the lesser of the two values of Earnings Before Overhead would be used to determine the Purchase Price. *See* Schedule B at pages 1-2.

At the end of the Calculation Period, using Method 2, Sound Physicians computed a Purchase Price of $26,605,885. *See* **Exhibit A**. Since this figure is less than the minimum $30 million Purchase Price, no Second Payment was required.

Generally following the procedure outlined in the Purchase Agreement, Dr. Carr reviewed Sound Physicians' calculation of the Purchase Price and objected to Sound Physicians' inclusion, when calculating Net Revenue, of a deduction of $1,844,541.94 for bad debt expense relating to periods before the Calculation Period.

**Bad Debt Expense From Prior Periods Must Be Included in Calculating Net Revenue**

Attached as **Exhibit A** is Sound Physicians' calculation of Net Revenue using the Method 2 Calculation set out on Schedule B. Sound Physicians properly included bad debt expense from prior periods as a deduction when calculating this Net Revenue for the following reasons:

First, Generally Accepted Accounting Principles in the United States (GAAP) expects changes in estimates, of which Net Revenue is one, to be included within the period the change is identified.

Second, industry standards support bad debt expense as a deduction to estimate Net Revenue.

Finally, in hindsight, inclusion of the bad debt expense deduction resulted in a Net Revenue calculation that more closely mirrored the actual cash received for dates of service within the Calculation Period.

**(A)      Revenue Recognition Must Take Bad Debt Expense Into Account**

Schedule B of the Purchase Agreement sets forth the methodology to calculate the Purchase Price, which incorporates the concept of Net Revenue.  *See* Schedule B at pages 1-2.  In accordance with the Financial Accounting Standards Board (FASB) Accounting Standards Codification *ASC 954-605 Health Care Entities - Revenue Recognition*, attached hereto as **Exhibit B**, Net Revenue is comprised of gross revenues net of contractual allowances, discounts, and a provision for bad debts, in order to ensure that Net Revenue is close to the amount that the health care entity expects to collect.  *See* **Exhibit B** at 954-605-45-4.  The FASB advises,

Some health care entities may perform services for patients for which the ultimate collection of all or a portion of the amounts billed or billable cannot be determined at the time services are rendered. For example, some health care entities have a policy of providing services to patients and recording patient service revenue regardless of their ability to pay and, in some cases *(for example, hospital emergency departments)*, are required by law to treat emergency conditions regardless of a patient's ability to pay. As a result, those health care entities might record revenue along with a relatively high bad-debt provision in the period of service. A health care entity that recognizes significant amounts of patient service revenue at the time the services are rendered even though it does not assess the patient's ability to pay shall present all of the following as separate line items on the face of the statement of operations:

a.  Patient service revenue (net of contractual allowances and discounts)

b.  The provision for bad debts (the amount related to patient service revenue and included as a deduction from patient service revenue)

c.  The resulting net patient service revenue less the provision for bad debts.

**Exhibit A** at 954-605-45-4 (emphasis added).  Accordingly, Sound Physicians records its best estimate of Net Revenue using inputs such as payer mix, published Medicare reimbursement fee

schedules, contracts with commercial payers, and guidance from third-party billing agencies related to expected collections.

In calculating Net Revenue using Method 2, Sound Physicians followed its revenue recognition policy, including its best estimate of the net amount expected to be collected for the emergency room services provided during the Calculation Period. The estimated Net Revenue (gross revenues less contractual allowances and less a provision for bad debts) included in the Purchase Price Calculation was $36,016,625, which equates to $117.76 net revenue per visit.[3] See **Exhibit A**.

**(B)     Net Revenue as an Estimate and GAAP Treatment of Changes in Estimate**

The recognition of Net Revenue is a significant accounting estimate for Sound Physicians. The language below is taken directly from Sound Physicians' Audited Financial Statements as of December 31, 2018, footnote (2), Summary of Significant Accounting Policies (bold emphasis added). A similar footnote was used for 2017 and 2016 audited financial statements:

*Use of Estimates*

*The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses at the date of the consolidated financial statements. **Significant estimates include the net realizable value of accounts receivable, including initial revenue recognition**, medical malpractice insurance receivable and payable for known claims, liabilities for claims incurred but not reported (IBNR) related to medical malpractice, and the valuation of goodwill and intangibles. **Such estimates are based on historical experience and various other assumptions that are expected to be reasonable under the circumstances. Actual results could differ from these estimates and any changes in these estimates are recognized when known.***

To aid in the understanding of the history of Sound Physicians' net revenue per visit (also referred to as encounter) for the Companies, we provide a summary from the Closing date forward:

**March 2016 - December 2016.**  Average net revenue per visit of $121.17 was recorded in Sound Physicians' general ledger.  See **Exhibit C.**  The initial net revenue per visit recorded in 2016 was recorded based upon Sound Physicians' best estimate—these Companies were Sound Physicians' first emergency medicine practices—leveraging its experience with hospital medicine and critical care medicine as well as various third-party billing company estimates provided to Sound during its search for a billing and collections vendor.

---

[3] While Method 1 places a limit on net revenue per visit, Method 2 does not.  *See* Schedule B at pages 1-2.

January 2017 - December 2017. Average net revenue per visit of $117.24 was recorded in the general ledger. See **Exhibit C**. This average net revenue per visit is inclusive of the $1,844,541.94 bad debt expense entry in question that related to 2016 dates of service. See **Exhibit D**. The $1,844,541.94 of contested bad debt expense relates specifically to an adjustment recorded during the Calculation Period that was necessary under Sound Physicians' accounting policies (which are in compliance with GAAP) to properly reflect net revenue and related accounts receivable expected to be collected at that time. This adjustment was recorded in June 2017 based upon the review of cash collections and accounts receivable remaining on the balance sheet, the determination of which utilized actual and expected collections data related to services provided from the Closing date through December 31, 2016.

In accordance with *ASC 250 Accounting Changes and Error Corrections*, specifically ASC 250-10-45-17, a change in accounting estimate is not accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods; rather, a change in accounting estimate is accounted for in the period of change. *See* **Exhibit E**. Accordingly, it was entirely appropriate to include a deduction for bad debt expense from prior periods in the Net Revenue calculation.

Additionally, when calculating the Purchase Price of $26,605,885, *see* **Exhibit A**, the average net revenue per visit inclusive of the bad debt expense entry in question yielded an appropriate estimate, $117.76 average net revenue per visit, which is reflective of Sound Physicians' collections experience, as follows.

January 2018 – December 2018. Average net revenue per visit of $102.64 was recorded in the general ledger. *See* **Exhibit C**. This average net revenue per visit is inclusive of a $3,095,417 bad debt expense entry recorded in December 2018 related to 2017 dates of service. *See* **Exhibit F**. Like the bad debt expense entry in question, this adjustment related to dates of service from a prior period, 2017; notably, nine of the twelve months of the Calculation Period were in 2017. Yet the necessity for the increase in bad debt expense, and thus decrease in net revenue, was only determined in 2018 and thus recorded in 2018. Excluding the bad debt increase in December 2018, Sound had recorded an estimated average net revenue of $116.17 per visit from January 2018 to November 2018, reflecting what Sound Physicians had similarly experienced with 2016 and 2017 dates of service. *See* **Exhibit C**.

January 2019 – December 2019. Average net revenue per visit of $119.80 was recorded in the general ledger. *See* **Exhibit C**. At this time, Sound Physicians continues to work through the normal year end procedures, and this net revenue per visit is likely to change when finalizing year end 2019 financial statements. This preliminary estimate of $119.80 average net revenue per visit reflects an increase from an average of $118.61 per visit estimate from January 2019 – August 2019 to an average of $122.17 per visit beginning in September 2019 due to process and contractual improvements effective in 2019 that are unrelated to the issue at hand.

**Summary:** The history of average net revenue per visit from acquisition date of the Companies forward to December 2019 demonstrates the consistency in the overall estimate made in each fiscal year, as well as within the Calculation Period. While the accrual of net revenue to the financial statements is a significant management estimate, the average net revenue per visit for each year, as well as for the twelve months within the Calculation Period, reflects Sound Physicians' best estimate of ultimate cash collections for visits/encounters with patients. These estimates included both monthly as well as periodic adjustments to bad debt expenses in order to appropriately reflect Sound Physicians' best estimate of net revenue per visit, as required under GAAP.

**(C)     Sound Physicians' Estimate of Net Revenue Is Reasonable When Compared To Actual Collections**

To assess the reasonableness of the estimated $117.76 average net revenue per visit recorded during the Calculation Period, Sound Physicians considered the model utilized to determine the value of the business being acquired, noting that the historical data provided by Dr. Carr during transaction due diligence indicated $105.00 net revenue per visit for the year 2014. *See* **Exhibit G**. Thus the $117.76 net revenue per visit used in Sound Physicians' Method 2 calculation of the Purchase Price is over $12 per visit *higher* that the rate earned prior to Sound Physicians' assumption of the operation of the acquired Companies.

Moreover, at the time of the Purchase Price calculation, Net Revenue was an accounting estimate. However, as of December 31, 2019, total cash received related to the Calculation Period was $33,719,687.43. This is reflective of $114.07 per visit. *See* **Exhibit H**. While reasonable, Sound Physicians' estimate of Net Revenue during the Calculation Period was slightly overstated compared to the cash ultimately received.

