# EXHIBIT C



Kutak Rock LLP
The Omaha Building, 1650 Farnam Street, Omaha, NE 68102-2103
office 402.346.6000

**John P. Passarelli**
402.346.6000
john.passarelli@kutakrock.com

February 21, 2020

**VIA E-MAIL**

Steven A. Wolf, CPA
Cherry Bekaert LLP
200 East Broward Boulevard, Suite 2000
Fort Lauderdale, FL  33301

    Re:    Resolution by Neutral Accountant of Dispute Under LLC Interest and Stock Purchase Agreement dated March 16, 2016, by and among Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. (collectively, "Sound Physicians") and T.M. Carr, M.D. ("Dr. Carr") (the "Purchase Agreement")

Dear Mr. Wolf:

    Sound Physicians has prepared the following information to provide background into the question before you, which is whether, in calculating Net Revenue as a component of the Purchase Price[1], the recording during the Calculation Period[2] of $1,844,541.94 of bad debt expense relating to prior periods was appropriate.

    Sound Physicians specifically notes that in the Court's Order dated October 10, 2019 that allowed for this Neutral Accountant procedure, the Court found that "Section 1.4(d) of the Agreement explicitly states '[e]ach of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant . . . .' Thus, [Sound Physicians] will be able to present [its] argument for why [it] included Bad Debt Expenses in the calculation of the Purchase Price." Order at 8-9.  Indeed, the Purchase Agreement specifically states, "Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing." Purchase Agreement § 1.4(d).  Though both parties are interested in an expedited arbitration process, Sound Physicians believes the process should afford you the opportunity to request additional information and seek clarification of the respective parties' positions on this matter.  For example, during oral argument before the Court, Dr. Carr's counsel told the Court that there would be "a potential for the Neutral Accountant to say 'I need another piece of information.'"  Dr. Carr's counsel told the Court that during this Neutral Accountant procedure, "we have an expert accountant I would expect to say, 'I don't think I need that or I do.'  That's why he's the expert."

---

[1] All undefined capitalized terms herein have the same meaning as in the Purchase Agreement.  *See* Purchase Agreement § 1.1; *see also* Purchase Agreement Schedule B, Calculation of the Purchase Price.
[2] The twelve (12) month period ending March 31, 2018.  *See* Purchase Agreement § 1.4(a).

Sound agrees with that interpretation and approach and would be pleased to provide a supplement to today's submissions. Accordingly, while Sound Physicians took time and care to provide comprehensive information for your consideration, we welcome the opportunity to respond in writing to provide any additional information that you, as the expert, may require.

**The Purchase Agreement and the Purchase Price**

Sound Physicians and Dr. Carr entered into the Purchase Agreement to facilitate Dr. Carr's sale of emergency medicine services entities (the "Companies") to Sound Physicians. *See* Purchase Agreement page 1, Recitals A-C. According to the terms of the Purchase Agreement, the Purchase Price for these emergency medicine services Companies could be no less than $30 million nor greater than $59 million. *Id.* § 1.4(a). At Closing, Sound Physicians tendered the Initial Payment of $30 million. *Id.* § 1.4(b)(i). The Purchase Price, and therefore a Second Payment, if any, was determinable at the end of the Calculation Period. *Id.* § 1.4(b)(ii).

Under the Purchase Agreement, the Purchase Price would be calculated using a multiple times the Earnings Before Overhead realized by Sound Physicians from the operation of the purchased Companies during the Calculation Period. *See* Purchase Agreement, Schedule B at page 3. Earnings Before Overhead for the Calculation Period is defined as Net Revenue, Less Billing Expenses, and Less Labor Costs and Malpractice (each of which was defined slightly differently in two different calculation Methods). *See* Schedule B at pages 1-2. After utilizing both calculation Methods to calculate Earnings Before Overhead, the lesser of the two values of Earnings Before Overhead would be used to determine the Purchase Price. *See* Schedule B at pages 1-2.

At the end of the Calculation Period, using Method 2, Sound Physicians computed a Purchase Price of $26,605,885. *See* **Exhibit A**. Since this figure is less than the minimum $30 million Purchase Price, no Second Payment was required.

Generally following the procedure outlined in the Purchase Agreement, Dr. Carr reviewed Sound Physicians' calculation of the Purchase Price and objected to Sound Physicians' inclusion, when calculating Net Revenue, of a deduction of $1,844,541.94 for bad debt expense relating to periods before the Calculation Period.

**Bad Debt Expense From Prior Periods Must Be Included in Calculating Net Revenue**

Attached as **Exhibit A** is Sound Physicians' calculation of Net Revenue using the Method 2 Calculation set out on Schedule B. Sound Physicians properly included bad debt expense from prior periods as a deduction when calculating this Net Revenue for the following reasons:

First, Generally Accepted Accounting Principles in the United States (GAAP) expects changes in estimates, of which Net Revenue is one, to be included within the period the change is identified.

