# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

SOUND INPATIENT PHYSICIANS, INC. and
ROBERT A. BESSLER, M.D.,

                    Plaintiffs,

v.

T. M. CARR, M.D.,

                    Defendant.

Case No. 2:19-cv-02034-TLP-dkv

**AFFIDAVIT OF AUTUMN HUIATT**

I, Autumn Huiatt, hereby declare, pursuant to 28 U.S.C. § 1746, that if called upon as a witness in this matter, I would competently testify to the following facts and opinions based on my personal knowledge:

1.      I am of legal age and competent to testify as to the matters set forth herein. I am familiar with all events and documents referenced in this Affidavit.

2.      I am a Certified Public Accountant with a bachelor's degree in accounting. I am a member in good standing of the Washington Society of Certified Public Accountants. I also earned my master's degree in business administration through the Wharton School of the University of Pennsylvania.

3.      I am the Vice President of Operations, Managed Care Services, of Plaintiff Sound Inpatient Physicians, Inc. ("Sound Physicians"). From August 2014 to September 2019, I was the Controller of Sound Physicians. Prior to my employment at Sound Physicians, I worked as an auditor at Deloitte Touche Tohmatsu Limited from 2008 to 2014.

4.      In my role as Controller of Sound Physicians, I oversaw matters related to the accounting, financial records, and the documentation and testing of internal controls processes for Sound Physicians, including those relevant to net revenue.

5.      Net revenue practices are described in Sound Physicians' 2018 audited financial statements in footnote 4 as follows: *Gross revenue is recorded on an accrual basis in the period in which services are*

*provided at established rates. Contractual adjustments and an estimate for bad debts are recorded as deductions from gross revenue to determine net revenue.*

6.     The estimation process for recording net revenue is discussed within footnote 1 to Sound Physicians' 2018 audited financial statements as follows: [. . .] *The process of estimating the ultimate amount of revenue to be collected is highly subjective and requires the application of judgment based on many factors, including performance and the related measurement of outcomes, historical cash collection experience, contractual reimbursement rates, the payer mix, age of receivables and other relevant information. Revenue related to patient responsibility accounts is recorded at amounts reasonably assured of collection, which is net of a provision for uncollectible accounts. Uncollectible accounts receivable are written off after reasonable collection efforts have been exhausted.*

7.     The process of recording net revenue was consistent the entire time I was employed as Controller. Each month, gross revenue was recorded based upon the professional services performed, at established rates. The gross revenue was then reduced to the best estimate of ultimate cash to be collected. These reductions included (1) estimates of an allowance for contractual adjustments to reflect the estimated impact of the contractual rates agreed to by payers and Sound Physicians and (2) estimates of an allowance for bad debts to reflect the estimates of balances for which Sound Physicians would ultimately not receive payment. These estimates for allowances were set by Sound Physicians' revenue cycle, finance, and accounting teams jointly with the assistance of third party billing companies as collections experts.

8.     Throughout my time as Controller at Sound Physicians, the revenue cycle, finance, and accounting teams also evaluated the appropriateness of the net revenue accrual (more commonly referenced as the valuation of accounts receivable remaining on the balance sheet) by comparing the initial revenue estimate recorded to cash collections over time, as the time period for collecting on professional services billings can be at least 12-24 months. The frequency of this evaluation was at least quarterly from Q1 2016 onward, and annually prior to 2016. This quarterly review was performed consistently within each service line at Sound Physicians for all locations. As needed, adjustments to increase or decrease bad debt and contractual allowances were recorded to the general ledger and the results of the review were documented

in a quarterly memo retained for internal control purposes as well as to share with Sound Physicians' external auditors.

9.      From July 2014 – June 2018, the majority investor in Sound Physicians (via Sound Inpatient Physicians Holdings, LLC) was Fresenius Medical Care Holdings, Inc. ("FMC Holdings"). FMC Holdings is a wholly owned, indirect subsidiary of Fresenius Medical Care AG & Co. KGaA ("FMC AG"). FMC AG is a publicly traded German entity listed on both the Frankfurt Stock Exchange and the New York Stock Exchange and is therefore subject to the public company reporting and internal controls requirements of such exchanges.

