# EXHIBIT E



# Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D.
# v.
# T.M. Carr, M.D.

### Case No. 2:19-cv-02034-TLP-dkv

*Expert Report*
*of*

*Scott E. Evans, CPA, ABV, CFF*

*Simon Consulting, LLC*

*April 24, 2020*

FORENSIC ACCOUNTING & ECONOMICS • RECEIVERSHIP • RESTRUCTURING

3101 NORTH CENTRAL AVENUE • SUITE 670 • PHOENIX, AZ 85012 • 602.279.7500 • (FAX) 602.279.7510 • WWW.SIMONCONSULTING.NET

# TABLE OF CONTENTS

1. Background ............................................................................................................. 1

2. Scope of Engagement ............................................................................................ 3

3. Overview of Authoritative Accounting Standards ................................................ 3

4. Executive Summary ............................................................................................... 4

5. Summary of the Wolf Report ................................................................................ 5

6. Summary of Dr. Carr's Position ............................................................................ 7

7. Simon's Analyses and Findings ............................................................................ 7

      7.1. Wolf Unduly Interprets the Purchase Agreement ......................................... 8

          7.1.1. Wolf Concludes that Net Revenue is the Same as Net Patient Service Revenue .................... 8

          7.1.2. Wolf Concludes that Certain GAAP Provisions Do Not Apply to the Calculation of Net Revenue ................................................................................................................................ 8

      7.2. Wolf's Rationale for Not Applying GAAP to the Disputed Entry is Specious ............ 9

      7.3. Wolf Fails to Apply a Consistent Methodology ........................................ 12

      7.4. Wolf's Methodology is at Odds with Economic Reality ............................ 14

      7.5. Analysis of the Carr Submission .............................................................. 15

8. Conclusion ........................................................................................................... 17

## LIST OF APPENDICES AND EXHIBITS

Appendix A ....................Scott E. Evans' Curriculum Vitae

Appendix B ...................Documents Considered

Appendix C ...................Schedule B to the Purchase Agreement

Exhibit 1 ........................Analysis of Average Net Patient Service Revenue Per Visit During the Calculation Period

## 1. Background

Sound Inpatient Physicians, Inc. ("Sound"), a Delaware corporation, is a leading provider of physician services to hospitals through the United States.[1] Robert A. Bessler, M.D. ("Dr. Bessler") is the Chief Executive Officer of Sound. Sound and Bessler are collectively referred to herein as the Plaintiffs.

T.M. Carr, M.D. ("Dr. Carr" or the "Defendant") was the sole member of Professional Coverage Services, PLLC ("PCS"), which provides professional coverage services to hospital emergency departments.[2] PCS provides emergency department staffing services to Methodist Healthcare-Memphis Hospitals ("Methodist") pursuant to a Personal Services Agreement ("PSA") dated October 1, 2008 (and subsequently amended).[3] Dr. Carr was also the sole member of Carr, PLLC ("Carr PLLC") and T.M. Carr, M.D. PC ("Carr PC"), both of which contract with PCS to supply physicians to provide emergency medicine services at certain Methodist hospitals.[4] PSA, Carr PLLC, and Carr PC are collectively referred to herein as the Companies.

On March 16, 2016, Sound, Dr. Bessler, and Dr. Carr entered into the *LLC Interest and Stock Purchase Agreement* ("Purchase Agreement") whereby Sound agreed to purchase Dr. Carr's membership interests in PCS and Carr PLLC, as well as the issued and outstanding capital stock of Carr PC.[5]

According to Section 1.4 of the Purchase Agreement, the Purchase Price is to be determined based on the lesser amount derived from two different formulas, which utilize certain specified financial results from the twelve-month period ending March 31, 2018 ("Calculation Period"). Because the parties agree that the first proscribed methodology produces the higher result, this report will focus entirely on the second methodology ("Method 2"), which is shown in **Table 1**, below.

**Table 1**
**Method 2 for Determining the Purchase Price**

| | |
|---|---|
| | Total No. of Visits |
| x | Net Revenue Per Visit |
| = | Net Revenue |
| | |
| + | Net Revenue |
| – | Billing Expense |
| – | Labor Costs & Malpractice |
| = | Earnings before Overhead |
| | |
| | Earnings before Overhead |
| x | 7.37 |
| = | Total Purchase Price |

---

[1]  LLC Interest and Stock Purchase Agreement dated 03/16/16; Page 1, introductory paragraph and Recital C.
[2]  Ibid; Page 1, Recital A.
[3]  Ibid; Page 1, Recital A.
[4]  Ibid; Page 1, Recital B.
[5]  Ibid; Page 1, Recital D.

Schedule B to the Purchase Agreement, which outlines the methodologies to be used to calculate the Purchase Price, is attached hereto at **Appendix C**.

The Purchase Agreement states that the Purchase Price shall not be less than $30 million or greater than $59 million.[6] The Purchase Agreement required an initial payment of $30 million and a second payment equal to the amount by which the Purchase Price exceeded $30 million.[7]

At the end of the Calculation Period, Sound calculated the total Purchase Price to be $26,605,885,[8] which is approximately $3.4 million less than the minimum Purchase Price. Therefore, Sound asserts that no additional payments were required to be made to Dr. Carr.[9] Dr. Carr contested Sound's Purchase Price calculation by objecting to a single journal entry of $1,844,541.94 ("Disputed Entry") dated June 30, 2017. Sound asserts that this journal entry was posted to properly account for uncollectable accounts receivables when, in the ordinary course, it became apparent the amounts would likely not be collected.[10] Dr. Carr asserts that because the uncollectable accounts receivable relate to revenues occurring prior to the Calculation Period, the Disputed Entry should be excluded from the calculation of Earnings before Overhead when determining the Purchase Price.[11] If the Disputed Entry is excluded from Earnings before Overhead, the Purchase Price would be $40,734,142 according to Dr. Carr.[12]

On January 10, 2019, Sound filed a *Complaint* against Dr. Carr in the United States District Court for the Western District of Tennessee. However, on October 10, 2019, the Court issued an order compelling arbitration of the Plaintiffs' claim for declaratory judgment and staying litigation of this particular claim pending the results of arbitration.[13] The Court's order was based on Section 1.4(d) of the Purchase Agreement, which states that the parties "may immediately engage [a] Neutral Accountant to resolve any items that remain in dispute" with respect to the determination of the Purchase Price.[14]

Accordingly, the parties retained Steven A. Wolf, CPA ("Wolf") of Cherry Bekaert, LLP to serve as the neutral accountant with respect to the evaluation of the propriety of the $1,844,541.94 Disputed Entry. Each of the parties presented its position on the Disputed Entry to Wolf in writing on approximately February 21, 2020 pursuant to Section 1.4(d) of the Purchase Agreement. Wolf issued his report to the parties on March 20, 2020 ("Wolf Report").

---

[6]   Ibid; Page 4, Section 1.4(a).
[7]   Ibid; Page 4, Section 1.4(b).
[8]   Order Granting Motion to Compel Arbitration of Plaintiff's Claim for Declaratory Judgment dated 10/10/19; Page 2.
[9]   Ibid; Page 2.
[10]  Huiatt Affidavit, Paragraph 13.
[11]  Ibid; Pages 2-3.
[12]  Neutral Accountant Submission of T.M. Carr, M.D. dated 02/21/20 ("Carr Submission"); Page 2.
[13]  The Plaintiffs' Complaint references multiple claims, only one of which is subject to the Neutral Accountant clause.
[14]  LLC Interest and Stock Purchase Agreement dated 03/16/16; Pages 5-6, Section 1.4(d).

## 2. Scope of Engagement

Simon Consulting, LLC ("Simon") was engaged by Kutak Rock LLP, counsel for the Plaintiffs, to evaluate the Wolf Report and comment on the opinions stated therein, if necessary, and to also evaluate and comment on Dr. Carr's submission to Wolf if necessary. Simon was not requested to, and therefore does not, attempt to interpret the Purchase Agreement.

Simon's analyses were performed under the direction of Scott E. Evans, CPA, ABV, CFF. Mr. Evans' hourly rate in this matter is $390, and his Curriculum Vitae is attached hereto at **Appendix A**. Simon staff hourly rates range from $95 to $450. A detailed list of the documents considered in this matter as of the date of this report is attached hereto at **Appendix B**.

