# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| SOUND INPATIENT PHYSICIANS, INC. and M.D. ROBERT A. BESSLER, | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:19-cv-02034-TLP |
| v. | ) ) | |
| M.D. T.M. CARR, | ) ) | |
| Defendant. | ) ) | |

## ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD AND ORDER DENYING MOTION TO VACATE ARBITRATION AWARD AND ORDER GRANTING MOTION TO STAY JUDGMENT

The Court has competing motions here.  Defendant, T.M. Carr, M.D. ("Dr. Carr"), moves to confirm the Neutral Accountant's arbitration award.  (ECF No. 57.)  Sound Inpatient Physicians, Inc. ("Sound Inpatient") and Robert A. Bessler, M.D. ("Dr. Bessler") (collectively, "Plaintiffs"), oppose that motion (ECF No. 63), and move to vacate the arbitration award.  (ECF No. 67.)  Dr. Carr timely replied in favor of his own motion (ECF No. 72) but opposes Plaintiffs'.  (ECF No. 73.)

Plaintiffs also move to stay judgment of this claim until the Court resolves Plaintiffs' indemnity and breach of warranty claims.  (ECF No. 67.)

At Plaintiffs' request (ECF No. 67 at PageID 846), the Court held a hearing last month (ECF No. 81).  After careful consideration of the parties' written material, statements of counsel, and the entire record here, the Court **GRANTS** Defendant's motion to confirm the arbitration award and **DENIES** Plaintiffs' motion to vacate the arbitration award.  The Court

also **GRANTS** Plaintiffs' motion to stay judgment until the Court resolves their claims for breach of warranty and indemnity.

## BACKGROUND

In March 2016 Plaintiffs branched out from their core business of operating hospitals and acquired ownership of Defendant's emergency medicine practice in Memphis, Tennessee. (ECF No. 18 at PageID 200.)  They entered into an LLC interest and stock purchase agreement (the "Agreement") with Defendant to buy the entire membership interest in two Tennessee professional LLCs and all the stock of a Tennessee professional corporation (the "Companies"). Defendant was the sole member of the LLCs and the sole shareholder of the corporation.  (*Id.*) The Companies were, and continue to be, in the business of providing emergency medicine physicians and other staff to emergency departments at five Memphis-area hospitals.  (*Id.* at PageID 200.)  After the transaction closed, Sound Inpatient began operating the Companies. (*Id.*)

### I.       The Agreement—Purchase and Calculation of the Final Purchase Price

Under the Agreement, the purchase agreement price ("Purchase Price") would equal 7.37 times the earnings before overhead "generated" from operation of the Companies during a twelve-month period ending March 31, 2018 (the "Calculation Period").  (*Id.*)  The Purchase Price, however, could not be less than $30 million nor greater than $59 million.  (*Id.*)  At closing, Plaintiff paid the first payment of $30 million.  (*Id.*)  The second payment was determinable at the end of the Calculation Period.  (*Id.*)

At the end of the Calculation Period, Plaintiffs computed a total purchase price of $26,605,885, and, because the total was less than $30 million, determined that it owed no further payment to Defendant.  (*Id.* at PageID 201.)  Defendant contested Plaintiff's calculation,

objecting that (1) it included $1,844,541.94 of bad debt ("Bad Debt Expenses") from before the Calculation Period and (2) it should have included certain non-medical compensation expenses when calculating earnings before overhead.  (*Id.* at PageID 201–02.)

As for the first objection, Defendant argued Plaintiff should not have deducted the $1,844,541.94 in Bad Debt Expenses from the Earnings Before Overhead in the final Purchase Price calculation because, although realized during the Calculation Period (June 30, 2017), the expenses applied to the period between March 2016 and December 2016.  (ECF Nos. 58 at PageID 587; 58-1 at PageID 621–22.)  Plaintiffs counter that it properly included the $1,844,541.94 in Bad Debt Expenses in calculating the final Purchase Price because the expenses were in fact realized during the Calculation Period.  (ECF Nos. 58 at PageID 587; 58-1 at PageID 608–09.)

The parties, thus, disagreed on whether Plaintiffs properly calculated the price with these Bad Debt Expenses.  To deduct the $1,844,541.94 in accordance with Plaintiffs' theory leads to a final Purchase Price of $26,605,885 and no further payments to Defendant.  But if Defendant's theory prevails, the calculation will include that $1,844,541.94.  This leads to a final purchase price of $40,734,142 and a Second Payment to Defendant of $10,734,142.  The parties could not resolve their dispute.

## II.    The Agreement—Section 1.4(d)

Under § 1.4(d) of the Agreement, Plaintiff had 30 days after the Calculation period within which to calculate the Purchase Price and communicate it to Defendant.  If Defendant objected to part of the Purchase Price calculation and the parties did not resolve the disagreement, the parties may arbitrate that dispute.  It says the parties "may immediately engage [a] Neutral Accountant to resolve any items that remain in dispute."  (ECF No. 19-1 at PageID 232.)  So

when Defendant objected and the parties did not resolve it, he sought to submit his objections to a Neutral Accountant under the Agreement.  (ECF No. 18 at PageID 202–03.)

Plaintiffs chose a different route.  They sought a declaratory judgment about the proper construction of the Agreement, the role of the Neutral Accountant, and the calculation of the Purchase Price.  (*Id.* at PageID 208–09.)  Defendant moved to dismiss, arguing that Plaintiffs' declaratory judgment claim is subject to arbitration because the Agreement's Neutral Accountant provision is an agreement to arbitrate.  (ECF No. 22 at PageID 311–12.)  In October 2019, this Court found that § 1.4(d) of the Agreement was a valid agreement to arbitrate.  (*See* ECF No. 36.)  The Court added that the arbitration agreement called for the Neutral Account to decide only the issues raised by Defendant's objections.  (*See* ECF No. 36.)  And so the Court granted the motion to compel arbitration.  (ECF No. 36 at PageID 422–23.)

Although § 1.4(d) says that the Neutral Accountant will "act[] as an expert and not an arbitrator," the Court gave effect to the entirety of the provision and held that the parties' Agreement reflected an agreement to arbitrate.  (*Id.* at PageID 416–20.)  In doing so, the Court looked to the substance of the Agreement over its form and found that the substance of § 1.4(d) amounts to "arbitration in everything but name."  (*See id.* at PageID 418.)

 Following that order, the parties engaged Stephen A. Wolf, CPA, to resolve Defendant's objection to Plaintiffs' inclusion of prior Bad Debt Expenses in its Purchase Price calculation.  (*See* ECF No. 64-2.)  Under Section 1.4(d) of the Agreement, each party filed memoranda with the Neutral Accountant in support of their respective positions.  (ECF No. 64-2 at PageID 722–55.)  Mr. Wolf then rendered a decision that Plaintiffs' $1,844,541.94 Bad Debt Expenses charge in June 2017 "related to prior period operations [and thus] was not appropriate because

the timing of the expense does not match the revenue during the Calculation Period." (*Id.* at PageID 720.)

Defendant now moves for the Court to confirm the Neutral Accountant's opinion and to enter a judgment that Plaintiffs' inclusion of prior period Bad Debt Expenses in the Purchase Price calculation was improper. What is more, Defendant argues that the Purchase Price under the Agreement is $40,734,142, and that Sound Inpatient owes Defendant a second payment of $10,734,142 plus interest from the date of the decision. (*See* ECF No. 58.) At the same time, Plaintiffs move the Court to vacate the Neutral Accountant's award. (*See* ECF No. 67.)

## LEGAL STANDARD

### I.   Motions to Reconsider

Although Plaintiffs do not couch their motion as one for reconsideration of the order compelling arbitration, they in effect ask the Court to reverse its prior holding by finding that § 1.4(d) was not an arbitration clause. (*See* ECF No. 63.) The Court therefore finds it necessary to begin its analysis by addressing the standards for reconsidering a prior order.