**Conclusion**

With 295,596 visits at an estimated $117.76 per visit, Sound Physicians' estimated Net Revenue per Method 2 as provided for in the Purchase Agreement for the Calculation Period was $36,016,625 (including a deduction for the $1,844,541.94 of bad debt expense in question). Actual cash received was $33,719,687.43 through December 31, 2019, indicating Sound Physicians' estimate was too high, rather than too low, resulting in a Purchase Price calculation that was also too high, rather than too low.

Removing the $1,844,541.94 deduction for bad debt expense from the calculation, as proposed by Dr. Carr, would have increased the estimated Net Revenue still higher to $37,861,166.90, an overstatement of $4,141,479.47 compared to the actual cash received through December 31, 2019. This increase in Net Revenue for the Calculation Period is (1) inappropriate under GAAP and (2) unsupported by the actual Net Revenue collected for the Calculation Period.

For these reasons, the inclusion of the $1,844,541.94 deduction for bad debt expense in calculating Net Revenue during the Calculation Period was entirely appropriate.

If you require any further information regarding the above, please let us know.

Sincerely,

*/s/ John P. Passarelli*

John P. Passarelli

cc:    Mark A. Nebrig, Esq.
       Emily Pera, Esq.
       Pam W. Blair, Esq.
       Carol A. Svolos, Esq.

**EXHIBIT B**

<u>**Neutral Accountant Submission of T.M. Carr, M.D.**</u>

# TABLE OF CONTENTS

I.     Introduction ................................................................................................ 1

II.    Factual Background and Scope ................................................................. 3

       A.    The Purchase Agreement ................................................................. 3

       B.    Delivery of and Objection to the Purchase Price Under the Agreement ............................ 4

       C.    Dr. Carr's Objection to Sound's Purchase Price Calculation ................................. 5

       D.    The Court's Order Compelling Arbitration ....................................... 7

III.   Detailed Accounting Analysis .................................................................. 8

       A.    Sound's Calculation of Purchase Price and Second Payment ................................ 9

       B.    Sound Changes Billing Companies ................................................ 10

       C.    Identifying Sound's $1.84M Sunset Expense Entry ............................ 12

       D.    Understanding the $1.84M Sunset Expense Entry ............................. 13

             (1)    Sunsetting Billing Companies .......................................... 13

             (2)    Sources of Information for Analysis ................................ 14

             (3)    Timing of Sunset Entry and Receivables .......................... 14

             (4)    Failure of Internal Controls over Financial Reporting ................. 15

             (5)    "1611-PCS ACCTG" Site Number and Location .................. 16

       E.    Accounting Treatment of the $1.84M Sunset Expense Entry ................. 17

       F.    Timing of Sound's Error ................................................................ 20

       G.    Correct Calculation of the Purchase Price (and, as a result, the Second Payment) .............. 21

IV.    Conclusion – Sound's Sunset Expense Entry was Inappropriate ........................... 22

# I.    **Introduction**

In accordance with Section 1.4(d) of the LLC Interest and Stock Purchase Agreement (the "Agreement"[1]) between Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. (collectively "Sound") and T.M. Carr, M.D. ("Dr. Carr;" collectively with Sound, "the Parties"), Dr. Carr makes the following written submission to Stephen A Wolf, CPA (the "Neutral Accountant"), specifying the required scope of the Neutral Accountant's analysis and setting forth Dr. Carr's position as to his sole objection to Sound's calculation of the Purchase Price. Herein, Dr. Carr demonstrates why it was improper for Sound to include in its calculation of the Purchase Price a single journal entry for a bad debt expense adjustment of $1,844,541.94 (the "Bad Debt Expense"), which Sound incurred prior to and outside of the calculation period of April 1, 2017 through March 31, 2018 (the "Calculation Period") but recorded in June 2017. Further, Dr. Carr shows how this improper inclusion of the Bad Debt Expense artificially reduced the second payment of the Purchase Price owed by Sound to Dr. Carr, as contemplated by the Agreement, from $10,734,142 to $0.

Before moving into the substance of the sole accounting issue to be decided here by the Neutral Accountant, it is important for the Neutral Accountant to understand the scope of the analysis as required by the Agreement and the order of the federal court presiding over the Parties' dispute. Once the scope is defined, the detailed accounting analysis that follows will show how Sound improperly reduced the amount of the Purchase Price, and therefore the second payment owed to Dr. Carr.

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

1

In his order and opinion dated October 10, 2019 (the "Order"), U.S. District Court Judge Thomas L. Parker determined that the unambiguous terms of the Agreement delegated a single responsibility to the Neutral Accountant here: to "decide 'only the matters objected to by Dr. Carr and not resolved by Sound Physicians and Dr. Carr with respect to the determination of the Purchase Price.'" (Exhibit A: October 10, 2019 Order; Exhibit B: Agreement §1.4(d)). The Purchase Price calculated by Sound, under the procedure set forth in the Agreement and referenced by the Court, was $26,605,885, and the **only** matter to which Dr. Carr objected that was not resolved by the Parties, also in accordance with the Agreement and the Order, was Sound's inclusion of the Bad Debt Expense in its calculation, which reduced the amount of the second payment rightfully owed to Dr. Carr by $10,734,142. Therefore, in keeping with the terms of the Agreement and the Order, the Neutral Accountant's sole task here is to determine the propriety of Sound's inclusion of the Bad Debt Expense in its Purchase Price calculation of $26,605,885. Note that this sole issue for consideration by the Neutral Accountant is not bad debt expense in general, but the consideration of the propriety of a single Bad Debt Expense journal entry made by Sound in June 2017.

The Neutral Accountant's determination as to the propriety of the inclusion of the Bad Debt Expense will dictate whether Sound's calculated Purchase Price of $26,605,885 is correct. If Sound's inclusion of the Bad Debt Expense was proper, the Purchase Price stands. If its inclusion was improper, the Purchase Price must be adjusted by the Neutral Accountant to reflect the removal of the improperly-included expense. This adjustment would result in a Purchase Price of $40,734,142 and would require a second payment of $10,734,142. While Sound may invite the Neutral Accountant to disregard the Agreement and Judge Parker's Order and inappropriately

broaden the analysis – for example, to recalculate the Purchase Price beyond the inclusion of the Bad Debt Expense or to consider alternative Purchase Price Schedules – the Neutral Accountant is not allowed to accept such invitations.[2]

## II.    Factual Background and Scope

### A.    The Purchase Agreement

In March 2016, the Parties entered into the Agreement, through which Sound purchased Dr. Carr's membership interests in two Tennessee professional limited liability companies and all of the issued and outstanding stock of a Tennessee professional corporation (collectively, the "Companies"). The Agreement defined "Purchase Price" as the "total purchase price calculated and payable to Dr. Carr in accordance with Section 1.4." (*Id.* at § 1.1). Under Section 1.4, Payment of the Purchase Price, the Purchase Price would equal "(i) a multiple determined in the manner described in Schedule B hereto times (ii) the Companies' consolidated 'Earnings Before Overhead' generated during the twelve (12) month period ending March 31, 2018 (the "Calculation Period");…." (*Id.* at § 1.4(a)). The Purchase Price would be an amount no less than $30,000,000 and no greater than $59,000.000. (*Id.*)

Section 1.4 required Sound to pay the Purchase Price in two distinct payments: an initial payment of $30,000,000 on the closing date, and a second payment of an amount to be calculated based on Schedule B of the Agreement less the initial payment amount. According to Schedule B, the Purchase Price would be calculated based on the lesser of the two methods defined in Schedule B. If the lesser of those two methods yielded a final Purchase Price less than Sound's initial payment to Dr. Carr, there would be no second payment to Dr. Carr.

---

[2] These broadening tactics by Sound were considered by and expressly rejected by Judge Parker.

### B.    *Delivery of and Objection to the Purchase Price Under the Agreement*

Under Section 1.4(d), Sound was required to prepare and deliver to Dr. Carr its final determination of the amount of the Purchase Price (the "Purchase Price Schedule") within 30 days of the end of the calculation period (or by approximately April 30, 2018), "setting forth all components (and the amounts thereof) necessary to compute the Purchase Price." (*Id.* at § 1.4(d)). Sound was to determine the purchase price "in good faith on a basis consistent with Schedule B [there]to." (*Id.*) Notably, Section 1.4(d) did not provide for a process by which Sound could present subsequent alternative calculations to Dr. Carr at a later date, nor did it require Dr. Carr to consider, evaluate, or respond to such subsequent calculations. (*Id.*)

Once Sound timely delivered its Purchase Price Schedule to Dr. Carr, Section 1.4(d) afforded Dr. Carr the right to review the Schedule, examine its underlying calculations and materials, and "object to any amount or computation" in the Purchase Price Schedule by providing Sound with such objections in writing before the expiration of the review period. (*Id.*) It also established a process to address the specific matters to which Dr. Carr objected:

> If Dr. Carr timely objects to any item or computation appearing in the Purchase Price Schedule prior to the expiration of the Purchase Price Review Period, Dr. Carr and Sound Physicians shall, during the thirty (30) day period following the delivery of Dr. Carr's objection, attempt in good faith jointly to resolve **the matters on the Purchase Price Schedule to which Dr. Carr objected**.