Second, industry standards support bad debt expense as a deduction to estimate Net Revenue.

Finally, in hindsight, inclusion of the bad debt expense deduction resulted in a Net Revenue calculation that more closely mirrored the actual cash received for dates of service within the Calculation Period.

### (A) Revenue Recognition Must Take Bad Debt Expense Into Account

Schedule B of the Purchase Agreement sets forth the methodology to calculate the Purchase Price, which incorporates the concept of Net Revenue. *See* Schedule B at pages 1-2. In accordance with the Financial Accounting Standards Board (FASB) Accounting Standards Codification *ASC 954-605 Health Care Entities - Revenue Recognition*, attached hereto as **Exhibit B**, Net Revenue is comprised of gross revenues net of contractual allowances, discounts, and a provision for bad debts, in order to ensure that Net Revenue is close to the amount that the health care entity expects to collect. *See* **Exhibit B** at 954-605-45-4. The FASB advises,

> Some health care entities may perform services for patients for which the ultimate collection of all or a portion of the amounts billed or billable cannot be determined at the time services are rendered. For example, some health care entities have a policy of providing services to patients and recording patient service revenue regardless of their ability to pay and, in some cases *(for example, hospital emergency departments)*, are required by law to treat emergency conditions regardless of a patient's ability to pay. As a result, those health care entities might record revenue along with a relatively high bad-debt provision in the period of service. A health care entity that recognizes significant amounts of patient service revenue at the time the services are rendered even though it does not assess the patient's ability to pay shall present all of the following as separate line items on the face of the statement of operations:
>
> a. Patient service revenue (net of contractual allowances and discounts)
>
> b. The provision for bad debts (the amount related to patient service revenue and included as a deduction from patient service revenue)
>
> c. The resulting net patient service revenue less the provision for bad debts.

**Exhibit A** at 954-605-45-4 (emphasis added). Accordingly, Sound Physicians records its best estimate of Net Revenue using inputs such as payer mix, published Medicare reimbursement fee

schedules, contracts with commercial payers, and guidance from third-party billing agencies related to expected collections.

In calculating Net Revenue using Method 2, Sound Physicians followed its revenue recognition policy, including its best estimate of the net amount expected to be collected for the emergency room services provided during the Calculation Period. The estimated Net Revenue (gross revenues less contractual allowances and less a provision for bad debts) included in the Purchase Price Calculation was $36,016,625, which equates to $117.76 net revenue per visit.[3] See **Exhibit A**.

(B)     **Net Revenue as an Estimate and GAAP Treatment of Changes in Estimate**

The recognition of Net Revenue is a significant accounting estimate for Sound Physicians. The language below is taken directly from Sound Physicians' Audited Financial Statements as of December 31, 2018, footnote (2), Summary of Significant Accounting Policies (bold emphasis added). A similar footnote was used for 2017 and 2016 audited financial statements:

> *Use of Estimates*
>
> *The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses at the date of the consolidated financial statements.* ***Significant estimates include the net realizable value of accounts receivable, including initial revenue recognition****, medical malpractice insurance receivable and payable for known claims, liabilities for claims incurred but not reported (IBNR) related to medical malpractice, and the valuation of goodwill and intangibles.* ***Such estimates are based on historical experience and various other assumptions that are expected to be reasonable under the circumstances. Actual results could differ from these estimates and any changes in these estimates are recognized when known.***

To aid in the understanding of the history of Sound Physicians' net revenue per visit (also referred to as encounter) for the Companies, we provide a summary from the Closing date forward:

**March 2016 - December 2016.** Average net revenue per visit of $121.17 was recorded in Sound Physicians' general ledger. See **Exhibit C.** The initial net revenue per visit recorded in 2016 was recorded based upon Sound Physicians' best estimate—these Companies were Sound Physicians' first emergency medicine practices—leveraging its experience with hospital medicine and critical care medicine as well as various third-party billing company estimates provided to Sound during its search for a billing and collections vendor.

---

[3] While Method 1 places a limit on net revenue per visit, Method 2 does not. *See* Schedule B at pages 1-2.

KUTAKROCK
Steven A. Wolf, CPA
February 21, 2020
Page 5

**January 2017 - December 2017.** Average net revenue per visit of $117.24 was recorded in the general ledger. See **Exhibit C**. This average net revenue per visit is inclusive of the $1,844,541.94 bad debt expense entry in question that related to 2016 dates of service. See **Exhibit D**. The $1,844,541.94 of contested bad debt expense relates specifically to an adjustment recorded during the Calculation Period that was necessary under Sound Physicians' accounting policies (which are in compliance with GAAP) to properly reflect net revenue and related accounts receivable expected to be collected at that time. This adjustment was recorded in June 2017 based upon the review of cash collections and accounts receivable remaining on the balance sheet, the determination of which utilized actual and expected collections data related to services provided from the Closing date through December 31, 2016.