10.     With regard to the locations of service acquired from T.M. Carr, MD in March 2016, Sound Physicians employed the same processes as described in paragraphs 5-8: At the date of service, Sound Physicians accounting team recorded net revenue based upon the best estimate of cash to be collected from the professional services rendered, including an estimate of allowance for contractual adjustments and an estimate of allowance for bad debts. These allowances were estimated with the assistance of revenue cycle and finance teams, in addition to third party billing companies as collections experts. Quarterly, these locations were included in Sound Physicians' analysis of the appropriateness of the net revenue accrual and valuation of remaining accounts receivable.

11.     As of the 12/31/2016 review, collections were 9 months old for the oldest of Sound Physicians professional services claims from the locations of service acquired from T.M. Carr, MD; Sound Physicians did not have sufficient collections history to perform a comparison of revenue to completed cash collections and also did not have a history of Emergency Medicine collections patterns. In lieu of such analysis, Sound Physicians considered the trending of accounts receivable over time and also interviewed its third party biller for their professional opinion on the collectability of remaining accounts receivable. The "Sound Analysis of NPSR recorded and AR" memo from 12/31/2016 states the conclusion that accounts receivable appeared collectible based upon the analysis performed.

12.     As of the 3/31/2017 review, cash collections were 3 months more mature and Sound Physicians had a range of expected cash collections estimated for 2016 dates of service that was unfavorable

3

by $1 million to favorable by $1 million to the initial revenues estimated and recorded. In estimating this range of outcomes, Sound Physicians accounting and revenue cycle teams consulted the third party billing company as a collections expert. As a result, the "Sound analysis of NPSR recorded and AR" memo from 3/31/2017 states the following conclusion: *Sound continues to use the same rates of 2016, which appears appropriate given the range of expected cash collections has a mid point of the 2016 NPSR recorded (HM completed collections shows $1 million shortfall, Intermedix analysis shows $1 million favorability). Throughout Q2 2017, the collections activity for 2016 will be more completely known and Sound management will adjust rates as necessary to reflect.*

13.     As of the 6/30/2017 review, cash collections for dates of service in 2016 did not continue at the same rate as anticipated at the 3/31/2017 review. As a result, Sound Physicians recorded a $1,844,541.94 increase to bad debt expense to reflect the reduction in expected cash collections on 2016 dates of service and ensure accounts receivable on the balance sheet were appropriately valued in accordance with Generally Accepted Accounting Principles (GAAP). The "Sound analysis of NPSR recorded and AR" memo from 6/30/2017 states these conclusions.

14.     As part of the 6/30/2018 review, the remaining accounts receivable for dates of service in 2016 (revenue recorded less cash collected) were brought to $0 given the amount of time from the date of service. This resulted in an additional increase of $793,937 to bad debt expense. The "Sound analysis of NPSR recorded and AR" memo from 6/30/2018 summarizes these conclusions.

15.     As part of the 12/31/2018 review, Sound Physicians performed a review of 2017 and 2018 dates of service, comparing cash collected to revenue estimated and recorded, consistent with prior reviews. At this time, an adjustment was recorded to bring the remaining 2017 accounts receivable to $0. This resulted in a $3,095,417 increase to the bad debt allowance for 2017 dates of service, as well as a $903,243 increase to the bad debt allowance for 2018 dates of service. The "Sound analysis of NPSR recorded and AR" memo from 12/31/2018 states these conclusions.

16.     Throughout my time as employed as Controller, Sound Physicians recorded estimated revenues based upon its best estimate of cash to be ultimately collected for professional services rendered.

Sound Physicians evaluated the valuation of accounts receivable quarterly and made adjustments in accordance with GAAP, such that for all dates of service estimated revenues will eventually be adjusted to reflect actual cash received.

17.     In preparation of the purchase price calculation, Sound Physicians considered the appropriateness of the inclusion of $1,844,541.94 bad debt expense increase within net revenue. At the time of calculation preparation, Sound Physicians determined the inclusion was appropriate under GAAP as well as appropriately reflective of the cash collections per visit ultimately received and then being used to estimate revenue on go-forward basis.

18.     Furthermore, the process Sound Physicians employed to initially estimate revenue for the locations acquired from T.M Carr, MD, as well as to analyze cash collections against the estimated revenue was consistent with Sound Physicians' other locations nationwide, as well as in accordance with revenue recognition policies reported within Sound Physician's audited financial statements.

19.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 30, 2020.

_____
Autumn Huiatt

5