## 3. Overview of Authoritative Accounting Standards

The Financial Accounting Foundation ("FAF") is the independent, private-sector, not-for-profit organization responsible for the oversight, administration, financing, and appointment of the Financial Accounting Standards Board ("FASB").[15] The FASB's mission is to establish and improve financial accounting and reporting standards to provide useful information to investors and other users of financial reports and to educate stakeholders on how to most effectively understand and implement those standards.[16] The FASB developed and established the accounting standards that are collectively known as Generally Accepted Accounting Principles ("GAAP").[17] When financial statements are prepared under GAAP, they are based on standards developed by a robust, open due process that results in information that is [emphasis added]:

- Relevant, representationally faithful, and **reflective of economics**;
- Comparable with other organizations or governments;
- Verifiable and auditable by a third party; and
- Understood by lenders, investors, donors, taxpayers, and others.[18]

The FASB Accounting Standards Codification® ("ASC" or the "Codification") is the source of GAAP recognized by the FASB to be applied to nongovernmental entities.[19] According to ASC 105-10-05-05, "*All nongrandfathered non-SEC accounting guidance not included in the Codification is superseded and deemed nonauthoritative.*"

Therefore, the Codification is the sole authoritative source from which accounting standards should be derived for the purposes of determining compliance with U.S. GAAP.

---

[15] https://www.accountingfoundation.org/aboutfaf.
[16] Ibid.
[17] https://www.fasb.org/facts/index.shtml. There are two global scale frameworks of financial reporting: U.S. GAAP, as promulgated by the FASB, and International Financial Reporting Standards (IFRS), as promulgated by the International Accounting Standards Board (IASB). Note 1 to the Consolidated Financial Statements of Sound Inpatient Physicians Holdings, LLC and Subsidiaries for the years ended December 31, 2016 through 2018 specifically states that the company's financial statements are prepared in accordance with U.S. GAAP. Therefore, for the purposes of this report, all references to GAAP refer specifically to U.S. GAAP as promulgated by the FASB.
[18] https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage&cid=1176164538898#section_3.
[19] ASC 105-10-05-1.

## 4. Executive Summary

The conclusions and analyses presented in the Wolf Report require an interpretation of the Purchase Agreement, are materially flawed, are not supported by the Purchase Agreement, do not comport with GAAP, are not consistent with a comprehensive basis of accounting other than GAAP, are applied inconsistently and violate the GAAP consistency principle, and thus cause Net Revenue during the Calculation Period to be materially overstated and unreliable, for the reasons summarized below.

1. Method 2, as set forth on Schedule B to the Purchase Agreement (see **Appendix C**), requires the determination of "Net Revenue." However, Net Revenue is not a defined term in the Purchase Agreement.[20] Yet, the Wolf Report interprets the term Net Revenue in the Purchase Agreement to mean Net Patient Service Revenue. Net Patient Service Revenue is defined in FASB authoritative literature and is consistent with the term Net Service Revenue. GAAP specifies that healthcare entities are to deduct contractual adjustments, discounts, and an allowance for uncollectibles from gross service revenue to derive net service revenue.[21]

2. The Wolf Report further interprets the Purchase Agreement to mean that GAAP (specifically ASC 250-10-45-17) should *not* be followed when calculating the Purchase Price and therefore excludes the Disputed Entry from the calculation of the Purchase Price. No such provision is included in the Purchase Agreement.

   ASC 250-10-45-17 requires that changes in estimated bad debt reserves be recorded in the period in which it is determined a change in estimate is necessary (as was the Disputed Entry). The Wolf Report's only explanation as to why ASC 250-10-45-17 does not apply when calculating the Purchase Price is that doing so would violate the "matching principle." The Wolf Report provides no reference to the Purchase Agreement in support of this opinion and provides nothing more than conclusory statements to justify this position. Thus, this opinion is unsupported, is not calculated to a reasonable degree of certainty, and is made outside the Purchase Agreement's specifications.

3. Therefore, to the extent that it is determined that Net Revenue should be calculated in accordance with GAAP, then the Wolf Report improperly excludes the Disputed Entry[22] from the Purchase Price calculation in violation of ASC 250-10-45-17: "*a change in accounting estimate **shall not** be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods…*"[23] Further, the Wolf Report makes no determination that the Disputed Entry was improperly delayed in order to be included in the Calculation Period and does not raise that argument in support of the decision to exclude the Disputed Entry.

---

[20] Schedule B (Method 2 Calculation) of the Purchase Agreement defines Net Revenue as "*Total visits during the Calculation Period multiplied by net revenue per visit during the Calculation Period.*" This definition is circular, as "net revenue per visit" is also undefined.

[21] ASC 954-605-25-4 and ASC 954-605-25-5.

[22] It is undisputed that the Disputed Entry is an entry related to a change in estimated bad debt reserve.

[23] ASC 250-10-45-17 [emphasis added].

4. Alternatively, to the extent that it is determined that Net Revenue should be calculated on a basis other than GAAP, the Wolf Report's conclusion results in materially overstated Net Revenue by improperly selecting a single journal entry (the Disputed Entry) for disparate treatment. In other words, to the extent that entries to adjust the bad debt reserve should be recorded in the period when the revenue was earned, as advocated by Wolf, then all such entries should be treated similarly, which the Wolf Report fails to do. If all similar entries are not treated the same, then the result is unreliable.

The Wolf Report cites the matching principle as the sole basis to move the Disputed Entry outside the Calculation Period, yet violates the consistency principle by failing to apply the same methodology to all such entries. Sound posted a material adjustment to the bad debt reserve after the Calculation Period that partially applies to services provided during the Calculation Period. This entry must be included in the calculation of Net Revenue, if Wolf's methodology is adopted, in order to arrive at a valid and meaningful result. The Wolf Report fails to address this material flaw.

5. Lastly, an analysis of actual collections related to revenues earned during the Calculation Period demonstrates that Net Revenue calculated using Wolf's methodology materially exceeds Sound's actual collections for the period, thus demonstrating that Wolf's conclusion does not comport with economic reality, thus producing a meaningless result.

Simon's analysis and conclusions are presented in more detail in **Section 7**, below.

## 5.   Summary of the Wolf Report

Wolf concluded that the $1,844,541.94 Disputed Entry, which was posted in June 2017, related to services provided prior to the Calculation Period and should therefore be excluded from the calculation of the Purchase Price.[24]

Below is a summary of the conclusions presented in the Wolf Report:

1. The primary determination to be made is whether a "***prior period adjustment*** *should be included in the calculation of Net Revenue used to determine the Calculation of Purchase Price.*"[25] The term "prior period adjustment" is an accounting term of art that pertains specifically to the correction of errors or a change in accounting principle relating to a prior period.[26] Therefore, Wolf has assumed that the Disputed Entry is an accounting error rather than a change in accounting estimate.

---

[24]   Report of Steven A. Wolf, CPA dated 03/20/20 ("Wolf Report"); Page 6.

[25]   Ibid; Page 3 [emphasis added].

[26]   See superseded FASB Statement No. 16: Prior Period Adjustments ("SFAS 16"). SFAS 16 resulted from the FASB's consideration of *APB Opinion No. 9: Reporting the Results of Operations* issued by the Accounting Principles Board, Page FAS16–2, Paragraph 3, which states as follows [emphasis added]:

2. Wolf concludes that the term Net Revenue per the Purchase Agreement is consistent with the term Net Patient Service Revenue and is "*determined by subtracting from gross patient revenue contractual adjustments, policy discounts and other discounts, and adjustments less provisions for bad debts,*" which Wolf asserts is in accordance with GAAP.[27] Therefore, Wolf assumes that GAAP applies to the elements used in the Purchase Price Calculation.

3. Wolf acknowledges that GAAP (ASC 250-10-45-17) requires that changes in accounting estimate (e.g., changes in bad debt reserves such as the Disputed Entry) should be posted in the current period rather than posted retrospectively to prior periods.

4. However, Wolf concludes that GAAP (ASC 250-10-45-17) does *not* apply in the calculation of Earnings Before Overhead (i.e., the Purchase Price calculation) because "*In this circumstance, the adjustment relates only to prior period operations and not related to the Calculation Period or the future. Doing so would be inconsistent with the matching principle and could misstate Earnings Before Overhead for the underlying Calculation Period.*"[28]

5. Wolf concludes that Sound "*has not sufficiently demonstrated that the additional $1,844,541.94 bad debt expense charge relating to prior period operations should be deducted from Revenue during the Calculation Period...*"[29]

6. Therefore, Wolf concludes that the Disputed Entry should be treated as an accounting error (rather than a change in an accounting estimate) and excludes the entry from the Calculation Period.[30]

Simon disagrees with Wolf's assumptions and conclusions for the reasons set forth herein.

---

*Treatment as prior period adjustments should not be applied to the normal, recurring corrections and adjustments which are the natural result of the use of estimates inherent in the accounting process. For example, changes in the estimated remaining lives of fixed assets affect the computed amounts of depreciation, but these changes should be considered prospective in nature and not prior period adjustments. ... Some uncertainties, for example those relating to the realization of assets (collectibility of accounts receivable, ultimate recovery of deferred costs or realizability of inventories or other assets), would not qualify for prior period adjustment treatment, since economic events subsequent to the date of the financial statements must of necessity enter into the elimination of any previously-existing uncertainty. Therefore, the effects of such matters are considered to be elements in the determination of net income for the period in which the uncertainty is eliminated.*

Therefore, even under historical pre-Codification GAAP, items recognized during a period should be included in the determination of net income of that period. Furthermore, Wolf's usage of the term "prior period adjustment" does not apply to a change in accounting estimate.