The Sixth Circuit treats a motion for reconsideration as a motion to alter or amend the judgment in districts that do not have local rules on such a motion. *In re Greektown Holdings, LLC*, 728 F.3d 567, 574 (6th Cir. 2013) ("Treating a motion for reconsideration as a motion to alter or amend the judgment makes sense when a party files a document titled 'Motion for Reconsideration' in a district that does not have a local rule providing for such a motion."). A district court may grant a motion for reconsideration or a motion to alter or amend a judgment only when there is "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 496 (6th Cir. 2005).

5

This interpretation limits parties from raising legal arguments that they could have raised beforehand, rearguing a case, or introducing new evidence for the first time when the party should have presented that evidence earlier.  See *Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 495 (6th Cir. 2012); *see also Hamilton v. Gansheimer*, 536 F. Supp. 2d 825, 842 (N.D. Ohio 2007) (stating that "[c]ourts should not reconsider prior decisions where the motion for reconsideration either renews arguments already considered or proffers new arguments that could, with due diligence, have been discovered and offered during the initial consideration of the issue").

## II.   Motions to Confirm or Vacate an Arbitration Award

The Federal Arbitration Act ("FAA") expresses a presumption that Courts will confirm arbitration awards.  9 U.S.C. § 9; *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998).  When parties have agreed to arbitrate, courts must confirm the award "unless the award is vacated, modified, or corrected."  9 U.S.C. § 9.  So federal courts are limited to a narrow review of arbitration awards under the FAA.  *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).  This limited judicial review "maintain[s] arbitration's essential virtue of resolving disputes straightaway."  *Id.*  This is because if the parties could take "full-bore legal and evidentiary appeals," arbitration would become "merely a prelude to a more cumbersome and time-consuming judicial review process."  *Id.*

Under § 10 of the FAA, an award may be vacated only:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence

6

pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).

When a party has agreed to arbitrate, the award will be set aside only in narrow circumstances. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). Parties seeking to vacate an arbitration award under 9 U.S.C. § 10 bear a heavy burden. *Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 569 (2013). "It is not enough to . . . show that the [arbitrator] committed an error—or even a serious error." *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)). When the parties have "bargained for the arbitrator's construction of their agreement," arbitral decisions that "even arguably construe or apply a contract" must stand, regardless of a court's view of their merits. *Id.* (quoting *Eastern Assoc. Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)). Courts may only overturn an arbitral decision if the arbitrator acts outside the scope of their contractually delegated authority, such as by issuing an award reflecting their own notions of economic justice, instead of "draw[ing] its essence from the contract." *Id.* (citing *Eastern Assoc. Coal Corp.*, 531 U.S. at 62). Thus, the sole question is whether the arbitrator interpreted the parties' contract, not whether he got its meaning right or wrong. *Id.*

## **ANALYSIS**

## I.    **The Court Properly Ordered the Parties to Submit to Arbitration**

###     A.    **Section 1.4(d) of the Agreement is a Valid Agreement to Arbitrate**

Plaintiffs spend the bulk of their arguments here alleging that the Court should not have compelled them to arbitrate their dispute in the first place because § 1.4(d) is not an arbitration

agreement.  They argue that the parties never intended for this dispute to be subject to binding arbitration, and that Sound Inpatient did not intend to waive its right to adjudicate this dispute in an Article III court.  (ECF No. 63 at PageID 665.)  In asking this Court to revisit its earlier finding, Plaintiffs do not allege newly discovered evidence or an intervening change in law.  Instead, they appear to maintain that the Court made a clear error of law and that reconsideration of this previous ruling would prevent manifest injustice.  *See Henderson*, 469 F.3d at 496.  For the reasons below, the Court finds that it did not make a clear error of law and that it will not reconsider its previous order compelling the parties to arbitration with the Neutral Accountant.

### i.      The language of § 1.4(d)

Recognizing that § 1.4(d) of the Agreement says the Neutral Accountant should "act[] as an expert and not an arbitrator," the Court held before that the plain language of the rest of that section provides for "arbitration in everything but name."  (ECF No. 36 at PageID 418–20.)  Plaintiffs assert that the Court ignored the clear intent of the parties and the plain text of the Agreement by compelling arbitration despite that language in § 1.4(d).  (ECF No. 63 at PageID 675.)  Let's look at the section.

Section 1.4(d) of the Agreement provides for the engagement of a Neutral Accountant to settle any disputes surrounding the Purchase Price to which Defendant objects and which remain unresolved by the parties.  (ECF No. 19-1 at PageID 232–33.)  The entire section is 555 words long and provides, in full:

> Within thirty (30) days following the end of the Calculation Period, Sound Physicians, at its expense, shall prepare and deliver to Dr. Carr its determination of the amount of the Purchase Price (the "Purchase Price Schedule") setting forth all components (and the amounts thereof) necessary to compute the Purchase Price.  The Purchase Price reflected on the Purchase Price Schedule will be determined in good faith on a basis consistent with Schedule B hereto.  Dr. Carr

shall have the right to review the Purchase Price Schedule for a period of thirty (30) days following the delivery of the Purchase Price Schedule by Sound Physicians (the "Purchase Price Review Period").  Sound Physicians shall make the work papers, back-up materials and books and records used in preparing the Purchase Price Schedule available to Dr. Carr and his accountants at reasonable times and upon reasonable notice following the delivery of the Purchase Price Schedule by Sound Physicians to Dr. Carr hereunder, and any delay in making such documents and materials available shall result in an automatic extension of the Purchase Price Review Period by a number of days equal to the delay.  Dr. Carr shall have the right to object to any amount or computation appearing in the Purchase Price Schedule by notifying Sound Physicians in writing of such objections prior to the expiration of the Purchase Price Review Period.  If Dr. Carr does not make any such objection prior to the expiration of the Purchase Price Review Period, the Purchase Price as set forth on the Purchase Price Schedule shall be determinative for purposes of this Agreement and final and binding on all of the parties to this Agreement. If Dr. Carr timely objects to any item or computation appearing in the Purchase Price Schedule prior to the expiration of the Purchase Price Review Period, Dr. Carr and Sound Physicians shall, during the thirty (30) day period following the delivery of Dr. Carr's objection, attempt in good faith jointly to resolve the matters on the Purchase Price Schedule to which Dr. Carr objected.  In the event Dr. Carr and Sound Physicians cannot resolve all of such matters by the end of such thirty (30) day period, either Dr. Carr or Sound Physicians may immediately engage the Neutral Accountant to resolve any items that remain in dispute. Each of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant in writing, and the parties shall require the Neutral Accountant, within thirty (30) days thereafter, acting as an expert and not an arbitrator, to resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound Physicians with respect to the determination of the Purchase Price.  The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by Dr. Carr and Sound Physicians in their written submissions to the Neutral Accountant.  All fees and expenses of the Neutral Accountant in connection with any dispute under this Section l.4(d) shall be paid fifty percent (50%) by Sound Physicians and fifty percent (50%) by Dr. Carr.  The Purchase Price finally determined pursuant to this Section l.4(d) shall be determinative for purposes of calculating the amount of the Second Payment and shall be final and binding on all of the parties to this Agreement.

(*Id.*)

By asking that the Court hold that § 1.4(d) is not a binding arbitration clause, Plaintiffs

are, in effect, asking the Court to ignore the meaning and effect of the other 547 words in that

section in favor of 8 words:  "acting as an expert and not an arbitrator."  But the Court will not. The Sixth Circuit "does not exalt form over function in determining whether an arbitration award is 'final' for purposes of judicial review."  *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 722 (6th Cir. 2014) (citing *Island Creek Coal Sales Co. v. City of Gainesville, Fla.*, 729 F.2d 1046, 1049 (6th Cir. 1984)).