(*Id.* (emphasis added)). If the Parties could not resolve any of Dr. Carr's objections in good faith, Section 1.4(d) further detailed the process for binding resolution of those objections through engagement of a Neutral Accountant:

> In the event Dr. Carr and Sound Physicians cannot resolve all of such matters by the end of such thirty (30) day period, either Dr. Carr or Sound Physicians may immediately engage the Neutral

Accountant to resolve any items that remain in dispute. Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing, and **the parties shall require the Neutral Accountant**, within thirty (30) days thereafter, acting as an expert and not an arbitrator, **to resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound Physicians with respect to the determination of the Purchase Price**. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant. ... The Purchase Price finally determined pursuant to this Section 1.4(d) **shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to the Agreement**.

(*Id.* (emphasis added)).

### C. *Dr. Carr's Objection to Sound's Purchase Price Calculation*

On or about April 27, 2018, Sound delivered to Dr. Carr its Purchase Price Schedule – the only such schedule Sound delivered within the timeframe established by Section 1.4(d). (Exhibit C: PCS Contingent Payment Analysis – 3/31/2018). Sound's Purchase Price Schedule reflected a price calculation of $26,605,885.00, which was lower than the initial payment Sound made to Dr. Carr and, if accurate, would result in no second payment to Dr. Carr. (*Id.*).

In the ensuing months, Sound repeatedly delayed providing Dr. Carr with the information underlying its calculation. On September 27, 2018, as required by Section 1.4(d), Dr. Carr submitted to Sound his specific, formal objections to its Purchase Price Schedule. (Exhibit D: 9/27/18 Corresp. Stating Objections). Relevant here, Dr. Carr expressly objected to Sound's treatment of the Bad Debt Expense:

> Sound Physicians improperly accrued material charges for bad debt expenses during the Calculation Period relating to prior periods. This prior period adjustment affecting Net Patient Services Revenue during the Calculation Period is inappropriate under GAAP

> accounting and the Purchase Agreement. Sound Physicians'
> calculation of the Purchase Price Schedule and the Purchase Price
> included improperly accrued bad debt expenses of at least
> $1,844,541.94.

(*Id.*). This objection represented the "matters objected to by Dr. Carr" that would require good

faith discussions and, if unsuccessful, submission to the Neutral Accountant under the terms of

the Agreement. (Agreement § 1.4(d)).[3]

Rather than facilitate the engagement of a Neutral Accountant, Sound debated the merits

of Dr. Carr's objection and even attempted to submit an alternative, untimely calculation of the

Purchase Price that (1) Dr. Carr neither requested nor agreed to consider, and (2) was neither

expressly nor implicitly permitted under Section 1.4(d). Ultimately, Sound demonstrated its

acknowledgment and agreement to submit Dr. Carr's sole objection to its lone valid Purchase

Price calculation to the Neutral Accountant:

> Sound is prepared to engage Ernst & Young to act as the Neutral
> Accountant pursuant to Section 1.4(d) of the Purchase Agreement
> for the purpose of determining whether Sound properly included a
> bad debt reserve of $1,844,541.94 in connection with its
> estimation of the Companies' Net Revenue during the Calculation
> Period.

(Exhibit F: 12/6/18 Corresp. re: Neutral Accountant; *see also* Exhibit G: 12/14/18 Corresp. re:

Confusion of Issue of Neutral Accountant Submission)). However, notwithstanding its expressed

agreement to submit Dr. Carr's remaining objection to a Neutral Accountant, Sound

---

[3] While Dr. Carr initially asserted a second objection to Sound's inclusion of non-medical compensation expenses in the Purchase Price, that objection was ultimately resolved by the Parties. Mark Nebrig's correspondence to Steven Amen with Kutak Rock, dated November 14, 2018, confirms the objection to the inclusion of bad debt expense was the only remaining objection for resolution by the Neutral Accountant. (Exhibit E: 11/14/18 Corresp. Re: Unresolved Objection).

simultaneously sought to hijack the scope of Dr. Carr's objection and improperly expand the inquiry of the Neutral Accountant (*Id.*).

Nothing within the negotiated language of Section 1.4(d) permitted Sound to dictate, redefine, or expand the nature and scope of Dr. Carr's objection to the Purchase Price Schedule; rather, the objection was Dr. Carr's to articulate. (*Id.* at § 1.4(d)). While Dr. Carr continued to press for the expeditious engagement of a Neutral Accountant to resolve his sole objection, Sound side-stepped its obligation to submit the matter to the Neutral Accountant and initiated litigation in January 2019, through which it sought a declaratory judgment as to the calculation of the Purchase Price and the scope of the Neutral Accountant's analysis.

### D.   *The Court's Order Compelling Arbitration*

After full briefing and argument from counsel, Judge Parker expressly rejected Sound's attempts to broaden the scope of inquiry by the Neutral Accountant beyond a determination of whether the Bad Debt Expense (which was incurred prior to and outside of the Calculation Period of April 1, 2017 through March 31, 2018) was properly included in Sound's $26,605,885.00 Purchase Price.  On October 10, 2019, the Court granted Dr. Carr's motion to compel Sound's declaratory judgment claim to arbitration before a Neutral Accountant. In so ruling, Judge Parker **rejected** Sound's arguments that the scope of Section 1.4(d) covered "any items remaining in dispute" (as determined by either party) or that the Neutral Accountant should consider another "Purchase Price" from Sound, rather than only resolve Dr. Carr's only remaining objection to the $26,605,885.00. (Order p. 11). In compelling the sole issue of the Bad Debt Expense to a Neutral Accountant, Judge Parker noted that the clear language of Section 1.4(d) narrowed the scope of

any arbitration to **only** those matters objected to by Dr. Carr that remained unresolved. The Court opined:

> Section 1.4(d) specifies that the parties agreed to structure their arbitration agreement so that the arbitration is limited to only those issues objected to by Dr. Carr and only his objections that remained unresolved by the parties. The parties drafted § 1.4(d)'s arbitration clause to be quite narrow. **And the language of § 1.4(d) leaves no doubts about the scope of arbitrable issues – only those matters to which Dr. Carr objected and left unresolved by the parties are subject to arbitration.**

(*Id.* at p. 12) (emphasis added). In accordance with the Court's Order and the plain terms of the Agreement, Sound, through its Neutral Accountant submission, may not change the scope of the only relevant issue or offer alternative calculations to the $26,605,885.00 Purchase Price.

### III. Detailed Accounting Analysis

As set forth above, Dr. Carr's sole objection to Sound's Purchase Price calculation is whether Sound improperly accrued material charges for bad debt expenses of at least $1,844,541.94 during the Calculation Period relating to prior periods. More specifically, the $1.84M Bad Debt Expense is comprised of a single adjusting journal entry, JE-028542, posted on June 30, 2017, and the appropriateness of this single journal entry is the only matter that is properly before the Neutral Accountant for resolution. The entry exclusively relates to revenues and receivables recorded between March 16, 2016 and December 31, 2016, as shown in the chart below.



June 2017 Journal Entry to Bad Debt Exp:
Amount Reserved by Date of Service

Sound's inappropriate, prior period adjustment recorded during the Calculation Period impacted the second payment calculation associated with the Agreement by $10,734,142, which should be paid to Dr. Carr.

### A. Sound's Calculation of the Purchase Price and Second Payment

As previously stated, Schedule B of the Agreement required Sound to calculate the Purchase Price (and therefore the Second Payment amount) based on the lesser of two methods defined in Schedule B. Sound's calculation resulted in the following:

1) Method 1[4]: Purchase Price of $43,208,886, indicating a Second Payment of $13,208,886; and

2) Method 2: Purchase Price of $26,605,885, indicating a Second Payment of $0.

Sound provided the below showing its calculations of the two Methods:

---

[4] Method 1 was designed in a manner that approximated the Net Patient Service Revenue ("NPSR"), the operating ratios, costs, and profitability of the Companies as managed by Dr. Carr, adjusted for the patient volume – the actual business.

| METHOD 1 PAYOUT CALCULATION: | | | METHOD 2 PAYOUT CALCULATION: | | |
|---|---|---|---|---|---|
| Annual Visits (actual) | | 295,596 | Annual Visits (actual) | | 295,596 |
| NPSR / Visit (max $107.21) | | 107.21 | NPSR / Visit (actual) | | 117.76 |
| Net Revenue | $ | 31,690,847 | Subsidy Revenue (actual) | | $ 1,207,804 |
| | | | Net Revenue | | $ 36,016,625 |
| | | | | | |
| Less: Billing Expense (at 6.5% contract billing rate) | $ | (2,059,905) | Less: Billing Expense (actual) | | (2,135,694) |
| Less: Labor Costs and Malpractice (not to exceed 75% revenue) | $ | (23,768,135) | Less: Labor Costs and Malpractice (actual) | | (30,270,906) |
| | | | | | |
| Earnings before Overhead | $ | 5,862,807 | Earnings before Overhead | | $ 3,610,025 |
| | | | | | |
| Earnings before Overhead Multiple | | 7.37x | Earnings before Overhead Multiple | | 7.37x |
| Purchase Price | | 43,208,886 | Purchase Price | | 26,605,885 |
| 1st Payment | | 30,000,000 | 1st Payment | | 30,000,000 |
| 2nd Payment | | 13,208,886 | 2nd Payment | | - |
| | | | | | 3,394,115 shortfall |

| 3/31/18 earnout liability analysis: | | | |
|---|---|---|---|
| Earnout liability on balance sheet | $ | - | |
| Earnout per current forecast | | - | Lower of Method 1 or Method 2 |
| 3/31/18 reduction in liability | $ | - | |

(PCS Contingent Payment Analysis – 3/31/18; Sound's Earnout Calculation Xcel file is attached with this Submission and Exhibits). As Method 2 resulted in the lesser value, Sound determined that no Second Payment was due. Dr. Carr's sole objection to that calculation followed.