In accordance with *ASC 250 Accounting Changes and Error Corrections*, specifically ASC 250-10-45-17, a change in accounting estimate is not accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods; rather, a change in accounting estimate is accounted for in the period of change. *See* **Exhibit E**. Accordingly, it was entirely appropriate to include a deduction for bad debt expense from prior periods in the Net Revenue calculation.

Additionally, when calculating the Purchase Price of $26,605,885, *see* **Exhibit A**, the average net revenue per visit inclusive of the bad debt expense entry in question yielded an appropriate estimate, $117.76 average net revenue per visit, which is reflective of Sound Physicians' collections experience, as follows.

**January 2018 – December 2018.** Average net revenue per visit of $102.64 was recorded in the general ledger. *See* **Exhibit C**. This average net revenue per visit is inclusive of a $3,095,417 bad debt expense entry recorded in December 2018 related to 2017 dates of service. *See* **Exhibit F**. Like the bad debt expense entry in question, this adjustment related to dates of service from a prior period, 2017; notably, nine of the twelve months of the Calculation Period were in 2017. Yet the necessity for the increase in bad debt expense, and thus decrease in net revenue, was only determined in 2018 and thus recorded in 2018. Excluding the bad debt increase in December 2018, Sound had recorded an estimated average net revenue of $116.17 per visit from January 2018 to November 2018, reflecting what Sound Physicians had similarly experienced with 2016 and 2017 dates of service. *See* **Exhibit C**.

**January 2019 – December 2019.** Average net revenue per visit of $119.80 was recorded in the general ledger. *See* **Exhibit C**. At this time, Sound Physicians continues to work through the normal year end procedures, and this net revenue per visit is likely to change when finalizing year end 2019 financial statements. This preliminary estimate of $119.80 average net revenue per visit reflects an increase from an average of $118.61 per visit estimate from January 2019 – August 2019 to an average of $122.17 per visit beginning in September 2019 due to process and contractual improvements effective in 2019 that are unrelated to the issue at hand.

**Summary:** The history of average net revenue per visit from acquisition date of the Companies forward to December 2019 demonstrates the consistency in the overall estimate made in each fiscal year, as well as within the Calculation Period. While the accrual of net revenue to the financial statements is a significant management estimate, the average net revenue per visit for each year, as well as for the twelve months within the Calculation Period, reflects Sound Physicians' best estimate of ultimate cash collections for visits/encounters with patients. These estimates included both monthly as well as periodic adjustments to bad debt expenses in order to appropriately reflect Sound Physicians' best estimate of net revenue per visit, as required under GAAP.

      (C)    **Sound Physicians' Estimate of Net Revenue Is Reasonable When Compared To Actual Collections**

To assess the reasonableness of the estimated $117.76 average net revenue per visit recorded during the Calculation Period, Sound Physicians considered the model utilized to determine the value of the business being acquired, noting that the historical data provided by Dr. Carr during transaction due diligence indicated $105.00 net revenue per visit for the year 2014. *See* **Exhibit G**. Thus the $117.76 net revenue per visit used in Sound Physicians' Method 2 calculation of the Purchase Price is over $12 per visit *higher* that the rate earned prior to Sound Physicians' assumption of the operation of the acquired Companies.

Moreover, at the time of the Purchase Price calculation, Net Revenue was an accounting estimate. However, as of December 31, 2019, total cash received related to the Calculation Period was $33,719,687.43. This is reflective of $114.07 per visit. *See* **Exhibit H**. While reasonable, Sound Physicians' estimate of Net Revenue during the Calculation Period was slightly overstated compared to the cash ultimately received.

## Conclusion

With 295,596 visits at an estimated $117.76 per visit, Sound Physicians' estimated Net Revenue per Method 2 as provided for in the Purchase Agreement for the Calculation Period was $36,016,625 (including a deduction for the $1,844,541.94 of bad debt expense in question). Actual cash received was $33,719,687.43 through December 31, 2019, indicating Sound Physicians' estimate was too high, rather than too low, resulting in a Purchase Price calculation that was also too high, rather than too low.

Removing the $1,844,541.94 deduction for bad debt expense from the calculation, as proposed by Dr. Carr, would have increased the estimated Net Revenue still higher to $37,861,166.90, an overstatement of $4,141,479.47 compared to the actual cash received through December 31, 2019. This increase in Net Revenue for the Calculation Period is (1) inappropriate under GAAP and (2) unsupported by the actual Net Revenue collected for the Calculation Period.

      For these reasons, the inclusion of the $1,844,541.94 deduction for bad debt expense in calculating Net Revenue during the Calculation Period was entirely appropriate.

      If you require any further information regarding the above, please let us know.

                                 Sincerely,

                              */s/ John P. Passarelli*

                                John P. Passarelli

cc:     Mark A. Nebrig, Esq.
           Emily Pera, Esq.
           Pam W. Blair, Esq.
           Carol A. Svolos, Esq.