[27] Ibid; Page 4.
[28] Wolf Report; Page 5. Earnings Before Overhead is a defined term in the Purchase Agreement and is an element in the calculation of the Purchase Price (See **Table 1**).
[29] Ibid; Page 6.
[30] Ibid; Page 6.

## 6. Summary of Dr. Carr's Position

Pursuant to Section 1.4(d) of the Purchase Agreement, Dr. Carr presented his position on the Disputed Entry to Wolf in writing on approximately February 21, 2020 ("Carr Submission"). The Carr Submission asserts the Disputed Entry should not be included in the calculation of the Purchase Price for the following reasons:

First, Dr. Carr asserted that "*[t]he inexplicable delay in recognizing the Sunset Expense is suspicious given that it serves to benefit Sound to the tune of $10.7M.*"[31] Thus, the Carr Submission asserts that Sound's internal controls over financial reporting failed because Sound should have determined that the receivables reflected in the Disputed Entry were uncollectible prior to the preparation of its financial statements for the quarter ending March 31, 2017, or just prior to the Calculation Period.[32]

Second, Dr. Carr points to Sound's change in billing companies as "critical" to his objection to the Purchase Price calculation,[33] as it may reduce the efforts put forth toward collecting outstanding receivables.[34] However, it is not clear if Dr. Carr is asserting that Sound should not have changed billing companies and/or if the change resulted in less collections than would have occurred absent the change.

Third, the Carr Submission asserts that the Disputed Entry should be treated as the correction of an error because the adjustment did not result from any "*new information or subsequent developments leading to better insight or improved judgment regarding the collection*" of these receivables.[35]

In summary, the Carr Submission asserts that (1) the Disputed Entry should have been recorded prior to the Calculation Period; (2) Sound's change in billing companies negatively impacted the collections; and (3) the Disputed Entry represented the correction of an error rather than a change in accounting estimate and should therefore have been accounted for through an adjustment to the opening balance of retained earnings, thus not impacting Net Revenue during the Calculation Period.[36]

Simon disagrees with the Carr Submission for the reasons set forth herein.

## 7. Simon's Analyses and Findings

The conclusions and analyses presented in the Wolf Report are materially flawed, are not supported by the Purchase Agreement, do not comport with GAAP, are not consistent with a comprehensive basis of accounting other than GAAP, are not consistently applied and violate the

---

[31] Carr Submission; Page 16.
[32] Carr Submission; Page 15.
[33] Carr Submission; Page 10.
[34] Carr Submission; Pages 10 and 11.
[35] Carr Submission; Page 19.
[36] Carr Submission; Pages 23-24.

consistency principle, and thus cause Net Revenue during the Calculation Period to be materially overstated and unreliable. The basis for Simon's findings are discussed below.

## 7.1.    Wolf Unduly Interprets the Purchase Agreement

Wolf makes a number of inappropriate assumptions and interpretations of the Purchase Agreement in order to arrive at his ultimate conclusion. Wolf was directed to address whether or not the Disputed Entry should be included in the determination of Net Revenue; however, it is not clear that Wolf's mandate included contract interpretation in order to render his opinion.

Because Net Revenue is not clearly defined by the Purchase Agreement,[37] Wolf provides his own interpretation as to the required elements of the Purchase Price calculation in order to arrive at a conclusion.  Wolf specifically makes two interpretations of the Purchase Agreement, as discussed below.

### 7.1.1.    Wolf Concludes that Net Revenue is the Same as Net Patient Service Revenue

The Wolf Report interprets the term Net Revenue per the Purchase Agreement to mean Net Patient Service Revenue, a term used in GAAP accounting. The Wolf Report cited the *AICPA Audit and Accounting Guides, Health Care Entities* and ASC 954-605-55-2 and stated that Net Patient Service Revenue "*is determined by subtracting from gross patient revenue contractual adjustments, policy discounts and other discounts, and adjustments less provisions for bad debts to arrive at net patient service revenue for the subject reporting period*."[38] Wolf further stated, "*Both submissions acknowledge that **net patient service revenue (Net Revenue)** includes these deductions from gross patient service revenue*."[39]

Therefore, the Wolf Report concludes that the undefined term Net Revenue, a primary component in calculating the Purchase Price, should be interpreted as Net Patient Service Revenue as utilized in GAAP accounting.[40]

### 7.1.2.    Wolf Concludes that Certain GAAP Provisions Do Not Apply to the Calculation of Net Revenue

Despite arguing that Net Revenue should be calculated consistent with GAAP, Wolf then argues for an exception to GAAP related to a change in accounting estimate (i.e., a change to the bad debt reserve) because such an adjustment would not be appropriate for purposes of calculating the

---

[37]    Schedule B (Method 2 Calculation) of the Purchase Agreement defines Net Revenue as "*Total visits during the Calculation Period multiplied by net revenue per visit during the Calculation Period*." This definition is circular, as "net revenue per visit" is also undefined.
[38]    Wolf Report; Page 4.
[39]    Ibid; Page 4 [emphasis added].
[40]    Pursuant to ASC 954-605-25-4 and ASC 954-605-25-5, GAAP requires healthcare entities to deduct contractual adjustments, discounts, and an allowance for uncollectibles from gross service revenue to determine net service revenue.

Purchase Price (i.e., in calculating Earnings Before Overhead).[41]  This conclusion is not supported by any verbiage in the Purchase Agreement.

The Disputed Entry is a change in accounting estimate as it increases both the bad debt reserve and bad debt expense, which thus reduces net service revenue. The Disputed Entry was posted by Sound in June 2017 as it was determined, in the ordinary course, that certain accounts receivable pertaining to service dates prior to the Calculation Period were uncollectable.[42]

However, the Wolf Report concludes that the Disputed Entry should *not* be treated in accordance with GAAP based on the following interpretation of the inputs required for the Purchase Price calculation:

> *While **GAAP requires an expense to be recognized once known**, including prior period adjustments to determine Net Revenue earned during the Calculation Period **for purposes of calculating Earnings Before Overhead** [an element of the Purchase Price] **is not appropriate**. In this circumstance, the adjustment relates only to prior period operations and not related to the Calculation Period or the future. Doing so would be inconsistent with the matching principle and could misstate Earnings Before Overhead for the underlying Calculation period.[43]*

Wolf's treatment of the Disputed Entry did not result from any provision or guidance set forth in the Purchase Agreement as to the interpretation of Earnings Before Overhead, nor did it comply with GAAP. Instead, Wolf developed and applied his own interpretation and methodology as to what is appropriate to include in Net Revenue for the purpose of determining the Purchase Price under Method 2.

## 7.2.  Wolf's Rationale for Not Applying GAAP to the Disputed Entry is Specious

Wolf's explanation as to why, in his opinion, the calculation of the Purchase Price (i.e., how Net Revenue is calculated) does not require adherence to GAAP is simply illogical and circular. First and foremost, Sound applies GAAP to all of its financial transactions.[44] In fact, Sound's audited financial statements have received a "clean" audit opinion for each of the years ending December 31, 2016 through 2018 from a "big four" accounting firm.[45] Therefore, it is inconsistent to apply a non-GAAP methodology to a single entry, which produces artificially inflated revenue that does not reflect economic reality.[46]

---

[41]  Wolf Report; Page 5. Section 8.1(t) of the Purchase Agreement defines Earnings Before Overhead as, "the amount determined as such in the manner described in Schedule B hereto." Schedule B states that Earnings Before Overhead is calculated at Net Revenue less Billing Expense less Labor Costs and Malpractice.

[42]  Huiatt Affidavit, Paragraph 13.

[43]  Ibid; Page 5 [emphasis added].

[44]  Note 1 to the Consolidated Financial Statements of Sound Inpatient Physicians Holdings, LLC and Subsidiaries for the years ended December 31, 2016 through 2018 specifically state that the company's financial statements are prepared in accordance with U.S. GAAP.

[45]  Independent Auditor's Reports by KPMG, LLP dated 08/09/17 and 04/09/18; Independent Auditors' Report by Deloitte & Touche, LLP dated 05/29/19.

[46]  As discussed in Section 3 above, financial statements prepared under GAAP should be "Relevant, representationally faithful, and reflective of economics."