Plaintiffs question the Court's statement that "the parties did not expressly label § 1.4(d) an arbitration provision."  (ECF Nos. 63 at PageID 675; 36 at PageID 416.)  They rightly point out that part of § 1.4(d) *purports* to provide explicitly the parties' intent <u>not</u> to arbitrate.  (ECF No. 63 at PageID 675.)  According to Plaintiffs, the Court incorrectly then struck those 8 words—"acting as an expert and not an arbitrator"—from the meaning of the Agreement.  (*Id.*) But the Court did not do so.  There is much more to that section than those 8 words.  The Court was not, and is not, persuaded by Plaintiffs' attempts to invalidate an otherwise valid arbitration clause with eight magic words by ignoring the meaning and effect of the other 547 words in § 1.4(d).  That section of the Agreement sets up a process by which the Neutral Accountant hears from both sides and issues a binding opinion that is final.

"No particular language is required to evidence an agreement to arbitrate."  *Widmer Enterprises LLC v. Falck, USA, Inc.*, No. 13-cv-11138, 2019 WL 1057422, at *3 (E.D. Mich. Mar. 6, 2019) (quoting *Perceptics Corp. v. Societe Electronique et Sys. Trindel*, 901 F. Supp. 1139, 1142 (E.D. Tenn. 1992)).  Plaintiffs challenge this principle as applied to this matter— stating that their Agreement "'had particular language . . . to evidence an agreement' NOT 'to arbitrate.'"  (ECF No. 63 at PageID 676 (emphasis in original).)

ii.     *Widmer Enterprises LLC v. Falck USA, Inc.*

The facts of *Widmer Enterprises LLC v. Falck USA, Inc.*, No. 18-cv-11138, 2019 WL

1057422, at *4 (W.D. Mich. Mar. 6, 2019), are strikingly similar to the operative facts of this

case.

There, the parties agreed to a purchase price within a range based on a formula described

in the agreement.  *Id.* at *1.  That purchase price was calculated based on a multiple of 4.83

times the normalized earnings before interest, taxes, depreciation, and amortization of the

business for the twelve-month calculation period.  *Id.*  In the event of an unresolvable dispute,

Falck could promptly refer the dispute for resolution to an Accounting Expert.  *Id.* at *2.

According to the parties' agreement, the Accounting Expert would act "as an expert and not as a

mediator."  *Id.*  In any event, the expert would render their opinion under the agreement and

make a final and binding decision.  *Id.*

Despite phrasing the neutral's role as "an expert and not a mediator," the *Widmer* court

followed the Sixth Circuit's direction to resolve ambiguity in favor of arbitration and held that

the Accounting Expert provision amounted to "arbitration in everything but name."  *Id.* at *3.

The Accounting Expert provision there provided for all four requirements laid out by the Sixth

Circuit in *Shy*:

> (i) finality ("is decision shall (in the absence of manifest error) be final and
> binding on the parties"); (ii) an independent adjudicator (PricewaterhouseCoopers
> LLP); and (iii) substantive standards ("shall render its opinion in accordance with
> the definition and terms of this Agreement"). . . .  While the clause does not
> specifically call for an opportunity for each side to present its case, it does require
> that the Accounting Expert have access to the relevant evidence if necessary to
> reach a resolution in this case.

*Id.* (internal citations omitted).  The *Widmer* court also noted that the "most important"

factors—finality of the decision and independence of the adjudicator—were present in the clear

language of the agreement. *Id.* (citing *Evanston Ins. Co. v. Cogswell Properties, LLC*, 683 F.3d 684, 693 (6th Cir. 2012) (stressing that "[c]entral to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute") (internal quotation marks omitted)).

Like *Widmer*, the parties here phrased the Neutral Accountant's role as "an expert and not an arbitrator," § 1.4(d) of the agreement "amounts to 'arbitration in everything but name.'" (ECF No. 36 at PageID 418–20.)  Here all four *Shy* requirements are met:  (1) finality ("[t]he Purchase Price finally determined pursuant to this Section 1.4(d) *shall be determinative* for the purposes of calculating the amount of the Second Payment . . . "); (2) an independent adjudicator (Ernst & Young—a firm not associated with either party); (3) substantive standards ("[t]he Purchase Price will be equal to (i) a multiple determined in the manner described in Schedule B hereto times (ii) the Companies' consolidated "Earnings Before Overhead" generated during the twelve (12) month period ending March 31, 2018 (the "Calculation Period"); provided, however, that in no event shall the Purchase Price be less than THIRTY MILLION DOLLARS ($30,000,000) or greater than FIFTY-NINE MILLION DOLLARS ($59,000,000)") (emphasis in original); and (4) "an opportunity for each side to present its case ("[e]ach of Sound Physicians and Dr. Carr shall present its position on the disputed items to the Neutral Accountant . . . .").  Accordingly, looking to the substance of the Agreement over its form, § 1.4(d) is a valid agreement to arbitrate. *See Shy*, 781 F.3d at 825, and *Widmer Enterprises*, 2019 WL 1057422.

The Court recognizes that the parties here provided that the Neutral Accountant would act "as an expert and not an arbitrator" while the *Widmer* parties provided that the Accounting Expert would act "as an expert and not a mediator."  But the simple substitution of one word

does not require a different outcome in the Sixth Circuit. The Sixth Circuit in *Shy* makes clear that we look to the substance of the provision, not just the form. *See Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015). That is exactly what the district court did in *Widmer*, and exactly what the Court did here. Had the district court in *Widmer* addressed the language "as an expert and not an arbitrator," most likely the result there would match this Court's holding here.[1]

What is more, in the Court's opinion, it stands to reason that the opposite of the rule espoused in *Widmer* is true. Just as there is no requirement for particular language to evidence an agreement to arbitrate, there is likewise no "magic language" the parties can insert to wholesale invalidate what is otherwise an agreement to establish a valid, binding, arbitration clause. To do so would be to ignore the plain language and meaning of 547 words in § 1.4(d) which reflects a clear intent to arbitrate to isolate and give meaning to the other 8 words.

In sum, by giving meaning and effect to all the language of § 1.4(d), the Court found that the entire provision evidenced the parties' intent that the result of the Neutral Accountant procedure be final and binding. (ECF No. 36 at PageID 416–20.) Under Sixth Circuit precedent, parties agree to "arbitration in everything but name" when they include these features: (1) finality, (2) an independent adjudicator, (3) substantive standards (the contract terms), and (4) an opportunity for each side to present its case. *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015) (quoting *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004)). As the Sixth Circuit said in *Cogswell* "[c]entral to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling

---

[1] This is true, especially, considering the federal courts' strong presumption in favor of arbitration. *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 355 (6th Cir. 2003).

their dispute." *Cogswell Props.*, 683 F.3d at 693 (quoting *Salt Lake Tribune Pub. Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684 (10th Cir. 2004)).  The Court held that, while the parties did not label § 1.4(d) an arbitration provision, it met each of the four *Shy* factors, had all the hallmarks of an "arbitration in everything but name," and that the plain language of the *entire* provision evidenced an intent to arbitrate.  (ECF No. 36 at PageID 416–20.)

   iii.   ***Shy v. Navistar Int'l Corp.* and Other case law**

Next, Plaintiffs contend that the Court incorrectly applied *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 825 (6th Cir. 2015), in finding that the Court should look to the substance of the agreement over its form.  (ECF No. 63 at PageID 676.)  But the Court disagrees.

In *Shy*, under a settlement agreement and consent decree resolving a class action lawsuit relating to employee benefits, Navistar made annual contributions to a trust managed by a Supplemental Benefit Committee ("SBC").  *See Shy*, 781F.3d at 822–23.  The agreement provided for arbitration with an accounting firm if SBC disputed the "information and calculation[s]" provided by Navistar.  *Id.* at 823.  A dispute arose about Navistar's alleged manipulation of its corporate structure and misclassification of aspects of its business to avoid its profit-sharing obligations.  *See id.* at 824–25.