### B. *Sound Changes Billing Companies*

Critical to Dr. Carr's objection to the Purchase Price calculation is Sound's decision to change billing companies, as that change is the lone component of the disputed single journal entry of $1.84M. Healthcare entities often use billing companies to handle their revenue cycle management ("RCM"). RCM is the process by which these third-party billing companies handle a healthcare entity's initial encounter/appointment, billing for healthcare services, and collection of payments, among other related administrative tasks. Typically, these billing companies are paid based on a percentage of payment collections billed by that company. Historically, the Companies used two billing companies to handle their RCM: Martin Gottlieb and Associates ("Gottlieb") and Physician Revenue Management and Consulting, LLC ("PRMC").

Shortly after the acquisition of the Companies, Sound implemented a strategic decision to transition the existing billing companies utilized by the Companies for four of the hospital sites at which the Companies provided services to a new billing company, Intermedix. A strategic

decision of this nature would have been the subject of planning and financial analysis culminating in the decision to move forward with the transition.

An impending change of a billing company may reduce the efforts put forth toward collection of the Companies' outstanding receivables, since the prior billing company's incentives are significantly reduced leading up to and after termination. For any reasonable businessperson, this understanding should necessitate an expectation of higher than normal uncollectible revenue during the transition period. This is a factor that would have or should have been discussed and considered as Sound contemplated the transition of billing companies.

In July 2016, less than five months after Sound acquired the Companies, Sound terminated Gottlieb and contracted with Intermedix to handle the RCM related to two of the Companies' hospital sites. It is Dr. Carr's understanding that, around that same time, Sound attempted to terminate PRMC as the billing company for two other hospital sites; however, PRMC's contract only allowed Sound to terminate them at year-end with at least three months' notice. As such, Sound provided PRMC notice and terminated them as of December 31, 2016, less than ten months after Sound acquired the Companies. On January 1, 2017, Intermedix started serving as the new billing company for those two hospital sites.

Based on documents and data provided to Dr. Carr by Sound, Sound referred to this strategic decision and event as "Sunsetting Billing Companies." This strategic decision to sunset the existing billing companies is of particular note because all of the $1,844,542 in Bad Debt Expense (the "Sunset Expense," hereafter used synonymously with Bad Debt Expense), reflected in the journal entry (JE-028542) posted in June 2017 (the "Sunset Expense Entry"), is related to

those revenues and receivables managed by Gottlieb (through July 2016) and PRMC (through December 2016). None of the adjustment related to any of Intermedix's billings in 2016 or 2017.

### C.    Identifying Sound's $1.84M Sunset Expense Entry

During Dr. Carr's review of Sound's Purchase Price Schedule, Dr. Carr identified an unusually low NPSR per visit ("NPSR/Visit") for the month June 2017, as seen below.[5] For the month June 2017, the Companies had an NPSR/Visit of $46.04, which is just 37% of the average $124.28/Visit for all other months in the Calculation Period.



As seen in the calculation of the Purchase Price, NPSR/Visit is one of the most important inputs into the Method 2 calculation. Dr. Carr identified that this unusually low rate in June 2017 appeared to be related to a journal entry increasing bad debt expense by $1.84M for the month – the Sunset Expense Entry.

---

[5] Months outside of Calculation Period are Blue; Months inside of the Calculation Period are Green and Red; June 2017 is Red.

Dr. Carr requested information and support relating to the journal entry. On July 13, 2018, Dr. Carr had a call to discuss this $1.84M journal entry and other questions with Autumn Huiatt ("Ms. Huiatt"), Controller and Vice President of Accounting for Sound. Ms. Huiatt explained that the entry reserved for certain uncollectible amounts related to revenue and receivables recorded in 2016. She agreed to provide supporting documentation for the journal entry.[6]

The supporting documentation received by Dr. Carr after his request was a two page PDF document that included journal entry JE-028542, the Sunset Expense Entry, printed from Sound's accounting system and an analysis schedule titled "Sunsetting Billing Companies" that detailed the net $1.84M Sunset Expense Entry (Exhibit H: JE 028542 and Sunsetting Analysis).

### D. Understanding the $1.84M Sunset Expense Entry

After reviewing the supporting documents in tandem with other information provided by Sound, Dr. Carr identified several troubling characteristics about the substance of the $1.84M Sunset Expense Entry and Sound's corresponding analysis, as described below.

### (1) Sunsetting Billing Companies

Sound's analysis that calculated the Sunset Expense is titled "Sunsetting Billing Companies." As described previously, this refers to Sound's decision to change the billing companies used by the Companies from the existing providers Gottlieb and PRMC to a new billing company, Intermedix. Again, the Companies stopped using Gottlieb by the end of July 2016 and PRMC by the end of December 2016. Sound's sunsetting analysis calculates the anticipated

---

[6] Additionally, Sound explained to Dr. Carr that the Companies had been recording too high of an NPSR/Visit and the Companies needed to revise that rate down. Whether the Companies were recording the appropriate NPSR/Visit is not within the scope of this arbitration, per Judge Parker's orders; however, as shown in the graph above, the Companies actually started recording an even higher NPSR/Visit after June 2017, which contradicts the assertion made by Ms. Huiatt. In the two months prior to the improper Sunset Expense Entry, NPSR/Visit averaged $121.64, while in the nine months following the adjustment, NPSR/Visit averaged $124.85, a 2.6% increase.

uncollectible receivables for each billing company and each hospital location where that revenue and receivables were generated for the months of March 2016 through July 2016 for Gottlieb and March 2016 through December 2016 for PRMC. This analysis does not include any calculations of uncollectible amounts for Intermedix receivables recorded in 2016 or 2017.

(2)    <u>Sources of Information for Sound's Analysis</u>

Sound's analysis resulting in the Sunset Expense Entry was based on Sound's general ledger accounting system and the monthly reporting received by Sound from the Sunsetting Billing Companies. These monthly reports detail cash collections made on accounts receivable. As such, this is all information that was readily available to Sound any time it wished to analyze cash collections and accounts receivable.

(3)    <u>Timing of Sunset Expense Entry and Receivables</u>

As previously stated, this $1.84M Sunset Expense was posted to the financials in June 2017, the third month of the Calculation Period that started on April 1, 2017. The receivables being reserved for relate to revenue recognized in months March through December 2016. The chart below displays the amounts included in the Sunset Expense Entry organized by the month the revenue was recognized (i.e. the patients' dates of service).



As of December 31, 2016 – six months prior to the June 2017 entry – more than $1.66M of the $1.84M in sunset receivables are already aged at least 60 days and more than $1.47M of the receivables are aged at least 90 days. As of the quarter-ended March 31, 2017 (the day before the Calculation Period), all $1.84M receivables included in this Sunset Expense Entry are over 90 days old and **$1.82M are over 120 days old**.

### (4)    Failure of Internal Controls over Financial Reporting

Sound provided an excerpt of their Revenue Recognition Process Narrative (the "Narrative") to help Dr. Carr understand how revenue, bad debt expense, contractual adjustments, accounts receivable, and allowance for doubtful accounts are supposed to be recorded according to Sound Physicians' policies. (Exhibit I: Sound Revenue Recognition Process Excerpt). The Narrative describes several processes and controls that should have taken place regularly during the relevant period. As an example, the last paragraph of the Narrative states:

> Periodically cash collections are reviewed and compared with revenue recorded to ensure appropriate estimates of APC per billable visit. Adjustments are taken as necessary to reflect ultimate cash expected to be received.

In a typical business with functioning internal controls over financial reporting, it would be expected that a "periodic" control as fundamental as the one described above would be performed on at least a quarterly basis. Sound should have performed this analysis and identified the need for an adjustment to receivables and bad debt expense during the preparation of its 2016 year-end financials. Sound should have performed this analysis again during the preparation of the financial statement close for the quarter ending March 31, 2017.

The inexplicable delay in recognizing the Sunset Expense is suspicious given that it serves to benefit Sound to the tune of $10.7M. Further, the unique nature of the account numbers and "site" number/location of the bad debt expense accounts is also suspicious. In the document "Request #3 - PCS Consolidated Monthly Trial Balances FINAL.xlsx" provided by Sound, the structure of the account numbering system used by Sound was described by Sound in the below note:

> Note: Each tab represents a consolidated monthly trial balance for all PCS entities. The overall GL account structure is as follows:
>
> 1111-22-3333-444
> 1111 = Main general ledger account
> 22 = Department number
> 3333 = Site number
> 444 = Legal entity
>
> GL accounts can be sorted by site number and legal entity to show separate trial balances. However, site trial balances will not have debits and credits equal since some assets and liabilities are not site specific (e.g., cash, AR).