The consistency principle requires that like items be treated similarly. "*Consistency refers to the use of the same methods for the same items, either from period to period within a reporting entity or in a single period across entities. Comparability is the goal; consistency helps to achieve that goal.*"[47] Absent consistent treatment of similar transactions, the financial results become unreliable. Therefore, it is improper to change the accounting treatment of a single transaction without doing so for all similar transactions.

Moreover, Wolf failed to determine or evaluate if his proposed change in accounting methodology would result in a lack of comparability to the methodology used to derive the Purchase Price multiple of 7.37. The 7.37 multiple was derived using the Earnings Before Overhead for the period ended June 30, 2015 of $5,900,000, calculated using GAAP basis financial statements.[48]

Therefore, the non-GAAP methodology proposed by Wolf is *not* calculated on the same basis as the Purchase Price multiple resulting in a material inconsistency between Wolf's methodology and the methodology used to derive the Purchase Price multiple. This material difference in methodologies will produce an inconsistent result in the calculation of the Purchase Price.

Moreover, Wolf's failure to calculate Net Revenue consistent with the methodologies used to calculate the Purchase Price multiple violates the GAAP principles of comparability and consistency.[49] In other words, it is improper to multiply an Earnings Before Overhead amount by the 7.37 multiple if the Earnings Before Overhead is derived on a different basis than was used to originally derive the multiple.

Second, Wolf makes the incongruous argument that the "matching principle" would be violated if the Disputed Entry were treated in accordance with GAAP (ASC 250-10-45-17). In other words, compliance with ASC 250-10-45-17, in accordance with GAAP, would somehow violate the GAAP matching principle.

Wolf argues that ASC 250-10-45-17 is not applicable because, "*In this circumstance, the adjustment relates only to prior period operations and not related to the Calculation Period or the future. Doing so would be inconsistent with the matching principle and could misstate Earnings Before Overhead for the underlying Calculation period.*"[50] The Wolf Report provides no other analysis besides this conclusory statement.

Moreover, the reasoning in this statement is circular because virtually all changes in accounting estimates pertain to prior periods, which is why ASC 250-10-45-17 specifically addresses this issue and unequivocally states that such changes in estimates are to be recorded in the period when the change is known and "***shall not be accounted for by restating or retrospectively adjusting***

---

[47] FASB Statement of Financial Accounting Concepts No. 8, As Amended (August 2018); Paragraph QC22.
[48] See Schedule B to the Purchase Agreement, attached as **Appendix C** to this report. Footnote 1 to the multiple calculation found in Schedule B to the Purchase Agreement states "*EBITA means the Companies' aggregate earning before any deduction of interest, tax, depreciation and amortization expenses, calculated as if the Companies prepared financial statements **on an accrual basis in accordance with accounting principles generally accepted in the United States**.*" [Emphasis added].
[49] FASB Statement of Financial Accounting Concepts No. 8, As Amended (August 2018); Paragraph QC20 – QC25.
[50] Wolf Report; Page 5.

*amounts reported in financial statements of prior periods.*"[51] Therefore, Wolf's argument for disregarding ASC 250-10-45-17 is baseless. Furthermore, while Wolf asserts that adherence to ASC 250-10-45-17 violates the matching principle, following Wolf's methodology would require the untenable frequent restatement of prior period financial statements every time new information was obtained and estimates were changed.

Third, the Wolf Report asserts, "*The appropriate accounting treatment for this adjustment from a prior period would be to adjust the carrying amounts of any impacted assets or liabilities as of the first accounting period presented, with an offset to the beginning retained earnings balance in that same accounting period.*"[52] Similarly, the Wolf Report concludes, "*This prior period adjustment should be reflected in the Companies* [sic] *opening retained earnings balance and not be charged as an expense during the Calculation Period.*"[53]

Therefore, Wolf erroneously treats the Disputed Entry as an error rather than a change in accounting estimate. Wolf's proposed accounting treatment is the treatment that GAAP requires for the correction of an error— ASC 250-10-45-23 states, "*Any __error__ in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued…shall be reported as an error correction, by restating the prior-period financial statements,*" which includes "*an offsetting adjustment…to the opening balance of retained earnings.*"[54] Therefore, Wolf (and the Carr Submission) conclude that the Disputed Entry should be treated as an error under GAAP; yet, Wolf presents no analysis or basis to support this conclusion (other than a perfunctory reference to the matching principle). More importantly, as discussed above, Wolf's conclusion directly contradicts ASC 250-10-45-17, which specifically states changes in estimates for bad debt reserves are *not* to be treated as the correction of an error.

The Wolf Report further concludes that Sound "*has not sufficiently demonstrated that the additional $1,844,541.94 bad debt expense charge relating to prior period operations should be deducted from Revenue realized during the Calculation Period…*"[55] It is not clear what information Wolf considered in making this conclusory statement, nor did Wolf explain why the information presented by Sound was deemed insufficient. Furthermore, given that Sound treated the Disputed Entry (and conducted all of its accounting) in accordance with GAAP (ASC 250-10-45-23),[56] the onus would presumably be on Wolf to clearly demonstrate why Sound's treatment is improper, and why Wolf's alternative treatment is the correct interpretation of the Purchase Agreement. However, Wolf offers nothing but conclusory statements to support his interpretation. Moreover, it is Simon's understanding that Wolf did not ask Sound to provide additional information that might have been deemed sufficient to justify the Disputed Entry. Therefore, Wolf's conclusion is unsupported and not based on sufficient competent evidential matter.

---

51  ASC 250-10-45-17 [emphasis added].
52  Wolf Report; Page 5.
53  Wolf Report; Page 6.
54  ASC 250-10-45-23 [emphasis added].
55  Wolf Report; Page 6.
56  Note that Sound's audited financial statements have received a clean audit opinion for each of the years ending December 31, 2016 through 2018 from a "big four" accounting firm.

Fourth, the Carr Submission implies that Sound improperly delayed the Disputed Entry so that it was posted during the Calculation Period in an effort to reduce the Purchase Price.[57] However, the Wolf Report provides no analysis of this assertion and makes no determination that the Disputed Entry was improperly delayed in order to be included in the Calculation.

The Carr Submission implies that Sound did not properly analyze its bad debt reserve as of year-end 2016.[58] However, it should be noted that Sound received a "clean" audit opinion from KPMG for its 2016 financial statements.[59] Further, Sound asserts that it made the Disputed Entry in the ordinary course of business based on its standard methodology for evaluating the collectability of bad debts. The Affidavit of Autumn Huiatt ("Huiatt Affidavit") specifies the procedures undertaken by Sound to timely evaluate its bad debt reserves.[60] The Huiatt Affidavit also details the specific steps taken with regard to evaluating the collectability of the 2016 billings over time.[61]

Therefore, Wolf's determination is based on his interpretation as to how to calculate Net Revenue for purposes of calculating the Purchase Price and is not based on any determination that the Disputed Entry was improperly delayed to the Calculation Period. Moreover, any analysis of the timing of journal entries should include an analysis of entries made after the Calculation Period.

Lastly, the Carr Submission raises the argument that Sound's change of billing companies is "critical" to an analysis of the Disputed Entry. However, Wolf's conclusion does not incorporate or address this argument in any way. Moreover, it is not clear on what basis Wolf could evaluate this argument given that Sound was not prohibited by the Purchase Agreement from changing billing companies, nor does the Purchase Agreement provide for an adjustment to the Purchase Price based on the efficacy of Sound's collection efforts.

## 7.3.  Wolf Fails to Apply a Consistent Methodology

As noted above, the Wolf Report makes the unsupported conclusion that GAAP requirements pertaining to changes in bad debt estimates should be ignored when calculating the Purchase Price. While Wolf provides no basis for his interpretation of the Purchase Agreement, he makes a material error by failing to consistently apply the same methodology to all of Sound's adjusting entries related to changes in bad debt estimates pertaining to the Calculation Period.

Sound made multiple material journal entries related to the Calculation Period that impacted Sound's bad debt reserves, yet Wolf only addresses the Disputed Entry. **Table 2**, below, summarizes two of these relevant journal entries.

---

[57]   Carr Submission; Page 16.
[58]   Carr Submission; Page 15.
[59]   Independent Auditor's Reports by KPMG, LLP dated 08/09/17.
[60]   Huiatt Affidavit, Paragraph 8.
[61]   Huiatt Affidavit, Paragraphs 11-14.

**Table 2**
**Summary of Material Journal Entries Related to the Calculation Period that Impact the Bad Debt Reserve**

| Entry Date | Posted During the Calculation Period? | Increase in Bad Debt Expense | Period When Revenues Were Earned |
|---|---|---|---|
| 06/30/17 | Yes | $ 1,844,541.94 | March-December 2016 |
| 12/31/18 | No | $ 3,095,416.60 | January-December 2017 [1] |

**Note:**
[1] $1,058,538.38 relates to revenues earned during Jan-Mar 2017 (pre-Calculation Period), and $2,036,878.22 relates to revenues earned during Apr-Dec 2017 (during the Calculation Period).