The *Shy* court looked into the substance of the agreement and observed that the "accountant-based" nature of the arbitration provision "at most creates some ambiguity as to whether the scope of the disputes over 'information and calculation[s]' was intended to be restricted to disputes in which no legal analysis whatsoever might be necessary."  *Id.* at 825. That said, the majority concluded that "the otherwise unqualified language of the agreement trumps any assumption that the parties would not have committed legal disputes to an accountant's resolution" and the ambiguity, if any, "must be resolved in favor of arbitration."

14

*Id.* at 826.  And although the Sixth Circuit focused largely on the scope of the arbitration agreement, the *Shy* court cited approvingly the four *Fit Tech* factors district courts should apply to determine whether an agreement to arbitrate exists.  *Shy*, 781 F.3d at 825 (quoting *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004)).

Plaintiff points out that the parties did not dispute that the subject section was an arbitration agreement upon appeal.  (ECF No. 63 at PageID 676.)  And although *Shy* is distinguishable in that regard, the Court still finds that the lessons of *Shy* still apply to this case.

As in *Shy*, the language of § 1.4(d), as a whole, is unqualified about what the Neutral Accountant may resolve.   Although the scope of his decision is limited to Defendant's objections, there is no limit under § 1.4(d) to the objections Defendant could assert.  (*See* ECF No. 19-1 at PageID 232–33.)  In like manner to *Shy*, this Court looked to the *substance* of § 1.4(d) in rendering its decision.  Although the language "acting as an expert and not an arbitrator" is straightforward, the Court finds that the rest of § 1.4(d) is also straightforward.  It shows an intent to arbitrate Defendant's objections about the calculation of the proposed Purchase Price.  Applying *Fit Tech*'s factors—which the Sixth Circuit held to be persuasive—to this case, § 1.4(d) meets all the requirements for "arbitration in everything but name":  finality, an independent adjudicator, substantive standards, and an opportunity for each side to present its case.  And, in any event, any ambiguity over the limitations and scope of the Neutral Accountant's decision should be "resolved in favor of arbitration."  *Shy*, 781 F.3d at 826.

Plaintiffs cite a case from Delaware in support of their proposition that "acting as an expert and not an arbitrator" explicitly shows they did not want to resolve disputes through arbitration.  *Penton Bus. Media Holdings, LLC v. Informa PLC*, No. CV 2017-0847-JTL, 2018 WL 3343495, at *3 (Del. Ch. July 9, 2018).   In that case, the Delaware Court of Chancery held

that the language "acting as an expert not an arbitrator" showed a clear intent not to arbitrate. *Id.* So that court found the dispute resolution procedure there required the parties to retain an appraiser, not an arbitrator. *Id.* Yet that court also noted "[i]t is even possible to envision a setting where the parties include 'expert not arbitrator' language, but then constructed a dispute resolution provision that had numerous features associated with commercial arbitration." *Id.* at *13.

For all that, this Court finds *Widmer*, a district court opinion in this Circuit more persuasive. *See Widmer*, 2019 WL 1057422, at *4. The striking similarities between the facts of *Widmer* and the facts of this case, as well as *Widmer*'s application of binding Sixth Circuit precedent, leads this Court to find that *Widmer* is highly persuasive—much more so than Plaintiff's cited cases out of the Delaware Chancery Courts. Accordingly, because of the binding Sixth Circuit precedent and persuasive authority out of this Circuit holding that the Court should look to the substance of the agreement to determine whether the parties agreed to arbitrate, the Delaware case does not change this Court's holding that the intent of the parties under § 1.4(d) is to arbitrate.

At bottom, Plaintiffs have not convinced this Court that § 1.4(d) is anything but a valid arbitration provision.

### iv.     Intent to arbitrate

Next, Plaintiffs ask the Court to find that there are new facts, now in evidence, to suggest that the parties never intended to arbitrate. (ECF No. 63 at PageID 666.) And so, Plaintiffs ask the Court to peer behind the language of the contract to receive more evidence about Plaintiffs' intent during the drafting of § 1.4(d) of the Agreement. What is more, Plaintiffs argue that Defendant's actions before the Neutral Accountant suggest that Defendant also did not consider

§ 1.4(d) to be an arbitration clause.  (ECF Nos. 63 at PageID 666; 64-1 at PageID 687–713; 64-2 at PageID 714–65.)

Under Tennessee law, the Court should determine the intention of the parties to an agreement by "first looking to the plain language of the contract" to "ascertain and effectuate the parties' intent as reflected in that language."  *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 41 (Tenn. 2014) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).  If a court finds that the language of the contract is clear and unambiguous, the literal meaning controls the dispute.  *Id.* at 42.  Courts apply other rules of contract construction to "determine the parties' intent" only if some ambiguity exists.  *Id.* (citing *Dick Broad Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013)).

But here the Court did not, and does not, find that the language of § 1.4(d) is ambiguous.  (*See* ECF No. 36 at PageID 418.)  Rather, the Court found that § 1.4(d), despite the "expert not arbitrator" language, still called for arbitration of the issues objected to by Defendant through a final, binding opinion of a Neutral Accountant.  The Court, therefore, finds it inappropriate to address any extrinsic evidence of the parties' motives at the time of contract or Defendant's actions while engaging with the Neutral Accountant.

Even if this Court were to consider the extrinsic evidence, Plaintiffs attach declarations of their corporate counsel as evidence that they never intended to arbitrate under § 1.4(d).  (ECF Nos. 64–66.)  This evidence was available to Plaintiffs when they argued against Defendant's motion to compel arbitration.  The Sixth Circuit makes clear that it is improper to reconsider orders when a party submits evidence for the first time when the party should have presented that evidence earlier.  See *Shah*, 507 F. App'x at 495; *see also Hamilton*, 536 F. Supp. 2d at 842 (N.D. Ohio 2007) (stating that "[c]ourts should not reconsider prior decisions where the motion

for reconsideration either renews arguments already considered or proffers new arguments that could, with due diligence, have been discovered and offered during the initial consideration of the issue"). Besides, these declarations contain extrinsic evidence of intent that the Court will not consider because the contract is not ambiguous. And so the Court will not consider these declarations as "newly discovered evidence" sufficient to justify reconsideration of the Court's previous order.

In the end, the Court finds that the plain language of § 1.4(d), as a whole, shows the parties' intent that the Neutral Accountant's decision be final and binding among them. This amounts to a "classic" arbitration clause. Section § 1.4(d) contains all the hallmarks of a provision constituting "arbitration in everything but name," and the Court finds that it is not appropriate to delve into extraneous evidence of the parties' intent.

### B.     Each Party had a Chance to Present their Case

Plaintiffs next argue that they did not have a chance to present their case on the nonaccounting issues put forth by Defendant and so this Court should not confirm the award. (*Id.* at PageID 679.) Plaintiffs submitted a concise, 7-page submission to the Neutral Accountant over the inclusion of the Bad Debt Expenses into the final Purchase Price. (ECF No. 64-2 at PageID 722–28.) And in response, Defendant submitted a 24-page position paper that included some discussion of nonaccounting issues. (ECF No. 64-2 at PageID 731–55.)

Because they did not respond to those nonaccounting issues, Plaintiffs now argue they did not have a chance to present their case. The Court is unpersuaded. In their February 21, 2020, letter to the Neutral Accountant, Stephen Wolf, Plaintiffs agreed that he could ask for more information if he needed it. And then Plaintiffs stated, "we welcome the opportunity to respond in writing to provide any additional information that you, as the expert, may require."

18

(ECF No. 64-3 at PageID 768.)  But the Neutral Accountant did not request any additional information from the parties to make his determination.