As seen above, the seventh through tenth digits of the account number represent the "Site number." As seen in the Sunset Expense Entry below, the $1.84M entry is associated with the "1611" site number with the corresponding site name "PCS Acctg." PCS Acctg is presumably an abbreviation for Professional Coverage Services accounting. Professional Coverage Services ("PCS") was the longtime legal name used by Dr. Carr for the primary entity that comprised the Companies. In the Agreement, Sound purchased the stock of PCS from Dr. Carr. Sound's coding of these one-time, particularized entries further indicate its mistreatment of the Sunset Expense to improperly reduce its second payment to Dr. Carr.

| | | Batch Number: 25104 | | | |
| JE-028542 | 6/30/2017 | EM Bad Debt Reserve | | amarchetti | |
| **Account Number** | | **Description/Comment** | | **Debit** | **Credit** |
| 1328-00-1607-287 | | Doubtful Allow-Athen/Germantown/Carr PLLC EM Bad Debt Reserve | | 135,710.85 | |
| 1328-00-1608-288 | | Doubtful Allow-Athen/MethodNort/TMCarrMDPC EM Bad Debt Reserve | | | 635,144.96 |
| 1328-00-1609-288 | | Doubtful Allow-Athen/MethodSout/TMCarrMDPC EM Bad Debt Reserve | | | 905,231.77 |
| 1328-00-1610-287 | | Doubtful Allow-Athen/MethodUniv/Carr PLLC EM Bad Debt Reserve | | | 439,876.06 |
| 5701-01-1611-287 | | BD Self Pay PT/Site Ops/PCS Acctg/Carr PLLC EM Bad Debt Reserve | | 304,165.21 | |
| 5701-01-1611-288 | | BD Self Pay PT/Site Ops/PCS Acctg/TMCarrMDPC EM Bad Debt Reserve | | 1,540,376.73 | |
| | | **Journal JE-028542 Totals:** | | 1,980,252.79 | 1,980,252.79 |

As part of Dr. Carr's review, Dr. Carr requested and Sound provided the entire general ledger detail reports for the period January 1, 2017 through March 31, 2018.[7] Over this 15 month period of time, there were over 1,500 journal entries posted to the general ledger including over 24,000 non-zero account entries. The Sunset Expense Entry **consists of the only two instances** that site number "1611" or site location "PCS Acctg" **ever** appear with activity in the general ledger.

### E.    *Accounting Treatment of the $1.84M Sunset Expense Entry*

During Dr. Carr's review period, Sound tried to claim that the Sunset Expense Entry was appropriate because it was a change in accounting estimate per ASC 250 – Accounting Changes and Error Corrections. That argument is patently false and contrary to GAAP, as shown below.

ASC 250-10-20 offers the following four definitions:

Change in Accounting Estimate:

> A change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities. A change in accounting estimate is a necessary consequence of the assessment, in

---

[7] "Request #4 - GL_DetailReport FY2017.xlsx" and "Request #4 - GL_DetailReport FY2018.xlsx"

conjunction with the periodic presentation of financial statements, of the present status and expected future benefits and obligations associated with assets and liabilities. **Changes in accounting estimates result from new information.** Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, and warranty obligations.

Accounting Change:

A change in an accounting principle, an accounting estimate, or the reporting entity. **The correction of an error in previously issued financial statements is not an accounting change.**

Error in Previously Issued Financial Statements:

**An error in recognition, measurement, presentation, or disclosure in financial statements resulting from** mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or **oversight or misuse of facts that existed at the time the financial statements were prepared**. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

Restatement:

The process of **revising previously issued financial statements to reflect the correction of an error** in those financial statements.

(emphasis added). APB 20 paragraphs 10 and 13 provide further distinction and context to the matter at hand:

[...]Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained.

...

Reporting a correction of an error in previously issued financial statements concerns factors similar to those relating to reporting

an accounting change and is therefore discussed in the Opinion. **Errors in financial statements result from** mathematical mistakes, mistakes in the application of accounting principles, or **oversight or misuse of facts that existed at the time** the financial statements were prepared. **In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate.** A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error for purposes of applying this Opinion.

(APB 20 ¶¶ 10, 13 (emphasis added)).

Regardless of whether Sound's intent was malicious by delaying the recognition of the Sunset Expense (i.e. intentional oversight or misuse) or simply a matter of oversight, the facts and information related to the aged receivables were available in the regular reporting provided to Sound each month by the sunsetting billing companies. Further, Sound had accounting policies and procedures in place that should have identified the need to address the Sunset Expense long before the Calculation Period began.

There was no new information or subsequent developments leading to better insight or improved judgment regarding the collection of excessively aged receivables. The billing companies reported this information to Sound every month. Thus, Sound's error is clearly distinguishable from a change in estimate scenario.

As Sound's recognition of the Sunset Expense is clearly identifiable as an error, ASC 250-10-45-24 describes the appropriate accounting treatment:

> Those items that are reported as error corrections **shall**, in single period statements, **be reflected as adjustments of the opening balance of retained earnings**. When comparative statements are

presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, **to reflect the retroactive application of the error corrections**.

Instead of treating the Sunset Expense appropriately as an adjustment to retained earnings, Sound's improper treatment resulted in a **windfall to Sound** of $10,734,142 – at Dr. Carr's expense.

### F.    *Timing of Sound's Error*

Treating the Sunset Expense as a one-time expense during the Calculation Period caused a direct reduction to NPSR and, therefore, the calculated Purchase Price. Recall that the Purchase Price is not calculated until Sound has operated the Companies for approximately two full years, as illustrated here:

|  | March 16, 2016 | Closing Date | Sound takes control of Operations |
|---|---|---|---|
| March 16, 2016 - | March 31, 2017 | Sound Operations | Not included in Calculation Period |
| April 1, 2017 - | March 31, 2018 | Sound Operations | Calculation Period (i.e. Second Payment) |

Yet, the Sunset Expense Entry was for receivables generated from revenues that Sound recorded between March 2016 and December 2016, which is prior to the Calculation Period.

Sound should have reserved for the anticipated uncollectible receivables related to their Sunsetting Billing Companies transition prior to April 1, 2017, the beginning of the Calculation Period. As explained above, including the Sunset Expense in the financials during the Calculation Period ran afoul of both general accounting practice as well as Sound's own internal control procedures.

### G. *Correct Calculation of the Purchase Price (and Resulting Second Payment)*

As seen in Sound's calculation below, NPSR and the number of patient visits are the two most significant drivers in arriving at Net Revenue:

| METHOD 2 PAYOUT CALCULATION: | |
|---|---:|
| Annual Visits (actual) | 295,596 |
| NPSR / Visit (actual) | 117.76 |
| Subsidy Revenue (actual) | $ 1,207,804 |
| **Net Revenue** | **$ 36,016,625** |
| | |
| **Less: Billing Expense (actual)** | **(2,135,694)** |
| **Less: Labor Costs and Malpractice (actual)** | **(30,270,906)** |
| | |
| **Earnings before Overhead** | **$ 3,610,025** |
| | |
| Earnings before Overhead Multiple | 7.37x |
| Purchase Price | 26,605,885 |
| 1st Payment | 30,000,000 |
| **2nd Payment** | **-** |

Because Sound had all the information necessary and the opportunity to appropriately reserve for the $1.84M Sunset Expense long before the beginning of the Calculation Period, and should have done so, Dr. Carr has corrected Sound's error by removing the $1.84M Sunset Expense Entry from the Calculation Period, adding $1.84M back into the NPSR calculation for June 2017. The below schedules show the revised NPSR/Visit and recalculated Second Payment (certain amounts rounded):

| | Sound Method 2: NPSR / Visit Calculation | | | Corrected Method 2: NPSR / Visit Calculation | | | |
|---|---|---|---|---|---|---|---|
| | Net Patient Service Revenue (NPSR) | Visits | NPSR/Visit | Add Back | Correct NPSR | Visits | NPSR/Visit |
| Apr-2017 | $ 3,030,127 | 24,891 | $ 121.74 | | $ 3,030,127 | 24,891 | $ 121.74 |
| May-2017 | 3,190,899 | 26,255 | 121.53 | | 3,190,899 | 26,255 | 121.53 |
| Jun-2017 | 1,091,282 | 23,702 | 46.04 | $ 1,844,542 | 2,935,824 | 23,702 | 123.86 |
| Jul-2017 | 2,973,151 | 23,789 | 124.98 | | 2,973,151 | 23,789 | 124.98 |
| Aug-2017 | 3,292,339 | 26,345 | 124.97 | | 3,292,339 | 26,345 | 124.97 |
| Sep-2017 | 2,885,744 | 23,178 | 124.50 | | 2,885,744 | 23,178 | 124.50 |
| Oct-2017 | 3,007,037 | 24,173 | 124.40 | | 3,007,037 | 24,173 | 124.40 |
| Nov-2017 | 3,105,381 | 24,876 | 124.83 | | 3,105,381 | 24,876 | 124.83 |
| Dec-2017 | 3,249,639 | 26,027 | 124.86 | | 3,249,639 | 26,027 | 124.86 |
| Jan-2018 | 3,155,904 | 25,182 | 125.32 | | 3,155,904 | 25,182 | 125.32 |
| Feb-2018 | 2,877,529 | 23,067 | 124.75 | | 2,877,529 | 23,067 | 124.75 |
| Mar-2018 | 3,018,047 | 24,111 | 125.17 | | 3,018,047 | 24,111 | 125.17 |
| Total | $ 34,877,078 | 295,596 | | $ 1,844,542 | $ 36,721,620 | 295,596 | |
| Average NPSR/Visit | | | $ 117.76 | | | | $ 124.24 |

| METHOD 2 PAYOUT CALCULATION: | | CORRECTED METHOD 2 PAYOUT CALCULATION: | |
|---|---|---|---|
| Annual Visits (actual) | 295,596 | Annual Visits (actual) | 295,596 |
| NPSR / Visit (actual) | 117.76 | NPSR / Visit (actual) | 124.24 |
| Subsidy Revenue (actual) | $ 1,207,804 | Subsidy Revenue (actual) | $ 1,207,804 |
| Net Revenue | $ 36,016,625 | Net Revenue | $ 37,933,620 |
| | | | |
| Less: Billing Expense (actual) | (2,135,694) | Less: Billing Expense (actual) | (2,135,694) |
| Less: Labor Costs and Malpractice (actual) | (30,270,906) | Less: Labor Costs and Malpractice (actual) | (30,270,906) |
| | | | |
| Earnings before Overhead | $ 3,610,025 | Earnings before Overhead | $ 5,527,021 |
| | | | |
| Earnings before Overhead Multiple | 7.37x | Earnings before Overhead Multiple | 7.37x |
| Purchase Price | 26,605,885 | Purchase Price | 40,734,142 |
| 1st Payment | 30,000,000 | 1st Payment | 30,000,000 |
| 2nd Payment | - | 2nd Payment | $ 10,734,142 |