Had Wolf consistently applied his methodology, then the portion of the December 31, 2018 journal entry pertaining to the Calculation Period should be included in the calculation of Net Revenue because this entry pertains to services provided during the Calculation Period. Sound brought this issue to Wolf's attention in its submission to Wolf,[62] yet Wolf failed to address the merits of Sound's analysis.

In other words, Wolf asserted that the June 30, 2017 Disputed Entry should be excluded from Net Revenue in determining the Purchase Price because the adjustment did not pertain to services provided during the Calculation Period. However, by this logic, the portion of the December 31, 2018 journal entry that relates to the Calculation Period, as referenced in **Table 2** above, should be included in Net Revenue in order to determine the Purchase Price.

If the relevant portion of the 2018 journal entry noted above is included in the calculation of the Purchase Price and the 2017 Disputed Entry is excluded, pursuant to Wolf's methodology, the Purchase Price would be calculated as shown in **Table 3**, below:

**Table 3**
**Calculation of Purchase Price Assuming Consistent Application of Wolf Methodology**

| | | |
|---|---|---|
| Net Patient Service Revenue (NPSR) | $ | 34,877,079 |
| Add Back 06/30/17 Bad Debt Entry | + | 1,844,542 |
| Subtract Portion of 12/31/18 Bad Debt Entry for Services Provided in Apr-Dec 2017 | – | 2,036,878 |
| Adjusted NPSR | = | 34,684,743 |
| Plus: Subsidy Revenue (actual) | + | 1,207,804 |
| Less: Billing Expense | – | 2,135,694 |
| Less: Labor Costs & Malpractice | – | 30,270,906 |
| Adjusted Earnings before Overhead | = | 3,485,947 |
| Earnings before Overhead Multiple | x | 7.37 |
| **Adjusted Purchase Price** | = | **$ 25,691,429** |
| *Adjusted NPSR ÷ 295,596 Visits* | *=* | *$      117.34* |

---

[62]    Letter from John Passarelli to Steven Wolf dated 02/21/20; Page 5.

## 7.4. Wolf's Methodology is at Odds with Economic Reality

Whether based on GAAP or some other comprehensive basis of accounting (such as tax or cash basis of accounting), accounting systems are designed to produce financial results that reasonably reflect the economic reality of the entity using the accounting methodology, as well as to provide comparability across periods and among entities using the same methodology. As stated above, financial statements prepared under GAAP result in information that is:

- Relevant, representationally faithful, and **reflective of economics**
- **Comparable with other organizations** or governments
- Verifiable and auditable by a third party
- Understood by lenders, investors, donors, taxpayers, and others.[63]

Wolf's methodology for calculating Net Revenue does not reflect economic reality and is not comparable to the methodology used to derive the Purchase Price multiple.

GAAP requires healthcare entities to deduct contractual adjustments, discounts, and an allowance for uncollectibles from gross service revenue to determine net service revenue.[64] These estimates are intended to reflect management's best estimate of the amount of revenue that will ultimately be collected. In this instance, it is clear that the result derived by applying Wolf's conclusion is inconsistent with the actual revenues collected by Sound.

If Sound had perfectly estimated its bad debt and other deductions from revenues earned during the Calculation Period, then its reported revenues would exactly equal the cash collected on those revenues. In other words, in this instance, actual cash collections is the appropriate benchmark to measure the accuracy of any estimate or methodology.

Sound provided Wolf an analysis of the actual cash collected on the revenues earned during the Calculation Period.[65] However, the Wolf Report, inexplicably, offers no comment on Sound's actual collection results and fails to evaluate Wolf's conclusion against this benchmark.

**Chart 1**, below, demonstrates the disparity between average collections per patient based on the Wolf Report, actual cash collections, and the collections amount reported by Sound in its determination of the $26,605,885 Purchase Price.[66] **Chart 1** also shows the average collections per patient if Wolf's methodology were consistently applied to the similar bad debt adjustment noted in **Table 2** above.[67]

---

[63]  https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage&cid=1176164538898#section_3. [Emphasis added].
[64]  ASC 954-605-25-4 and ASC 954-605-25-5.
[65]  Letter from John Passarelli to Steven Wolf dated 02/21/20; Page 6 and Exhibit H.
[66]  Order Granting Motion to Compel Arbitration of Plaintiff's Claim for Declaratory Judgment dated 10/10/19; Page 2.
[67]  The average net patient service revenue per visit based on the consistent application of Wolf's methodology is calculated in **Table 3** above.

**Chart 1**
**Comparison of Results Derived By Applying Different Methodologies**[68]



**Chart 1** demonstrates that Wolf's methodology produces an unreasonable result, as average net patient service revenue per patient of $124.23 exceeds actual cash collections by 8.9%; i.e., Wolf's methodology overstates actual collected revenues. Therefore, Wolf's conclusion should be rejected, as it produces a materially inaccurate result.

**Chart 1** further shows that Sound overstated the revenues earned during the Calculation Period by approximately 3.4% compared to actual collections, even when the Disputed Entry is included in the Calculation Period. Further, the consistent application of Wolf's methodology to the similar bad debt entry (dated December 31, 2018) would have resulted in average collections per patient that varied by 2.9% from actual collections. See **Exhibit 1** for details of these calculations.

Furthermore, if Wolf's methodology were taken to its logical conclusion, all write-offs of revenues earned during the Calculation Period should be taken into account (not just those posted through 2018) such that the adjusted revenue amount would ultimately equal the cash collected.

In summary, Wolf's conclusions are not supportable, are not in compliance with GAAP, are not consistently applied, and do not comport with economic reality and should therefore be disregarded.

**7.5. Analysis of the Carr Submission**

As stated above, the Carr Submission asserted that "*[t]he inexplicable delay in recognizing the Sunset Expense is suspicious given that it serves to benefit Sound to the tune of $10.7M.*"[69]

---

68   Simon has adjusted the y-axis of **Chart 1** from zero to $100.00 to more clearly demonstrate the disparity between the different methodologies for calculating average net patient service revenue per visit. See **Exhibit 1** for details of these calculations and an alternative version of **Chart 1** in which the y-axis begins at zero.

69   Carr Submission; Page 16.

However, Sound asserts that it made the adjustment in the ordinary course of business based on its standard methodology for evaluating the collectability of bad debts, which is consistent across all lines of business. Sound's assertion is supported by the Huiatt Affidavit[70] as well as the following:

1. Sound entered a similar bad debt adjustment of $793,937.30 on June 30, 2018, after conducting further evaluation of the collectability of the 2016 revenues. Thus, demonstrating that Sound continued to evaluate and adjust its estimate of the collectability of the receivables generated in 2016 after the Disputed Entry.

2. Both the June 30, 2018 journal entry and the Disputed Entry are supported by detailed calculations containing monthly breakdowns of net patient service revenue recorded in the general ledger, the total collections to date, and the expected future cash receipts based on various factors.

3. Sound provided Simon excerpts from several quarterly memos prepared by its accounting personnel describing their periodic analyses of Net Patient Service Revenue and related bad debt, as discussed below.

   a. Sound's December 31, 2016 memo references the fact that Sound's emergency medicine line of business began in March 2016 with the acquisition of PCS, which limited the amount of data available to perform a complete collections analysis. To overcome this limitation, Sound considered cash collections received post-acquisition related to dates of service prior to the acquisition and evaluated the increase in accounts receivable from March 2016 to December 2016. In addition, Sound communicated with its collections vendor on January 5, 2017 to discuss collections activity and anticipated net service revenue by site. Based on this analysis, Sound estimated that the accounts receivable recorded as of December 31, 2016 was collectible.

   b. According to Sound's June 30, 2017 memo, Sound performed a complete collections analysis based on historical collection factors to date, as well as its collection vendor's estimate of total cash to be received for 2016 dates of service. Based on this analysis, Sound projected a cash shortfall of approximately $1.8 million and increased the bad debt reserve accordingly.

The Carr Submission also asserted that the Disputed Entry represented the correction of an error because the adjustment did not result from any "*new information or subsequent developments leading to better insight or improved judgment regarding the collection*" of these receivables.[71] However, Dr. Carr did not provide any basis for this assertion. Simon noted the following, which contradict Dr. Carr's assertions:

---

[70] Huiatt Affidavit, Paragraph 18.
[71] Carr Submission; Page 19.

- 16 -

1. An analysis of Sound's collections data as of June 30, 2018 indicates that Sound continued recording cash collections and chargebacks related to revenues earned as far back as May 2016 (over 24 months prior).