It is also well established in this Circuit that "[a]rbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing." *Barrick Enters., Inc. v. Crescent Petro., Inc.*, 496 F. App'x 614, 620 (6th Cir. 2012) (alteration in original) (quoting *Nat'l Post Office Mailhandlers v. U.S. Postal Serv.*, 751 F.2d 834 (6th Cir. 1985)).  "Arbitrators are not bound to hear all the evidence tendered by the parties; they only need to afford each party the opportunity to present their arguments and evidence." *Urban Assocs., Inc. v. Standex Electronics, Inc.*, No. 04-CV-40059, 2012 WL 1079720, at *4 (E.D. Mich. Mar. 30, 2012) (quoting *Terk Techs. Corp. v. Dockery*, 86 F. Supp. 2d 706, 709 (E.D. Mich. 2000)).  For these reasons, not every failure to receive evidence constitutes misconduct under § 10(a)(3).  Instead, the question is simply whether the parties had a fundamentally fair proceeding.  *See Urban Assocs.*, 2012 WL 1079723, at *11 (referencing *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 557 (3d Cir. 2009) and *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 287 (S.D.N.Y. 2007)).

The Court cannot say that the parties here did not have a fundamentally fair proceeding simply because Plaintiffs did not respond to Defendant's nonaccounting issues.  The parties each had a chance to—and did—submit written submissions to the Neutral Accountant to aid him in deciding the sole issue presented to him.  (ECF No. 64-2 at PageID 722–55.)  Likewise, Plaintiffs failed to raise their objections to Defendant's improper submissions during arbitration. *See Singh Mgmt. Co., LLC v. Singh Dev. Co., Inc.*, 774 F. App'x 921, (6th Cir. 2019) (citing *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 846 (6th Cir. 2003) ("A party may

waive its objection to the jurisdiction of the arbitrators by acquiescing in the arbitration with knowledge of the possible defect.")).

What is more, at no point in the Neutral Accountant's decision did he purport to rely on Defendant's submitted nonaccounting issues.  (ECF No. 64-2.)  Instead, the Neutral Accountant confined his decision to the sole issue presented—whether it was proper for Sound Inpatient to include the June 2017 Bad Debt Expense journal entry deduction of $1,844,541.94.  (*Id.*)  In the end, Plaintiffs have not submitted anything but conjecture that Defendant's purported improper submissions swayed the Neutral Accountant's decision based solely on the accounting issue.

### C.    The Neutral Accountant Issued an Arbitration Award

Plaintiffs also assert that the Court cannot confirm the award because the Neutral Accountant did not provide a final, binding remedy.[2]  (ECF No. 63 at PageID 674, 680.)  In particular, Plaintiffs argue that the Neutral Accountant did not render an arbitration award because the Neutral Accountant did not recalculate the Purchase Price.  (*Id.* at PageID 680.)

But § 1.4(d) of the Agreement does not require the Neutral Accountant to calculate the final Purchase Price.  Instead, "either Dr. Carr or Sound [Inpatient] Physicians [had a right to] immediately engage the Neutral Accountant to resolve *any items* that remain in dispute" to which Defendant objected.  (ECF No. 19-1 at PageID 232) (emphasis added).  Although the Neutral Accountant's decision to restore the $1,844,541 in the calculation all but determines the

---

[2] Plaintiffs also assert that the Neutral Accountant himself described his decision as an "expert opinion" and not an "arbitration award."  (ECF No. 63 at PageID 673.)  So, according to Plaintiffs, his opinion is not an arbitration award and it cannot be confirmed by this Court.  (*Id.* at PageID 673–74.)  But how Mr. Wolf describes his decision is of no consequence here because the parties' agreement provided that he would make a final, binding decision on Dr. Carr's objections.  As the Court addressed in great detail above, § 1.4(d) was an arbitration provision meeting all four of the *Fit Tech* factors evidencing that § 1.4(d) amounts to "arbitration in everything but name."  *See supra* pp. 8–20.

final Purchase Price, the parties did not contract for the Neutral Accountant to tell them that price.  Instead, the parties, in § 1.4(d) of the Agreement, explicitly agreed that the Neutral Accountant would resolve any unresolved issue to which Defendant objected .  (ECF No. 19-1 at PageID 232.)  And so, the Court ordered the Neutral Accountant to determine whether Plaintiffs' including the deduction of Bad Debt Expenses from 2016 in the earnings before overhead calculation was proper.  Besides, the plain language of § 1.4(d) shows the parties intended to limit the scope of arbitration to Defendant's objections.  (ECF No. 36 at PageID 418–19.)

Finally, even if an award does not finally dispose of all claims which may have been submitted to arbitration, the Court may confirm an interim award which finally and definitively disposes of separate, independent claims.  *Island Creek Coal Sales*, 729 F.2d at 1049.  The Neutral Accountant's decision here finally and definitely disposes of the issue over the Bad Debt Expenses.  (*See* ECF No. 64-2.)  Resolving this dispute in accordance with § 1.4(d) of the Agreement determines the final and binding Purchase Price.  And so, Plaintiffs' argument that no arbitration award has been rendered because the Neutral Accountant failed to recalculate the Purchase Price is not persuasive.[3]

Because the Court finds that Neutral Accountant issued an arbitration award, the parties may now enforce the decision under 9 U.S.C. § 9 if there are no other grounds to vacate that decision.  The Court addresses those issues next.

---

[3] In fact, under § 1.4(d) of the Agreement, the Purchase Price should be calculated just as originally presented by Sound Inpatient to Defendant, but without the bad debt expense deduction in the earnings before overhead calculation.  (ECF No. 19-1 at PageID 232–33.)

## II.     The Validity of the Arbitration Award

### A.     Evident Partiality

Plaintiffs next argue that the Court must vacate the Neutral Accountant's opinion under 9 U.S.C. § 10(a)(2) because there was evident partiality in his decision.  (ECF No. 67-1 at PageID 851.)  Evident partiality "will only be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."  *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 626 (6th Cir. 2002) (quoting *Andersons, Inc.*, 166 F.3d at 328–29); *see also Schmitz v. Zilveti*, 20 F.3d 1043, 1048 (9th Cir. 1994) (citing *Commonwealth Coatings Corp. v. Continental Gas Co.*, 393 U.S. 145, 149 (1968) (finding that the legal standard for evident partiality is whether there are "facts showing a reasonable impression of partiality.").  In particular, an arbitrator must "not only be unbiased[,] but also must avoid even the appearance of bias."  *Commonwealth Coatings*, 393 U.S. at 150.

Plaintiffs first argue that Defendant submitted "irrelevant, harmful allegations" about Plaintiff's motives and accounting practices to the Neutral Accountant.  (*Id.*)  Second, Plaintiffs contend Defendant's "one-sided version of the 'facts' . . . created a false picture . . . of malfeasance on the part of Sound [Inpatient]," and "the fact that [the Neutral Accountant] 'carefully considered [the information in both submissions]' shows . . . his impartiality was affected."  (*Id.* at PageID 855.)  The Court addresses each argument in turn.

### i.     Defendant's "irrelevant, harmful allegations" about their motives and accounting practices did not create evident partiality in the Neutral Accountant's decision

Plaintiffs assert that "Defendant submitted page upon page of inflammatory rhetoric," which attacked their motives in calculating the Purchase Price and changing billing companies, while also questioning their accounting practices.  (ECF No. 67-1 at PageID 851.)  They further

claim that "there was no procedure whatsoever for rebuttal" of Defendant's statements, which the Court has already addressed above. *See supra* pp. 18–20.

But Plaintiffs make no showing about how Defendant's submissions cause evident partiality or create "even [an] appearance of bias" on the part of the Neutral Accountant. *Commonwealth Coatings*, 393 U.S. at 150. Instead, Plaintiffs imply that the Neutral Accountant cannot discern legitimate arguments from inflammatory language. They also imply that the Neutral Accountant—with over 30 years of accounting experience—cannot distinguish between accounting-related and nonaccounting issues.[4]

What is more, Plaintiffs' argument focuses solely on Defendant's conduct. This does not, by itself, create any reasonable impression of bias on the part of the Neutral Accountant. *Commonwealth Coatings*, 393 U.S. at 150; *see also*, *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 307 (6th Cir. 2008) ("[A] party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator."). And as this Court has already noted, at no point in the Neutral Accountant's decision did he purport to rely on Defendant's submitted nonaccounting issues or inflammatory rhetoric. (ECF No. 64-2.) Instead, the Neutral Accountant confined his decision to the sole issue presented. (*Id.*) This is precisely what the parties bargained for in their Agreement.