As shown above, by correcting the sole error in the calculation that is at issue for the Neutral Accountant – removing the $1.84M Sunset Expense and recalculating the Purchase Price to $40,734,14 – the second payment amount due to Dr. Carr is $10,734,142.

## IV.  Conclusion – Sound's Sunset Expense Entry was Inappropriate

Sound's inappropriate inclusion of the Sunset Expense of $1.84M dramatically reduced the Purchase Price Calculation. The Sunset Expense Entry was exclusively related to prior periods and should have been recorded in those prior periods. To summarize the information described above:

- Sound acquired the Companies on March 16, 2016.

- The Parties negotiated a Second Payment Calculation that <u>excluded</u> the first year of Sound's operations of the Companies.

- The Parties negotiated that the Second Payment Calculation Period would utilize the second year of the Companies' performance and was defined as "the twelve (12) month period ending March 31, 2018." (Agreement, § 1.4(d)).

- In the first year of operations, Sound executed a strategic plan to replace third party billing companies that the Companies had utilized historically in favor of a new billing company, Intermedix.

- As should be expected, ending the business relationship with a company responsible for billing and collecting your receivables reduces that company's incentive to try to collect your outstanding receivables.

- Sound received monthly billing reports from the sunsetting billing companies that provided detail on accounts receivable. As of year-end December 31, 2016, Sound had clearly identifiable uncollectable receivables related to sunsetting the previous billing companies.

- Sound's internal accounting policies required procedures to be performed regularly that would have identified those uncollectible accounts in a timely manner, had they actually performed them.

- Suspiciously, Sound recorded this Sunset Expense to an account site number, 1611, and location name, "PCS Acctg," that was never utilized in any other journal entry in their entire general ledger.

- By delaying the recording of the $1.84M Sunset Expense until June 2017, Sound failed to comply with their own procedures and standard accounting practices. Whether this failure was inadvertent or intentional, this failure directly resulted in a cash benefit to Sound (at the expense of Dr. Carr) of almost six times (6x) the Sunset Expense.

- The Sunset Expense Entry was not the result of new information or subsequent events. The information Sound utilized to perform the calculations for the entry was readily available for the financial statement close procedures for the year ended December 31, 2016 and the quarter ended March 31, 2017.

- Sound's error was the result of oversight or the misuse of facts that existed at the time the financial statements were prepared.

- As the Sunset Expense Entry is actually correcting an error in previously issued financial statements, the appropriate accounting entry should be an adjustment to the opening balance of retained earnings, not bad debt expense during the Calculation Period.

Sound Physicians failed to record the Sunset Expense in a timely manner. This error – the sole issue before the Neutral Accountant here – resulted in a material misstatement in the Companies' financials in prior periods and materially impacted the Second Payment Calculation by reducing the calculation by $10,734,142.

Respectfully submitted this 21st day of February, 2020

MOORE & VAN ALLEN, PLLC

Mark A. Nebrig
Emily C. Pera
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Telephone: (704) 331-3787
Fax: (704) 339-5997
marknebrig@mvalaw.com
emilypera@mvalaw.com

Attorneys for T.M. Carr, M.D.

**EXHIBIT C**



# Steven A. Wolf, CPA, CFE, ABV/CFF, ASA
## Partner, Forensic Services

**Let's Talk**
E swolf@cbh.com
C 954.612.3595
P 954.556.1737

A Partner with Cherry Bekaert, Steve specializes in forensic accounting, economic damages, fraud investigation and valuation services. Clients often seek his guidance on complex commercial contract disputes, internal investigations, partnership and shareholder disputes, construction default and delay claims, post-acquisition disputes, economic damages and earning loss calculations, professional liability claims and bankruptcy matters.

With more than 30 years of experience, Steve has either prepared or evaluated numerous financial accounting, insurance claim and economic analyses, business valuations, feasibility studies, fairness opinions, and solvency analyses. In addition, he has assessed contract compliance, and investigated matters involving employee dishonesty and white collar fraud. A sought-after expert witness, Steve has testified at trial, arbitration and at deposition in matters related to accounting, economic damages, fraud investigation and business valuation. He has also served as a court-appointed neutral expert.

Steve began his career as a staff accountant at a Big Four firm in New York where he performed financial and operational audits of Fortune 500 companies. He has since served in executive and practice leadership positions at top-tier international litigation consulting and valuation services practices. Prior to joining Cherry Bekaert, Steve spent five years as an executive director at a leading litigation, forensic and transaction advisory services firm in Washington, DC.

 **Healthcare**

 **Financial Services**

 **Real Estate & Construction**

## Education

BS in Accounting, Binghamton University

MBA, Temple University

## CPA License

FL-AC46910
MD-0033539
PA-CA030531R

## Specialties/Areas of Expertise

` Commercial Litigation
` Economic Damages
` Forensic Accounting & Financial Investigations
` Fraud Investigation

` Tax Controversy
` Transaction Disputes
` Trustee, Monitoring & Receivership
` Valuation

## Professional Involvement

` American Institute of Certified Public Accountants (AICPA)

` Association of Certified Fraud Examiners

` American Society of Appraisers

` Florida Institute of Certified Public Accountants (FICPA)

cbh.com/swolf





# Steven A. Wolf, CPA, CFE, ABV/CFF, ASA

Partner – Forensic Services

### Contact

954-556-1737

swolf@cbh.com

### Industry Experience

Financial Services

Healthcare and Medical Equipment

Leisure and Hospitality

Manufacturing

Real Estate and Construction

Technology

### Selected Matters

Bear Stearns – Advisor to the Law Firm

Duane Reade– Advisor to the Law Firm

Enron – Advisor to the Law Firm

Freddie Mac – Advisor to the Co.

HMS Host – Advisor to the Company

Roche Medical Diagnostics – Advisor to the Law Firm

Liberty Healthcare – Advisor to the Company

Pinnacle Construction – Advisor to the Company

Lyondell Chemical Company – Advisor to the Lenders

Mirant Corp. – Advisor to the law Firm

NYMEX – Advisor to the Law Firm

Diamond Resorts – Advisor to the Law Firm

Wachovia Bank ERISA – Advisor to ERISA plan members

### Experience

With over 30 years of professional advisory experience, Mr. Wolf is the national partner in charge of Cherry Bekaert's Forensic and Litigation Advisory Services practice. He specializes in matters involving litigation, dispute analysis, business valuation, investigative, and transaction advisory services. He has significant experience in assessment of commercial economic loss matters involving complex commercial litigation attributed to breach of contract, allegations of fraud, insurance claims, forensic accounting, bankruptcy, employment and marital valuation disputes. His experience includes the calculation of lost earnings, economic damages, lost profits, liquidated and consequential damages, extra expenses incurred, loss mitigation involving complex commercial claims. He is a well-known expert in his field and has been recognized as a leader within the forensic accounting profession.

Earlier in his career, Mr. Wolf performed financial audits of Fortune 500 companies. He has been accepted as an expert witness in several jurisdictions in the areas of accounting, economic damages, fraud investigation, and business valuation.

### Representative Experience in Selected Matters

- Performed a forensic accounting analysis as a Court appointed neutral expert to assist the parties resolve accounting dispute associated with a formula used in a waterfall calculation related to healthcare benefits involving workers compensation medical claims. This matter required an extensive analysis of accounting records and cost accounting methodologies of both parties and effectively reconcile transactions among the parties to assist the Court to determine how certain issues would be resolved under alleged breaches of reps and warranties.

- Assisted regional healthcare and rehabilitation services company located North Carolina analyze lost business income and profits associated with potential contract breach. The analysis required an understanding of payer mix and reimbursement rates among more than a dozen facility locations.

- Assisted international timeshare developers calculate the economic impact to its business due to alleged tortious interference and false advertising claims resulting in greater than expected customer account default rates.

- Acting as a neutral forensic accountant on behalf of a family estate for the trustee and temporary guardian to analyze financial transactions, develop a sources and uses analysis and identify potential irregular activities.

- Assisted a litigation trust to determine economic damages from asbestos product liability claims. Assignment was to estimate future claims and establish reasonable reserves for the trust.