2. An analysis of the data supporting the calculation of the Disputed Entry indicates that approximately 52% of the Disputed Entry related to revenues that were aged less than one year as of the date of the entry.[72] Furthermore, Sound continued to report collections and chargebacks related to services provided during the Calculation Period each month leading up to the date of the Disputed Entry, which further informed its estimate as to the collectability of the revenues earned from the line of business acquired from Dr. Carr.

Thus, Dr. Carr's assertion that there was no new collection information as of the date of the Disputed Entry is incorrect, as Sound continued reporting collections and charge-backs on revenues from this line of business for approximately 24 months after the revenue was initially recorded. Therefore, each month provided more clarity on the collectability of the receivables. For Dr. Carr's assertion to be valid, Sound would have had to know with relative certainty the collectability of its 2016 revenues prior to June 2017, despite the limited collection history for this line of business, and despite the fact that Sound would continue to receive payments on its 2016 revenues for several more months.

Additionally, although the $1,844,541.94 Disputed Entry seems particularly significant in a vacuum, it represents only 3.2% of the total bad debt expense reported during the Calculation Period, only 0.6% of the total write-offs (bad debt expense plus contractual allowance), and only 0.5% of the gross patient service revenue for the period. Therefore, when viewed in context, the Disputed Entry is relatively minor.[73]

## 8. Conclusion

Based on the above, the conclusions and analyses presented in the Wolf Report require an interpretation of the Purchase Agreement, are materially flawed, are not supported by the Purchase Agreement, do not comport with GAAP, are not consistent with a comprehensive basis of accounting other than GAAP, are not consistently applied and violate the GAAP consistency principle, and thus cause Net Revenue during the Calculation Period to be materially overstated and unreliable.

Simon was not requested to, and therefore does not, attempt to interpret the terms of the Purchase Agreement. Should the Purchase Agreement require Sound to comply with GAAP, then Sound's accounting should abide by ASC 250-10-45-17, which states that changes in estimates are to be recorded in the period when the change is known and "***shall not** be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods.*"[74] Should the

---

[72] Approximately $965,239 relates to revenues earned during Jul-Dec 2016 (less than one year from June 30, 2017, or the date of the Disputed Entry), and approximately $879,305 relates to revenues earned during Mar-Jun 2016 (more than one year from the date of the Disputed Entry).

[73] During the Calculation Period, Sound reported gross patient service revenue of $347,158,928.43, contractual allowances of $254,143,525.59, and bed debt expenses of $58,138,324.66.

[74] ASC 250-10-45-17 [emphasis added].

Purchase Agreement allow a methodology other than GAAP, then the methodology must be consistent in its application.

Wolf's conclusion (1) violates ASC 250-10-45-17 by erroneously (and without support) treating the Disputed Entry as an error rather than a change in accounting estimate; and (2) is applied inconstantly, which violates the GAAP consistency principle by failing to apply the same methodology to similar bad debt adjustments affecting the Calculation Period. These material errors result in a flawed and unreliable Net Revenue amount for the Calculation Period.

Should additional information be provided, Simon reserves the right to update its analyses and findings.

Scott E. Evans, CPA, ABV, CFF

April 24, 2020

Date



## SCOTT E. EVANS CPA, ABV, CFF

**EDUCATION AND TRAINING**

Bachelor of Science in Accounting/Finance, University of Arizona, 1987

Numerous technical training courses on subjects including damages, business valuation, forensic accounting, taxes, accounting, finance and economics

**PROFESSIONAL EXPERIENCE**

Simon Consulting, LLC, Phoenix; Managing Director, 2011 – Present

Navigant Consulting, Inc., Phoenix; Associate Director, Disputes & Investigations, 1999 - 2011

PricewaterhouseCoopers, Phoenix; Senior Manager, Financial Advisory Services, 1997 - 1999

Rossi O'Brien & Company, Long Beach, CA; Senior Manager, Litigation and Forensic Accounting, 1993 - 1997

Price Waterhouse, Costa Mesa, CA; Senior Auditor, 1990 - 1993

Ernst & Young, Tucson; Staff/Senior Auditor, 1988 - 1990

**PROFESSIONAL DESIGNATIONS AND LICENSES**

Certified Public Accountant, State of Arizona,[1] 1990

Certified in Financial Forensics, 2008

Accredited in Business Valuation, 2014

Arizona Life Insurance License, 2007-2015

Series 65 Uniform Investment Adviser Law Examination, 2008

**PROFESSIONAL AND COMMUNITY ORGANIZATIONS**

American Institute of Certified Public Accountants, Member

Arizona Society of Certified Public Accountants, Member

Friends of the Phoenix Library, Board of Directors/Past President/Past Treasurer

**TESTIMONY & SELECTED EXPERT EXPERIENCE**

Aware Owner, LLC and Rapid Response Services, LLC v. Select Adjusters, LLC, et al; Maricopa County Superior Court, Trial Testimony, 2020

BH & LH Buckeye, LLC and Wing and A Prayer investments, LLC v. M. Elaine Lamb as Trustee of Lamb Living Trust date 6/3/1987, et al; American Arbitration Association Proceeding, Deposition Testimony, 2020

---

[1]    Scott E. Evans is a licensed CPA in Arizona. Neither Scott E. Evans nor Simon Consulting, LLC provide audit or review services as defined by the American Institute of Certified Public Accountants.



# SCOTT E. EVANS CPA, ABV, CFF

## TESTIMONY & SELECTED EXPERT EXPERIENCE (Continued)

VIP Construction, Inc. v. Bahia Live/Work Lofts & Townhomes, LLC; American Arbitration Association Proceeding, Deposition and Hearing Testimony, 2019

John Anthony Drafting & Design, LLC, et al v. Sabin Lee Burrell, Kayla Jantz, American et al; United States District Court for the District of Arizona, Deposition Testimony, 2019

Steven W. Kohls v. Lee and Associates, et al; Maricopa County Superior Court, Deposition Testimony, 2019

Insight Business Consulting v. Odyssey & Company, Cody Towler and Irene Palmer; American Arbitration Association Proceeding; Hearing Testimony, 2018

Great Western Bank v. GW102923, LLC; Maricopa County Superior Court, Deposition Testimony, 2018

Jason and Shayna Vedadi v. Solutions Building, LLC and Arizona Ironworks, LLC; Maricopa County Superior Court, Deposition Testimony, 2018

Investigative Reviewer for the Arizona State Board of Accountancy, 2016 - current

First Command Financial Planning, Inc. v. John Velez; FINRA Arbitration Hearing, Hearing Testimony, 2018

Jordan Kopcio v. Nicole Boerboom; Maricopa County Superior Court, Hearing Testimony, 2018 (Court Appointment)

Bergen v. Bergen; Maricopa County Superior Court, Trial Testimony, 2018

David C. Maki v. NSII, LLC, Allan P. Harris, John W. Kercheval, III, Sundin & Fish, PLC, Paul B. Sundin; United States District Court, District of Arizona; Trial Testimony, 2018

Thomas Lewis and Erin Compton v. Rufus Lohmueller and John Sabey; District Court, City and County of Denver, State of Colorado; Deposition, 2017

Aaron Ludwig v. State of Arizona and Donald Conrad; Maricopa County Superior Court; Deposition, 2017

State of Arizona v. Marianne Visanska Foley; Maricopa County Superior Court; Two Interviews, Trial Testimony, 2017

STG International, Inc. v. Millennium Health & Fitness, Inc.; American Arbitration Association Proceeding; Hearing Testimony, 2016

Luxul Technology Inc. v Nectarlux, LLC, JKEENEY Consulting, Inc. and James Keeney; United States District Court for the Northern District of California; Deposition, 2016

Southwest Model Management, LTD v. Ford Models, Inc.; American Arbitration Association Proceeding; Deposition and Hearing Testimony, 2016

David M. Reaves, Trustee v. Jack D. Rose and Vanessa Palma Rose; United States Bankruptcy Court, Trial Testimony, 2015



## SCOTT E. EVANS CPA, ABV, CFF

### TESTIMONY & SELECTED EXPERT EXPERIENCE (Continued)

Fancher v. Fancher; Yavapai County Superior Court; Trial Testimony, 2015 (Court Appointment)

State of Arizona v. Deborah Verna; Yavapai County Superior Court; Interview, 2015

Michael Tometich v. Mark Sennett and Alicia Sennett; Plug & Play Media, LLC; Maricopa County Superior Court, Hearing Testimony, 2015

Thomas Q. Huynh v. Le Kwake Le and Vinh T. Le; United States Bankruptcy Court, Trial Testimony, 2015

Ashton Tiffany, LLC v. Tina Karie Hancock, Eric Reed Hancock, et al; United States Bankruptcy Court; Trial Testimony, 2014

State of Arizona v. Nikatdam Arieva; Maricopa County Superior Court; Interview & Trial Testimony, 2014