---

[4] Plaintiffs and Defendant agreed to use this Neutral Accountant because of his expertise. Although Plaintiffs now argue that this Neutral Accountant was their ninth choice because of conflicts of interest for other Accountants, the Court finds that this, alone, will not invalidate his decision. As Plaintiffs' counsel noted during the hearing on this motion, Plaintiffs are sophisticated. They have substantial financial resources and they operate a portfolio of hospitals. And so Plaintiffs and Defendant have many relationships with accountants and accounting firms. It is unsurprising that it was hard for them to settle on an accounting firm with no prior dealings with either side here.

In the end, Plaintiffs have just speculated that Defendant's purported improper submissions created evident partiality in the Neutral Accountant's decision. "The alleged partiality must be direct, definite, and capable of demonstration, and 'the party asserting [it] . . . must establish specific facts that indicate improper motives on the part of the arbitrator." *Dawahare v. Spencer*, 210 F.3d 666, 699 (6th Cir. 2000) (citing *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998)). Plaintiffs fail to do so here.

Plaintiffs also complain that the Neutral Accountant did not address each argument in his opinion. (*Id.* at PageID 855.) But a decisionmaker does not err simply because he does not address every single argument raised by one of the parties. *See Samaan v. Gen. Dynamics Land Sys.*, 835 F.3d 593 (6th Cir. 2016) (citing *United States v. Collazo*, 818 F.3d 247, 260 (6th Cir. 2016) (finding that the district court's failure to address a non-dispositive issue raised by a party was not error)). Again, not every failure to receive evidence constitutes misconduct under § 10(a)(3). Instead, the question is simply whether the process deprived a party of a fundamentally fair proceeding. *See Urban Assocs.*, 2012 WL 1079723, at *11. Plaintiffs have not convinced the Court here that either the Neutral Accountant or the dispute procedure they agreed to have deprived them of a fundamentally fair proceeding.

### ii. The Neutral Accountant considered both parties' submissions

Plaintiffs point to the Neutral Accountant's statement that he "carefully considered the information included in both submissions" as proof that Defendant's allegedly improper advocacy affected his impartiality. (ECF No. 67-1 at PageID 855.) They claim that Defendant's submission "create[d] a false picture for [the Neutral Accountant] of malfeasance on the part of Sound Inpatient.]" (*Id.*) This argument also implies that the Neutral Accountant

cannot discern legitimate arguments from inflammatory language.  And for the reasons this Court has already given, this argument lacks merit.

Plaintiffs also fail to cite any authority to support their claim that submissions from a party can constitute "evident partiality" on the Neutral Accountant's part.  Evident partiality necessarily requires the arbitrator to engage in some improper conduct.  *See Commonwealth Coatings*, 393 U.S. at 147–48 (finding evident partiality when an arbitrator failed to disclose a close financial relationship that had existed between him and a party for many years).   The conduct of one's opposing party alone cannot establish evident partiality unless there is a showing that it influenced the decision.  *See ARMA, S.R.O. v. BAE Sys., Inc.*, 961 F. Supp. 2d 245, 260–62 (D.C. Cir. 2013) (denying a motion to vacate in part because petitioner lacked any evidence that improper correspondence sent by respondent after the record closed *actually influenced* the arbitrator).   "The alleged partiality must be direct, definite, and capable of demonstration, and 'the party asserting [it] . . . must establish specific facts that indicate improper motives on the part of the arbitrator."  *Dawahare*, 210 F.3d at 699 (citing *Andersons*, 166 F.3d at 328).

Plaintiffs have not met their burden here.  They provide no evidence giving this Court an impression of partiality or even an appearance of bias on the part of the Neutral Accountant.  In fact, the Neutral Accountant confined his decision to the issue presented.  (ECF No. 64-2.)  And factual allegations made by one party against another, which the arbitrator relies on when making an award, amount to no more than an attack on the witness's credibility and the arbitrator's assessment of it—they cannot establish fraud and corruption so as to cast doubt on the arbitrator's award.  *Switzer v. Credit Acceptance Corp.*, No. 5:09cv00075, 2010 WL 424573, *17 (W.D. Va. Jan. 29, 2010).   If they were, every finding of fact based on conflicting testimony

would be subject to review in court.  *Id.*  Plaintiffs have failed to show evident partiality here. As a result, the Court will not vacate the arbitration award on this basis.

### B.    Exceeded Powers

Plaintiffs next argue that the Court must vacate the Neutral Accountant's opinion because he exceeded his powers under the Agreement.  (ECF No. 67-1 at PageID 855.)  "'[A]s long as an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed a serious error does not suffice to overturn his decision.'"  *Eastern Assoc. Coal Corp.*, 531 U.S. at 62 (quoting *Misco*, 484 U.S. at 38).  It is well-settled in the Sixth Circuit, however, that a reviewing Court may vacate an award where the arbitrator has "manifestly disregarded the law."  *Dawahare*, 210 F.3d at 699 (citing *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996)); *see also*, *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262 (5th Cir. 2016) (holding that judicial deference does not extend to circumstances where "the arbitrator exceeds the express limits of his contractual mandate").

First, Plaintiffs allege that the Neutral Accountant improperly interpreted provisions in the Agreement when the parties only agreed that he would act within his area of expertise— accounting.  (ECF No. 67-1 at PageID 855.)  Next, Plaintiffs allege that the Neutral Accountant failed to apply Generally Accepted Accounting Principles ("GAAP"), and instead devised his own accounting methods "reflecting his own notion of economic justice[.]"  (*Id.* at PageID 857.)  Third, Plaintiffs claim the Neutral Accountant violates the Financial Accounting Standards Board's ("FASB") Consistency Principle in favor of his own preferred methodology. (*Id.* at PageID 858.)  Plaintiffs argue that the Neutral Accountant's adherence to the Matching Principle rather than the Consistency Principle is flawed and violates GAAP.  (*Id.* at PageID

26

861.)  Fourth, Plaintiffs argue that the Neutral Accountant's applying the Matching Principle was internally inconsistent, leaving an accounting gap.  (ECF No. 67-1 at PageID 859.)  Finally, Plaintiffs argue that the Neutral Accountant exceeded his powers by applying a conclusion inconsistent with Sound Inpatient's actual revenues.  (*Id.* at PageID 862.)  The Court addresses each argument in turn.

At the outset, the Court reminds the parties that the plain language of § 1.4(d) of the Agreement provides the Neutral Accountant would "resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound [Inpatient] Physicians with respect to the determination of the Purchase Price."  (ECF No. 19-1 at PageID 232.)  And so the Court has already determined that the scope of the Neutral Accountant's review under the Agreement is limited only to issues to which Defendant objected that remain unresolved by the parties.  (ECF No. 36 at PageID 423.)

### i. The Neutral Accountant's interpretation of "Net Revenue" as "Net Patient Service Revenue"

Plaintiffs contend that the Neutral Accountant exceeded his powers under the Agreement when he interpreted "Net Revenue" as "Net Patient Service Revenue."  (ECF No. 67-1 at PageID 856- 857.)  Plaintiffs fail to clarify, however, how this interpretation affected the Neutral Accountant's decision.  What is more, the parties' agreement undeniably permits the Neutral Accountant to review the Agreement.  *See Babock & Wilson Co. v. Asist Corp.*, No. 90-cv-71532-DT, 1990 U.S. Dist. LEXIS 19544, at *11 (E.D. Mich. Sept. 6, 1990) ("It is a well-established principle that an arbitrator may construe ambiguous contract language.").  Arbitrators are expected to interpret the Agreement as part of the decision-making process, and even an incorrect interpretation does not vacate an arbitration award.  *Mich. Family Resources, Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 749 (6th Cir. 2007).  If the

arbitrator makes a good-faith interpretation of the contract, the Court cannot say that he has so exceeded his powers as to implement his own brand of industrial justice and vacate his award. *Id.* at 754–55.