**Representative Experience in Selected Matters** (cont'd)

- Performed an internal investigation on behalf of a leading national healthcare outpatient rehabilitation provider to determine the facts stemming from a multi-year financial misstatement and alleged earnings management scheme perpetrated by senior corporate officers. Analysis included reviewing financial documents, conducting interviews, evaluating internal controls and accounting systems, reviewing e-mails, and determining possible causes of action for potential recovery.  An integral component of this investigation was analysis of the payer mix and capitation rates.

- Assisted SE Regional public hospital analyze potential economic damages attributed to an alleged breach of contract of a subcontractor and medical supplies vendor involving allegations of fraud and overbilling. Analyzed contract compliance and competitive bidding practices.

- Led a world-wide team of forensic accountant analyze the financial accounting of one the world's leading medical diagnostics companies.  The matter involved the calculation of economic damages resulting from underreporting of product sales and resulting royalties due to licensor of patented technology

- Assisted the board of directors of several hospitals in Pennsylvania and Ohio investigate alleged medical billing irregularities involving unbundling of CPT codes as recommended by an outside consultant.

- Performed numerous forensic white-collar crime accounting investigations from suspected embezzlement by corporate officers or employees. The investigations involved forensic examination of corporate books and records, sales and vendor contracts, bank statements and tax returns. In each case, the forensic analysis provided a factual accounting of fraudulent or suspicious transactions perpetrated by the employee. The findings were later used to terminate and prosecute the officer and  employees.

- Calculated business interruption loss and provided expert testimony for the largest airport retail concessions operator in the United States for losses incurred after the September 11th, 2001 terrorist attacks. The losses were attributed to the governments civil authority order that prohibited access to airports. This matter was the first ruling from a federal court granting coverage under an insurance policy for business interruption losses sustained at airports nationwide in the wake of the September 11th terrorist attacks. This analysis required calculation of business interruption at approximately sixty airports containing hundreds of retail concessions. This analysis was used to effectively settle the valuation dispute after expert testimony was offered.

- Evaluated and critiqued alleged lost profits and extra expenses of an acute care hospital located in Louisiana, stemming from the aftermath of Hurricane Katrina. The analysis included assessment of the institutions.

- Prepared property damage, extra expense and business interruption insurance claim for race track casino and hotel located in the Gulf Coast from the aftermath of Hurricanes Rita and Katrina.

- Calculated individual's economic loss claim by quantifying the difference between projected income and benefits (i.e., wages, fringe benefits, retirement income) and actual income and benefits. The individuals' ranged from teenagers and those advanced in their careers. This economic loss claim was intended to award U.S. Citizens injured, U.S. Citizens killed, and the immediate family members of those killed as a result of the 1983 bombing of the U.S. Embassy in Beirut, Lebanon. These analyses included assessment and review of each individual's earnings history and education, industry and labor statistics, life expectancy census and future employment opportunities. The methodology and loss calculations were presented at trial in Federal District Court in Washington, D.C.

- Calculated an individual minor's lost lifetime earnings stemming from learning disability. Lost earnings included salary, fringe benefits, post-retirement benefits and out-of-pocket expenses. This analysis included evaluating and predicting anticipated future career opportunities based on assumed level of educational attainment but for the disability.  The analysis involved calculating the difference between projected income (assuming no disability) offset by projected income (with disability). Various economic assumptions were developed that supported the calculation of economic loss.



**Representative Experience in Selected Matters** (cont'd)

- Calculated an individual's past and future lost earnings resulting from her wrongful discharge from employment stemming from alleged Civil Rights violations. Lost earnings included salary, merit pay, fringe benefits, post-retirement benefits and out-of-pocket expenses. This analysis included evaluating historical salary levels and growth rates, history of promotions, job performance evaluations, anticipated future career opportunities available within the organization, educational background, statistical work-life and life expectancy and general economic trends.

- Prepared an individual's economic loss claim for past and future lost earnings and post-retirement lost income stemming from an injury suffered on the job and resulting workers compensation benefits. This dispute arose from an E.E.O.C. claim involving the denial of workers compensation benefits. These benefits were anticipated throughout the plaintiff's statistical work-life but were terminated without cause. The analysis involved calculating the difference between projected income (assuming no injury) and benefits available under workers compensation. Various economic assumptions were developed that supported the calculation of economic loss. The estimate of loss and related assumptions were accepted by the E.E.O.C., which resulted in a favorable settlement.

- Developed an alternative methodology to compute economic loss for the estate of an individual killed in the Pentagon on September 11, 2001. The September 11th Victim Compensation Fund of 2001 was established by Congress to provide compensation to individuals who were injured or killed as a result of the attacks. The calculated loss required extensive economic research and development of assumptions including effective tax rate, discount rate, inflation rate, statistical census data involving work-life and life-expectancy and personal consumption factor, etc. The analysis resulted in the preparation of a supportable claim for almost three times the pre-determined amount offered by the U.S. Government.

- Calculated compensatory damages for more than 25 individuals killed or injured stemming from the 1991 Iraq invasion of Kuwait (Gulf War). This is known as the "Human Shields" case. Analysis involved quantifying the difference between projected income and benefits (i.e., wages, fringe benefits, retirement income) and actual income and benefits. In addition, it was necessary to identify and deduct any mitigating income identified. Recently, the U.S. Government authorized claims to be paid from frozen Iraqi assets.

- Performed a forensic accounting investigation of a technology-based energy company on behalf of its majority investor stemming from an alleged D &O securities fraud. The investigation analyzed the source and use of all investment proceeds from inception to date and determined that funds were misappropriated by management. In addition, the analysis was used by government authorities to further prosecute the alleged fraudster. This investigation is ongoing.

- Prepared business interruption claim for an international provider of financial consulting services stemming from a computer virus that adversely impacted its ability to provide service to clients. Analysis included a multi-office review of average historical staff utilization and fees, cost and margin analysis, preparation of proof of loss report and negotiation with insurance company representatives that resulted in a favorable settlement of claim.

- Performed a forensic accounting analysis of the employee expense reimbursement policies and systems of a private equity firm on behalf of its board of directors to determine if there was potential for insurance recovery under its fidelity bond. The investigation analyzed the use of corporate assets to determine if funds were converted by employees for personal benefit. Analysis included reviewing financial documents and conducting interviews to determine possible causes of action for potential recovery. Analysis resulted in several employees making restitution to company.

- Assisted co-generation energy power plant to re-build its operations and recover economic losses stemming from an extended plant closure due to catastrophic fire and water damage. Analysis aided policyholder negotiate with carrier and the public adjuster to receive a fair and reasonable settlement under the terms of its insurance policy.

- Evaluated and critiqued the business interruption loss stemming from the largest commercial meat recall in United States history. The product recall included more than 27 million pounds of cooked sandwich meat after warnings of possible contamination from the listeria bacteria. The analysis included assessment of historical earnings, profitability/margins by product type, growth trends, and extra expenses. Assisted parties reach settlement.

.



**Representative Experience in Selected Matters** (cont'd)

- Provided expert testimony at trial in response to a major multi-brand automotive dealership and repair facility claimed business interruption losses stemming from roof collapse resulting in fire and water damage to premises on behalf of insurance carrier to evaluate the reasonableness of insureds claim. Expert testimony refuted claimed business interruption loss of policy holder that substantially reduced insured claim value.

- Performed an independent assessment of damages due to a covered insurance construction delay and disruption of two facilities inside the International Zone ("IZ") a/k/a/ "Green Zone" in Baghdad, Iraq in late 2007 through mid-2008. Analysis included assessment of project cost and allocation methods including cost verification of labor and materials expended that were not reimbursed.

- Evaluated and critiqued claims for business interruption lost profits of a publicly-held leading convenience store retailer and calculated an alternative measure of damages stemming from the World Trade Centre collapse. This project required an analysis of corporate historical sales, profitability, review of forecasts and budgets, assessment of specific store sales data and trends, customer loyalty program statistics to address their purchasing behaviour, and economic and industry data.

- Conducted a forensic accounting analysis and audit investigation of a major construction real estate development and management company working on behalf of the U.S. Government in an alleged breach of contract. Allegations included fraud and mismanagement involving subcontractor transactions and inappropriate accounting cost allocations and recordkeeping due to lax internal controls and inappropriate business relationships.

- On behalf of construction project surety performed a construction cost audit to determine costs incurred and remaining costs necessary to complete municipal project. Analysis included cost to complete analysis, review of general contractor's books and records, review of costs incurred to date and reasonableness of direct cost and overhead cost allocation methodology.

- Performed a forensic accounting damages assessment of an international oil refinery to recover insurance proceeds for lost profits and extra expenses. Analysis included direct construction cost analysis to repair pipeline and lost profits assessment.

- Performed a post-transaction valuation analysis on behalf of one of the nation's largest issuers of subprime residential mortgages that sold its business to a leading international financial services company. In dispute were the final terms of the sale agreement and determination of the value of substantially all of the assets and operating liabilities associated with the mortgage business, as well as specified contingent liabilities arising from our operation of the mortgage business prior to closing that were identified in the purchase and sale agreement.

- Performed a forensic accounting investigation of a major electric and gas company involving a decade of financial transactions to evaluate the form and substance of activity between the parent company and its subsidiary related to one of the largest financial restatements and subsequent bankruptcies in recent U.S. history. This matter required recasting financial statements for periods before the restatement period to evaluate the financial condition of the company.