Talisman Partners, LLC v. LHR, Inc., Wayne Lewis, et al; Maricopa County Superior Court; Contempt Hearing, 2014

Federal Trade Commission v. Money Now Funding, LLC et al; United States District Court, District of Arizona; Contempt Hearing, 2013

State of Arizona v. Chakeres; Maricopa County Superior Court; Restitution Hearing, 2013

Lohoff v Lohoff; Maricopa County Superior Court; Hearing Testimony, 2012 (Court Appointment)

Landmark Towers Condominium Assoc. v. Carlyle/CP Landmark Towers, et al; Deposition, 2011

Hudson Insurance Company, et al. v. M.J. Oppenheim in his quality as Attorney in Fact in Canada for Lloyd's Underwriters, Members of Lloyd's London, England; New York Supreme Court; Deposition, 2007 and 2010

Day and Sam Inc. v. New School for the Arts, et al.; Maricopa County Superior Court; Reasonableness Hearing Testimony, 2009

Shapiro v. Clancy, et al.; Maricopa County Superior Court; Trial Testimony, 2009

Erchonia Medical Inc. v. Energy Balance Resources Inc.; American Arbitration Association Proceeding; Testimony, 2008

Four Legs Baker LLC v Farnam Companies Inc.; Maricopa County Superior Court; Deposition and Trial Testimony, 2008

Show Low Partners 26 LLC v. GFM Development LLC, et al.; American Arbitration Association Proceeding; Testimony, 2006 (Appointed by Arbitrator)

Shamrock Golf LLC, et al. v Acordia of Phoenix Inc., et al.; Maricopa County Superior Court; Deposition, 2005

PMG Holdings Inc, et al. v. Rosenbaum; United States District Court, District of Nevada; Deposition; 2005



## SCOTT E. EVANS CPA, ABV, CFF

**TESTIMONY & SELECTED EXPERT EXPERIENCE (Continued)**

Plastic Products Acquisition Inc. v. Kiedrowski; Maricopa County Superior Court; Deposition/ Trial, 2004

American Physicians Assurance Corporation v. DS Barkley Insurance Management Inc., et al; Maricopa County Superior Court; Default Hearing, 2004

Priority Healthcare Corporation v. Drug Valet Inc., et al.; United States District Court, District of Arizona; Deposition, 2003

**ARTICLES/PUBLICATIONS/PRESENTATIONS**

"Keeping Your Damages Claims On-Track" *Arizona Attorney* March 2020 Expert Witness Special Issue.

"Fraud 101: The How and Why Schools are Vulnerable to Fraudulent Attack," Keynote presentation Arizona Association of School Business Officials January 2020 Winter Conference.

"Common Problems in Buy/Sell Agreements," *Simon Consulting, LLC Fall 2017 Newsletter*

"Three Important Decisions You Must Make for Every Business Valuation Used in Family Court," *Simon Consulting, LLC March 2017 Newsletter*

"Forensic Accounting 101 for Attorneys: Business Valuation – Dissecting Closely Held Entities" Presented May 31, 2017 at National Business Institute Seminar, Phoenix Arizona.

## Documents Considered

- Report of Steven A. Wolf, CPA dated 03/20/2020
- Letter dated 02/21/2020 from John P. Passarelli to Steven A. Wolf, CPA, including the following attachments:
    - Exhibit A – PCS Contingent Payment Analysis as of 03/31/2018
    - Exhibit B – FASB Accounting Standards Update No. 2011-07, July 2011: Health Care Entities (Topic 954)
    - 954-605 Health Care Entities - Revenue Recognition
    - Exhibit C – Excel file containing Average Net Patient Service Revenue (NPSR) by month for Aug 2018-Dec 2019
    - Exhibit D – Bad debt journal entry (JE-028542) dated 06/30/2017 and supporting calculations
    - Exhibit E – ASC 250 Accounting Changes and Error Corrections per https://dart.deloitte.com/USDART/home/codification/presentation/asc250?combine
    - Exhibit F – Excel file containing bad debt journal entries dated 12/01/2018-12/31/2018
    - Exhibit G – Chart showing Average Collections Per Patient by year for 2010-2014
    - Exhibit H – Excel file containing report of actual cash received by month by location for Apr 2017-Mar 2018
- Neutral Accountant Submission of T. M. Carr, M.D. dated 02/21/2020, including the following attachments:
    - Exhibit A – LLC Interest and Stock Purchase Agreement dated 03/16/2016
    - Exhibit B – Order Granting Motion to Compel Arbitration of Plaintiffs' Claim for Declaratory Judgment and Staying Litigation of this Claim Pending Arbitration, etc. dated 10/10/2019
    - Exhibit C – PCS Contingent Payment Analysis as of 03/31/2018
    - Exhibit D – Letter dated 09/27/2018 from Steven P. Amen to Brian Pope
    - Exhibit E – Letter dated 11/14/2018 from Mark A. Nebrig to Steven P. Amen
    - Exhibit F – Letter dated 12/06/2018 from Steven P. Amen to Mark A. Nebrig
    - Exhibit G – Letter dated 12/14/2018 from Mark A. Nebrig to Steven P. Amen
    - Exhibit H – Bad Debt journal entry (JE-028542) dated 06/30/2017 and supporting calculations
    - Exhibit I – Sound Physicians Proprietary and Confidential Information: NPSR Recorded in the General Ledger
- Consolidated Financial Statements of Sound Inpatient Physicians Holdings, LLC and Subsidiaries as of December 31, 2016 and 2015 (With Independent Auditors' Report Thereon) by KPMG, LLP
- Consolidated Financial Statements of Sound Inpatient Physicians Holdings, LLC and Subsidiaries as of December 31, 2017 and 2016 (With Independent Auditors' Report Thereon) by KPMG, LLP
- Consolidated Financial Statements of Sound Inpatient Physicians Holdings, LLC and Subsidiaries as of December 31, 2018, and for the periods January 1, 2018 through June 27, 2018 (Predecessor), and June 28, 2018 through December 31, 2018 (Successor), and Independent Auditors' Report by Deloitte & Touche, LLP

- Closing Binder containing LLC Interest and Stock Purchase Agreement, including schedules and exhibits, disclosure schedules, and transaction and other ancillary documents
- Amended Complaint Filed Under Seal dated 04/02/2019 (Case No. 2:19-cv-2034-TLP-dkv)
- Confidential presentation regarding Professional Coverage Services, PLLC by Brookwood Associates
- Excel file containing PCS Contingent Payment Analysis as of 03/31/2018, including underlying financial data for 2017 and Jan-Mar 2018.
- Excel file containing Bad Debt journal entries dated 12/01/2018-12/31/2018, including underlying financial data for Jan-Mar 2017 and Apr 2017-Mar 2018
- Excel file containing Bad Debt journal entry dated 12/31/2018 for Jan-Mar 2018 services
- Excel file containing report of actual cash received by location, recorded NPSR, and visits by month for Apr 2017-Mar 2018
- Excel file containing collections data by month and location for Mar 2016-June 2018
- Excerpts from the following memos prepared by Sound Inpatient Physicians:
  - Memo dated 12/31/16 regarding Q4 2016 A/R Reserve Analysis
  - Memo dated 03/31/17 regarding Q1 2017 A/R Reserve Analysis
  - Memo dated 06/30/17 regarding Q2 2017 A/R Reserve Analysis
  - Memo dated 06/30/18 regarding Q2 2018 A/R Reserve Analysis
  - Memo dated 12/31/18 regarding Q4 2018 A/R Reserve Analysis
- Affidavit of Autumn Huiatt
- FASB Accounting Standards Codification®
- AICPA Audit and Accounting Guide for Health Care Entities (September 1, 2019)
- Financial Accounting Foundation's (FAF) website (www.accountingfoundation.org)
- Financial Accounting Standards Board's (FASB) website (www.fasb.org)
- FASB Accounting Standards Update No. 2011-07 (July 2011): Health Care Entities (Topic 954)
- FASB Statement No. 16: Prior Period Adjustments
- FASB Statement of Financial Accounting Concepts No. 8, As Amended (August 2018)
- APB Opinion No. 9: Reporting the Results of Operations
- US GAAP versus IFRS: The basics (January 2019), by Ernst & Young Global Limited
- Financial reporting developments, A comprehensive guide: Accounting changes and error corrections (Revised May 2019), by Ernst & Young Global Limited
- Miscellaneous research regarding professional qualifications of Steven A. Wolf

Schedule B

Calculation of Purchase Price

The Companies' "Earnings Before Overhead" for the 12-month period ending on March 31, 2018 will equal the lesser of the amount calculated pursuant to the Method 1 Calculation below and the amount calculated pursuant to the Method 2 Calculation below:

Method 1 Calculation:

Net Revenue [1]

Less: Billing Expense [2]

Less: Labor Costs and Malpractice [3]

Equals:  Earnings before Overhead

[1] Total visits during the Calculation Period multiplied by net revenue per visit during the Calculation Period not to exceed $107.21 per visit.