The parties' only limitation to the scope of the Neutral Accountant's review was that he could only resolve issues to which Defendant objected and which remain unresolved by the parties. (ECF No. 19-1 at PageID 232–33.)  In seeking to resolve the parties' dispute, the Neutral Accountant construed the Agreement to assist his application of accounting principles to the dispute.  Whether he properly or improperly construed the meaning of "Net Revenue," Plaintiffs provide no proof that he did so in contravention of his powers under § 1.4(d) of the Agreement.  The Court finds that this, alone, is not enough to vacate the Neutral Accountant's decision.  *Stolt-Nielsen S.A.*, 559 U.S. at 67.

### ii. The Neutral Accountant's decision did not reflect his own notions of economic justice

Next, Plaintiffs argue that the Neutral Accountant exceeded his powers because he failed to apply GAAP accounting methods, and instead applied his own methods that reflect his own notion of economic justice.  (ECF No. 67-1 at PageID 857.)  They claim that although the Neutral Accountant stated that the parties should calculate Net Revenue according to GAAP, he "argues for an exception to GAAP" because including the Bad Debt Expenses from the period ending in 2016 would not be appropriate for calculating  the Purchase Price here.  (*Id.*)

While true that the Neutral Accountant recognized that "GAAP requires expenses to be recognized once known," he also provided a specific rationale for how the Bad Debt Expenses should have been recorded in accordance with the "matching principle."  (ECF No. 64-2 at PageID 719.)  His decision does not arbitrarily determine that including the Bad Debt Expenses from 2016 was improper.

Instead, the Neutral Accountant provided a well-reasoned and logical application of accounting principles supporting his decision. He explained that "[t]he appropriate accounting treatment for this [prior period] adjustment . . . would be to adjust the carrying amounts . . . as of the first accounting period presented, with an offset to the beginning retained earnings balance in that same accounting period." (*Id.*) This result, according to the Neutral Accountant, allows "revenues and any related expenses [to] be recognized together in the same reporting period so that the financial performance during a specific period can be measured. . . ." (*Id*. at PageID 719.) And because the parties agree that the June 2017 Bad Debt Expense journal entry relates to Sound Inpatient's operations between March 2016 and December 2016 (*id*. at PageID 715 n.2), the Neutral Accountant's decision provides for a more consistent accounting of a business's financial performance.

Even assuming the arbitrator erred, Plaintiffs have not shown that the Neutral Accountant's decision reflects his own notions of economic justice, especially given the reasoned nature of his decision. And the Court will not substitute its own judgment for that of the Neutral Accountant, who the parties agreed to have resolve this dispute. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 n.10 (1987). The Court remains unpersuaded that the Neutral Accountant applied his own notions of economic justice here.

### iii.    The Neutral Accountant's applying the Matching Principle instead of FASB's Consistency Principle

Plaintiffs next argue that the Neutral Accountant exceeded his powers by violating FASB's consistency principle in favor of his own preferred methodology, the matching principle. (ECF No. 67-1 at PageID 858.) To support this argument, Plaintiffs rely on a report by Simon Consulting ("Simon Report") they sought after the Neutral Accountant rendered his decision. (ECF No. 64-5 at PageID 781.) The Simon Report notes that "Sound [Inpatient]

applies GAAP to all of its financial transaction[,]" and "it is inconsistent for [the Neutral Accountant] to apply a non-GAAP methodology to a single entry." (*Id.* at PageID 792.) Plaintiffs therefore claim that the Neutral Accountant exceeded his powers by failing to apply consistently his methodology to journal entries to which Defendant did not object.

First, the parties did not agree for the Simon Report to resolve the parties' dispute. (ECF No. 19-1 at PageID 232–33.) Instead, the parties mutually agreed on a Neutral Accountant with more than 30 years' experience to resolve the matter. And, in the Court's view, the contents of the Simon Report simply highlight that the Neutral Accountant reasonably chose between two competing accounting methods in making his decision. Even if the Court disagreed with the Neutral Accountant's use of the Matching Principle, that is not enough to disturb his opinion. *See Oxford Health*, 569 U.S. at 569 ("It is not enough to show that the [arbitrator] committed an error—or even a serious error" for courts to vacate a valid arbitration award.)

> "It is the arbitrator's construction [of the Agreement] which was bargained for, and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." The arbitrator's construction holds, however good bad, or ugly.

*Id.* at 573 (alteration omitted) (citation omitted). The parties here bargained for the Neutral Accountant to decide disputes raised by Defendant which they could not resolve. And absent specific proof that the Neutral Accountant exceeded the express limits of his contractual mandate or manifestly disregarded the law, the Court will not disturb his construction of the applicable accounting principles under the Agreement.

Second, the Court has already found that the scope of the Neutral Accountant's authority was to "resolve only the matters objected to by Dr. Carr and not resolved by Dr. Carr and Sound [Inpatient] Physicians with respect to the determination of the Purchase Price." (ECF No. 36 at

PageID 422.)  Because Defendant only objected to one Bad Debt Expenses journal entry, the Neutral Accountant could only determine whether that specific journal entry was proper.  The Court will not expand the scope of the Agreement which the parties have already bargained for in this way.

Again, Plaintiffs fail to identify how the Neutral Accountant has exceeded his authority or manifestly disregarded the law.  *See Dawahare*, 210 F.3d at 69.  The Court, therefore, will not vacate the Neutral Accountant's award on this ground, regardless of the Court's view of its merits.  *Id.*; *see also United Paperworkers*, 484 U.S. at 40 n.10.

### iv.    The Neutral Accountant's applying the Matching Principle

Next, Plaintiffs claim the Neutral Accountant "[made] a material error by failing to apply the same methodology to all of Sound [Inpatient]'s adjusting entries relating to changes in bad debt estimates pertaining to the Calculation Period."  (ECF No. 67-1 at PageID 859.)

In oral arguments, Plaintiffs pointed out that the Court cannot wholesale accept the Neutral Accountant's opinion without the result being internally inconsistent.  Plaintiffs claim if the Court accepts the Neutral Accountant's analysis—that Plaintiffs improperly included the $1.8 million Bad Debt Expense arising in 2016 —then the Court must replace that amount with the Bad Debt Expense generated during the Calculation Period.  That amount is $3,095,416.60.  If the Court were to accept this approach, the resulting total Purchase Price would be even lower than its original calculation.  Thus, according to Plaintiffs, to apply the Neutral Accountant's opinion without then replacing the Bad Debt Expense with the journal entry from December 2018 leaves an accounting gap through which Defendant walks away with about a $10 million windfall.

The Court understands this concern and this seemingly unfair result.  But, unfortunately for Plaintiffs, hindsight truly is 20-20.  The problem for Plaintiffs is that this $3 million figure was not realized until the end of 2018, well beyond the time it had to arrive at the Purchase Price under the Agreement.  Under § 1.4(d) of the Agreement,

> Within thirty (30) days following the end of the Calculation Period, Sound [Inpatient] Physicians, at its expense, shall prepare and deliver to Dr. Carr its determination of the amount of the Purchase Price . . . setting forth all components (and the amounts thereof) necessary to compute the Purchase Price.

(ECF No. 19-1 at PageID 232.)  This is the deal Plaintiffs negotiated.  Plaintiff should have known when they negotiated the Agreement that it was going to be difficult—if not impossible—to calculate the Purchase Price within 30 days of the end of the Calculation Period. This is because, according to Plaintiff, there is a natural lag in the accounting process between budgeting and realizing these Bad Debt Expenses.