- Evaluated and critiqued business interruption claim for lost profits and extra expenses of a regional egg farm producer stemming from a fire causing partial product recall and economic damages due to unforeseen damage to physical plant refrigeration facilities and chickens. The project required an analysis of industry trends, review of company-specific historical production statistics, review of historical financial statistics regarding costs and profitability and preparation of an expert report. A key element of the analysis was assessment of mitigating factors that were not considered by the insured's. This report was used to settle the matter.

- Prepared business interruption and extra expense analysis on behalf of the world's largest fine-dining steakhouse stemming from fire and water damage at one of its Mid-Atlantic restaurants. Analysis provided a fair and credible estimate of economic loss used by both policyholder and the carrier to negotiate a reasonable insurance settlement.

# STEVEN A. WOLF, CPA, CFE, ABV/CFF, ASA
*Curriculum Vitae*

**Professional Experience:**

2014 – Present: Cherry Bekaert, LLP – Partner – Forensic Services

2009 – 2014: Capstone Advisory Group, LLC – Executive Director – Advisory Services

2008 – 2012: Georgetown University – Adjunct Professor - School of Business

1988 – 2008: A Combination of Big Four Public Accounting and Boutique Advisory Firm experience concentrated in Accounting, Forensics, Valuation and Litigation Consulting

**Education**

- Master in Business Administration - Temple University Fox School of Business
- Bachelor of Science – Accounting  - Binghamton University School of Management

**Professional Licenses:**

- Certified Public Accountant (CPA)
  - FL – AC46910
  - MD – 0033539
  - PA  – CA030531R

**Professional Designations:**

- ASA - Accredited Senior Appraiser in Business Valuation (ASA)
- ACFE - Certified Fraud Examiner (CFE)
- AICPA Certified Financial Forensic (CFF)
- AICPA Accredited in Business Valuation (ABV)

**Expert Testimony – Past 4 Years**

- <u>Westgate Resorts, LTD., et al. v. Reed Hein & Associates, LLC d/b/a Timeshare Exit Team, et al.</u> - deposed as an accounting and economic damages expert associated with a tortious interference matter, In the United States District Court, The Middle District of Florida, Orlando Division, Case No.: 6:18-cv-01088-GAP-DCI.

- <u>Prado Enterprises, Inc. v. Scottsdale Insurance Company,</u> deposed as an economic damages and accounting expert in connection with an alleged breach of contract matter, In the United States District Court, For the Middle District of Florida, Tampa Division,, Case No.: 8:18-CV-02574-MSS-CPT.

- <u>Brickellhouse Condominium Association, Inc. v. Brickellhouse Holding LLC.; Harvey Hernandez; and Hartford Steam Boiler Inspection & Insurance Company; et al.</u> – testified at trial as an accounting and economic damages expert in connection with an alleged breach of contract matter, In the Circuit Court of the Eleventh Judicial District, In and For Miami-Dade County, Florida, Case No. 16-001652-CA-01.

- <u>Diversified Maintenance-RWS, LLC, formerly known as Rite Way Service, LLC v. LS1, LLC et al.</u> – testified at Arbitration as an economic damages, GAAP and business valuation expert in connection with a disputed sales transaction involving alleged failure to provide adequate representations and warranties, JAMS Alternative Dispute Resolution Ref. No. 141007718.

- <u>Gateway Radiology Consultants, P.A. v. Philips Medical Capital, LLC, Philips Healthcare, a division of Philips Electronics North America Corporation, et al.</u> – deposed as an economic damages and business valuation expert in connection with an alleged breach of contract matter, In the Circuit Court of the Sixth Judicial Circuit, In and For Pinellas County, Florida, Case No.: 16-007936-CI.

- <u>Diamond Resorts International, Inc. et al., v. Austin N. Aaronson and Austin Aaronson, PA</u> – testified as an accounting and economic damages expert associated with a tortious interference and false advertising matter, In the United States District Court, The Middle District of Florida, Orlando Division,, Case No.: 6:17-cv1394-RBD-DCI.

- <u>Brickellhouse Condominium Association, Inc. v. Brickellhouse Holding LLC.; Harvey Hernandez; and Hartford Steam Boiler Inspection & Insurance Company; et al.</u> – deposed as an accounting and economic damages expert in connection with an alleged breach of contract matter, In the Circuit Court of the Eleventh Judicial District, In and For Miami-Dade County, Florida, Case No. 16-001652-CA-01.

- <u>Orange Lake Country Club, Inc., and Wilson Resort Finance, LLC v. Reed Hein & Associates, LLC d/b/a Timeshare Exit Team, et al.</u> - deposed as an accounting and economic damages expert associated with a tortious interference matter, In the United States District Court, The Middle District of Florida, Orlando Division, Case No.: 6:17-cv-01542-GAP-DCI.

- <u>Westgate Resorts, LTD., et al. v. Mitchell Reed Sussman</u>, individually, and Mitchell Reed Sussman & Associates - deposed as an accounting and economic damages expert associated with a tortious interference matter, In the United States District Court, The Middle District of Florida, Orlando Division,, Case No.: 6:17-cv-1467-GKS-DCI.

- ATA Fishville Fl, LLC v. Westchester Surplus Lines Insurance Company – testified in Examination Under Oath as an accounting and economic damages expert associated with insured's insurance proof of loss claim, Claim No. KY17K2313300.
- Diamond Resorts International, Inc. et al., v. Austin N. Aaronson and Austin Aaronson, PA – Deposed as an accounting and economic damages expert associated with a tortious interference and false advertising matter, In the United States District Court, The Middle District of Florida, Orlando Division,, Case No.: 6:17-cv1394-RBD-DCI.
- Lawrence C. Weinstein, as Trustee and as Beneficiary of Lawrence C. Weinstein Revocable Trust v. Bernard Cap Holdings, LLC and Bernard Cap, LLC – testified at arbitration as an accounting expert associated with a disputed post-closing adjustment valuation, JAMS, Case No. 1460004372.
- Mohamed Shahid Delwar, S.K. Mohammed Allap and Selima Akter v. United Food Mart, Inc. and United Food Mart II, Inc. – testified at trial (second trial) as an economic damages and valuation expert stemming from shareholder dispute, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Case No.: 04-15100 (13).
- Vital Pharmacueticals, Inc. d/b/a VPX/Redline v. Professional Supplements, LLC et al. – deposed as an economic damages expert stemming from alleged usurpation of corporate authority, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Complex Litigation Unit, Case No.: CACE 12-07083(07)
- Elka Holdings, LLC v. Project Development Enterprise, LLC and Tanios Khalil – testified at trial and was deposed as an economic damages expert stemming from a partnership dispute, In the Circuit Court of the Eleventh Judicial Circuit In and For Miami Dade County, Florida, Civil Division, Case No. 13-2015-CA-029334-01.
- Vincent Ferrara v. Dina Marie Saponara-Ferrara and Joe Cole Plumbing, Corp. – testified at trial as an accounting and business valuation expert witness stemming from a marital estate dispute, In the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida, Case No.: FMCE-14-007680.
- Patrick Fiorentino v. Systemax Inc. and TigerDirect, Inc. – deposed twice as an economic damages expert, In the Circuit Court of the 11th Judicial District, In and For Miami-Dade County, Florida, Case No. 12-00519 CA 40.
- Roger Schlossberg, Chapter 7 Trustee v. Bell Builders Remodeling, Inc. et. al. - deposed as an accounting and valuation expert witness in an economic damages matter stemming from an alleged alter ego action, In the Circuit Court for Montgomery County, Maryland, Case No. 413134-V.
- Mohamed Shahid Delwar, S.K. Mohammed Allap and Selima Akter v. United Food Mart, Inc. and United Food Mart II, Inc. – testified at trial (original) and deposed as an economic damages and valuation expert stemming from shareholder dispute, In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida, Case No.: 04-15100 (13).

- City of Atlanta v. Allianz Global Risks US Insurance Company – deposed as an accounting and economic damages expert, In the United States District Court for the Northern District of Georgia, Atlanta Division, Case No: 1:13-cv-02249-ODE.
- Unit Owner's Association of the Henry Condominium Association v. Fayette Street Condos, LLC, Westbrook Partners, LLC, et al. – testified as an accounting and economic damages expert at mediation, In the United States District Court for the Eastern District of Virginia (Mediation).

**Publications – Past 10 years**

In the spring of 2010, Mr. Wolf co-authored an article with Matthew J. Schlesinger, Esq. titled, "The Effect of Dodd-Frank Reform on Whistleblower Activity for SEC Violations and Potential Avenues of Insurance Recovery" in the *Minority Corporate Counsel Association.*

In November 2012, Mr. Wolf co-authored an article with Orie Attas, CPA titled "When the Whistle Blows." in the *Minority Corporate Counsel Association, Mondaq.*

In November 2013, Mr. Wolf co-authored an article with Lon Berk, Esq. titled, "Do you Have a Superstorm Sandy Claim?" in *Risk Management* magazine.

In winter 2014 Edition of Case Matters eNews, Mr. Wolf co-authored an article with Matt Druckman, CPA titled, "Data Forensics in the Cloud."

In March 2018, Mr. Wolf authored an article titled "3 Important Checks That Could Keep Your M&A Transaction From Going Sideways" in *Daily Business Review*.

In July, 2018, Mr. Wolf authored an article titled "Prepare for the Aftermath of Hurricane Season" in Miami Herald, Business Monday.