[2] Based on Sound Physicians' contracted percentage billing rate times Net Revenue.

[3] All labor costs, including employee salaries, medical director fees (net of any payments from Methodist), independent contractor wages, temporary labor, recruiting expenses, employee benefits, such as health insurance and payroll taxes, and malpractice insurance coverage.  Total Labor Costs and Malpractice will not exceed 75% of Net Revenue.  Costs shall exclude:

    (i)  administrative compensation paid to Dr. Carr's named replacement, if any, unless Dr. Carr's employment is terminated during the Calculation Period, in which case, (i) no severance payment made to Dr. Carr will be included in labor costs and/or Earnings Before Overhead or EBITDA herein for purposes of calculating the second payment, and (ii) the administrative compensation paid to Dr. Carr's named replacement shall be included to the extent it does not exceed the administrative compensation that would have been paid to Dr. Carr during the remainder of the Calculation Period;

    (ii)  the amount of any New Business Bonus (as defined in the Employment Agreement between Dr. Carr and Sound Physicians attached to the Agreement as Exhibit B) paid to Dr. Carr, and

    (iii)  any costs or expenses not directly attributable to the operations of the Company, including, but not limited to, (A) costs and expenses incurred by Sound or its Affiliates (other than the Companies), (B) any allocation of Sound's general corporate overhead expense (other than for a fair and reasonable allocation of its payroll processing expenses related directly to pay for employees

and independent contractors who are working at Methodist emergency rooms served by PCS and its affiliates), (C) any compensation or expense for non-clinical personnel that are hired by or on behalf of the Companies, except payroll for (1) the number of scribes working for Dr. Washington as of the Closing Date, unless payroll or payment for such scribe services becomes the responsibility of the physicians working at the Olive Branch location or scribe services are terminated prior to or during the period applicable to the calculation of the final payment of the Purchase Price (at which point, in either case, the costs will not be charged to the earnings of the Companies), and (2) shift work performed by such employees or independent contractors who provide medical care to the patients in the emergency rooms managed by the Companies, and (D) compensation expense of employees or independent contractors of Sound or its Affiliates (other than the Companies), except payroll for shift work performed by such employees or independent contractors who provide medical care to the patients in the emergency rooms managed by the Companies.

Method 2 Calculation:

Net Revenue [a]

Less: Billing Expense [b]

Less: Labor Costs and Malpractice [c]

Equals: Earnings before Overhead

[a] Total visits during the Calculation Period multiplied by net revenue per visit during the Calculation Period.

[b] Based on Sound Physicians' contracted percentage billing rate times Net Revenue.

[c] All labor costs, including employee salaries, medical director fees (net of any payments from Methodist), independent contractor wages, temporary labor, recruiting expenses, employee benefits, such as health insurance and payroll taxes, and malpractice insurance coverage. Costs shall exclude:

(i) administrative compensation paid to Dr. Carr's named replacement, if any, unless Dr. Carr's employment is terminated during the Calculation Period, in which case, (i) no severance payment made to Dr. Carr will be included in labor costs and/or Earnings Before Overhead or EBITDA herein for purposes of calculating the second payment, and (ii) the administrative compensation paid to Dr. Carr's named replacement shall be included to the extent it does not exceed the administrative compensation that would have been paid to Dr. Carr during the remainder of the Calculation Period;

(ii) the amount of any New Business Bonus (as defined in the Employment Agreement between Dr. Carr and Sound Physicians attached to the Agreement as Exhibit B) paid to Dr. Carr, and

(iii) any costs or expenses not directly attributable to the operations of the Company, including, but not limited to, (A) costs and expenses incurred by Sound or its Affiliates (other than the Companies), (B) any allocation of Sound's general corporate overhead expense (other than for a fair and reasonable allocation of its payroll processing expenses related directly to pay for employees and independent contractors who are working at Methodist emergency rooms served by PCS and its affiliates), (C) any compensation or expense for non-clinical personnel that are hired by or on behalf of the Companies, except payroll for (1) the number of scribes working for Dr. Washington as of the Closing Date, unless payroll or payment for such scribe services becomes the responsibility of the physicians working at the Olive Branch location or scribe services are terminated prior to or during the period applicable to the calculation of the final payment of the Purchase Price (at which point, in either case, the costs will not be charged to the earnings of the Companies), and (2) shift work performed by such employees or independent contractors who provide medical care to the patients in the emergency rooms managed by the Companies, and (D) compensation expense of employees or independent contractors of Sound or its Affiliates (other than the Companies), except payroll for shift work performed by such employees or independent contractors who provide medical care to the patients in the emergency rooms managed by the Companies.

The multiple to be applied to Earnings Before Overhead to determine the Purchase Price will be calculated as follows (numbers are examples):

| | |
|---|---|
| EBITDA[1] for twelve months ended June 30, 2015 | $ 5,800,000 |
| Times | 7.50 |
| Equals: Valuation at Closing | $43,500,000 |
| Divided by Earnings before Overhead for twelve months ended June 30, 2015 | $ 5,900,000 |
| Equals: Multiple to calculate Purchase Price | 7.37 |

[1] EBITDA means the Companies' aggregate earnings before any deduction of interest, tax, depreciation and amortization expenses, calculated as if the Companies prepared financial statements on an accrual basis in accordance with accounting principles generally accepted in the United States.

**Simon Consulting, LLC**
**Sound Inpatient Physicians, Inc. and Robert A. Bessler, M.D. v. T.M. Carr, M.D.**

**Sound Inpatient Physicians, Inc.**

**Analysis of Average Net Patient Service Revenue Per Visit During the Calculation Period**       **Exhibit 1**

| | Average Collections Per Patient | Variance from Actual Collections (as of Dec 2019) | Notes |
|---|---|---|---|
| **Wolf Methodology:** NPSR Adjusted to Exclude 06/30/2017 Bad Debt Entry for Services Provided in 2016 | **$124.23** | 8.9% | [1] |
| **Actual Collections (as of Dec 2019)** | **$114.07** | n/a | [2] |
| **NPSR Recorded in General Ledger** | **$117.99** | 3.4% | [3] |
| **Wolf Methodology Consistently Applied:** NPSR Adjusted to Include 12/31/2018 Bad Debt Entries for Services Provided During the Calculation Period | **$117.34** | 2.9% | [4] |



**Notes:**

**[1]** Wolf Methodology (NPSR Adjusted to Exclude 2017 Bad Debt Entry for 2016 Services) is calculated as follows:

| | |
|---|---|
| Net Patient Service Revenue (NPSR) recorded in the general ledger | $ 34,877,078.18 |
| Add back 2016 bad debt adjustment | 1,844,541.94 |
| **Adjusted NPSR** | 36,721,620.12 |
| No. of visits per Purchase Price calculation | 295,596 |
| **Adjusted NPSR per visit** | **$ 124.23** |

**[2]** Actual collections as of December 2019 ($33,719,687.43) per Exhibit H to the letter from John Passarelli to Steven Wolf dated 02/21/20 divided by number of visits (295,596) equals $114.07.

**[3]** Net Patient Service Revenue (NPSR) recorded in the general ledger ($34,877,078.18) per Exhibit H (revised by Sound to include additional data points) to the letter from John Passarelli to Steven Wolf dated 02/21/20 divided by number of visits (295,596) equals $117.99.

**[4]** Wolf Methodology Consistently Applied (NPSR Adjusted to Include 12/31/18 Bad Debt Entries for Services Provided During the Calculation Period) is calculated as follows:

| | |
|---|---|
| Net Patient Service Revenue (NPSR) recorded in the general ledger | $ 34,877,078.18 |
| Add back 2016 bad debt adjustment | 1,844,541.94 |
| Subtract 2017 bad debt adjustment | (3,095,416.60) |
| Add back portion of bad debt adjustment allocable to Q1 2017 | 1,058,538.38 |
| **Adjusted NPSR** | 34,684,741.90 |
| No. of visits per Purchase Price calculation | 295,596 |
| **Adjusted NPSR per visit** | **$ 117.34** |

**Sources:**

Report of Steven A. Wolf, CPA dated 03/20/2020.

Letter dated 02/21/2020 from John P. Passarelli to Steven A. Wolf, CPA and attached exhibits.

Excel file containing Bad Debt journal entries dated 12/01/2018-12/31/2018, including underlying financial data for Jan-Mar 2017 and Apr 2017-Mar 2018.

Excel file containing report of actual cash received by location, recorded NPSR, and visits by month for Apr 2017-Mar 2018.