The Court sympathizes with Plaintiffs.  But, unfortunately for Plaintiffs, they essentially contracted themselves into a box here.  They did not give themselves enough time to calculate an accurate Purchase Price with the Bad Debt Expenses arising during that period.  Because they failed to give themselves enough time to account for the Bad Debt Expenses during the Calculation Period, Plaintiffs tried to plug in a $1,844,541.94 Bad Debt Expense number from the prior period to offset those potential losses.  And even more unfortunately for Plaintiffs, that figure—which the Neutral Accountant reviewed and found to be inappropriately applied—falls far short of the actual losses incurred during the Calculation Period.

Now, Plaintiffs argue that it is unfair that Defendant will walk away with a Purchase Price without any deduction for Bad Debt Expense, much less the $3,095,416.60 *incurred* during the Calculation.  In essence, Plaintiffs ask the Court to enter the fray and remedy a flaw in the Agreement's construction and apply Bad Debt Expenses realized months *after* the

Calculation Period closed and after the agreed-upon 30-day window to deliver the Final

Purchase Price. They ask the Court to replace one error in their calculation—including Bad

Debt Expenses for 2016—with another error—allowing them to include Bad Debt Expenses

from the Calculation Period that it did not *realize* until about eight months after Plaintiffs

needed to calculate its Final Purchase Price.

In this sense, Plaintiffs want the Court to rewrite the Agreement. But the Court is

unwilling to do so. And absent a finding of cause to invalidate the entire Agreement, the Court

will not invalidate the parties' Agreement—the result of negotiations by sophisticated parties

represented by capable attorneys on both sides.

At bottom, Plaintiffs seek a finding that falls outside the scope of the Neutral

Accountant's decision. As this Court has already held, § 1.4(d) limits the scope of arbitration

*only* to matters objected to by Defendant and unresolved by the parties. (ECF No. 36 at PageID

422–23.) This means that the only Bad Debt Expense journal entry properly before the Neutral

Accountant was the one from June 2017 totaling $1,844,541.94. The Court will not now step

outside the parties' express agreement in § 1.4(d)—calling for strict Purchase Price calculation

time limits—and apply a $3,095,416.60 Bad Debt Expense. That issue was not properly before

the Neutral Accountant. And this Court finds no basis to invalidate his opinion.

### v.  Plaintiffs' argument that the Neutral Accountant exceeded his powers by reaching a result inconsistent with actual revenues collected by Sound Inpatient

Finally, Plaintiffs argue that the Neutral Accountant's own notion of economic justice

impermissibly ignores economic reality and does not reflect economics because "the result

derived by applying [the Neutral Accountant]'s conclusion is inconsistent with the actual

revenues collected by Sound [Inpatient.]" (ECF No. 67-1 at PageID 862.) They claim that the

Neutral Accountant's methodology produces an average net patient service revenue per patient of $124.23, which exceeds Sound [Inpatient]'s actual cash collections of $114.07 by 8.9%. (*Id.* at PageID 863.)

And again, "[i]t is not enough to show that the [arbitrator] committed an error—or even a serious error" for courts to vacate a valid arbitration award. *Oxford Health*, 569 U.S. at 569. Even if the Court believes the Neutral Accountant's decision is incorrect, that is not a proper basis for the Court to find that he exceeded his powers so that his decision should be vacated. *Id.*; *see also*, *Mich Family Res.*, 475 F.3d at 752 (citing *United Paperworkers*, 484 U.S. at 36 ("[C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or in misinterpretation of the contract," and even where such awards involve "improvident, even silly, decision-making".)). Without some proof that this decision exceeded his powers as defined by the parties in the Agreement, the Court will not disturb the Neutral Accountant's decision. The Court concludes here that the Neutral Accountant did not exceed his powers under the Agreement and that he has construed the Agreement in reaching his final determination.

In the end, Plaintiffs have not shown evident partiality by the Neutral Accountant or that he exceeded his powers under the Agreement. Parties seeking to vacate an arbitration award must clear a "high hurdle," which Plaintiffs fail to do here. *Stolt-Nielsen S.A.*, 559 U.S. at 67. Plaintiffs therefore articulate no basis on which the Court may vacate the arbitration award. The Court therefore **DENIES** Plaintiff's motion to vacate the Neutral Accountant's arbitration award and **GRANTS** Defendant's motion to confirm the arbitration award.

At the hearing, Plaintiffs agreed[5] that confirmation of the Neutral Accountant's award excluding $1,844,541.94 in Bad Debt Expenses from the June 2017 journal entry necessarily leads to an ending final Purchase Price of $40,734,142.  Because the parties agree that the final Purchase Price after excluding the disputed Bad Debt Expenses leads to Defendant's proposed calculation, the Court finds that the final Purchase Price is in fact $40,734,142.  This calculation leads to a Second Payment to Defendant totaling $10,734,142[6] plus interest from the date of the Neutral Accountant's decision.

### III.   Stay of the Claim Pending Resolution of the Remaining Claims

Finally, and in the alternative, Plaintiffs contend that the Court should stay judgment on this claim until it resolves Plaintiffs' indemnity and warranty claims.  (ECF No. 67-1 at PageID 864.)  They claim that there is "just reason for delay" because each claim is intertwined and has to do with the parties' rights under the Agreement, so the Court may not yet render a final judgment for this claim over the Purchase Price.  (*Id.*)

In oral arguments, Plaintiffs reasoned that the entire case revolves around the amount of money owed to Defendant; so, it makes sense to stay judgment on this claim pending the resolution of Plaintiff's independent indemnity claims relating to undisclosed Physician Agreement Liabilities and medical scribe losses.  According to Plaintiffs, if the Court upholds the Neutral Accountant's opinion and enforces a final Purchase Price of $40,734,142, then

---

[5] Plaintiffs purported to provide a conditional agreement as to that final Purchase Price—in effect, that $40,734,142 is the proper final Purchase Price *assuming* the Court both confirms the arbitration award *and* that the Court does not then apply the additional $3,095,416.60 Bad Debt Expense journal entry from December 2018.  The Court has already dispensed with both conditions, leaving Plaintiffs' agreement that the final Purchase Price is, in fact, $40,734,142.

[6] The Court derives this second payment amount from the terms of § 1.4(b)(ii) of the Agreement, under which the Second Payment is "equal to the amount by which (A) the Purchase Price . . . exceeds (B) $30,000,000."  (ECF No. 19-1 at PageID 231.)

Plaintiffs prevail on their other claims, the Court should subtract that amount from the final Purchase Price to prevent duplicative transfers of funds.  Defendant, on the other hand, argues that staying judgment on this claim would deprive them of the advantages of submitting issues to arbitration in the first place—efficiency and quick resolution of the issue.

There is just reason for delay whenever claims are so closely related that a court might have to revisit the same facts under a different legal theory.  *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 821 (6th Cir. 2005).  A judgment must represent an "ultimate disposition of an individual claim entered in the course of a multiple claims action."  *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446, U.S. 1, 7 (1980).

Although the Court sympathizes with Defendant that delay of judgment deprives him of the benefits of arbitration, the Court will stay judgment in this claim until the Court resolves the rest of the claims.  And given the complexity of the claims under the Agreement, and the possibility that monies will change hands back and forth if Plaintiffs prevail on their breach of warranty and indemnity claims, the Court finds just reason to stay judgment on this claim until it resolves the other claims.  The bench trial here is currently set in February 2021, meaning that this Court should resolve the case shortly.

The Court therefore **GRANTS** Plaintiffs' motion to stay judgment on this claim until the resolution of Plaintiff's indemnity and breach of warranty claims.

## <u>CONCLUSION</u>

For all the reasons above, the Court **GRANTS** Defendant's motion to confirm the arbitration award (ECF No. 57), **DENIES** Plaintiffs' motion to vacate the arbitration award (ECF No. 67), and **GRANTS** Plaintiffs' motion to stay judgment on this issue until the Court resolves the remaining claims.

**SO ORDERED**, this 20th day of August, 2020.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE